D.C. No. 1:22-cv-00435-JAO-KJM

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————

In Re:  PANIOLO CABLE COMPANY, LLC,

Debtor.

WAIMANA ENTERPRISES INC.,

Appellant,

v.

HAWAIIAN TELCOM, INC., et al.,

Appellees.

———————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

NO. HI-22-01179

HON. ROBERT J. FARIS

**APPENDIX**

WILLIAM MEHEULA          2277
MEHEULA LAW, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone No.: (808) 599-9554
Email:  bill@meheulalaw.com

Attorney for Appellant
WAIMANA ENTERPRISES INC.;
PA MAKANA LLC; and
CLEARCOM, INC

i

# TABLE OF CONTENTS

Volume 1

2020/02/04 (Dkt. 36) Notice of Execution ........................................................ 1-15

2022/08/18 (Dkt. 67) Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss The First Amended Complaint In Its Entirety ............................... 16-18

2022/08/30 (Dkt. 76) Notice of Appeal and Statement of Election ................... 19-25

2022/05/27 (Dkt. 28) First Amended Complaint ............................................... 26-313

2020/04/24 (Dkt. 252) Michael Katzenstein, as Chapter 11 Trustee's Motion to Approve Settlement Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019 ........................................................................................................ 314-319

2020/06/04 (Dkt. 271) Order Granting Michael Katzenstein, As Chapter 11 Trustee's Motion To Approve Settlement Agreement Pursuant To Federal Rule Of Bankruptcy Procedure 9019 ...................................................................... 320-335

2020/12/28 (Dkt. 366) Order (a) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (b) Approving the Asset Purchase Agreement, (c) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired leases in connection with the sale, (d) Approving the Operational Support and Sales Services Agreement, (e) Approving a Break-Up Fee, and (f) Granting Related Relief; Exhibits "A" and "B" ..................................................................................... 336-383

2021/08/19 (Dkt. 432) Department of Hawaiian Home Land's Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference, Filed Herein on August 16, 2021 [Dkt. 425] ............................... 384-391

2021/10/18 (Dkt. 480, at 1-5) Sandwich Isles Communications Inc's Memorandum In Opposition to Motion of Hawaiian Telcom, Inc. to Enforce Sale Order [Dkt. 459] ..................................................................................................... 392-413

2022/03/29 (Dkt. 637, at 8-9) Motion By Hawaiian Telcom, Inc. For Interim And Final Relief Enforcing The Court's Sale Order ........................................... 414-564

Volume 2

2022/04/04 (Adv. No. 22-90008 Dkt. 1) Defendant Hawaiian Telcom Inc.'s Notice of Removal of State Court Action to Bankruptcy Court ⸻1-204

2022-05-02 (Dkt. 713) Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom [Dkt. 637] ⸻205-265

2022/05/17 (Dkt. 729) Order Granting Final Relief in Connection With Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order ⸻266-273

2022/05/18 (Adversary Proceeding No. 22-90008, Dkt. 22) Tentative Ruling on Motion to Dismiss ⸻274-281

2022/06/10 (Adversary Proceeding No., Dkt. 35) Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety ⸻282-337

2022/07/01 (Dkt. 40, at 9-10) Plaintiffs' Memorandum In Opposition to Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety, Filed June 10,2022 [Dkt. 35] ⸻338-354

2022/07/08 (Dkt. 47) Reply in Support of Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint it its Entirety ⸻355-377

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON        9650-0
    jbolton@goodsill.com
CHRISTOPHER P. ST. SURE    10001-0
    cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11) |
| MICHAEL KATZENSTEIN, as<br>CHAPTER 11 TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>SANDWICH ISLES<br>COMMUNICATIONS, INC.,<br><br>Defendant. | Adversary No. 19-90022<br><br>NOTICE OF EXECUTION |

## <u>NOTICE OF EXECUTION</u>

7885164.1

Notice is hereby given that pursuant to law and by virtue of a *Writ of Execution to the United States Marshal*, issued out of the above-entitled Court in the above-entitled case, the U.S. Marshal for the District of Hawai'i, did levy upon certain real and personal property assets of Defendant/Judgment Debtor SANDWICH ISLES COMMUNICATIONS, INC., in and to the real and personal property described in Exhibit "A", attached hereto.

DATED:  Honolulu, Hawai'i, ~~January~~ February 4, 2020.

CHARLES L. GOODWIN
For United States Marshal
District of Hawai'i

By: _____ cousm
Deputy U.S. Marshal

2

## Real Property

*Oahu-Mililani*

PINE SPUR:

All of those certain parcel(s) of land situate at Waipio, Waikele, Waikakalaua, Ulu, Auiole Poopalupalu, Hopenui, Kahuaiki, Hanuhanu, Kanupoo, Kapakahi and Ewa, District of Ewa, City and County of Honolulu, State of Hawaii, described as follows:

| LOT | AREA | MAP |
|---|---|---|
| 1-A-1 | 1.083 acres | 18 |
| 1-A-2 | 0.032 acre | 18 |
| 1-A-3 | 0.083 acre | 18 |
| 1-A-4 | 0.431 acre | 18 |
| 8-A-1 | 0.245 acre | 20 |
| 8-A-2 | 17.863 acres | 20 |
| 8-A-3 | 0.902 acre | 20 |
| 8-A-4 | 3.191 acres | 20 |
| 8-A-5 | 0.084 acre | 20 |
| 8-A-6 | 0.014 acre | 20 |
| 8-A-7 | 0.396 acre | 20 |
| 8-A-8 | 20.694 acres | 20 |
| 8-A-9 | 1.250 acres | 20 |
| 8-A-10 | 0.014 acre | 20 |
| 8-A-11 | 0.457 acre | 20 |
| 8-A-12 | 13.807 acres | 20 |
| 8-A-13-A | 1.603 acres | 52 |
| 540 | 58.560 acres | 68 |
| 541 | 0.278 acre | 68 |
| 542 | 28.304 acres | 68 |
| 5399-A | 2.718 acres | 687 |
| 5400-A | 0.043 acre | 687 |
| 5401-A | 5.185 acres | 687 and |
| 5402-A | 5.605 acres | 687 |

as shown on the aforementioned Maps, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1000 of John Ii Estate, Limited;

TOGETHER WITH AND SUBJECT TO THE FOLLOWING:

As to Lot 1-A-2:     Together with access to a public highway, namely, Kamehameha Highway, by means of Lot 1-A-1 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9104, filed July 11, 1949.

As to Lot 8-A-4:      Together with access to a public highway, namely, Kamehameha Highway, by means of Lots 8-A-5, 8-A-6, 8-A-7, 8-A-10, 8-A-11 and 8-A-15 as shown on Map 20 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9106, filed July 11, 1949.

As to Lot 541:      Together with access to a public highway over Lot 540 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 542:      Together with access to a public highway over Lots 540 and 541 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 5399-A:      Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5400-A:      Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20 of said Land Court Application No. 1 000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5401-A:      Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5402-A:      Together with access to a public road over Lots 1-A-1 and 1-A-4 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

Being land(s) described in Transfer Certificate of Title No. 600,112 issued to SANDWICH ISLES COMMUNICATIONS, INC., a Hawaii corporation.

# Schedule A.2 Assets

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office.  Unknown Manholes. |
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |

*Oahu – Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu – Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building to the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations.  Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards the Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii – Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards the Laiopua central office. |

*Hawaii – Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item – to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance polities and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| | |
|---|---|
| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>        Debtor. | CASE NO. 18-01319<br>(Chapter 11) |
| WAIMANA ENTERPRISES INC.,<br>PA MAKANI LLC, CLEARCOM,<br>INC.<br><br>        Plaintiffs,<br><br>   v.<br><br>HAWAIIAN TELCOM INC.,<br><br>        Defendant. | Adversary Proceeding No. 22-90008<br><br>**ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**<br><br><br>Hearing:<br>Date: August 1, 2022<br>Time: 9:30 a.m.<br>Judge: Honorable Robert J. Faris |

**ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC.
TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**

The *Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* which motion was filed on June 10, 2022 at Docket No. 35 in the above-captioned adversary proceeding (the "Motion to Dismiss") came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "Hearing").

The Court, having duly considered the Motion to Dismiss, all of the written memoranda and exhibits filed in connection with the Motion to Dismiss, the First Amended Complaint filed at Docket No. 28, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Dismiss is GRANTED. The *First Amended Complaint*, filed at Docket No. 28 by Waimana Enterprises Incorporated, Pa Makani LLC, and Clearcom, Inc., and all claims asserted therein, are hereby DISMISSED in their entirety, WITH PREJUDICE.

**END OF ORDER**

APPROVED AS TO FORM:

_____ /s/ William K. Meheula, III _____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                            8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

<table>
<tr><td colspan="2"><strong>Information to identify the case:</strong></td><td></td></tr>
<tr><td>Debtor(s)</td><td><strong>Paniolo Cable Company, LLC</strong></td><td rowspan="2"><strong>United States Bankruptcy Court<br>District of Hawaii</strong></td></tr>
<tr><td>Parties</td><td>Waimana Enterprises Inc, et al.</td></tr>
<tr><td></td><td>Plaintiff(s)</td><td></td></tr>
<tr><td></td><td>v.</td><td></td></tr>
<tr><td></td><td>Hawaiian Telcom Inc.,</td><td>Bankruptcy Case number:  <strong>18–01319</strong><br>Chapter:  <strong>11</strong></td></tr>
<tr><td></td><td>Defendant(s)</td><td>Adversary Proceeding No:  <strong>22–90008</strong></td></tr>
</table>

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss the First Amended Complaint In Its Entirety. (Related Doc # 35) Date of Entry: 8/18/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 18, 2022                                    Michael B. Dowling
                                                         Clerk

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

*Filer's Name, Address, Phone, Fax, Email:*

WILLIAM MEHEULA  (2277)
Meheula Law, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i  96813
Telephone No.:  (808) 599-9554
Facsimile No.:  (808) 599-9610
Email: meheula@smlhawaii.com

Attorneys for Plaintiffs WAIMANA ENTERPRISES INC., PA
MAKANI LLC, and CLEARCOM, INC.

Form 417A (12/15)



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF HAWAII**
**1132 BISHOP STREET, SUITE 250**
**HONOLULU, HI 96813**

| Debtor(s): | Chapter: | Case No.: |
|---|---|---|
| Paniolo Cable Company, LLC | **11** | 18-01319 |

| *(If Adversary Proceeding)* Plaintiff(s): | A.P. No.: |
|---|---|
| Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc. | 22-90008 |

| *(If Adversary Proceeding)* Defendant(s): | Related Docket No.: |
|---|---|
| Hawaiian Telcom, Inc. | 67 |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):

   Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

2. Position of appellant(s) in adversary proceeding or bankruptcy case that is subject of this appeal:

For appeals in an adversary proceeding.

For appeals in a bankruptcy case and not in an adversary proceeding.

☒ Plaintiff
☐ Defendant
☐ Other (describe):

☐ Debtor
☐ Creditor
☐ Trustee
☐ Other (describe):

### Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:

   Order Granting Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in Its Entirety, filed August 18, 2022 [Dkt. 67], attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: August 18, 2022

**Part 3: Identify the other parties to the appeal**

List the names of all the parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:                                   Attorney:

    SEE ATTACHED PAGE

2. Party:                                   Attorney:

**Part 4: Optional election to have appeal heard by District Court**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect(s) to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

/s/ William Meheula                           Date: August 30, 2022
_____

Signature of attorney for appellant(s) (or
appellant(s) if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):

WILLIAM MEHEULA (2277)
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-9554
Email: meheula@smlhawaii.com

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

## Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:   Hawaiian Telcom, Inc.   Attorney:   Ted N. Pettit, Esq.
David G. Brittin, Esq.
Case Lombardi & Pettit, A Law Corporation
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, HI 96813
Tel No.: (808) 547-5400

Attorney:   Andrew J. Gallo, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110-1726
Tel No.: +1 (617) 951-8117

Attorney:   Melissa Y. Boey, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
Tel No.: +1 (650) 843-4000



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>          Debtor. | CASE NO. 18-01319<br>(Chapter 11) |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC.<br><br>          Plaintiffs,<br><br>    v.<br><br>HAWAIIAN TELCOM INC.,<br><br>          Defendant. | Adversary Proceeding No. 22-90008<br><br>**ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**<br><br><br><br>Hearing:<br>Date: August 1, 2022<br>Time: 9:30 a.m.<br>Judge: Honorable Robert J. Faris |

EXHIBIT A

**ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC.
TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**

The *Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* which motion was filed on June 10, 2022 at Docket No. 35 in the above-captioned adversary proceeding (the "Motion to Dismiss") came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "Hearing").

The Court, having duly considered the Motion to Dismiss, all of the written memoranda and exhibits filed in connection with the Motion to Dismiss, the First Amended Complaint filed at Docket No. 28, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Dismiss is GRANTED. The *First Amended Complaint*, filed at Docket No. 28 by Waimana Enterprises Incorporated, Pa Makani LLC, and Clearcom, Inc., and all claims asserted therein, are hereby DISMISSED in their entirety, WITH PREJUDICE.

**END OF ORDER**

U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 71 Filed 08/18/22 Page 2 of 4

APPROVED AS TO FORM:

_____/s/ William K. Meheula, III_____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                           8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

| Information to identify the case: | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number: **18–01319** Chapter: **11** |
| | Defendant(s) | Adversary Proceeding No: **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss the First Amended Complaint In Its Entirety. (Related Doc # 35) Date of Entry: 8/18/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 18, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

SULLIVAN MEHEULA LEE
A Limited Liability Law Partnership

WILLIAM MEHEULA          (2277)
D. KAENA HOROWITZ        (9836)
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawai'i  96813
Telephone:  (808) 599-9555
Facsimile:  (808) 533-2467
Email: meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, AND
CLEARCOM, INC.

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In re | Case No. 18-01319 (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| | Adversary Proceeding No. 22-90008 |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC., | FIRST AMENDED COMPLAINT; EXHIBITS A-P |
| Plaintiffs, | |
| v. | |
| HAWAIIAN TELCOM, INC., | |
| Defendant. | |

<u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Waimana Enterprises Incorporated ("**Waimana**"), Pa Makani LLC

("**Pa Makani**") and Clearcom, Inc. ("**Clearcom**") for their First Amended

Complaint against Defendant Hawaiian Tel Inc. ("**HTI**") allege and aver as

follows.

1.    Waimana is the primary owner and holder of License 372 that

requires Waimana to provide all infrastructure necessary to provide modern

telecommunications services on Hawaiian Home Lands ("**HHL**"), no matter how

remote their residence may be.  License 372 was issued to a native Hawaiian

corporation in 1995 and the term is in perpetuity.  Many of its customers do not

have electricity or water and one family lives in a tent.  License 372 mandates that

no matter how expensive the infrastructure may be in order to provide such

service, Waimana's monthly charge to the customer will be no more than is

charged for comparable service in the adjacent non-HHL areas.   The provisions of

License 372 are the reason the residents of the HHL have modern

telecommunication service today, including in many cases fiber-optic cable to their

homes.  It is essential to sustaining, expanding and upgrading non-voice

telecommunications service to the HHL residents in the future that the

requirements of License 372 be continued.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28   Filed  05/27/22   Page 2 of 23

2.     Plaintiff Waimana is a corporation organized and existing under the laws of the State of Hawai'i.

3.     Plaintiff Pa Makani is a limited liability company organized and existing under the laws of the State of Hawai'i.

4.     Plaintiff Clearcom is a corporation organized and existing under the laws of the State of Hawai'i.

5.     Defendant HTI is a corporation organized under the laws of the State of Hawai'i.

6.     Former Plaintiff but now non-party Sandwich Isles Communications, Inc. ("**SIC**") is a corporation organized and existing under the laws of the State of Hawai'i.

7.     Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**HHCA**") states: "The department is authorized to <u>grant licenses as easements for</u> railroads, <u>telephone lines</u>, electric power and light lines, gas mains, <u>and the like</u>." Emphasis added.

8.     Section 204(2) of the HHCA states "In the management of any retain available lands … the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon to a native Hawaiian, or organization or associations

3

owned or controlled by native Hawaiians, for commercial, industrial or other business purposes …"

9.     Plaintiffs are native Hawaiian organizations as noted in License 372 and the Partial Assignments.

10.     Section 206 of the HHCA states:

"OTHER OFFICERS NOT TO CONTROL HAWAIIAN HOME LANDS; EXCEPTIONS.  The powers and duties of the governor … in respect to the lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

11.     The Hawaii Public Utilities Commission ("**PUC**") is a division of the Governor's administration and therefore has no authority on HHL.

12.     Waimana is the owner and holder of License No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to authorization from the HHC (hereinafter "**License 372**").  A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

13.     License 372 granted Waimana a right to provide "telecommunication services of all types" to HHL, <u>see</u> Exhibit A at 1:

Licensor determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to <u>local, intrastate, interstate and international telephone</u>; video on demand interactive communication; cable television; medical and educational links; and electronic data transmission) <u>to LICENSOR'S lands</u> in a timely manner;

4

The added underscored words identify the type and area of telecommunication services assigned to SIC in the Partial Assignment of License, discussed below. The right to provide all other types of telecommunication services were retained by Waimana.

14.     Under HHCA 207(c)(1), License 372 is an interest in real property issued to Waimana pursuant to HHCA 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.

15.     By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the "**SIC Partial Assignment**").  A true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is attached hereto as **Exhibit "C"**.

16.     The SIC Partial Assignment is expressly limited to "***IntraLata and Intrastate telecommunication services***", which means "limited to local, intrastate, interstate and international telephone" on HHL ("**voice only service**").  Consistent with that voice only service limitation and area of service limitation, SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice only services on HHL.

5

17.     Waimana caused other subsidiaries including Clearcom, Inc. and Pa Makani LLC to provide other telecommunications services (internet, wireless etc.) both on and off HHL.

18.      By instrument dated December 30, 2011, Waimana partially assigned License 372 to Pa Makani (the "**Pa Makani Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***wireless communications services of all types***" under License 372.  DHHL consented to the Pa Makani Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "D",**

19.     By instrument dated May 29, 2014, Waimana partially assigned License 372 to Clearcom (the "**Clearcom Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***broadband communications services of all types***" under License 372.  DHHL consented to the Clearcom Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "E",**

20.     License 372 in relevant part also provides:

> LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians.
>
> NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal

6

successors and assigns, the [1] <u>exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR,</u> and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and [2] <u>including also the right of entry upon the Easement and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.</u>[1]

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, <u>in perpetuity</u>, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

4.    <u>ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.</u>  LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost.  LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5.    <u>LEVEL OF TELECOMMUNICATION SERVICES.</u> LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

---

[1] Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL.  ("**License 372 Service Right**").

Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "the <u>easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.</u>" ("**License 372 Easement**").

7

6. COST OF TELECOMMUNICATIONS SERVICES. LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7. JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational opportunities for beneficiaries of LICENSOR each year. For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8. EMPLOYMENT. LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9. CAPITAL EXPENDITURES/CONTRACTS. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

19. BREACH. If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove

8

its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.[2]

21.     Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing and underground conduits to beneficiary lessee residences on License 372 Easement. SIC used those facilities for the provision of voice only services only on HHL. Plaintiffs developed other telecommunications facilities on HHL.

22.     Paniolo Cable Company Inc. ("**Paniolo**") developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai.  Paniolo's facilities were connected to and housed in existing facilities on License 372 Easement, pursuant to SIC's joint use agreement with Paniolo.  All of Paniolo's facilities were leased to SIC at a time when Paniolo was a third-party mainland undersea cable company not owned or controlled by Waimana nor any affiliate of Waimana.  Paniolo had no interest in any HHL, as the License 372 Easement was licensed to Waimana pursuant to its rights under License 372.  The assets owned by Paniolo and leased to SIC including the assets on the License 372 Easement are hereinafter referred to as the "**Paniolo Assets**."

---

[2] Although DHHL initially sent Waimana and SIC a notice of violation in March 2020 that notice was effectively withdrawn by DHHL in January 2021 when Waimana and SIC requested a contested case hearing, and since then, DHHL has not sent Plaintiffs any such notice of breach.

9

23.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

24.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

25.     With the money judgment, on February 4, 2020, Katzenstein filed a Notice of Execution in Case No. 19-90022 (Dkt 36), which is attached hereto as **Exhibit "M,"** that identified levied SIC property described in Exhibit "A" as **Real Property**, which is real property in Mililani on Oahu, and **Schedule A-2 Assets**, (collectively, "**SIC Property**").

26.     Schedule A-2 at the end of the section entitled "Licenses" stated:

 -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation <u>SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands</u>.

-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, <u>easements</u>, leases, <u>license agreements</u>, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets.

Emphasis added.

27.     On March 6, 2020, pursuant to the Writ of Execution, the Trustee at a public auction purchased the SIC Property.

10

28.     By the Rule 9019 Settlement Agreement effective as of March 6, 2020, and approved and entered by the Bankruptcy Court on June 4, 2020, attached hereto as **Exhibit "L,"** the Court approved the Rule 9019 Settlement Agreement between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana, Pa Makani and Clearcom), which referenced, adopted and approved the Master Relationship Agreement ("**MRA**"), a copy of the MRA is attached hereto as **Exhibit "F."**

29.     Schedule 2, section 2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network). <u>SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements</u> **(other than the DHHL License)** <u>that may by their terms be so assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands.</u> <u>To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo the broadest possible right to use the Entitlement.</u> For the avoidance of doubt, <u>the Parties acknowledge and agree that</u> **DHHL License will not be assigned by SIC to Paniolo**<u>, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.</u>

Emphasis added.

30.     Thus, regardless of whether the MRA was assumed by HTI, the SIC Property did not include and the Trustee did not obtain "<u>SIC's interest in License</u>

11

Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A-2.

31.     In addition, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which includes Plaintiffs' right to provide (post FCC Order non-exclusive) telecommunications services other than voice only service on HHL including Pa Makani's Partial Assignment and Clearcom's Partial Assignment, and Plaintiffs' License 372 Easement areas that Plaintiffs developed on HHL.

32.     On November 30, 2020, without Waimana, Pa Makani, Clearcom or SIC's knowledge or concurrence, the Trustee and HTI entered into the Asset Purchase Agreement dated ("**APA**"), a true copy of which is attached hereto as **Exhibit "G"** where Katzenstein agreed to sell SIC Property as limited by the MRA and Rule 9010 Settlement Agreement (together with Paniolo's Assets) to HTI.

33.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "O,"** confirming that, "The Buyer [HTI] will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in emails dated January

12

6, 2021, to alhee@waimana.com that states that License 372 has not been cancelled, and: "The License remains valid. DHHL informed the Court that any purchaser of the assets would require a license from DHHL." And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "P,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

34. Moreover, even if HTI obtains a new license from DHHL, such easement cannot be in the same areas already granted to Plaintiffs under License 372 as that would constitute a breach of License 372 and breach of fiduciary duties by DHHL. In addition, even if for purposes of argument the Trustee obtained "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 despite the Rule 9019 Settlement Agreement and the MRA (the determination of which involves discovery and questions of fact and a State Court determination of the scope of and rights under License 372), that does not eliminate Plaintiffs' License 372 Easement and right to provide non-voice telecommunications services on HHL.

35. DHHL's 8/19/21 filing also disclosed the Limited Right-of Entry to HTI, which violates Plaintiffs' License 372 rights.[3] See, Plaintiffs lawsuit in First

---

[3] In section 13 of the Limited Right-of Entry, HTI refused to defend and indemnity DHHL for any claim brought by Waimana.

13

Circuit Court against DHHL for breach of License 372 and related claims, in Civil No. 1CCV-22-0000617, a copy of which without exhibits is attached hereto as **Exhibit "N."**

36.     On August 31, 2021, the APA sale to HTI closed.

37.     HTI had the opportunity to assume from Katzenstein all of the benefits of MRA including the defined Entitlements but decided not to assume it.

38.     At the time HTI made its choice not to assume this agreement with SIC, HTI knew that it was buying facilities located on Plaintiffs' License 372 Easement.

39.     HTI's failure to assume this agreement was not inadvertent. HTI has repeatedly emphasized that its decision not to assume the agreement that allowed Katzenstein to use the License 372 Easement was deliberate and intentional.   For example, in HTI's motion filed in the U.S. Bankruptcy Court on November 16, 2021, attached hereto as **Exhibit "H,"** HTI asserted that the agreements giving Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election. … **HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI**

Id. at 14 (emphasis added).

14

40.     In addition, although Plaintiffs were parties to the 9019 Settlement Agreement approved by Order dated June 4, 2020 (Dkt 271), because HTI did not assume the MRA and Settlement Agreement, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment and HTI cannot bind Plaintiffs to commitments made therein as the settlement agreement included the representation that Plaintiffs entering into the settlement agreement was consideration for the Trustee entering into the MRA and committing that any assignor would be bound by the MRA.

41.     Thus, HTI is a trespasser on Plaintiffs' License 372 Easement.

42.     On and after August 31, 2021, HTI had no right to locate the assets it had purchased on the Plaintiffs' License 372 Easement.  HTI does not have a license allowing its assets to be on Plaintiffs' License 372 Easement.

43.     Plaintiffs are not aware whether DHHL has granted HTI any right to provide telecommunications services on HHL, and if DHHL is contemplating doing so, DHHL would breach fiduciary duties to its beneficiaries if that license does not include the same strict obligations that Waimana assumed in License 372 including paragraphs 6-9 of License 372 and if allowed use of the same easement areas licensed to Plaintiffs who are native Hawaiian entities.

44.     HTI may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 ("**FCC Order**"), attached hereto as **Exhibit "I,"**

15

requires DHHL to provide access to the License 372 Easement on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the License 372 Service Right. However, the order does not require Plaintiffs to share use of their License 372 Easement areas. The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

45.    Under the severability provision of the License 372 at paragraph 22, while the exclusive License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate, and FCC does not have jurisdiction to invalidate Plaintiffs' License 372 Easement or its non-exclusive License 372 Service Rights. Plaintiffs require exclusive possession to perform its telecommunications obligations required under License 372. Thus, Plaintiffs' right to exclusive possession of their License 372 Easement areas survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL. An internal DHHL memo to the HHC dated January 18, 2022, a copy of which is attached hereto as **Exhibit "J",** states "DHHL has informed its lessees,

16

tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice"; confirming that the FCC Order dealt with License 372 Service Right.

46.     Plaintiffs own numerous improvements on the License 372 Easement that were not obtained by Katzenstein and thus were **not** purchased by HTI and are still owned, maintained and used by Plaintiffs to provide service to their HHL customers.  HTI's destructive actions are interfering with Plaintiffs.   HTI is using Plaintiffs' License 372 Easement and non-exclusive post FCC Order License 372 Service Right for non-voice only telecommunications services on HHL without authorization or paying for such use.

47.     HTI's letter March 11, 2022 asserting their rights under the FCC Order and Limited Right of Entry attached hereto as **Exhibit "K,"** only proves that HTI is wrongly using Plaintiffs' License 372 Service Rights and Plaintiffs' License 372 Easement areas.

COUNT I - TRESPASS

48.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 45 hereinabove.

49.     HTI is a trespasser preventing Plaintiffs from exclusive unimpeded use and occupancy of their License 372 Easement areas to serve HHL lessees.

17

50. HTI has no license, nor any other legal right, to occupy Plaintiffs' License 372 Easement.

51. Plaintiffs are entitled to: (a) an injunction barring HTI from access to their License 372 Easement, and/or a similar judgment for possession of their License 372 Easement areas and an order evicting of HTI from their License 372 Easement areas and an order to remove any property of HTI located thereon, (b) damages for wrongfully using Plaintiffs' License 372 Easement areas in violation of Plaintiff's rights under License 372 including damages for use of the License 372 Easement and disgorgement of HTI profits; and (c) punitive damages.

## COUNT II – CONVERSION

52. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 49 hereinabove.

53. HTI has willfully used and damaged Plaintiffs' License 372 Easement areas and property located on thereon, which constitutes conversion.

54. HTI has also willfully used without Plaintiffs' authorization their License 372 Service Right for all telecommunications services on HHL except voice only services granted to Plaintiffs as native Hawaiian organizations under Section 204(2) of the HHCA, which constitutes conversion.

55. Plaintiffs are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by HTI's tortious actions in

18

deliberately, repeatedly damaging Plaintiffs' property; (b) lost profits and compensation for use of the License 372 Easement areas and License 372 Service Rights; (c) disgorgement of HTI profits for use of Plaintiffs' License 372 Easement areas and License 372 Service Rights; and (c) punitive damages.

COUNT III – UNFAIR COMPETITION

56.　　Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 52 hereinabove.

57.　　HTI is a competitor with Plaintiffs in the telecommunications business.

58.　　HTI engaged in unfair methods of competition by usurping Plaintiffs License 372 Easements and their License 372 Service Rights without compensation, and destroying relations with their DHHL and HHL customers.

59.　　HTI's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

60.　　HTI's conduct negatively affects competition and harms fair competition as provided for in the Telecommunications Act of 1996 by impeding Plaintiffs' operations on HHL.

61.　　Plaintiffs have been damaged in its business and property by HTI's unfair methods of competition in an amount to be proven at trial.

## COUNT IV – INTENTIONAL INTERFERENCE OF CONTRACT

62.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 58 hereinabove.

63.     The elements of tortious interference with contractual relations include:

> 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part ; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff. It is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

Ace Quality Farm Prods., Ltd. Liab. Co. v. Hahn, 136 Hawai'i 373, 362 P.3d 806 (App. 2015).

64.     Here, 1) Plaintiffs have License 372 agreements with DHHL; 2) HTI knew of them; 3) HTI intentionally enticed, encouraged and induced DHHL to breach these agreements with Plaintiffs; 4) For numerous reasons HTI had no justification for doing so, including but not limited to rejecting the MRA and 9019 Settlement Agreement and over reaching by using Plaintiffs' License 372 rights that clearly were never transferred to HTI, particularly for data (non-voice) telecommunications; 5) encouraged and induced DHHL to breach its obligations to Plaintiffs under License 372 by entering into the Limited Right-of Entry, making

20

filings in this Court and potentially negotiating a new license with HTI that violate Plaintiffs rights under License 372 and Partial Assignments to Pa Makani and Clearcom; and 6) which damaged Plaintiffs' business on HHL.

COUNT V – DECLARATORY RELEIF

65.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 61 hereinabove.

66.     Plaintiffs are entitled to a declaratory relief determination that by entering into the Rule 9019 Settlement Agreement and MRA that were approved by Order dated June 4, 2020 (Dkt 271), attached hereto as **Exhibit "L,"** even though HTI did not assume these agreements, (a) the Trustee nonetheless did not obtain "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee acknowledged in Schedule 2, section 2.3 of the MRA that SIC did not assign its interests in License 372, which Plaintiffs have an interest in because they use SIC's excess capacity to provided non-voice telecommunications services; and (b) although Plaintiffs were parties to the 9019 Settlement Agreement, because HTI also refused to assume the MRA, HTI cannot enforce Plaintiffs' commitments made in the settlement agreement including the agreement to provide access to the Transferred Assets and Equipment as it would be unfair to continue to bind Plaintiffs to those commitments as Trustee's agreement to enter into the MRA and

21

including the commitment that any "purchaser or assignee approved by the Court shall be bound by the terms of the" MRA, was consideration for Plaintiffs entering into the settlement agreement.

67. Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment only provided SIC with the right to provide voice only service on HHL and no other telecommunications services throughout Hawaii, including wireless that was assigned to Pa Makani and broadband that was assigned to Clearcom.

68. Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment did not include Plaintiffs' License 372 Easement areas.

WHEREFORE, Plaintiffs prays the Court grant the following relief:

1. Issuance of a judgment for eviction against HTI, evicting HTI from Plaintiffs License 372 Easement areas and to remove its property therefrom;

2. Issuance of a Writ of Possession in favor of Plaintiffs and against HTI directing the sheriff to remove HTI from the lands covered by Plaintiffs' License 372 Easement areas;

3. For a temporary restraining order and preliminary and permanent injunctions enjoining HTI from occupying the Plaintiffs' License 372 Easement areas and prohibiting HTI from damaging Plaintiffs' facilities and property located on HHL.

22

4.      For damages in an amount to be determined at trial.

5.      For treble damages in an amount be determined at trial.

6.      For punitive damages in an amount to be determined at trial.

7.      Declaratory relief set forth in Count V.

8.      For plaintiffs' reasonable costs and attorneys' fees incurred herein.

9.      For such other and further relief as the Court deems just.

DATED:  Honolulu, Hawaiʻi, May 27, 2022.


                                /s/ William Meheula
                                WILLIAM MEHEULA
                                D. KAENA HOROWITZ

                                Attorneys for Plaintiff
                                WAIMANA ENTERPRISES INC.,
                                PA MAKANI LLC, and CLEARCOM, INC.

# EXHIBIT A

THE ORIGINAL OF THIS DOCUMEN
RECORDED AS FOLLOWS:
STATE OF HAWAII

BUREAU OF CONVEYANCE
DATE MAY 1 2 1995 32
DOCUMENT NO. 95-064

STATE OF HAWAII

DEPARTMENT OF HAWAIIAN HOME LANDS

LICENSE AGREEMENT NO. 312

THIS LICENSE made and entered into this _____9th_____ day
of ____May_____, 19_95__, by and between the State of Hawaii,
DEPARTMENT OF HAWAIIAN HOME LANDS, whose place of business is
335 Merchant Street, Honolulu, Hawaii 96813, and whose mailing
address is P. O. Box 1879, Honolulu, Hawaii 96805, hereinafter
referred to as "LICENSOR," and WAIMANA ENTERPRISES,
INCORPORATED, a native Hawaiian corporation (Federal I.D. No.
99-0263871), whose principal place of business and mailing
address is 1001 Bishop Street, Pauahi Tower, Suite 1520,
Honolulu, Hawaii 96813, hereinafter referred to as "LICENSEE."

W I T N E S S E T H   T H A T:

LICENSOR, pursuant to the authority granted to it by
Section 207(C)(1)(A), HHCA, is authorized to grant licenses as
easements for railroads, telephone lines, electric power and
light lines, gas mains and the like;

LICENSOR, pursuant to the provisions under Section 10-4-22,
Title 10, State of Hawaii, Department of Hawaiian Home Lands,
Administrative Rules 1981, as amended (DHHL Administrative
Rules), may grant licenses for public purposes for any length of
term subject to reverter to LICENSOR upon termination or
abandonment, on such terms and conditions as may be prudently
and reasonably set by the LICENSOR;

LICENSOR, pursuant to the provisions under Section 10-4-21,
DHHL Administrative Rules, may allow the rental for licenses to
be nominal should the use benefit LICENSOR or its native
Hawaiians beneficiaries;

LICENSOR determines that the LICENSE established herein is
essential in order to provide broad band telecommunication
services of all types (including but not limited to local,
intrastate, interstate and international telephone; video on
demand; interactive communication; cable television; medical and
educational links; and electronic data transmission) to
LICENSOR'S lands in a timely manner;

FURTHER, LICENSOR determines that the issuance of this
LICENSE established herein is essential for LICENSEE to obtain
necessary funds needed to construct and operate the necessary
telecommunications infrastructure;

EXHIBIT A

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and the welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE, and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided, LICENSOR agreeing and LICENSEE understanding that the nominal rental of ONE AND NO/100 DOLLARS ($1.00) for the entire term is waived.

AND LICENSEE hereby covenants with LICENSOR, each for itself and not for the other that:

1. <u>INITIAL DEMONSTRATION PERIOD.</u> BOTH PARTIES agree to allow LICENSEE an initial period of not more than FIVE (5) YEARS in which LICENSEE shall demonstrate satisfactory performance of the applicable terms and conditions contained in this License. LICENSEE shall demonstrate financial capability to complete the initial project within ONE (1) YEAR from date of the LICENSE. Financial capability may be demonstrated by providing a bond, letter of credit, corporate guarantee, bank loan commitment letter, loan approval from a government agency or other similar instrument in the amount of the telecommunications construction. When LICENSEE has demonstrated its ability to fund, install and operate the telecommunications network for the selected project, the remaining provisions, terms and conditions of this LICENSE shall automatically take effect. No other action shall be required from either party.

2. <u>NEW CONSTRUCTION TELECOMMUNICATION INFRASTRUCTURE COSTS.</u> LICENSEE agrees to construct and install all telecommunications infrastructure on LICENSOR'S lands at LICENSEE'S cost for all new construction to include but not limited to residential, agricultural, pastoral, commercial

and/or industrial subdivisions developed after January 1, 1996 in the LICENSE area at LICENSOR'S cost. In the alternative, LICENSEE at its option, may choose to reimburse LICENSOR for all costs to install telecommunications infrastructure provided the telecommunications infrastructure is installed to LICENSEE'S specifications.

3. **EXISTING TELECOMMUNICATIONS INFRASTRUCTURE.** LICENSOR agrees to sell and LICENSEE agrees to purchase at LICENSOR'S cost and/or install telecommunications infrastructure on LICENSOR'S land at LICENSEE'S cost including but not limited to all existing residential, agricultural, pastoral, commercial and/or industrial subdivisions. If the existing infrastructure is not owned by the LICENSOR, LICENSEE shall have the option, to be exercised in LICENSEE'S sole discretion, to either purchase or install new telecommunications infrastructure. After LICENSEE activates the existing and/or new telecommunications infrastructure, LICENSOR agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on LICENSOR'S lands.

4. **ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.** LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost. LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5. **LEVEL OF TELECOMMUNICATION SERVICES.** LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE. LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6. **COST OF TELECOMMUNICATIONS SERVICES.** LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7. **JOB TRAINING/EDUCATION.** LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational

opportunities for beneficiaries of LICENSOR each year. For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8. **EMPLOYMENT**. LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9. **CAPITAL EXPENDITURES/CONTRACTS**. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

10. **TAXES**. During the term of this LICENSE, LICENSEE shall pay when due, all real property taxes and any other assessments, including all charges for utility services, which shall, during the term of this LICENSE, be lawfully charged, assessed, imposed, or become due and payable upon or on account of the licensed premises and the improvements now on or hereafter erected thereon.

11. **DUE CARE AND DILIGENCE**. LICENSEE shall use due care and diligence in the operation and maintenance of the premises and shall keep the grounds and improvements in good and safe condition and repair.

12. **INDEMNITY**. LICENSEE shall, to the extent permitted by law, indemnify and hold harmless, LICENSOR, from any and all claims and demands against LICENSOR for any loss or damage or injury or death to persons or property resulting from, or in any way connected with, the condition or use of the premises covered by this LICENSE not caused by the negligence of LICENSOR, their agents, servants or employees acting within the scope of their employment, and from and against all damages, costs, counsel fees, or liabilities incurred or brought thereon.

13. **ASSIGNMENTS**. Except as expressly provided in this LICENSE, this LICENSE is not transferable. At no time during the term of this LICENSE, shall LICENSEE assign, mortgage or pledge its interest in this LICENSE or its interest in the improvements now or hereafter erected on the premises without the prior written consent of LICENSOR, which consent will not be withheld unreasonably.

14. **CONDEMNATION**. If at any time the premises across which this LICENSE extends, or any part thereof, shall be condemned or taken for any public project by a governmental authority, LICENSEE shall have the right to claim and recover from the condemning authority, but not from LICENSOR, such

compensation as is payable for the LICENSE and LICENSEE'S improvements, if any, used in connection with this LICENSE, which shall be payable to LICENSEE as its interests appear.

15. ABANDONMENT. In the event the easement area hereby granted shall be abandoned or shall remain unused for a continuous period of one year, all rights granted hereunder shall terminate, and LICENSEE will remove its equipment and improvements and restore the land as nearly as is reasonably possible to the condition existing immediately prior to the signing of this License. Failure of LICENSEE to remove its equipment and improvements and to restore the land within 90 days after notification to do so from LICENSOR by certified mail at LICENSEE'S last known address, will constitute a breach of this LICENSE and LICENSOR may thereafter remove LICENSEE'S equipment and improvements and restore the land to a condition similar to that existing immediately prior to the signing of this LICENSE and LICENSEE will reimburse LICENSOR for all reasonable costs in connection with the removal and restoration.

16. RELOCATION. If LICENSOR determines that the continued exercise of the easement rights granted herein constitutes an undue interference with a subdivision or other development of the land over which the granted easement crosses, LICENSOR shall have the right to terminate the easement granted to the extent necessary to eliminate such interference; provided, that it shall grant to LICENSEE without payment of any monetary consideration, a substitute easement of similar width within the reasonable vicinity to permit LICENSEE to effect relocation of any facility or portion thereof, installed, placed or constructed on the easement area at LICENSEE'S own cost and expense, which substitute easement shall be subject to the same terms and conditions as this LICENSE contains.

17. CONSTRUCTION OF IMPROVEMENTS. LICENSEE shall undertake no construction until LICENSOR has reviewed and approved the plans. All buildings or structures or other major improvements of whatever kind that LICENSEE constructs or erects on the premises shall remain the property of LICENSEE and LICENSEE shall have the right, prior to termination of this LICENSE, or within such additional period as LICENSOR in its reasonable discretion may allow, to remove its property from the premises; provided that in the event LICENSEE shall fail to so remove such property within thirty (30) days after written notice to remove, LICENSOR may at its option retain the property or remove the same and charge the cost of removal and storage, if any, to LICENSEE.

18. MAINTENANCE OF PREMISES. During the term of this LICENSE, LICENSEE shall repair and maintain all improvements heretofore and hereafter erected upon the premises, including all glass, water and gas plumbing, electrical wiring, and all

other fixtures in or on the premises with all necessary reparations and amendments whatsoever; shall keep the premises and all improvements thereon in a strictly clean and sanitary condition, and shall comply with all laws, ordinances, rules and regulations of the Federal, State, County or municipal governments that are applicable to the premises and improvements; and shall allow LICENSOR or its agents, at all reasonable times, free access to the premises for the purpose of examining the same or determining whether the conditions herein are being fully observed and performed, and shall make good at its own cost and expense all defects within sixty (60) days after receipt of written notice by certified mail to the last known address of LICENSEE.

19. **BREACH.** If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.

20. **RIGHT OF ENTRY.** LICENSOR and its duly authorized representatives shall have the right to enter the Premises at all times for the purposes of conducting its own inspection and to ensure that LICENSEE is in compliance with the provisions of this LICENSE.

21. **WAIVER.** That notwithstanding any provision contained herein to the contrary, wherever applicable, LICENSOR may for good cause shown, extend the time for compliance and/or waive any of the terms, conditions and covenants contained herein that LICENSEE, must observe and perform.

22. **SEVERABILITY.** Whenever possible each provision of this LICENSE shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this LICENSE should be prohibited or invalidated under applicable law or for any other reason whatsoever, such provision shall not invalidate any other portion of this License.

23. **DEFINITION.** The word "premises", when it appears herein, includes and shall be deemed to include the lands described above and improvements whenever and wherever erected or placed thereon.

24. **SINGULAR/PLURAL.** The singular or plural depends on its appropriate use.

25. **AGREEMENT.** This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed the day and year first above written.

Approved by the HHC
at its meeting held on
December 20, 1994

Approved as to form:

_____
Deputy Attorney General
State of Hawaii

State of Hawaii
DEPARTMENT OF HAWAIIAN HOME LANDS

By _____
Kali Watson, Chairman
Hawaiian Homes Commission

                    LICENSOR

WAIMANA ENTERPRISES, INC.
a Hawaii corporation

By _____
Albert S.N. Hee, President

                    LICENSEE

STATE OF HAWAII        )
                       ) ss
CITY AND COUNTY OF HONOLULU  )

On this _9th_ day of ____May____, 19 _95_,
before me personally appeared Albert S.N. Hee, to me personally
known, who, being by me duly sworn, did say that he is the
President of Waimana Enterprises, Inc., a Hawaii corporation,
and that the instrument was signed on behalf of the corporation
and he acknowledged the instrument to be the free act and deed
of the corporation.

Notary Public, State of Hawaii
My commission expires: _12/27/95_

# EXHIBIT B

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-2   Filed  05/27/22   Page 1 of 2

## PARTIAL ASSIGNMENT OF LICENSE

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC. (Assignor) hereby assigns, transfers and sets over to SANDWICH ISLES COMMUNICATIONS, INC. (Assignee) those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the following described License:

License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Signed under seal this 15th day of January, 1996.

Albert S.N. Hee, President
Assignor

Albert S.N. Hee, President
Assignee

STATE OF HAWAII )
                ) SS.
COUNTY OF HONOLULU )

On this 15th day of January, 1996, before me personally appeared Albert S.N. Hee, being first duly sworn, deposes and says that he is the President of Sandwich Isles Communications, Inc. and Waimana Enterprises, Inc.to me known to be the person who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Witness my hand and seal.

*Relin Kanakahi*

My commission expires: 3/24/99

EXHIBIT B

# EXHIBIT C

## STATE OF HAWAII

## DEPARTMENT OF HAWAIIAN HOME LANDS

## CONSENT TO PARTIAL ASSIGNMENT OF LICENSE AGREEMENT NO. 372

**KNOW ALL MEN BY THESE PRESENTS:**

The **STATE OF HAWAII**, by its Hawaiian Homes Commission, is the "Licensor" named in that certain License Agreement No. 372, dated May 9, 1995, in favor of Waimana Enterprises, Incorporated, a native Hawaiian corporation ("Licensee"), recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

**WHEREAS THE LICENSOR DOES HEREBY CONSENT** to that certain Partial Assignment of License, dated January 15, 1996, by and between Licensee, as Assignor, and Sandwich Isles Communications, Inc., a Hawaii corporation, as Assignee, with respect to those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the License Agreement, upon the following conditions:

(1) This consent shall not authorize, nor deemed to authorize, any further or other assignment of the License Agreement;

(2) This consent shall not be deemed nor construed to be a waiver of any of the terms, covenants or provisions of said License Agreement; all rights of Licensor under said License Agreement being hereby reserved;

(3) Should there be any conflict between the terms of said License Agreement and the terms of said Partial Assignment of License, the former shall control, and nothing herein shall be construed as being a waiver of any of the terms, covenants, conditions, or provisions of said License Agreement;

(4) All rights of the Licensor or against the Licensee under the License Agreement are reserved; and

(5) All other conditions upon which the approval of this consent was made subject to by the board of the Hawaiian Homes Commission on May 21, 1996.

**WHEREAS,** the Hawaiian Homes Commission unanimously approved said Partial Assignment of License at its meeting on May 21, 1996, and this consent shall be effective as of said date.

# EXHIBIT C

**IN WITNESS WHEREOF,** the **STATE OF HAWAII,** by its Hawaiian Homes Commission, has executed these presents this _____6th_____ day of _____October_____, 2008.

Approved by the Hawaiian Homes
Commission on May 21, 1996

STATE OF HAWAII
DEPARTMENT OF HAWAIIAN HOME LANDS

By _____

Micah A. Kane, Chairman
Hawaiian Homes Commission

APPROVED AS TO FORM:

_____
Deputy Attorney General
State of Hawaii

2

STATE OF HAWAII          )
                         ) ss:
CITY AND COUNTY OF HONOLULU   )

    On this 6th day of October, 2008, before me appeared MICAH A. KANE, to me personally known, who, being by me duly sworn, did say that he is the Chairman of the Hawaiian Homes Commission and the person who executed the foregoing instrument and acknowledged to me that he executed the same freely and voluntarily for the use and purposes therein set forth.

                                _____
                                Notary Public, State of Hawaii

                                **ABIGAIL L. TUBERA**
                                _____
                                Print Name of Notary Public

                                My commission expires:_____

Doc. Date:_____10/6/08_____   # Pages: 3

Notary Name:____Abigail L. Tubera____  First Circuit

Doc. Description: _Consent to Partial Assignment to LA 372 - Waimana Enterprises, Inc._

_____  10/6/08
Notary Signature               Date

3

# EXHIBIT D

## PARTIAL ASSIGNMENT OF LICENSE

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC., a native Hawaiian corporation (Assignor) hereby assigns, transfers and sets over to PA MAKANI LLC dba SANDWICH ISLES WIRELESS, a Hawaii limited liability company (Assignee) those certain rights, title and interest necessary to provide wireless communications services of all types, including but not limited to the construction and operation of all necessary wireless communications infrastructure, in and to the following described License:

    License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home
    Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances,
    State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Such partial assignment shall be effective December 30, 2011.

        WAIMANA ENTERPRISES, INC., a native Hawaiian
        corporation

        Albert S.N. Hee
        Its President

            "Assignor"

        PA MAKANI LLC, a Hawaii limited liability company
        By WAIMANA ENTERPRISES, INC., a native Hawaiian
        corporation
        Its Manager,

        Albert S.N. Hee
        Its President

            "Assignee"

1

# EXHIBIT D

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-4   Filed 05/27/22   Page 2 of 4
U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 639-3   Filed 03/29/22   Page 2 of 4
Exhibit M-3

STATE OF HAWAII )
) SS.
COUNTY OF HONOLULU )

On this 9th day of January 2012, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Waimana Enterprises, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

The foregoing instrument is dated December 30, 2011 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: FEB 0 1 2012

STATE OF HAWAII )
) SS.
COUNTY OF HONOLULU )

On this 9th day of January 2012, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee ("Officer"), to me personally known, who being by me duly sworn, did say that he is the President of Waimana Enterprises Incorporated, a Hawaii corporation (the "Manager"), the Manager of Pa Makani LLC, a Hawaii limited liability company which is Manager-Managed (the "LLC"); that said instrument was executed by said Officer in the name and on behalf of said Manager by authority of its Board of Directors; that said instrument was executed by said Manager in the name and on behalf of said LLC by authority of its members; and said Officer acknowledged that he executed said instrument as the free act and deed as such officer of the Manager, as the free act and deed as the Manager of said LLC, and as the free act and deed of said LLC.

The foregoing instrument is dated December 30, 2011 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: FEB 0 1 2012

2



Doc. Date: DEC 3 0 2011 # Pages: 2 + certification
Name: Joycelynn P.S. Costa     First Circuit
Doc. Description: ___Partial___
_Assignment of License_
                    JAN 0 9 2012
Signature          Date
        NOTARY CERTIFICATION



Doc. Date: DEC 3 0 2011 # Pages: 2 + certification
Name: Joycelynn P.S. Costa     First Circuit
Doc. Description:   Partial
_Assignment of License_
                    JAN 0 9 2012
Signature          Date
        NOTARY CERTIFICATION

# EXHIBIT E

**PARTIAL ASSIGNMENT OF LICENSE**

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC., a native Hawaiian corporation (Assignor) hereby assigns, transfers and sets over to CLEARCOM, INC. dba SANDWICH ISLES BROADBAND, a Hawaii corporation (Assignee) those certain rights, title and interest necessary to provide broadband services of all types, including but not limited to the construction and operation of all necessary broadband infrastructure, in and to the following described License:

License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Such partial assignment shall be effective May 29, 2014 .

WAIMANA ENTERPRISES, INC., a native Hawaiian corporation

Albert S.N. Hee
Its President

"Assignor"

CLEARCOM, INC., a native Hawaiian corporation

Albert S.N. Hee
Its President

"Assignee"

1

# EXHIBIT E

STATE OF HAWAII )
) SS.
COUNTY OF HONOLULU )

On this 29th day of May, 2014, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Waimana Enterprises, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

This Partial Assignment of License is dated May 29, 2014 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: 2/1/2016

STATE OF HAWAII )
) SS.
COUNTY OF HONOLULU )

On this 29th day of May, 2014, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Clearcom, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

This Partial Assignment of License is dated May 29, 2014 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: 2/1/2016

2

# EXHIBIT F

## MASTER RELATIONSHIP AGREEMENT

This Master Relationship Agreement (this "MRA" and, together with all Schedules and Exhibits hereto, the "Agreement") is entered into as of March 6, 2020, by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"). SIC and Paniolo are each referred to as a "Party" and are collectively referred to as the "Parties".

### RECITALS:

A.     WHEREAS, Paniolo owns and operates a submarine cable system and related terrestrial assets ("the Paniolo System") connecting certain islands in Hawaii;

B.     WHEREAS, SIC owns and operates certain facilities and provides telecommunications services in the Hawaiian Home Lands;

C.     WHEREAS, in connection with that certain Adversary Proceeding No. 19-90022, *Katzenstein Trustee v. Sandwich Isles Communications, Inc.* (the "Adversary") pending in *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 (RJF), in the United States Bankruptcy Court for the District of Hawaii (the "Paniolo Bankruptcy Proceeding"), the Parties have entered into that certain Rule 9019 Settlement Agreement ("Settlement Agreement") in order to restructure their business and financial affairs;

D.     WHEREAS, the Settlement Agreement sets forth the Parties' agreement, in general terms, with respect to:  (a) the grant by SIC to Paniolo of an indefeasible right to access, occupy, and use certain assets for the purpose of operating and maintaining the Paniolo System (which assets, together with the Paniolo System, are referred to as the "Paniolo Network");  and  (b) the assignment, transfer, conveyance, sublease, sublicense or grant of the indefeasible right of use by SIC to Paniolo of certain easements, leases, licenses, permits and rights of way necessary to operate and maintain the Paniolo Network;  (c) the lease by Paniolo to SIC of fiber pairs on the Paniolo Network for the sole purpose of providing retail telecommunications service in the Hawaiian Homelands;  (d) the lease by Paniolo to SIC of collocation space and conduit access necessary to use such fiber pairs;  (e) the lease by Paniolo to SIC of certain transport services utilizing existing Fujitsu transport assets in the Paniolo Network; and (f) the provision of related operations and maintenance services and power by one Party to the other;

E.     WHEREAS, the Parties desire to enter into this Agreement to more specifically memorialize the terms of the Settlement Agreement;

F.     Accordingly, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# EXHIBIT F

## ARTICLE 1
## DEFINITIONS

1.1. "Adversary" is defined in Recital C.

1.2. "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party. For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.,* limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.3. "Agreement" is defined in the Preamble.

1.4. "Assets IRU" is defined in Section 3.2 and Schedule 2.

1.5. "Bankruptcy Event" means any proceeding instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors. For the avoidance of doubt, "Bankruptcy Event" shall not include the pending Paniolo Bankruptcy Proceeding with respect to Paniolo.

1.6. "Business Day" means any official working day other than a legal or bank holiday in the State of Hawaii. Unless otherwise specifically indicated as a "Business Day" the word "days" as used in the Agreement means calendar days.

1.7. "Charges" means the fees and charges set out in the Agreement or a Schedule and may include recurring and non-recurring charges.

1.8. "Claims" is defined in Section 7.1.

1.9. "Collocation Space" means the space leased by Paniolo to SIC for the purposes of installing and operating equipment for the provision of retail telecommunications services pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule and Exhibit C thereto.

1.10. "Conduits" means the conduits and ducts to which Paniolo grants SIC access to and use of pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.11. "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party. Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party under no confidentiality obligation.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 3 of 50

1.12. "Default" is defined in Section 11.

1.13. "Dispute" is defined in Section 13.1.

1.14. "Effective Date" means the latter of: (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.15. "Entitlements" means the various easements, leases, licenses, license agreements, letters of approval, special area management permits, rights of way or rights of entry assigned, transferred, sublicensed, or subleased by SIC to Paniolo (or to which SIC grants Paniolo an indefeasible beneficial right of use) pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.16. "Fiber Pair" means two dark fibers used to transmit and receive optical signals on the Paniolo System.

1.17. "Force Majeure Event" is defined in Article 12.

1.18. "Indemnified Parties" is defined in Section 7.1.

1.19. "Indemnifying Party" is defined in Section 7.1.

1.20. "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, but not limited to, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21. "IRU Assets" means the assets subject to the Assets IRU granted to Paniolo by SIC pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.22. "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.23. "Leased Fiber" means the Paniolo Network Fiber Pairs leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.24. "MRA" means the main body of this Agreement.

1.25. "O&M Services" means the operations and maintenance services provided by one Party to another pursuant to this Agreement, and includes "Assets O&M Services" (O&M Services provided by SIC with respect to the IRU Assets) and "Leased Fiber and Transport Services O&M

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-6  Filed 05/27/22  Page 4 of 50

Services (O&M Services provided by Paniolo with respect to the Leased Fiber), all such O&M Services to be provided on commercially reasonable terms and conditions.

1.26.  "Paniolo" means Paniolo Cable Company, LLC, and its permitted successors and assigns.

1.27.  "Paniolo Bankruptcy Proceeding" is defined in Recital C.

1.28.  "Paniolo Equipment" means any equipment owned or leased, or to which Paniolo has an indefeasible right of use (other than the IRU Assets), that Paniolo uses to operate the Paniolo Network.

1.29.  "Paniolo Network" is defined in Recital D.

1.30.  "Paniolo System" is defined in Recital A.

1.31.  "Party" refers to each of SIC and Paniolo, and their respective permitted successors and assigns.

1.32.  "Released Claims" is defined in Section 3.2.

1.33.  "SIC" means Sandwich Isles Communications, Inc. and its permitted successors and assigns.

1.34.  "Settlement Agreement" is defined in Recital C.

1.35.  "SIC Equipment" means any equipment installed by or on behalf of SIC and/or its Affiliates in the Collocation Space or Conduits for the purpose of using the Leased Fiber as permitted under this Agreement, including any electronic or optronic equipment.  For the avoidance of doubt, "SIC Equipment" does not include any IRU Assets.

1.36.  "SIC Lease" is defined in Section 3.1.

1.37.  "Specifications" means the technical and performance specifications applicable to the Leased Fiber, as more particularly identified in Section 2.2 of Schedule 1 and Exhibit A thereof.

1.38.  "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.39.  "Term" is defined in Section 2.1.

1.40.  "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided by Paniolo leveraging the Paniolo Network Fujitsu equipment existing in the Paniolo Network central offices (*i.e.,* those offices where the Paniolo Network Fiber Pairs interconnect).

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-6  Filed 05/27/22  Page 5 of 50

## ARTICLE 2
## TERM

2.1.    Term.  This MRA is effective as of the Effective Date and shall remain in force until all Schedules hereto have terminated ("Term").

2.2.    Termination of Schedules.  Any Schedule may be terminated by the written agreement of both Parties.  In addition, any Schedule other than Schedule 2 may be terminated by a Party in the event the other Party is in Default.  For the avoidance of doubt, the Parties expressly agree that Schedule 2 is irrevocable and non-terminable.  SIC's remedies for a Paniolo Default with respect to Schedule 2 shall be damages at law, or equitable remedies pursuant to Section 6.

2.3.    Effect of Termination.  Termination of this Agreement or a Schedule shall not affect the rights or obligations of either Party that have arisen before the date of termination or expiration.

## ARTICLE 3
## SCHEDULED SERVICES AND RIGHTS OF USE

3.1.    SIC Lease.  In consideration for the Assets IRU, Paniolo shall lease to SIC, and SIC shall lease from Paniolo, the Leased Fiber for the sole purpose of providing retail telecommunications services in the Hawaiian Home Lands (the "SIC Lease").  The SIC Lease is subject to the terms and conditions more particularly set forth in Schedule 1, attached hereto and incorporated herein by reference. To facilitate SIC's use of the Leased Fiber, Paniolo shall also: (a) lease to SIC, and SIC shall lease from Paniolo, the Collocation Space to use the Leased Fiber as well as space on related fiber patch panels to connect to the Leased Fiber as well as Collocation Space for other SIC Equipment occupying the Paniolo Network central office space; (b) lease to SIC, and SIC shall lease from Paniolo, Conduits used by SIC for connectivity to the Hawaiian Home Lands as of the Effective Date; (c) lease to SIC, and SIC shall lease from Paniolo, the Transport Services in connection with the Leased Fiber as of the Effective Date; and (d)  provide to SIC Fiber O&M Services and power, subject to the terms and conditions more particularly set forth in Schedule 1. Nominal Charges shall apply to (a) the Leased Fiber and related Transport Services leased to SIC as of the Effective Date, and (b) Collocation Space and Conduits occupied by SIC and its Affiliates as of the date of this Agreement (but in the case of such Collocation Space and Conduits, only for the period beginning with the Effective Date and ending at midnight December 31, 2020).  For the avoidance of doubt, such Nominal Charges shall not apply to (a) any Fiber Pairs and related Transport Services other than the Leased Fiber leased to SIC as of the Effective Date and Transport Services related to such Leased Fiber, (b) any Collocation Space or Conduits for any time after December 31, 2020; or (c) O&M Services and power; instead market rates shall be charged to SIC therefor.

3.2.    Paniolo Assets IRU.  In consideration for the nominal Charges for Leased Fiber, Collocation Space,  Conduits and Transport Services provided for in the SIC Lease, and the release of certain claims identified in the Settlement Agreement ("Released Claims"), SIC shall grant to Paniolo, and Paniolo shall purchase from SIC, an indefeasible right to use the IRU Assets ("Assets IRU") on the terms and conditions more particularly set forth in Schedule 2, attached hereto and incorporated herein by reference.  To facilitate Paniolo's use of the IRU Assets, SIC shall also:  (a) assign, transfer, convey, sublease, sublicense or grant an indefeasible right to the beneficial use of

99754430.1

5

the Entitlements to Paniolo; and (b) provide Assets O&M Services and power to Paniolo, also on the terms and conditions as may be agreed upon by the Parties pursuant to Schedule 2.

3.3.   <u>Additional Services.</u> The Parties may, from time to time, agree on additional services to be provided by one Party to the other. Any such services shall be set forth in a Schedule, which Schedule shall be attached hereto and incorporated herein by reference.

3.4.   <u>No Additional Rights; No Liens.</u>   Nothing in this Agreement shall grant to either Party any rights in and to the real and personal property of the other Party, except as expressly provided herein. Each Party shall indemnify and hold the other Party harmless from, and shall keep the other Party's personal and real property free and clear of and from, all mechanics' and materialmen's liens and claims of liens, and all other liabilities, liens, claims and demands of any kind (other than any pre-existing, perfected liens and security interests of the United States Rural Utilities Services, if any). If any such lien is filed on account of a Party at any time against the other Party's real or personal property, such Party shall cause such lien to be discharged of record within ten (10) days after the filing thereof. For purposes of this Section 3.4, Paniolo's real and personal property includes the IRU Assets.

### ARTICLE 4
### CHARGES AND INVOICING

4.1.   <u>Charges.</u>   All Charges shall be identified in the relevant Schedules. The Parties acknowledge and agree that the Charges for Leased Fiber and Transport Services as of the Effective Date are nominal, as such Charges reflect the offset of the value of the IRU Assets and value of the Released Claims.

4.2.   <u>Invoicing and Payment.</u>   Charges shall be invoiced and paid pursuant to the terms set forth in the relevant Schedule. Invoices shall be delivered to the Parties at the following physical and electronic addresses:

| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention: Michael Katzenstein, Chapter 11 Trustee<br>Three Times Square, 9th Floor<br>New York, NY 10036 |
|---|---|
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention: Breanne Kahalewai |

4.3.   <u>No Other Offset.</u>   Except as expressly provided in Section 4.1 or in a Schedule, neither Party shall have any rights of offset or deduction.

4.4.    Disputes. Either Party may dispute an invoice by providing notice to the other Party within sixty (60) days of receipt of the disputed invoice, which notice provides sufficient explanation of the nature of the dispute. The Parties will cooperate in good faith to resolve any such disputes within a sixty (60) day period after the disputing Party provides notice. Neither Party shall be entitled to withhold any disputed amount pending resolution of a dispute. Upon resolution of a dispute, the non-prevailing Party shall promptly credit any amount determined to be owed, if any, to the other Party's account. In the event the Parties are unable to resolve a billing dispute, the billing dispute will be deemed a "Dispute" as defined in and subject to Article 13.

4.5.    Late Payments; Interest. In the event a Party fails to make any payment owed hereunder when due, such Party shall pay interest on the unpaid amount at the rate of one and one-half percent (1.5%) per month or the highest rate permitted by law, whichever is lower, until such sum is paid in full.

## ARTICLE 5
## TAXES

5.1.    From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement. The Parties shall cooperate to minimize adverse tax consequences.

(a)    An invoicing Party may charge, and the invoiced Party will pay (1) applicable national, state or local sales or use Taxes or value added Taxes that the invoicing Party is legally obligated to charge and (2) applicable regulatory Taxes that the invoicing Party is legally permitted to charge, including the Universal Service Fund surcharge. The invoiced Party may provide the invoicing Party with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case the invoicing Party will not charge or collect the Taxes covered by that certificate. All invoiced Taxes must be identified as a separate line upon an invoice.

(b)    From and after the Effective Date, Paniolo shall be solely responsible for any real or personal property Taxes, if any, relating in any way to the IRU Assets.

## ARTICLE 6
## LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES

6.1.    LIMITED WARRANTY. EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.2.    Limitation on Liability. Subject to Section 6.3, no Party shall be liable under this Agreement, whether in contract, tort (including, but not limited to, negligence and strict liability)

99754430.1

7

or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

6.3.     <u>Limitation on Liability Not Applicable.</u>  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)     For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, agents or employees;

(b)     For fraud and/or fraudulent misrepresentation;

(c)     For misuse of Confidential Information;

(d)     Under Article 7 (Indemnification);

(e)     For payment of sum property due and owing to the other in the course of normal performance; or

(f)     For matters which cannot be excluded under applicable Law.

6.4.     Subject to Section 6.2 and Section 6.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

6.5.     The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement, may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

## ARTICLE 7
## INDEMNIFICATION

7.1.     Each Party (as "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "<u>Indemnified Parties</u>") from and against all third-party liability, loss, cost, damage, expense, or claim, demand, allegation, cause of action (or threat thereof) of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death) to the Paniolo Indemnitees), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "<u>Claims</u>"), arising from Indemnifying Party's negligence or willful misconduct in connection with performance by Indemnifying Party of its obligations (or breach thereof) or the exercise by Indemnifying Party of its rights under this Agreement.

7.2.     In connection with the indemnification provided pursuant to this <u>Article 7</u>, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations;  and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; <u>provided</u> that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written

consent. In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 8
## INSURANCE

8.1. During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella) policies:

    (a) Workers' Compensation, as provided for under any Worker's Compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

    (b) Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

    (c) "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

    (d) Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

    (e) "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

    (f) Umbrella form excess liability insurance with limits of not less than $5,000,000.

8.2. Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured for their acts or omissions under the Agreement.

8.3. Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

8.4. Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

8.5. Each Party's insurance will be primary for their own acts or omissions.

8.6. Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

99754430.1

8.7.    Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

## ARTICLE 9
## NOTICES

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested), or by email (under normal service conditions, with confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).

| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention:  Michael  Katzenstein,  Chapter  11 Trustee<br><br>-with a copy to-<br><br>Goodsill Anderson Quinn & Stifel<br>A Limited Liability Law Partnership<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813<br>Attention:  Johnathan C. Bolton |
|---|---|
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention:  Breanne Kahalewai<br><br>-with a copy to-<br><br>Kobayashi Sugita & Goda, LLP<br>999 Bishop Street, 26th Floor<br>Honolulu, HI 96813<br>Attention:  Lex R. Smith |

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

99754430.1

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 11 of 50

## ARTICLE 10
## CONFIDENTIALITY

10.1.    Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used.  A Party shall not disclosure the other Party's Confidential Information without the prior written consent of the disclosing Party. Notwithstanding the foregoing, the receiving Party may disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)    Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)    The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity.  For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law.

10.2.    The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 11
## DEFAULT

11.1.    A Default shall be deemed to have occurred under this Agreement (including any Schedule hereto) if a Party:

(a)    fails to timely pay any amount due under this Agreement, which failure is not remedied within ten (10) days from receipt of notice thereof;

(b)    violates any applicable Law with respect to its rights and obligations under this Agreement and such violation(s) are not remedied within thirty (30) days after written notice thereof;

(c)    fails to perform any of its material obligations (other than the timely payment of amounts due, which is subject to the 10-day cure period identified above) under this Agreement, and such non-performance is not remedied within thirty (30) days after notice thereof; or

(d)    undergoes a Bankruptcy Event.

99754430.1

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-6  Filed 05/27/22  Page 12 of 50

11.2.   In the event of any Default hereunder, the non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity, including specific performance.

11.3.   A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

## ARTICLE 12
## FORCE MAJEURE

In no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay) due to causes beyond its control (a "Force Majeure Event") including:  acts of God, fire, explosion, vandalism, cable or fiber cut not due to a Party's negligence, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

## ARTICLE 13
## GOVERNING LAW; DISPUTE RESOLUTION

13.1.   The Agreement is governed by the laws of the State of Hawaii, without regard to conflict of laws principles.

13.2.   The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions at the operational level.  In the event that a resolution is not achieved, the disputing Party shall provide the other Party with written notice of the same and the Parties shall attempt to resolve such dispute between the respective vice presidents of operations (or equivalent position with the power to resolve the dispute) of the disputing Parties.  All negotiations conducted by such officers shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations.  If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

(a)   Failing resolution of a dispute in accordance with Section 13.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any legal action, suit or proceeding with respect to any matter under or arising out of or in any way connected with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the courts of the State of Hawaii, and each Party hereby agrees to the personal and exclusive jurisdiction of such courts.  The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

99754430 1

## ARTICLE 14
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS

14.1.    Each Party represents and warrants that:

(a)    it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)    this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)    its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

14.2.    During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

14.3.    During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 15
## RELOCATION

Either Party may relocate any physical component or asset to which it has legal title that is the subject of this Agreement:  (a) due to a court order or the requirements of governmental authorities (including but not limited to condemnation) or third parties with the right to require any such change;  (b) due to adverse changes in environmental conditions;  (c) in the event of destruction or damage thereto;  (d) to allow the installation of additional cables, facilities or equipment;  or (e) due to operational requirements.  Any such changes shall be at the relocating Party's sole cost and expense (subject to the last sentence hereof), except in the event that the need for same has been caused by the acts or omissions of the other Party, its agents or contractors, in which case such other Party shall be solely responsible for the entire cost and expense thereof. Notwithstanding the foregoing reference to legal title:  (i) Paniolo shall have the right to relocate the IRU Assets for any reason specified in this Article 15; provided, however, that any voluntary relocation shall not adversely affect (in Paniolo's commercially reasonable judgment) SIC's ability to provide service in the Hawaiian Home Lands; and (ii) SIC shall have the right to relocate IRU Assets only if such relocation arises pursuant to subsection (a), and in such instance Paniolo shall have the right to approve any relocation site, which approval shall not be unreasonably withheld, conditioned, or delayed.  A Party shall reimburse the relocating Party for its pro rata shares of any costs and expenses relating to any changes made pursuant to subsections (a), (b), and (c) above (based on its respective percentage interest in the use of the relocated asset(s)) to the extent the relocating Party is not otherwise reimbursed by reason of insurance, condemnation award, or otherwise.

99754430.1

13

# ARTICLE 16
# GENERAL PROVISIONS

16.1. <u>Binding Agreement.</u> This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

16.2. <u>Waiver.</u> A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

16.3. <u>Assignment.</u> Paniolo may assign this Agreement, or any of its rights and corresponding obligations hereunder, for any reason upon prior notice to SIC. SIC may not assign this Agreement without the prior written consent of Paniolo (such consent not to be unreasonably withheld, conditioned, or delayed), except as provided in this Section 16.3. SIC may transfer or assign this Agreement to any entity providing retail telecommunication services to the Hawaiian Home Lands. SIC may sublease rights under the Lease, as long as all restrictions on use contained herein fully apply to the sublessee. Any purported assignment or sublease in contravention of this Section 16.3 shall be void.

16.4. <u>Interpretation.</u> In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

        (a)    when a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference is to an Article or Section of, or a Schedule to, the MRA, Schedule or Exhibit where referenced unless otherwise indicated;

        (b)    the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

        (c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

        (d)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

        (e)    when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the

U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-6 Filed 05/27/22 Page 15 of 50

reference date in calculating such period shall be excluded, and if the last day of such period is not a business day, the period shall end on the immediately following business day.

16.5.  <u>Joint Participation.</u> The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

16.6.  <u>Performance Standard.</u> The Parties shall perform all actions, activities, consents, approvals and other undertakings in this Agreement in a reasonable and timely manner, and each expressly acknowledges and understands that time is of the essence in the performance of obligations required to be performed by a date expressly specified herein.  Except as specifically set forth herein, for the purpose of this Agreement the standards and practices of performance within the telecommunications industry in the relevant market shall be the measure of a Party's performance.

16.7.  <u>Entire Agreement.</u> This Agreement (inclusive of all Schedules and Exhibits) constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

16.8.  <u>Amendment.</u> This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, SIC and Paniolo or (b) by a waiver in accordance with <u>Section 16.2.</u>

16.9.  <u>Relationship.</u> The relationship between Paniolo and SIC shall not be that of partners, agents, or joint venturers, and nothing contained in this Agreement shall be deemed to constitute a partnership or agency agreement between them for any purposes, including federal income tax purposes.  Paniolo and SIC, in performing any of their obligations hereunder, shall be independent contractors or independent parties and shall discharge their contractual obligations at their own risk subject, however, to the terms and conditions hereof.

16.10.  <u>Invalidity.</u> If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent

16.11.  <u>Priority.</u> In the event of an inconsistency between the terms of the MRA and any Schedule, the terms of the Schedule will prevail with respect to the specific subject matter thereof. In all other respects, this MRA shall prevail.

99754430.1

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-6  Filed 05/27/22  Page 16 of 50

16.12. <u>Further Actions.</u> The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement.

16.13. <u>Counterparts and Electronic Signatures.</u> This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _____President_____

Date: _____4/15/2020_____


PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____Chapter 11 Trustee_____

Date: _____4/17/20_____

## SCHEDULES AND EXHIBITS

**Schedule 1:**   SIC Lease

         Exhibit A:    Leased Fiber Specifications and Service Levels

         Exhibit B:    Collocation Space

         Exhibit C:    Conduits

         Exhibit D:    Leased Fiber O&M Services

**Schedule 2:**   Assets IRU

         Exhibit A:    IRU Assets

         Exhibit B:    Entitlements

         Exhibit C:    Assets O&M Services

**Schedule 3:**   [Reserved]

**Schedule 4:**   [Reserved]

## SCHEDULE 1

## SIC LEASE

This SIC Lease is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to Paniolo's lease to SIC, and SIC's lease from Paniolo, of Leased Fiber, Transport Services, Collocation Space, and Conduits pursuant to that certain Master Relationship Agreement to which this Schedule 1 (SIC Lease) is attached. Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.    Term. Except as set forth in Section 3.5 below, this SIC Lease is effective as of the Effective Date and shall remain in force until terminated as provided in Section 2.2 below (the "Lease Term").

1.2.    Termination by Paniolo. Paniolo may terminate this SIC Lease either: (a) upon an SIC Default; or (b) in its sole discretion in the event Paniolo decides to decommission the Paniolo System.

1.3.    Termination by SIC. SIC may terminate this SIC Lease for any reason.

1.4.    Automatic Termination. This SIC Lease will terminate immediately and without further action or notice by Paniolo in the event SIC purports to assign, transfer, or sublease any of its interest in the Leased Fiber (including the sale of any wholesale capacity), except as permitted pursuant to Section 2.5.

1.5.    Mutual Termination. The Parties may terminate this SIC Lease upon mutual written agreement.

1.6.    Effect of Termination. In the event of termination, the following provisions shall apply:

(a)    SIC shall within sixty (60) days disconnect and remove all SIC Equipment installed in the Collocation Space and Conduits, leaving the Collocation Space and Conduits in the same condition (wear and tear excepted) as existed on the Effective Date. In the event it fails to do so, Paniolo shall have the right to remove and store all such SIC Equipment, at SIC's sole cost and expense, or sell such SIC Equipment and retain the proceeds.

(b)    If termination is pursuant to Section 1.2(b), Paniolo may, but is not obligated to, transfer ownership of the Paniolo System, including all associated liabilities, to SIC upon commercially reasonable terms, in which case subsection (a) shall not apply.

(c)     For the avoidance of doubt, the Parties acknowledge and agree that any termination of this SIC Lease shall have no effect on the Assets IRU, nor on any Charges due thereunder, if any, except as expressly provided in Schedule 2.

## ARTICLE 2
## SIC LEASE; LEASED FIBER; COLLOCATION; CONDUITS

2.1.    <u>SIC Lease; Leased Fiber.</u>  Paniolo hereby leases to SIC, and SIC leases from Paniolo Fiber Pairs on the Paniolo Network (the <u>"Leased Fiber"</u>) as specified in Exhibit A denoted by a quantity of Fiber Pairs (which shall initially be two (2) Fiber Pairs) throughout the Paniolo Network effective as of the Effective Date.  The number of Fiber Pairs that comprise the Leased Fiber may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Fiber Pairs.  The Parties acknowledge and agree that the Nominal Charges and other commercial terms applicable to the Leased Fiber leased to SIC as of the Effective Date shall not automatically apply to additional Fiber Pairs unless otherwise stated.  The number of Fiber Pairs that comprise the Leased Fiber shall not be less than two (2) and shall in all cases be limited to the number of Fiber Pairs necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.

2.2.    <u>Fiber Specifications.</u>  The Parties acknowledge and agree that the Leased Fiber has been tested and meets the technical and performance specifications set forth at Exhibit A hereto ("Specifications").

2.3.    <u>SIC Lease; Transport Services.</u>  Paniolo hereby leases to SIC, and SIC leases from Paniolo Transport Services on the Paniolo Network as provided as of the Effective Date, which Transport Services are identified on Exhibit A by circuit type and transmission speed (DS1, DS3, OC3, OC12, or OC48) and demarcation points (*i.e.,* the Paniolo offices between which the Transport Services are provided).  The quantity of circuits that comprise Transport Services may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Transport Services.  The Parties acknowledge and agree that the Nominal Charges applicable to Transport Services shall not automatically apply to additional Transport Services.  In all cases, the quantity of circuits that comprise the Transport Services shall not exceed the number necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.  Paniolo shall be responsible for the cost, if any, of reconfiguring current SIC traffic onto the Leased Fiber; provided further that Paniolo shall have the sole discretion to determine how and when such reconfiguration shall be implemented.

2.4.    <u>Applicability of Nominal Charges.</u>  For the avoidance of doubt, Paniolo and SIC agree that Nominal Charges shall apply only to the following:  (a) for the entire term of this Lease: (i) SIC's use of the Leased Fiber leased as of the Effective Date; (b) Transport Services in connection with SIC's use of the Leased Fiber leased as of the Effective Date; and (b) for the period beginning on the Effective Date and ending December 31, 2020, SIC's use of Collocation

99754430.1

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 20 of 50

Space and Conduits used by SIC and Affiliates as of the Effective Date. All other charges shall be at market rates.

2.5. <u>Restricted Use.</u> SIC may only use the Leased Fiber, Transport Services, Collocation Space, and Conduits to provide retail telecommunications services in the Hawaiian Home Lands in compliance with all applicable Laws. SIC may sublease, assign, transfer, or convey any interest in and to the Leased Fiber upon prior notice to Paniolo. The Parties acknowledge and agree that the use restriction set forth in this Section 2.4 shall apply to any such assignment or sublease.

2.6. <u>Collocation Space.</u> Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Collocation Space (including allocated power) depicted and described on Exhibit B. SIC shall have access to the Collocation Space 24 hours a day, 7 days a week, subject to Section 2.8. The Collocation Space is delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Collocation Space shall be an acknowledgement that such Collocation Space is in good condition.

(a) <u>Types of Collocation Space.</u> Collocation Space shall consist of cageless space in the central office that will be shared with Paniolo and other third-party collocators. Collocation Space will be made available in Relay Rack increments. "Relay Rack" is defined as the space necessary to place the framing material to mount telecommunications equipment into a lineup of telecommunications equipment. Relay Rack increments will be provided in two types: (a) Cabinetized Relay Racks such as SIC is presently utilizing for its Alcatel/Lucent 5ESS equipment that includes sufficient width and depth in the lineup to contain the telecommunications equipment in a secure cabinet; and (b) Non-Cabinetized Relay Racks that are typically 19-inch wide spaces where the telecommunications equipment is placed but without additional space needed for providing a secure cabinet around the telecommunications equipment. Charges for these two types of Relay Racks will be separately identified.

(b) <u>DC Power.</u> Paniolo will provide DC Power (48 Volt) to the Relay Racks that is protected by both battery backup and generator backup in the event of a longer term commercial AC outage. The rental rates for Cabinetized Relay Racks and Non-Cabinetized Relay Racks will be inclusive of the average cost for DC Power usage.

2.7. <u>Conduits.</u> Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Conduits identified on Exhibit C during the Lease Term. SIC shall have access to the Conduits 24 hours a day, 7 days a week, subject to Section 2.8. The Conduits shall be delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Conduits shall be an acknowledgement that such Conduits are in good condition.

2.8. <u>Security.</u> SIC's access to and use of Collocation Space and Conduits shall at all times be subject to Paniolo's security policies and procedures, as updated from time to time in Paniolo's sole discretion.

2.9. <u>Additional SIC Equipment.</u> The Parties acknowledge and agree that SIC may replace existing SIC Equipment or install additional SIC Equipment in SIC's Collocation Space subject to Paniolo's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

99754430.1

- 3 -

# ARTICLE 3
# LEASED FIBER AND TRANSPORT SERVICES O&M SERVICES; ADDITIONAL SERVICES

3.1.  <u>Paniolo System Maintenance.</u>  Paniolo shall maintain the Paniolo System in a manner which will permit SIC's use of the Leased Fiber, Transport Services, Collocation, and Conduit as permitted under this Schedule 1.  Paniolo shall maintain all components of the Paniolo System in accordance with manufacturers' specifications, and shall maintain the Leased Fiber, Transport Services, Collocation, and Conduit in accordance with the Specifications.

3.2.  <u>Leased Fiber and Transport Services O&M Services.</u>  Paniolo shall provide the Leased Fiber and Transport Services O&M Services identified on Exhibit D, which O&M Services will initially cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. Except as set forth herein, SIC will be solely responsible for providing and paying for any and all maintenance for all SIC Equipment used in connection with the operation of the Leased Fiber and Transport Services, none of which is included in the Leased Fiber and Transport Services O&M services to be provided hereunder.

3.3.  <u>Subcontracting.</u> Paniolo may subcontract any of the Leased Fiber and Transport Services O&M Services provided that Paniolo shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D.  The use of any such subcontractor shall not relieve Paniolo of any of its obligations hereunder.

3.4.  <u>Additional Services.</u>  SIC may order additional services from Paniolo from time to time, including additional operations and maintenance services and interconnection services.  Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties.

3.5  <u>Effective Date of Leased Fiber and Transport Services O&M Services.</u>  Paniolo's obligations to provide Leased Fiber and Transport Services O&M Services pursuant to Section 3.3 will be effective as of the date a sale of under Section 363 of the Bankruptcy Code of all or substantially all of Paniolo's assets that comprise Paniolo Network is consummated and approved by the Bankruptcy Court. The Parties acknowledge and agree that all maintenance and repair obligations with respect to Leased Fiber and Transport Services shall continue to be performed by SIC until such date.

# ARTICLE 4
# ACCEPTABLE USE; MANDATORY MONITORING

4.1.  <u>Acceptable Use.</u>  SIC's access to and use of the Leased Fiber, Transport Services, Collocation Space, Conduits and SIC Equipment associated therewith shall fully comply with Paniolo's security policies and procedures and further shall not:  (a) interrupt, interfere with, or impair service over the Paniolo Network;  (b) interrupt, interfere with, or impair Paniolo's customers' use of the Paniolo Network; (c) except as required by applicable Law, impair the privacy of any communications transmitted over the Leased Fiber;  or (d) cause damage or create

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 22 of 50

hazards to the Paniolo Network, Paniolo personnel, Paniolo's customers, their interconnecting companies, or the general public.

4.2. <u>Suspension.</u>  In the event that Paniolo has a reasonable belief that SIC is in breach of Section 4.1, in addition to any other remedy it may have, Paniolo may suspend SIC's right to access and use the Leased Fiber.  Any such suspension shall be lifted as soon as Paniolo, acting reasonably, determines that the event giving rise to the suspension has been cured.

4.3. <u>Mandatory Monitoring.</u>  Paniolo represents and warrants that it will not capture, modify, or intercept the contents of any data destined or sourced from the Leased Fiber, with the exception of control traffic used for operational engineering, unless Paniolo deems it reasonably necessary to protect the security or operation of the Paniolo Network or as required by Law ("Mandatory Monitoring"). In such case, Paniolo must immediately notify SIC of any Mandatory Monitoring (if lawful to do so), and must cease such Mandatory Monitoring as soon as possible and lawful to do so.

## ARTICLE 5
## CHARGES AND INVOICING

5.1. <u>Charges.</u>  The Charges for the Leased Fiber, Transport Services, Collocation, Conduit, and Transport Services O&M Services shall be set out in Exhibit E.  Paniolo reserves the right to modify the Charges annually with the exception of the nominal Charges established as of the Effective Date for existing Fiber Pairs comprising Leased Fiber and Transport Services.  All such Charges shall be commercially reasonable.

5.2. <u>Invoicing; Payment.</u>  Paniolo shall invoice SIC on the Effective Date for the first quarter's Charges.  Thereafter, Paniolo shall invoice SIC monthly in advance of each successive quarter during the Lease Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

## ARTICLE 6
## FURTHER ACTIONS

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 1.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this SIC Lease as of the dates identified below.

99754430.1

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _Presicent_____

Date: _4/15/20_____


PANIOLO CABLE COMPANY, LLC

By: _____

Title: _Chapter 11 Trustee_____

Date: _4/17/20_____

# EXHIBIT A

## LEASED FIBER SPECIFICATIONS AND SERVICE LEVELS

### Demarcation Points

| Demarcation A | Demarcation Z | Strands | Notes |
|---|---|---|---|
| Anahola | Kekaha | 4 | |
| Lateral (Anahola-Kekaha) | Lihue (Verizon) | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Lateral (Anahola-Kekaha) | Hanapepe | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Kakaha | Nanakuli | 4 | |
| Waimanalo | Kalamaula | 4 | |
| Kalamaula | Hoolehua Airport DLC | 4 | |
| Lateral (Kalamaula-Hoolehua Airport DLC) | Hoolehua East DLC | 4 | Lateral from Kalamaula-Hoolehua Airport DLC Cable to Hoolehua East DLC Only |
| Kalamaula | Puunene | 4 | |
| Puunene | Waiehu | 4 | |
| Puunene | Puukapu | 4 | |
| Puukapu | Laiopua CO | 4 | |
| Hilo | DLC Locations | 4 | Need to Be Identified |

### Technical Performance Specifications

1.  Sandwich Isles, by using the fiber provided in Demarcation Points Table indicated above, warrants that the fiber meets the technical specifications necessary for Sandwich Isles to provide the services needed.

2.  Paniolo warrants that the minimum capacity for the fiber will be 10 Gigabits per second.

### Service Level Commitments

1.  For the terrestrial network, Paniolo will respond to a fiber outage within 24 hours with a crew sufficient to provide a temporary repair to the affected fiber.

99754430.1

2. For the marine network, Paniolo will respond commensurate with the capabilities of the marine contractor (Global Marine) to make resources available to provide a temporary repair to the affected fiber.

## EXHIBIT B

## COLLOCATION SPACE

| Node | Island | Cabinets | Relay Racks |
|------|--------|----------|-------------|
| Anahola Central Office | Kauai | 9 | 6 |
| Kekaha Terminal Building | Kauai | 0 | 6 |
| Nanakuli Terminal Building | Oahu | 0 | 10 |
| Waimanalo Terminal Building | Oahu | 11 | 5 |
| Kalamaula Terminal Building | Molokai | 13 | 7 |
| Puunene Terminal Building | Maui | 0 | 7 |
| Waiehu Central Office | Maui | 9 | 6 |
| Puukapu Terminal Building | Hawaii | 0 | 7 |
| Laiopua Central Office | Hawaii | 11 | 5 |
| Hilo Central Office | Hawaii | 11 | 5 |

## EXHIBIT C

## CONDUITS

Conduits require either receiving documentation as requested on an inventory of assets from the Marshal Sale or from discussion with Sandwich Isles. The Conduits that must be identified are those that are utilized to reach Hawaiian Home Lands (HHL) locations.

99754430.1

**EXHIBIT D**

**LEASED FIBER O&M SERVICES**

1. The services provided under Exhibit D are limited to Lease Fiber Services which are for specific strands on fiber cables owned and operated by Paniolo.

2. Operations and Maintenance Services for the fiber cable will be commensurate with those that Paniolo provides for its own use of the remaining strands in the fiber cable. Sandwich Isles will receive the same Operations and Maintenance Services as it provides for the remainder of the cable containing the fibers.

3. Under a failure or impairment on Sandwich Isles strands, Paniolo will provide patch or repair services to the Sandwich Isles strands in conformance with the intervals indicated in Exhibit A.

4. To the extent that the failure or impairment relates to only the Sandwich Isles fiber strand, the issue will be diagnosed at the equipment level and repair and maintenance to the fiber strand will be provided within the intervals indicated in Exhibit A.

**EXHIBIT E**

**CHARGES**

1. Existing Leased Fiber Services are provided at a nominal charge for the fibers indicated in Exhibit A. Additional fibers will be provided at the then-current market rate.

2. Existing Conduit is provided at a nominal charge for the Conduit indicated in Exhibit C. Additional Conduit will be provided at the then-current market rate.

3. The following charges for Collocation are inclusive of average power usage as well as space as indicated below:

   a. Cabinetized Relay Racks: $900.00 per Month

   b. Non-Cabinetized Relay Racks: $600.00 per Month

## SCHEDULE 2

## ASSETS IRU

This Assets IRU is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC"), and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to the grant by SIC to Paniolo, and the purchase by Paniolo from SIC, of an indefeasible right to use the IRU Assets, and the assignment, conveyance, transfer, sublease, or sublicense by SIC to Paniolo of the Entitlements pursuant to that certain Master Relationship Agreement to which this Schedule 2 (Assets IRU) is attached. Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.    Term.  This Assets IRU is effective as of the Effective Date and shall remain in force until terminated as provided in Sections 1.2 through 1.4 below (the "IRU Term").

1.2.    Termination by Paniolo.  Paniolo may terminate this Assets IRU upon an SIC Default.

1.3.    Automatic Termination.  This Assets IRU shall terminate automatically upon the decommissioning of the Paniolo System.

1.4.    Mutual Termination.  The Parties may terminate this SIC Lease upon mutual written agreement.

1.5.    Effect of Termination.  In the event of termination, Paniolo shall cease all use of the IRU Assets and shall within sixty (60) days disconnect and remove all Paniolo Equipment installed in or connected to the IRU Assets, leaving the IRU Assets in the same condition (normal wear and tear excepted) as existed on the Effective Date.  In the event it fails to do so, SIC shall have the right to remove and store all such Paniolo Equipment, at Paniolo's sole cost and expense or to sell such Paniolo Equipment and retain the proceeds.

## ARTICLE 2
## IRU ASSETS; ENTITLEMENTS

2.1.    Grant of Assets IRU; IRU Assets.  SIC hereby grants to Paniolo, and Paniolo purchases from SIC, as of the Effective Date, an exclusive, indefeasible right of use to the IRU Assets, as more particularly identified on Exhibit A hereto.

2.2.    Purchase Option.  At any time during the IRU Term, Paniolo shall have the right to purchase any or all of the IRU Assets from SIC.  Should Paniolo exercise this right, the Parties shall negotiate in good faith to agree upon a purchase price and to prepare and execute a bill of sale and to execute all other necessary documents that will be required to transfer legal title to the

purchased IRU Assets, including, but not limited to, the assignment, transfer, or conveyance of any Entitlements. In the event the Parties are not able to agree upon a purchase price, the purchase price shall be determined by an appraisal process in which each Party selects a neutral, qualified appraiser with knowledge of the type of assets subject to the transaction to conduct an appraisal, and the purchase price shall be the average of the two appraisals.

2.3.    Entitlements.  The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network).  SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements (other than the DHHL License) that may by their terms be so assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands.  To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo the broadest possible right to use the Entitlement. For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

2.4.    SIC Compliance.  During the IRU Term, SIC shall fully comply with the terms, covenants, and conditions of all Entitlements not transferred or conveyed by SIC to Paniolo pursuant to section 2.3, including the payment of any fees due thereunder, and take such additional actions as may be necessary to maintain the Entitlements in full force and effect.

2.5.    Paniolo Compliance.  Paniolo shall assume all rights and obligations under any Entitlement assigned, transferred, or conveyed by SIC to Paniolo hereunder, and shall fully comply with all terms, covenants, and conditions thereof, including the payment of any fees or charges due thereunder. Paniolo shall also comply with the terms, covenants, and conditions applicable to any Entitlement to which it has acquires a leasehold-, license-, or IRU-interest or other right.

2.6.    Security.  Paniolo shall have the right to establish and implement security policies and procedures to protect the IRU Assets and the Paniolo Network.  To the extent SIC retains any rights to or beneficial use of the Entitlements (pursuant to the SIC Lease or otherwise), SIC shall comply with all such security policies and procedures.  Paniolo shall have the right to update such policies and procedures from time to time, in its sole discretion.

### ARTICLE 3
### BANKRUPTCY EVENTS

SIC represents, warrants and covenants that for all purposes, including without limitation those of Section 541(d) of the Bankruptcy Code: (a) Paniolo shall hold an equitable interest in the IRU Assets for the IRU Term; (b) SIC retains only legal title to the IRU Assets and not any equitable interest;  and (c) Paniolo has exclusive possession, use and control over, and is for all purposes the equitable owner of, the IRU Assets during the IRU Term.  SIC agrees and

99679422.3

acknowledges that, from the Effective Date, it has no right to use the IRU Assets (except as otherwise leased to SIC pursuant to the SIC Lease). For the avoidance of doubt, any rights of Paniolo to the IRU Assets are not intended to be a revocable license or a lease, but rather to provide the broadest possible legal rights to Paniolo over such IRU Assets consistent with this Agreement. The Parties acknowledge that in the event of an SIC Bankruptcy Event, Paniolo shall be deemed to have acquired and completed, in advance of any petition or proceeding and on an indefeasible basis, a beneficial ownership in such IRU Assets. The Parties further acknowledge that: (a) obtaining such beneficial interest or IRU is intended to be non-executory in nature; (b) Paniolo shall have full and unfettered rights of access to the IRU Assets; and (c) denying Paniolo access to the IRU Assets under such circumstances would render Paniolo's rights hereunder nugatory. Such rights to access and use the IRU Assets will run for the remainder of the IRU Term.

## ARTICLE 4
## ASSETS O&M; ADDITIONAL SERVICES

4.1. <u>Assets O&M Services.</u> In the event Paniolo and SIC determine that SIC shall provide Assets O&M Services, such services shall be identified on Exhibit D and attached hereto. For the purposes of Assets O&M Services, these services may cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. SIC shall provide such Assets O&M Services (if any) for successive one (1) year terms, which may be terminated by Paniolo pursuant to Section 4.5 or by either Party by providing written notice to the other Party sixty (60) days prior to the expiration of the then-current term. For the avoidance of doubt, the term of any Assets O&M Services shall automatically terminate without further notice or action if this IRU is terminated pursuant to Section 1.

4.2. <u>Subcontracting.</u> SIC may subcontract any of the Assets O&M Services provided that SIC shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D. The use of any such subcontractor shall not relieve SIC of any of its obligations hereunder.

4.3. <u>Additional Services.</u> Paniolo may order additional services from SIC from time to time, interconnection services. Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties, and shall be set forth on an updated Exhibit D.

4.4. <u>Other Service Providers.</u> Paniolo has the right, in its sole discretion, to hire any third party to perform any operations or maintenance services with respect to the IRU Assets.

4.5. <u>SIC Breach.</u> In the event of an SIC breach relating to the performance or non-performance of Assets O&M Services, which breach is not cured within thirty (30) days of notice thereof, Paniolo may, without further notice, terminate SIC's provision of such O&M Services, without any further obligation.

99679422.3

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-6  Filed 05/27/22  Page 31 of 50

## ARTICLE 5
## CHARGES AND INVOICING

5.1.     <u>Charges for IRU Assets.</u>  There shall be no Charges for the IRU Assets, it being acknowledged and agreed that the Released Claims and nominal Leased Fiber Charges are the consideration for the IRU Assets.

5.2.     <u>Assets O&M Charges.</u>  The Charges for the Assets O&M shall be [$•] per quarter.

5.3.     <u>Charges for Entitlements.</u>  The Charges for the Entitlements shall be [$•] per quarter.  The Parties acknowledge and agree that these Charges are a pass-through of fees and charges payable by SIC pursuant to the terms of the Entitlements, without any mark-up.  In the event such fees and charges increase, the Charges due hereunder will correspondingly increase, unless such increase arises out of an act or omission by SIC.

5.4.     <u>Invoicing; Payment.</u>  SIC shall invoice Paniolo on the Effective Date for the first quarter's Charges.  Thereafter, SIC shall invoice Paniolo thirty (30) days in advance of each successive quarter during the IRU Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

## ARTICLE 6
## FURTHER ACTIONS

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 2.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Assets IRU as of the dates identified below.

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _Presldent_____

Date: _4/15/20_____

U.S. Bankruptcy Court - Hawaii  #22-90008   Dkt # 28-6   Filed 05/27/22   Page 32 of 50

PANIOLO CABLE COMPANY, LLC

By: _____

Title: _Chapter 11 Trustee_____

Date: _4/17/20_____

99679422.3

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 33 of 50

# EXHIBIT A

## IRU ASSETS

### Schedule A.2 Assets

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office. Unknown Manholes. |

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 34 of 50

| | |
|---|---|
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |

*Oahu-Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames or equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu - Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building o the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power nfrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DSl to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located 'in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to he already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. [Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes .11 cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. . |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards he Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii - Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to lbe brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards he Laiopua central office. |

*Hawaii - Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers Utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item - to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance policies and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| | |
|---|---|
| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of<br>Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

# EXHIBIT B

# ENTITLEMENTS


## EXISTING ENTITLEMENTS

<u>Federal</u>

1.      Finding of No Significant Impact, January 2006 -- Rural Utilities Branch

2.      Section 10 of the River and Harbor Act, October 11, 2006 -- Dept. of Army

3.      Cable Landing License, June 2, 2004 – Federal Communications Commission

4.      Section 106 of the National Historic Preservation Act.  Individual Memorandum of Agreements have been executed between SIC, USDA Rural Utilities Service (RUS), and SHPD in compliance with Section 106. These agreements govern the archaeological and cultural monitoring during construction of the project (see nos. 17, 20, 26, 29 and 39 below).


<u>State</u>

5.      Final Environmental Assessment/Finding of No Significant Impact, June 8, 2004 -- DLNR

6.      Hawaii Coastal Zone Management (CZM) Program Federal Consistency, June 14, 2006 -- Dept. of Business, Economic Development & Tourism (DBEDT), Office of Planning

7.      Conservation District Use Permit (all sites except Sandy Beach) ST 05-3176, July 16, 2004 -- Dept. of Land and Natural Resources (DLNR), Office of Conservation and Coastal Lands

   7.1.    Extension to Conservation District Use Permit (all sites except Sandy Beach), ST 05-3176, June 23, 2005 - DLNR, Office of Conservation and Coastal Lands.

8.      Conservation District Use Permit (Sandy Beach), OA-3360, August 2, 2006 -- DLNR, Office of Conservation and Coastal Lands

9.      DLNR Right-of-Entry Permit to Sandwich Isles Communications, Inc. to Enter Upon State-Owned Lands, June 25, 2007

10.     Dept. of Health, Notice of General Permit Coverage (NPDES) permits have been completed for each of the terrestrial routes to the landing sites and for the landing sites:

   •   Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, September 12, 2002 (File No. HI R10B320)

   •   Termination of Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, August 8, 2006 (File No. HI R10B320)

- Notice of General Permit Coverage (NGPC) Nanakuli to Kili Drive Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C084)

- Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C127)

- Letter dated June 5, 2006, re Compliance with Conditions 9.b., c., e., f., g., and h. of the Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project Phase 6 (File No. HI R10C127)

- Authorization to Discharge Under the National Pollutant Discharge Elimination System (NPDES) Kalanianaole to Waimanalo Fiber Optics Ductline Project, June 9, 2006 (Permit No. HI S000061)

- Notice of General Permit Coverage (NGPC) Kalamaula to Alii Fish Pond Fiber Optics Ductline Project, December 3, 2004 (File No. HI R10B984)

- Notice of General Permit Coverage (NGPC) Puunene to Makena Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C133)

- Notice of General Permit Coverage (NGPC) Honokowai to Waiko Road Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C132)

- Notice of General Permit Coverage (NGPC) Kawaihae to Upolu Fiber Optics Ductline Project, November 23, 2004 (File No. HI R10B890)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Lahaina and Kula, Maui, Hawaii, July 20, 2007 (File No. HI R10C888)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Waiane and Honolulu, Oahu, Hawaii, July 23, 2007 (File No. HI R10C880)

11. Finding of No Significant Impact (FONSI) for Kauai terrestrial segments, June 23, 2001, Department of Transportation (DOT)

12. Finding of No Significant Impact (FONSI) for Oahu terrestrial segments, June 23, 2001, DOT

13. Finding of No Significant Impact (FONSI) for Maui County (Maui and Molokai) terrestrial segments, August 8, 2001, DOT

14. Finding of No Significant Impact (FONSI) for Hawaii County terrestrial segments, June 23, 2001, DOT

Kauai

15. Special Management Area (SMA) exemption letter, June 30, 2004 – County of Kauai Planning Dept.

16. Hanamaulu to Kekaha Fiber Optic Duct Line (Akiohala Road (Kekaha)) Conditional Letter – Dated 9/19/02 and Executed 9/24/02 and construction plan approval.

17. Memorandum of Agreement (MOA) between USDA, RUS, Hawaii SHPO, and SIC regarding SIC's Kauai Fiber Optic Duct Lines Project - Dated October 10, 2001

Oahu

18. SMA (2004/SMA-67) and SSV (2004/SV-18), Makaha (Kili Drive) December 13, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

19. Nanakuli to Kili Drive Fiber Optic Duct Line (Kili Drive (Makaha)) Conditional Letter – Dated 6/23/05 and Executed 6/28/05 and construction plan approval

20. MOA regarding SIC's Oahu Rural Fiber Optic Duct Lines Project - Dated October 10, 2001

21. SMA (2004/SMA-58), Sandy Beach Park, December 27, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

22. Kalanianaole to Waimanalo Fiber Optic Duct Line (Sandy Beach to Waimanalo) Conditional Letter – Dated 11/28/06 and Executed 12/6/06 and construction plan approval

23. SSV (2004/SV-17), November 30, 2004 – City & County of Honolulu, Dept. of Planning and Permitting


Molokai

24. SMA exemption letter for Onealii landing site, Molokai, December 10, 2004 – County of Maui, Dept. of Planning

25. Kalamaula to Alii Fish Pond (Onealii Homestead (Kalamaula)) Conditional Letter – Dated 10/20/04 and Executed 11/1/04 and construction plan approval

26. MOA regarding SIC's Molokai Rural Fiber Optics Duct Lines Project - Dated October 10, 2001


Maui

27. SMA (SM2 2004/0075) and Shoreline Setback Approval (SSA 2004/0016), Poolenalena Park, July 22, 2004 – County of Maui, Dept. of Planning

   27.1. Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 1, 2005 – County of Maui, Dept. of Planning

   27.2. Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 8, 2006 – County of Maui, Dept. of Planning

28. Puunene to Makena Fiber Optic Duct Line (Poolenalena Park (Makena) Conditional Letter – Dated 3/5/07 and Executed 3/7/07 and construction plan approval

29. First Amended MOA between USDA, RUS, Hawaii HPO, and SIC with Concurrence by the Maui/Lanai Islands Burial Counsel – Dated April 2004

30. DLNR right of entry for archaeological site work at Poolenalena landing site:

   • Right of Entry Permit dated January 8, 2003, issued by DLNR (Ref. PSF 02OD-417)

- Right of Entry Permit dated January 23, 2004, issued by DLNR (Ref. PSF 02OD-417)

- Extension of Right of Entry Permit dated March 9, 2007, issued by DLNR (Ref. PSF 02OD-417)

31. SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, July 22, 2004 – County of Maui Dept. of Planning

   31.1. Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 1, 2005 – County of Maui Dept. of Planning

   31.2. Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 8, 2006 – County of Maui Dept. of Planning

32. Honokowai to Waiko Fiber Optic Duct Line (Wahikuli (Lahaina)) Conditional Letter – Dated 3/23/07 and Executed 3/27/07 and construction plan approval

33. Decision and Order and Findings of Fact and Conclusions of Law each dated June 6, 2007 (Docket No. 07-NR-VN-14, V-462) issed by State Department of Health (noise variance for nighttime work obtained with Henkels & McCoy as contractor along Wahikuli route; HDD only)

34. State DLNR, Division of Boating and Ocean Recreation (DOBOR) letter of no objection to laying of Undersea fiber optic within the Kaanapali Water

35. Maui County Dept. of Parks and Recreation letters of no objection to submarine fiber optic cable at Poolenalena Beach Park and Wahikuli Wayside Park dated Feb. 13, 2007

36. Maui County Dept. of Parks and Recreation letter of no objection to relocated alignment of submarine fiber optic cable at Poolenalena Beach Park dated Feb. 23, 2007


Hawaii

37. SMA Permit No. 152, April 13, 2004 – County of Hawaii, Planning Dept.

   37.1. Extension to SMA Permit No. 152, July 14, 2005 – County of Hawaii, Planning Dept.

   37.2. Extension of SMA Permit No. 152, June 27, 2007 – County of Hawaii, Planning Dept.

38. Kawaihae to Maluokalani (Kaewa Place (Kawaihae)) Conditional Letter – Dated 6/23/05 and Executed 7/13/05 and construction plan approval

39. MOA regarding SIC's Hawaii Rural Fiber Optic Duct Lines Project – Dated October 10, 2001

DHHL

40. Construction Plan Approval by Dept. of Hawaiian Home Lands (DHHL) pursuant to License Agreement No. 372 for (i) temporary construction site for Kekaha landing site, (ii) Molokai landing at Onealii, and (iii) construction on DHHL lands at Kaewa, Kawaihae

**PENDING ENTITLEMENTS**

<u>State</u>

1.  Extension to CDUP, ST 05-3176 for all marine landing sites, except Sandy Beach (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

2.  Extension to CDUP, ST 04-3360, for Sandy Beach landing site (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

3.  SDOT conditional letters and approval of plans for landing sites

<u>Kauai</u>

4.  Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Kekaha

5.  Easement for Kekaha Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

<u>Oahu</u>

6.  City & County Easement for use of City Parks (Sandy Beach and Makaha landing sites)

<u>Molokai</u>

7.  DHHL easement for Molokai landing at Onealii

<u>Maui</u>

8.  Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Poolenalena

9.  Easement for Poolenalena Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

10. County of Maui Parks Department approval of plans for Wahikuli

11. Archaeological inventory survey of the proposed area to be bored at Poolenalena

12. Easement from County of Maui for marine fiber running under Wahikuli Wayside Park (to be obtained after completion of construction)

<u>Hawaii</u>

13. DHHL easement for use of DHHL lands at Kaewa, Kawaihae

# EXHIBIT C

## ASSETS O&M SERVICES

1.     Periodic maintenance within keeping with the particular asset category in question will be performed.

2.     Regular testing of the backup generator and battery systems will be performed. To the extent that issues are found with these components, remediation will be performed in keeping with normal industry practice.

3.     Routine monitoring and maintenance of electronic assets will be performed as consistent with manufacturer guidelines and industry standard practice. To the extent that issues are found with the electronic assets, remediation will be performed in keeping with normal industry practice.

4.     Maintenance of the grounds will be performed in keeping with the requirements given the state of vegetation growth and in accordance with the requirements of the leaseholder for the land (if applicable).

5.     Routine maintenance of the building will be performed including roof, facia, and environmental systems in keeping with normal industry practice. To the extent that issues are found with the building or environmental systems, remediation will be performed in keeping with normal industry practice.

# EXHIBIT G

# ASSET PURCHASE AGREEMENT

by and between

## MICHAEL KATZENSTEIN, as Seller

solely in his capacity as chapter 11 trustee for

the bankruptcy estate of

## PANIOLO CABLE COMPANY, LLC, as Debtor

and HAWAIIAN TELCOM, INC., as Buyer

dated

**November 30, 2020**

# EXHIBIT G

ARTICLE I    DEFINITIONS ................................................................................... 1

    Section 1.1    Definitions ................................................................................. 1

    Section 1.2    Rules of Construction .............................................................. 7

ARTICLE II    PURCHASE AND SALE OF THE PURCHASED ASSETS ........................... 8

    Section 2.1    Purchase and Sale of the Purchased Assets; Assumption of
                    Liabilities ................................................................................ 8

    Section 2.2    Purchase Price ........................................................................ 11

    Section 2.3    Deliveries by Seller ................................................................ 11

    Section 2.4    Deliveries by Buyer ............................................................... 12

    Section 2.5    Escrow Agreement for Earnest Money ................................... 12

    Section 2.6    Payment of Purchase Price; Delivery of Closing Documents;
                    Allocation of Purchase Price ................................................. 13

    Section 2.7    Closing ................................................................................... 13

    Section 2.8    As is, Where is Nature of Sale ............................................... 13

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF SELLER ........................... 14

    Section 3.1    Authority; Execution and Delivery ........................................ 14

    Section 3.2    Non-Contravention; Approvals and Consents ........................ 14

    Section 3.3    Title to the Purchased Assets ................................................. 15

    Section 3.4    No Subsidiaries ...................................................................... 15

    Section 3.5    Seller's Brokerage Agreements .............................................. 15

    Section 3.6    Litigation ............................................................................... 15

    Section 3.7    Assignable Contracts, Assigned Claims, Assigned Permits, and
                    Assigned Rights ..................................................................... 15

    Section 3.8    Real Estate ............................................................................. 16

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF BUYER ........................... 16

    Section 4.1    Organization and Good Standing ........................................... 16

    Section 4.2    Authorization of Agreement; Execution and Delivery ........... 16

    Section 4.3    Non-Contravention; Approvals and Consents ........................ 16

    Section 4.4    Financial Ability .................................................................... 16

    Section 4.5    Buyer's Brokerage Agreements ............................................. 17

    Section 4.6    No Affiliates of Debtor .......................................................... 17

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 313-4 Filed 11/30/20 Page 2 of 58
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-7 Filed 05/27/22 Page 3 of 59

Section 4.7    Adequate Assurances Regarding Assignable Contracts and Assigned Rights .................................................................................. 17

ARTICLE V     COVENANTS ............................................................................. 17

Section 5.1    Conduct of the Business .......................................................... 17

Section 5.2    Risk of Loss; Duty to Repair ................................................. 17

Section 5.3    No Solicitation ....................................................................... 17

Section 5.4    Pre-Closing Access ................................................................ 17

Section 5.5    Notification ............................................................................ 18

Section 5.6    Additional Agreements .......................................................... 18

Section 5.7    Investigation and Agreement by Buyer ................................. 18

Section 5.8    Permits or Consents of Governmental Authorities ............... 19

Section 5.9    Injunctions ............................................................................. 20

Section 5.10    Adequate Assurances Regarding Assignable Contracts and Assigned Rights .................................................................................. 20

Section 5.11    Cure of Defaults ..................................................................... 20

Section 5.12    Bankruptcy Covenants ........................................................... 20

Section 5.13    Migration of Capacity ............................................................ 20

ARTICLE VI    CONDITIONS TO THE CLOSING .............................................. 21

Section 6.1    Conditions to Obligations of Each Party ............................... 21

Section 6.2    Conditions to Obligation of Buyer ......................................... 21

Section 6.3    Conditions to Obligation of Seller ......................................... 22

ARTICLE VII    TERMINATION ........................................................................ 23

Section 7.1    Termination ............................................................................ 23

Section 7.2    Effect of Termination ............................................................ 24

Section 7.3    Survival .................................................................................. 24

ARTICLE VIII    OFFSET AMOUNTS ................................................................. 24

Section 8.1    Costs Relating to the Purchased Assets ................................. 24

Section 8.2    Limitations ............................................................................. 24

Section 8.3    Claim Procedures .................................................................. 24

U.S. Bankruptcy Court - Hawaii #18-90318 Dkt # 313-4 Filed 11/30/20 Page 3 of 58
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-7 Filed 05/27/22 Page 4 of 59

ARTICLE IX   MISCELLANEOUS ............................................................................................ 24

Section 9.1   Post-Closing Access ........................................................................ 24

Section 9.2   Public Announcements .................................................................. 24

Section 9.3   Further Assurances .......................................................................... 25

Section 9.4   Expenses ............................................................................................ 25

Section 9.5   Notices ................................................................................................ 25

Section 9.6   Confidentiality .................................................................................. 26

Section 9.7   Entire Agreement; Amendment; Waiver ................................... 26

Section 9.8   Severability ........................................................................................ 26

Section 9.9   Successors and Assigns; Third Party Beneficiaries ................ 27

Section 9.10  Governing Law ................................................................................. 27

Section 9.11  Captions ............................................................................................. 27

Section 9.12  Counterparts ..................................................................................... 27

Section 9.13  Enforcement of Agreement .......................................................... 27

Section 9.14  Time of Essence; Specified Dates .............................................. 28

Section 9.15  No Director or Affiliate Liability ............................................... 28

Section 9.16  No Personal Liability ..................................................................... 28

Section 9.17  No Successor Liability ................................................................... 28

EXHIBITS
EXHIBIT A  -      Form of Sale Order
EXHIBIT B  -      Form of Assignment and Assumption Agreement
EXHIBIT C  -      Form of Bill of Sale
EXHIBIT D  -      Allocation of Purchase Price
EXHIBIT E  -      Form of Escrow Agreement
EXHIBIT F  -      Form of Credit Agreement
EXHIBIT G  -      Form of Security Agreement
EXHIBIT H  -      Form of Operational Support and Sales Services Agreement

SCHEDULES

1.1(a)   -   ASSIGNABLE CONTRACTS
1.1(b)   -   ASSIGNED PERMITS
1.1(c)   -   ASSIGNED RIGHTS

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4   Filed 11/30/20   Page 4 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7   Filed 05/27/22   Page 5 of 59

2.1(a)   -   DEBTOR ASSETS

SELLER DISCLOSURE SCHEDULE

3.3(a)   -   TITLE TO PURCHASED ASSETS
3.5      -   SELLER'S BROKERAGE AGREEMENTS


BUYER DISCLOSURE SCHEDULE

4.5      -   BUYER'S BROKERAGE AGREEMENTS
4.6      -   NO AFFILIATES OF DEBTOR

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2020 (the "Execution Date"), by and between Michael Katzenstein, solely in his capacity as chapter 11 trustee ("Seller") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware ("Debtor" or "Paniolo"), and Hawaiian Telcom. Inc.. a Hawaii corporation ("Buyer").

## R E C I T A L S:

**WHEREAS**, Debtor owns and operates a submerged marine fiber and terrestrial fiber telecommunications cable network that connects the five principal islands in the State of Hawaii (the "Business").

**WHEREAS**, on November 13, 2018, certain creditors of Debtor filed an involuntary petition for relief against Debtor under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"), which case is being administered under Case No. 19-013139 (RJF) (the "Bankruptcy Case").

**WHEREAS**, on January 30, 2019, the Bankruptcy Court entered an Order for Relief against Debtor in the Bankruptcy Case.

**WHEREAS**, on February 11, 2019, the Bankruptcy Court appointed Seller as chapter 11 trustee for Debtor's bankruptcy estate (the "Estate").

**WHEREAS**, the Estate is the owner of the Purchased Assets (hereinafter defined).

**WHEREAS**, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell the Purchased Assets to Buyer, in consideration of the receipt of the Purchase Price (hereinafter defined) in the manner and subject to the terms and conditions set forth herein and in accordance with the Bankruptcy Code, including sections 363 and 365 thereof.

**WHEREAS**, the transactions contemplated herein shall be consummated pursuant to the terms and conditions of this Agreement and a Sale Order (hereinafter defined) to be entered by the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in reliance upon the mutual covenants and agreements hereinafter set forth and subject to the terms and conditions herein contained, the parties hereto agree as follows:

1

**Section 1.1  Definitions.**  The following terms shall have the following meanings in this Agreement:

"A.1 Assets" shall mean the Debtor's Assets identified as part of Schedule A.1 as described in Schedule 2.1(a).

"A.2 Assets" shall have the Debtor's Assets identified as part of Scheduled A.2 as described in Schedule 2.1(a).

"Acquisition Proposal" shall have the meaning ascribed to such term in Section 5.2(b).

"Affiliate" shall, with respect to any Person, mean any other Person that controls, is controlled by or is under common control with the former, including all affiliates as that term is defined in 11 U.S.C. §101.

"Agreement" shall mean this Asset Purchase Agreement, and each Exhibit and Schedule hereto.

"Antitrust Agency" shall have the meaning ascribed to such term in Section 6.1(a).

"Antitrust Investigation" shall have the meaning ascribed to such term in Section 6.1(a).

"Assigned Claims" shall mean the Debtor's right, title and interest, if any, in claims, causes of action, warranty claims, insurance claims, or claims against third parties, or any proceeds or amounts receivable in connection therewith, whether sounding in contract, tort, equity or otherwise, to pursue recovery or equitable relief in connection with use of the Debtor Assets prior to the Closing, or for damages to the Debtor Assets.

"Assignable Contracts" shall mean the Contracts of Debtor relating to the Business that are identified on Schedule 1.1(a).

"Assigned Permits" shall mean the Debtor's interest, if any, in the Permits relating to the Business that are identified on Schedule 1.1(b), including, for the avoidance of doubt, the Entitlements.

"Assigned Rights" shall mean any of Debtor's rights granted by third parties, including without limitation any and all rights, licenses, vendor consents, rights-of-way, easements, wayleaves, colocations, leases and other approvals, that are necessary for the lawful ownership of the Purchased Assets or other lawful conduct of the Business as currently conducted, including, without limitation, those identified on Schedule 1.1(c).

"Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 2.3(b).

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.1(c).

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 7 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 8 of 59

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals hereof.

"Burdensome Condition" means any Remedy Action or Remedy Actions that, individually or in the aggregate (taken as a whole), would be reasonably likely to have a material adverse effect on Buyer and its Affiliates.

"Business" shall have the meaning ascribed to such term in the recitals hereof.

"Business Day" shall mean any day of the year other than (i) any Saturday or Sunday or (ii) any other day on which banks located in the State of Hawaii generally are closed for business other than the retail depository business.

"Buyer" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Buyer Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article IV.

"CAFP" means the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Section established by Executive Order 13913 (previously known as Team Telecom), and any of its member and advisor agencies, or a grouping thereof, acting in their CAFP capacities.

"Cash Payment" shall have the meaning ascribed to such term in Section 2.2.

"Cash Offset Amount(s)" shall mean any Repair Expenses arising out of or relating to a break in the Submarine Cable.

"CFIUS" means the Committee on Foreign Investment in the United States or any member agency thereof designated to act on behalf of CFIUS.

"CFIUS Clearance" means that any review or investigation by CFIUS under Section 721 of the transactions contemplated by this Agreement shall have been concluded and one of the following has occurred:  (a) written notice has been received by Buyer and Seller (or their respective counsel) from CFIUS stating that the review or investigation of the transactions contemplated by this Agreement pursuant to Section 721 has been concluded and that CFIUS has made a determination that the transactions contemplated by this Agreement do not present any unresolved national security concerns, (b) CFIUS shall have concluded that the transactions contemplated by this Agreement are not subject to review under Section 721; or (c) the President of the United States shall not have acted pursuant to Section 721 to suspend or prohibit the consummation of the transactions contemplated by this Agreement and the applicable period of time for the President to take such action shall have expired.

"Claim" shall mean a right to (i) a payment, whether or not such right is reduced to

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 8 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 9 of 59

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured or unsecured.

"Closing" shall have the meaning ascribed to such term in Section 2.7.

"Closing Date" shall have the meaning ascribed to such term in Section 2.7.

"Closing Documents" shall mean, collectively, the documents delivered by Seller pursuant to Section 2.3 and the documents delivered by Buyer pursuant to Section 2.4.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended. All references to the Code, U.S. Treasury Regulations or other governmental pronouncements shall be deemed to include references to any applicable successor Regulations or amending pronouncement.

"Contracts" shall mean any agreements, contracts, commitments, understandings, binding arrangements, unexpired leases of real and personal property, licenses, purchase orders and all other legally binding arrangements, whether written or oral.

"Consent" shall mean any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority that is necessary to be obtained prior to the consummation of the transactions contemplated by this Agreement in order to properly effectuate such transactions.

"Court" shall mean any court, federal, state, United States territorial or local, or arbitration tribunal.

"Cure Costs" shall have the meaning ascribed to such term in Section 2.1(d)(ii).

"Debtor" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Debtor Assets" shall mean the assets that are identified on Schedule 2.1(a), including the A.1 Assets and the A.2 Assets.

"Designated Contracts" shall mean those Assignable Contracts that are designated, pursuant to a written notice delivered by Buyer to Seller at least five (5) Business Days prior to the Closing Date, for assignment to Buyer at Closing.

"Effective Time" shall mean 12:01 a.m. (United States Central time) on the Closing Date.

"Entitlements" shall have the meaning ascribed to such term in Schedule 1.1(b).

"Escrow Agent" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Agreement" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Amount" shall have the meaning ascribed to such term in Section 2.5(a).

4

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 9 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 10 of 59

"Escrow Property" shall mean the Escrow Amount and any interest, income and earnings thereon.

"Estate" shall have the meaning ascribed to such term in the recitals hereof.

"Execution Date" shall have the meaning set forth in the preamble of this Agreement.

"FCC" shall mean the United States Federal Communications Commission.

"FCC Consent" shall mean the consent by the FCC to the assignment of the FCC Permit in connection with the consummation of the transactions contemplated hereby.

"FCC Permit" the Submarine Cable Landing License SCL-LIC-20070223-00003 issued by the FCC to Debtor.

"Final Order" shall mean an order of the Bankruptcy Court or other Court of competent jurisdiction (a) as to which no appeal, notice of appeal or motion for rehearing or new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, (b) as to which the time for instituting an appeal or motion for rehearing or new trial shall have expired and (c) as to which no stay is in effect; provided, however, that (x) no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order; and (y) the Sale Order shall fail to be a Final Order if, and only if, a timely filed appeal, motion for rehearing or motion for new trial challenges the Bankruptcy Court's conclusion that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Financing" shall have the meaning ascribed to such term in Section 2.2.

"Financing Documents" shall mean the Credit Agreement and Security Agreement, each substantially in the form attached hereto as Exhibit F and Exhibit G, respectively.

"Financing Offset Amount(s)" shall mean any Repair Expenses, Routine Maintenance Expenses or other amounts owed to Buyer under Article VIII hereof, but excluding any Cash Offset Amounts.

"Governmental Authority" shall mean any foreign, federal, state, county, municipal, United States territorial, local or other governmental department, authority, regulatory or administrative agency, body, authority, entity, commission, unit, subdivision or governmental authority, including Courts.

"HSBC" shall mean HSBC Securities (USA), Inc.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Incidental Rights" shall mean any and all rights of Debtor of any kind which are incidental to or arise out of the lawful ownership of any of the Purchased Assets, including, but not limited

5

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 10 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 11 of 59

to, the Assigned Rights and Assigned Permits.

"Knowledge" shall mean, with respect to Buyer, the actual knowledge of the directors and executive officers of such party. "Knowledge" shall mean, with respect to Seller, the actual knowledge of the Seller.

"Law" shall mean (a) all laws, statutes and ordinances of the United States, any foreign country, any domestic or foreign state or territory, or any political subdivision thereof, including all decisions of Courts having the effect of law in each such jurisdiction, and (b) all Regulations.

"Liens" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory, judicial or otherwise), security interest or other charge or encumbrance, any financing lease having substantially the same economic effect as any of the foregoing, any assignment of the right to receive income, any other type of preferential arrangement, or any right-of-way, easement, encroachment or encumbrance of any kind.

"Material Adverse Effect" shall mean any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the sale of the Purchased Assets or (b) the ability of Buyer to operate the Business, taken as a whole, from and after the Closing.

"North American Zone Maintenance Authority Agreement" shall mean that certain multi-party agreement entered into by SIC on April 1, 2012, as amended on April 1, 2013, January 1, 2016 and January 1, 2019, and subsequently assigned to the Trustee.

"Offset Amount(s)" shall mean the Cash Offset Amount and Financing Offset Amount.

"Offset Claim" shall mean any claim for Offset Costs.

"Offset Costs" shall have the meaning ascribed to such term in Section 8.1.

"Outside Date" shall have the meaning ascribed to such term in Section 7.1(a)(iii).

"Permitted Liens" shall mean the following: (a) the agreements or conditions imposed on the issuance of land use permits, zoning, business licenses, use permits or other entitlements of various types issued by any Governmental Authority and necessary or beneficial to the continued use and occupancy of the Purchased Assets in connection with the Business; (b) zoning Regulations and restrictive covenants and easements of record that do not materially affect, impair or interfere with any property affected thereby or the use of the Purchased Assets; and (c) public utility easements of record, in customary form, to serve the Purchased Assets.

"Permits" shall mean all permits, approvals, franchises, licenses or other rights granted by any Governmental Authority and necessary for the lawful ownership of the assets of Debtor, or other lawful conduct of the Business as currently conducted.

"Person" shall mean an individual, partnership, limited liability company, corporation,

6

joint stock company, trust, estate, joint venture, association or unincorporated organization, Governmental Authority or any other form of business or professional entity.

"Purchased Assets" shall mean, collectively, the Debtor Assets, the Assigned Claims and the Designated Contracts.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.2.

"Real Property" shall mean all buildings, structures, improvements and fixtures, together with all rights of way, easements, privileges, and other appurtenances pertaining or belonging thereto, in which Seller has any interest, whether pursuant to a fee simple interest, leasehold interest, license, or any other agreement.

"Regulation" shall mean any rule or regulation of any Governmental Authority having the effect of law.

"Remedy Action" shall mean (i) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of businesses, product lines, assets or operations of Buyer or any of its Affiliates, (ii) conducting Buyer and its Affiliates' businesses in a specified manner, or proposing and agreeing or permitting to conduct any of such businesses in a specified manner, including by agreeing to undertakings required by a Governmental Entity that Buyer or any of its Affiliates will take, or refrain from taking, any action, including committing the Buyer or any of its Affiliates to invest specific dollar amounts in specific geographic markets, and (iii) otherwise taking or committing to take actions that after the Effective Time would limit Buyer or any of its Affiliates' ability to retain one or more of the businesses, product lines, assets or operations of the Buyer or any of its Affiliates, in each case, to the extent necessary to obtain any such clearance, resolve any such objections or avoid or eliminate any such impediments.

"Repair Expenses" means any amount paid or payable to third-parties or to Buyer, for labor, materials, replacements, or repairs to, any component of the Purchased Assets, including, for the avoidance of doubt, any Pre-existing Infrastructure Repair (as defined under the Services Agreement).

"Routine Maintenance Expenses" means any amount paid or payable to Buyer for labor related to the performance of routine maintenance activities on the Purchased Assets, as outlined in Schedule A of the Services Agreement.

"Sale Order" shall mean an order of the Bankruptcy Court that is acceptable to Seller and Buyer that authorizes the transactions contemplated hereunder, including authority to convey the Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and that contains a finding of fact that Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, substantially in the form of Exhibit A attached hereto.

"Section 721" means Section 721 of the Defense Production Act of 1950, codified as amended at 50 U.S.C. § 4565 (including provisions of the Foreign Investment Risk Review Modernization Act of 2018), and all rules and regulations thereunder, including those codified at 31 C.F.R. Parts 800 through 802.

7

"Seller" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Seller Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article III.

"Services Agreement" shall mean that certain Operational Support and Sales Services Agreement with respect to the Purchased Assets, to be entered into by Seller and Buyer following entry of the Sale Order (as defined herein).

"Settlement Agreement" shall have the meaning ascribed to such term in Schedule 1.1(a).

"SIC" shall have the meaning ascribed to such term in Schedule 1.1(a).

"Submarine Cable" shall have the meaning set forth in the Services Agreement.

"Subsidiary" shall mean any Person of which another specified Person owns directly or indirectly at least a majority of the outstanding capital stock (or other securities) entitled to vote generally or otherwise having the power to elect a majority of the board of directors (or similar governing body) of such Person.

"Superior Proposal" shall have the meaning ascribed to such term in Section 5.2(c).

"Taxes" shall mean all income taxes and all other taxes, charges, imposts, tariffs, fees, levies or other similar assessments or liabilities, including income taxes, ad valorem taxes, excise taxes, withholding taxes or other taxes of or with respect to gross receipts, premiums, real property, personal property, windfall profits, sales, use, transfers, licensing, employment, payroll and franchises imposed by or under any Law; and such terms shall include any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any such tax or any contest or dispute thereof.

"Tax Return" shall mean all returns, declarations, reports, estimates, information returns and statements required to be filed by or with respect to Debtor in respect of Taxes, including federal, state, United States territorial, local or foreign Income Tax returns filed on a consolidated, combined or unitary basis.

"Transaction Documents" shall mean this Agreement, the Services Agreement, the Closing Documents and any other agreements or documents the execution of which are contemplated by this Agreement.

### Section 1.2 Rules of Construction.

(a)     The inclusion of any information in the Seller Disclosure Schedule shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion therein, that such information is required to be listed therein or that such information is material to Debtor, the Estate or the Business. The headings, if any, of the individual sections of the Seller Disclosure Schedule are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of this Agreement. The Seller Disclosure Schedule is arranged in sections merely

8

for convenience, and the disclosure of an item in one section of the Seller Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of the Seller Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Seller Disclosure Schedule is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement.

(b)     Each of the parties hereto acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of such independent counsel. Each party and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafts it is of no application and is hereby expressly waived.

(c)     All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of such Articles, Sections, subsections or other subdivisions, and shall be disregarded in construing the language contained therein. The words "*this Agreement*," "*herein*," "*hereby*," "*hereunder*" and "*hereof*" and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "*this Section*," "*this subsection*" and words of similar import refer only to the Sections or subsections hereof in which such words occur. The word "*including*" (in its various forms) means "*including, without limitation*." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms. Any reference to "$" or "dollars" means the currency of the United States of America.

9

## ARTICLE II
## PURCHASE AND SALE OF THE PURCHASED ASSETS

### Section 2.1 <u>Purchase and Sale of the Purchased Assets; Assumption of Liabilities</u>.

(a)     <u>Purchase and Sale of Purchased Assets</u>.     Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Estate's right, title and interest in and to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens other than Permitted Liens, in accordance with Sections 363 and 365 of the Bankruptcy Code and the Sale Order.

(b)     <u>Excluded Assets</u>.  The Purchased Assets shall not include the following properties and assets of the Estate, except to the extent expressly included in the Purchased Assets (collectively, the "Excluded Assets"):

        (i)     All cash and cash equivalents and all marketable securities;

        (ii)     All deposits, withholdings, prepayments, credits and refunds of Seller or the Estate not related to the Business;

        (iii)     All Claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment relating to the Excluded Assets, and except with respect to the Assigned Claims, all rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including all avoidance powers granted to Seller under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, except with respect to the Purchased Assets in each case;

        (iv)     That certain judgment in favor of Seller entered by the Bankruptcy Court in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.;*

        (v)     All capital stock or other equity interest of the Debtor;

        (vi)     The assets listed on <u>Schedule 2.1(b)(vi)</u>;

        (vii)     The articles of organization, seals, minute books, and stock transfer books of the Debtor; and

        (viii)     All rights that accrue to Seller under this Agreement.

(c)     <u>Assumption of Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due or payable, only the following liabilities and obligations (collectively, the "Assumed Liabilities"):

        (i)     the liabilities and obligations under the Incidental Rights accruing from and after the Closing;

10

(ii)     all other liabilities and obligations relating to or arising from the ownership of the Purchased Assets after the Closing.

(d)     Assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights.  The Sale Order shall provide for the assignment to Buyer of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights, effective upon the Closing, on the following terms and conditions:

(i)     On the Closing Date, Seller shall assign to Buyer, the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights.  Seller shall provide timely and proper written notice of the motion to approve the sale filed with the Bankruptcy Court to all counterparties to the Assignable Contracts and any applicable Incidental Rights.  The Assignable Contracts shall also be identified by the date of the Assignable Contract and the other party or parties to the Assignable Contract set forth on the Schedule 1.1(a) and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assignable Contracts. Similarly, the Assigned Rights shall also be identified by the date of the Assigned Right and the other party or parties to the Assigned Right set forth on the Schedule 1.1(c), and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assigned Rights.

(ii)     Seller shall be responsible for the payment of any and all liabilities and obligations of Seller or the Estate for all cure, compensation and reinstatement costs or expenses of or relating to the assumption and assignment of the Designated Contracts under Section 365 of the Bankruptcy Code (the "Cure Costs") as determined by the Bankruptcy Court.

(iii)     With respect to any Contract or Incidental Right not specifically identified on Schedule 1.1(a) or Schedule 1.1(c), and provided such Contract or Incidental Right has not been rejected by Seller pursuant to Section 365 of the Bankruptcy Code, upon reasonable written notice(s) from Buyer, Seller shall, at Buyer's sole cost and expense, including Buyer's payment of any and all liabilities and obligations of the Seller for all cure, compensation and reinstatement costs or expenses relating to the assumption and assignment of each such Contract and Incidental Right, take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contract(s) or Incidental Right(s) set forth in Buyer's notice(s).  Seller acknowledges and agrees that Seller shall provide Buyer with reasonable advance notice of any motion(s) to reject any Contract. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Incidental Right is assumed and assigned to Buyer pursuant to this Section 2.1(d)(iii), such Contract or Incidental Right shall be deemed an Assignable Contract or Assigned Right, as applicable, for all purposes under this Agreement. No increase in Purchase Price shall be made for the inclusion of any additional Contract or Incidental Right assigned hereunder.

(e)     Excluded Liabilities.  Notwithstanding any other provision hereof or any Schedule or Exhibit hereto and regardless of any disclosure to Buyer, other than the Assumed Liabilities and liabilities under the Financing, Buyer shall not assume or be obligated or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities whatsoever (collectively, the "Excluded Liabilities").  For clarity, the Excluded Liabilities shall specifically include any Liens in or to any Purchased Assets or proceeds therefrom.

11

**Section 2.2  Purchase Price.** The purchase price (the "Purchase Price") payable by Buyer to Seller in consideration for the sale of the Purchased Assets and Incidental Rights shall be (i) in consideration of only the A.2 Assets and any Incidental Rights related thereto, $500,000 cash; plus (ii) in consideration of all other Purchased Assets and Incidental Rights, (a) $24,500,000.00 cash, less the Cash Offset Amount, if any (collectively (i) and (ii)(a), the "Cash Payment") plus (b) $25,000,000.00 in financing on the terms set forth on Exhibit F, less (c) the Financing Offset Amount (the "Financing") plus (d) the assumption of the Assumed Liabilities. Payment of the Cash Payment shall be net of any Taxes Buyer shall be required under applicable Law to deduct or withhold from the Cash Payment. Buyer shall make such deductions and withholdings and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

**Section 2.3  Deliveries by Seller.** At the Closing, Seller shall deliver to Buyer, the following:

(a)  Duly executed bills of sale for the assets, including a separate bill of sale for the A.2 Assets, to be conveyed to Buyer substantially in the form of Exhibit C hereto (each, a "Bill of Sale");

(b)  The duly executed assignment and assumption agreement providing for the assignment and assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights in substantially the form of Exhibit B hereto ("Assignment and Assumption Agreement");

(c)  The Financing Documents;

(d)  The certificate of Seller referred to in Section 6.2 hereof; and

(e)  Such other documents as Buyer may reasonably request to effect the purchase and sale of the Purchased Assets and Incidental Rights and the assumption of the Assumed Liabilities as contemplated hereby.

**Section 2.4  Deliveries by Buyer.** At the Closing, Buyer shall deliver to Seller the following:

(a)  The Cash Payment, less the Escrow Amount and less any amounts owed to Buyer under the Services Agreement, in immediately available funds, pursuant to written wiring instructions delivered by Seller to Buyer a reasonable time prior to the Closing;

(b)  The Financing Documents;

(c)  The certificate of Buyer referred to in Section 6.3 hereof;

(d)  The duly executed Assignment and Assumption Agreement; and

(e)  Such other documents as Seller may reasonably request to effect the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as contemplated hereby.

12

## Section 2.5  Escrow Agreement for Earnest Money.

(a)     Prior to entry of the Sale Order, Buyer, Seller and PNC Bank, N.A., a national association, as escrow agent (the "Escrow Agent"), shall execute an escrow agreement in substantially the form attached hereto as Exhibit E (the "Escrow Agreement") pursuant to which Buyer will deposit five million dollars ($5,000,000) as earnest money into an escrow account to be governed by the terms of the Escrow Agreement and this Agreement. At the Closing Date, the amount in escrow ("Escrow Amount") shall be paid to Seller as part of the Purchase Price in accordance with the Escrow Agreement and this Agreement.

(b)     If, prior to the Closing, Buyer should breach this Agreement in a manner that gives rise to a termination right pursuant to Section 7.1(a)(vi) on the part of Seller, then Seller shall have the right to terminate this Agreement pursuant to Section 7.1(a)(vi) and to recover damages for a breach of contract. The Escrow Agent shall hold the Escrow Amount pending either a final judicial determination of the amount of such damages payable to Seller or a settlement between the parties regarding the amount of such damage; provided that the Seller's sole and exclusive remedy shall be (i) a claim for damages against the escrow account in an amount not to exceed $2,500,000 and, in addition, (ii) Buyer, as Service Provider under the Services Agreement shall promptly waive and release all rights to payment for accrued and unpaid Fees (as such term is defined in the Services Agreement) owing by Trustee to Service Provider thereunder. The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer. For the avoidance of doubt, notwithstanding Buyer's release of such rights to payment under the Services Agreement, Service Provider shall remain obligated to fulfill all its duties thereunder, including without limitation, indemnification of the Trustee.

(c)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(i), (a)(ii), (a)(iii), (a)(v), or (a)(vii) then the Escrow Agent shall return the Escrow Amount to Buyer as promptly as possible after the termination of this Agreement in accordance with the notice and other provisions of the Escrow Agreement.

(d)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(iv), then Seller shall be entitled to damages in the amount of $3,700,000.00.  The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer, provided that in the event Seller does not collect funds from the escrow account in an amount sufficient to pay such damages in full, Buyer shall pay Seller an amount equal to any such unpaid damages.

## Section 2.6  Payment of Purchase Price: Allocation of Purchase Price.

(a)     At the Closing, Buyer and Seller shall deliver a joint written notice to the Escrow Agent directing the Escrow Agent to pay to Seller, by wire transfer of immediately available funds to an account or accounts designated by Seller, the Escrow Amount.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 18 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 19 of 59

(b)     At the Closing, Buyer shall deliver to Seller, pursuant to Section 2.4(a), the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement), less the Escrow Amount.

(c)     At the Closing, Buyer shall execute and deliver the Financing Documents as provided therein, with the proceeds delivered to the Seller payable toward the Purchase Price.

(d)     For purposes of Section 1060 of the Code, Buyer and Seller hereby allocate the Purchase Price among the Purchased Assets and Assumed Liabilities pursuant to the allocation provisions set forth on Exhibit D hereto.

**Section 2.7  Closing.** The closing of the transactions contemplated hereby (the "Closing") shall take place remotely via the exchange of documents and signatures (or such other location or teleconference as mutually agreed upon by the parties hereto) on the second Business Day after the satisfaction of all conditions in Article VI other than those that by their nature are to be satisfied by deliveries by the parties at the Closing. The actual date on which the Closing takes place is referred to herein as the "Closing Date." The Closing shall be deemed to be effective as of the Effective Time.

**Section 2.8  AS IS, WHERE IS NATURE OF SALE.** BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER, THE ESTATE AND DEBTOR MAKE NO (AND SELLER, THE ESTATE AND DEBTOR EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITH RESPECT TO THE SALE OF THE PURCHASED ASSETS, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY UNDER SECTION 8-108 OF THE UNIFORM COMMERCIAL CODE, OR WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS, DEBTOR, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE BUSINESS, DEBTOR, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES AS BUYER HAS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS PURCHASE OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS, INVESTIGATIONS AND EVALUATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING AND TO BUYER'S RIGHTS UNDER THIS AGREEMENT AND SELLER'S OBLIGATIONS HEREUNDER, AND EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, BUYER WILL PURCHASE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE AGAINST SELLER, THE ESTATE OR DEBTOR.

14

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 19 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 20 of 59

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Buyer in a schedule attached hereto and made a part hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

**Section 3.1 Authority; Execution and Delivery.** Seller is the duly appointed chapter 11 bankruptcy trustee for the Estate. Subject to approval and entry of the Sale Order by the Bankruptcy Court, Seller has the requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Seller. Subject to the entry and effectiveness of the Sale Order, this Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Seller on behalf of the Estate, enforceable against Seller on behalf of the Estate in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws now or hereafter in effect relating to creditor's rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 3.2 Non-Contravention; Approvals and Consents.** The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Seller on behalf of the Estate will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), to the knowledge of Seller, under the provisions of any agreement entered into by the Seller.

**Section 3.3 Title to the Purchased Assets; Exclusive Ownership and Right to Use.** At the Closing, Seller will transfer to Buyer all of the Estate's right, title and interest to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens (other than Permitted Liens), in accordance with Section 363 and 365 of the Bankruptcy Code and as provided by the Sale Order. Except as otherwise provided by the Sale Order or as set forth in any Designated Agreement, at the Closing, Buyer will not be subject to any lease, sublease, indefeasible right of use, or right to use or occupy the Purchased Assets in favor of any third party.

**Section 3.4 No Subsidiaries.** Debtor has no Subsidiaries.

**Section 3.5 Seller's Brokerage Agreements.** Except as set forth on Seller Disclosure Schedule 3.5, Seller has not engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Debtor as a result of any action taken by Seller.

**Section 3.6 Assignable Contracts, Assigned Claims, Assigned Permits and Assigned Rights.** Other than in connection with the DIP Financing, neither Seller nor the Estate has assigned, transferred, pledged or otherwise conveyed its rights under any of the Assigned Claims,

15

Assignable Contracts, Assigned Permits or Assigned Rights. Any pledge or encumbrance arising under the DIP Financing will be released at Closing.

**Section 3.7 Real Property.** Except for any portion of the Purchased Assets or Incidental Rights which may constitute Real Property as used in this Agreement, Debtor has no interest in any Real Property.

**Section 3.8 Antitrust.** Seller has determined that no premerger notifications are required under the HSR Act.

**Section 3.9 Settlement Agreement Matters.** Seller has executed and delivered to Buyer true, complete and correct copies of all of the "Definitive Documentation" (as that term is defined in the Settlement Agreement).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as otherwise disclosed to Seller in a schedule attached hereto and made a part hereof (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Seller as follows:

**Section 4.1 Organization and Good Standing.** Buyer is validly existing and in good standing under the Laws of the State of Delaware.

**Section 4.2 Authorization of Agreement; Execution and Delivery.** Buyer has all requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. The execution and delivery by Buyer of the Transaction Documents and the consummation of the transactions contemplated thereby have been duly and validly authorized by all requisite action on the part of Buyer. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Buyer. This Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to creditors' rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 4.3 Non-Contravention; Approvals and Consents.** The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Buyer will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under (i) any provision of the certificate of incorporation or bylaws (or any similar organizational documents) of Buyer, (ii) the provisions of any agreement to which Buyer or any of its Affiliates is a party or (iii) applicable Law. Prior to the consummation of the transactions contemplated by this Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, notice to, or permit from, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of any of the Transaction

16

Documents by Buyer or the consummation by Buyer of the transactions contemplated thereby, except for (1) the FCC Consent, and (2) the entry by the Bankruptcy Court of the Sale Order.

**Section 4.4 <u>Financial Ability</u>.** Buyer has sufficient funds available to pay the Cash Payment, assume and perform the Assumed Liabilities, consummate the transactions contemplated hereby and by the other Transaction Documents, and pay all fees and expenses related thereto. Other than with respect to the Financing, Buyer acknowledges that its obligations under this Agreement and the other Transaction Documents are not subject to any conditions regarding its ability to obtain financing for the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 4.5 <u>Buyer's Brokerage Agreements</u>.** Except as set forth on <u>Buyer Disclosure Schedule 4.5</u>, none of Buyer or any of its Affiliates have engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Buyer or any of its Affiliates. Buyer or its Affiliates are exclusively responsible for the full payment and satisfaction of all fees or commissions associated with any such engagement by Buyer or its Affiliates set forth on <u>Buyer Disclosure Schedule 4.5.</u>

**Section 4.6 <u>No Affiliates of Debtor</u>.** Except as set forth on <u>Buyer Disclosure Schedule 4.6</u>, no current or former equity holder, director or officer (or similar executive level Person) of Debtor is affiliated with Buyer in any capacity, including but not limited to, an Affiliation in a capacity such as a holder of any equity interest in Buyer (and any of Buyer's non-public Affiliates), or an officer, director, employee, consultant, agent, member, partner or other representative of Buyer or any of its Affiliates. In addition, except as set forth on <u>Buyer Disclosure Schedule 4.6</u>, no current or former Affiliate of Debtor possesses the authority to, in any way, exercise effective control, including voting control, over Buyer or any of its non-public Affiliates.

**Section 4.7 <u>Adequate Assurances Regarding Assignable Contracts</u>.** Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assignable Contracts.

**Section 4.8 <u>CFIUS</u>.** Buyer has determined that the filing of a voluntary notice or declaration with CFIUS for CFIUS Clearance is neither required nor necessary under Section 721.

**Section 4.9 <u>Antitrust</u>.** Buyer has determined that no premerger notifications are required under the HSR Act.

### ARTICLE V
### COVENANTS

**Section 5.1 <u>Conduct of the Business</u>.** During the period from the date hereof until the Closing Date, Seller covenants that (except as may be expressly permitted or required by this Agreement, consented to in writing by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, or as required by the applicable provisions of the Bankruptcy Code or any orders of the Bankruptcy Court), Seller shall cause Debtor, to (i) maintain the Business in the ordinary course consistent with prudent business practices of an owner and operator of telecommunications infrastructure assets, including but not limited to, performing manufacturer

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 313-4 Filed 11/30/20 Page 22 of 58
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-7 Filed 05/27/22 Page 23 of 59

recommended maintenance activities as needed, and maintaining the North American Zone Maintenance Authority Agreement in good standing, and compliance with <u>Section 5.2</u>, (ii) not sell or dispose of any of the Purchased Assets and not create any Lien with respect to the Purchased Assets, (iii) continue all activities required pursuant to the terms of the Assigned Permits, including the payment of any fees due thereunder, (iv) not modify or amend any Assignable Contract or waive any right under any Assignable Contract, (v) pay, on a current basis, all liabilities under the Assignable Contracts, (vi) not terminate or amend any Assigned Permits, (vii) not terminate or amend any Assigned Rights, (viii) not cause to increase or accelerate any of the Assumed Liabilities, (ix) continue in force all policies of insurance on the Purchased Assets, including, for the avoidance of doubt, insurance required under the Services Agreement, and (x) not commit or agree, whether in writing or otherwise, to take any action prohibited by this <u>Section 5.1</u>. Notwithstanding the foregoing, Seller shall not be in breach of this Section 5.1 if its purported breach hereof is due to a breach by Buyer of a related obligation of Buyer under the Services Agreement.

**Section 5.2** <u>Risk of Loss; Duty to Repair</u>. Seller shall bear all risk of loss with respect to the Business and the Purchased Assets prior to Closing. Seller shall be responsible for Repair Expenses and Routine Maintenance Expenses, and Buyer shall be entitled to recover any such expenses either as Cash Offset Amounts or Financing Offset Amounts in accordance with this Agreement.

**Section 5.3** <u>No Solicitation of Other Bids.</u>

(a) Seller and HSBC shall not, and shall not authorize or permit any of their respective representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal except in accordance with <u>Section 5.3(c)</u>. HSBC agrees that (i) it shall not assign or transfer its interest as a creditor to the Estate, or any rights in connection therewith, prior to either the Closing or termination of this Agreement, and (ii) it shall not exercise any right to credit bid in connection with the Bankruptcy Case.

(b) Except as may be required by <u>Section 5.3(c)</u>, Seller shall immediately cease and cause to be terminated all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "<u>Acquisition Proposal</u>" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning the purchase of the Purchased Assets or any other matter that is within the scope of this Agreement.

(c) In addition to the other obligations under this <u>Section 5.3</u>, Seller shall promptly (and in any event within two (2) Business Days after receipt thereof by Seller) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same. Notwithstanding anything to the contrary in this Agreement, in the event that, prior to the Bankruptcy Court's approval of the

18

U.S. Bankruptcy Court - Hawaii #18-01318 Dkt # 313-4 Filed 11/30/20 Page 23 of 58
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-7 Filed 05/27/22 Page 24 of 59

Sale Order, Seller or HSBC receives an unsolicited bona fide written Acquisition Proposal that: (a) either (i) was not obtained or made as a direct or indirect result of a breach of (or in violation of) this Agreement or (ii) was received from a party which had previously submitted a bid to the Trustee or HSBC; and (b) is on terms and conditions that the Seller or HSBC determines in good faith and taking into account its fiduciary obligations, and following consultation with its outside legal counsel and outside financial advisors, if any, are more favorable, from a financial point of view, to the Estate, than the terms of this Agreement, and (c) provides for payment to Buyer of a fee of Three Million Seven Hundred Thousand Dollars ($3,700,000) (such proposal a "Superior Proposal"), and the Seller is required to consider such Superior Proposal in order to comply with its fiduciary obligations, Seller shall (i) within 48 hours of receipt, provide Buyer with a copy of any Superior Proposal, and (ii) shall provide Buyer with an opportunity to amend this Agreement to provide for at least equivalent financial terms to those included in the Superior Proposal. Seller and Buyer agree to negotiate in good faith in respect of any such amendment, and in the event that Buyer and Seller agree to amend this Agreement as provided above within five (5) Business Days of Buyer's receipt of the Superior Proposal, Seller shall not accept the Superior Proposal.

(d)     Notwithstanding anything to the contrary in this Section 5.3, nothing herein shall require Seller or the Estate to take any action or to refrain from taking any action in connection with this Section 5.3, to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.

(e)     Seller agrees that the rights and remedies for noncompliance with this Section 5.3 shall include having such provision specifically enforced by the Bankruptcy Court, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.4     Pre-Closing Access.**

(a)     From the date of this Agreement until the Closing Date, Seller shall use commercially reasonable efforts, to the extent permitted under applicable Law, to give to Buyer and its representatives reasonable access, during normal business hours and upon reasonable notice, to the Estate's properties, books and records relating to the Business and to the Estate's properties, books and records relating to the Purchased Assets (including the Assignable Contracts, the Assigned Rights and the Assigned Permits) and the Assumed Liabilities.

(b)     Seller shall permit Buyer to review all Assignable Contracts to facilitate Buyer's assumption of such contracts at Closing.

(c)     Without limiting the obligations under Section 5.4(e) hereof, Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable notice, to enter and inspect all physical plants, central offices, or any other facility or infrastructure used in connection with the Business.

(d)     Nothing contained in this Section 5.4 shall obligate Seller or the Estate to (i) breach any duty of confidentiality owed to any Person whether such duty arises contractually, statutorily or otherwise or (ii) waive any attorney/client, work product or similar privilege.

19

(e)     Seller agrees to cooperate, and when applicable, coordinate with SIC, to provide Buyer with access sufficient for Buyer to perform each of its obligations under the Services Agreement from and after the entry of the Sale Order.

## Section 5.5 Notification.

(a)     Prior to the Closing, Seller shall notify Buyer, and Buyer shall notify Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its Knowledge, threatened against Seller, the Estate, Debtor or Buyer, as the case may be, that challenges the transactions contemplated hereby.

(b)     Seller shall give prompt written notice to Buyer of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Seller to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

(c)     Buyer shall give prompt written notice to Seller of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Buyer contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Buyer to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

**Section 5.6 Additional Agreements.** Subject to the terms and conditions of this Agreement, each of the parties hereto will use commercially reasonable efforts to do, or cause to be taken all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including, the fulfillment of the conditions set forth in Article VI to the extent that the fulfillment of such is within the control of such party.

**Section 5.7 Investigation and Agreement by Buyer.** Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Purchased Assets, the Assumed Liabilities, the Business and operations of Debtor, the information contained in the Confidential Information Memorandum prepared by Seller and dated February 14, 2020 and other information about the business strategies of Debtor. Buyer has also conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.

## Section 5.8 Permits or Consents of Governmental Authorities.

(a)     Within ten (10) Business Days after the date that the Sale Order is entered by the Bankruptcy Court, the parties hereto shall prepare and file, or cause to be prepared and filed, applications seeking any applicable Permits or Consents of any Governmental Authority (including the FCC) required under Section 6.1(b). Each party shall provide the other party with all information required for any applications, notifications, or other filings to be made pursuant to any applicable Law in connection with the transaction contemplated by this Agreement. In

addition, the parties hereto shall reasonably cooperate to make any notice filings required in connection with this matter on a timely basis.

      (b)     Buyer shall bear all filing fees in connection with the preparation and prosecution of any applications, notifications or other filings related to a Permit or Consent of a Governmental Authority. Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to assist and cooperate with each other to prepare and prosecute any required applications, notifications or other filings related to a Permit or Consent of a Governmental Authority (including, but not limited to, the FCC) in good faith and with due diligence before the applicable Governmental Authorities and in connection therewith shall take such actions as may be reasonably necessary or reasonably required in connection with any application (or other type of filing document) to the applicable Governmental Authorities, including responding as promptly as practicable to any requests of the FCC for information and furnishing to any applicable Governmental Authorities any documents, materials or other information requested by such Governmental Authority in order to obtain any applicable Permit or Consent of a Governmental Authority as expeditiously as practicable, provided that neither party shall have an obligation to share with the other any confidential business information including to the extent such information is requested by a Governmental Authority. In addition, to the extent practicable, the parties hereto shall use commercially reasonable efforts to (i) promptly notify each other of any communication to that party from any Governmental Authority with respect to a Permit or Consent of a Governmental Authority, (ii) permit a representative of the other party reasonably acceptable to the first party to attend and participate in meetings (telephonic or otherwise) with any Governmental Authority and (iii) permit the other party to review in advance, as reasonable, any proposed written communication to any Governmental Authority (provided that each party may designate certain information communications to the government as "Outside Counsel Only") and consider in good faith all reasonable additions, deletions or changes suggested in connection with any submissions to any Governmental Authority, provided that Buyer shall determine the timing and strategy and be solely responsible for the final content of any substantive or oral communications with any applicable Governmental Authority. No party hereto shall knowingly take, or fail to take, any action if the intent or reasonably anticipated consequence of such action or failure to act is, or would be, to cause any Governmental Authority (including, but not limited to, the FCC) not to grant a Permit or Consent or materially delay the granting of any such Permit or Consent.

      (c)     In the event that CFIUS should request the filing of a notice or declaration pursuant to Section 721 for CFIUS Clearance, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

      (d)     In the event that a Governmental Authority should initiate an Antitrust Investigation, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

      **Section 5.9  Injunctions.** Prior to the Closing, if any Governmental Authority issues or otherwise promulgates any injunction, stay, decree or similar order that prohibits the consummation of any of the transactions contemplated hereby, the parties, at Buyer's sole cost and expense, shall use commercially reasonable efforts to have such injunction dissolved or otherwise

eliminated as promptly as possible and, prior to or after the Closing, to pursue the underlying litigation diligently and in good faith.

**Section 5.10 Adequate Assurances Regarding Designated Contracts and Assigned Rights.** With respect to each Designated Contract and Assigned Right, to the extent required by the Bankruptcy Court, Seller or the counterparty to such Designated Contract or Assigned Right, Buyer shall provide the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Designated Contract or Assigned Right by Buyer. To the extent that Buyer's performance of any such Designated Contract or Assigned Right shall require the cooperation or performance of the Seller, including, without limitation, delivery of any additional instruments or filings by Seller in order to effectuate the complete assignment of any Designated Contract or Assigned Right, Seller covenants to provide such cooperation or performance; provided, however, that nothing in this Section 5.9 shall (a) require Seller or the Estate to make any expenditure or incur any obligation on its own or on Buyer's behalf (unless Buyer agrees to promptly reimburse Seller and the Estate for such expenditure or Buyer agrees to fully indemnify Seller and the Estate for such obligation) or (b) prohibit Seller or the Estate from ceasing operations or winding up its affairs following the Closing.

**Section 5.11 Cure of Defaults.** Seller shall, on or prior to the Closing, pay all Cure Costs and otherwise cure any and all defaults under the Designated Contracts that are required to be cured under the Sale Order so that such Designated Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

**Section 5.12 Bankruptcy Covenants.** From and after the date hereof, Seller and/or Buyer, in each case as indicated below, covenant and agree as follows:

(a)     Seller and Buyer each shall act promptly, diligently and in good faith, and use their respective best efforts, in pursuing entry of the Sale Order, and otherwise effectuating and consummating the transactions contemplated herein, including the sale of the Purchased Assets to Buyer, under the terms and conditions of this Agreement, in each case, as soon as practicable, but in any case within the applicable timeframes contemplated by this Agreement, including promptly, diligently and in good faith, and using their respective best efforts in (i) preparing and filing appropriate supporting papers, (ii) furnishing available supporting testimony or other evidence, (iii) contesting any applicable objections, (iv) responding to any applicable discovery requests and (v) contesting any applicable appeals or related relief.

(b)     In the event an appeal is taken or a stay pending appeal is granted from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay order and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date hereof, Seller shall not take any action that is intended to or does result in, or fail to take any action the intent of which failure to act would or does result in, the reversal, voiding, modification or staying of the Sale Order.

(d)     Seller shall: (i) file the required notice of a sale hearing with the Bankruptcy Court within one (1) day of the date of this Agreement, and (ii) request that a sale hearing occur in the Bankruptcy Court not less than twenty one (21) days of filing such notice.

**Section 5.13  Migration of Capacity; Clearance of Paniolo Network.** Upon the completion of the Network Inventory (as defined in the Service Agreement) Seller and Buyer shall, subject to and in accordance with the terms and conditions of the Services Agreement, migrate existing SIC capacity and services onto the fibers designated for SIC, and Buyer and Seller shall jointly cooperate to ensure that no third parties other than SIC, Buyer or users who have contracted for capacity pursuant to the Services Agreement are utilizing capacity or services on the Paniolo Network, which cooperation may include, without limitation, the negotiation and execution of additional Designated Contracts acceptable to Seller and Buyer.

## ARTICLE VI
## CONDITIONS TO THE CLOSING

**Section 6.1  Conditions to Obligations of Each Party.** The obligations of each party to this Agreement to effect the transactions contemplated hereby to occur on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     No temporary restraining order, preliminary or permanent injunction, stay or other order issued by any Governmental Authority preventing the consummation of the transactions contemplated hereby to occur at the Closing Date shall be in effect, and (i) neither the Federal Trade Commission, Department of Justice, nor any state Attorney General (each an "Antitrust Agency") has opened an antitrust-related investigation, proceeding, or inquiry ("Antitrust Investigation") relating to the transactions contemplated hereby, or (ii) any Antitrust Agency that has opened any Antitrust Investigation has notified the parties that such Antitrust Investigation has been closed;

(b)     FCC Consent shall have been obtained by Buyer and Seller and shall not contain any terms, conditions, liabilities, obligations, commitments or sanctions, or any structural or remedial actions, that constitute, individually or in the aggregate, a Burdensome Condition;

(c)     In the event that the parties are required to file any notice or declaration with CFIUS pursuant to Section 5.8(c) of this Agreement, the parties shall have received CFIUS Clearance; and

(d)     The Bankruptcy Court shall have approved this Agreement and the transactions contemplated hereby by entry of the Sale Order and the Sale Order shall have become a Final Order.

**Section 6.2  Conditions to Obligation of Buyer.** The obligation of Buyer to effect the transactions contemplated hereby to occur at the Closing Date and to fund on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 28 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 29 of 59

(a)     Each of the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Buyer shall have received a certificate signed by Seller to such effect;

(b)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Buyer shall have received a certificate signed by the Seller to such effect;

(c)     Seller shall have paid all Cure Costs and cured any defaults under the Designated Contracts;

(d)     Intentionally omitted;

(e)     Seller shall have delivered all entitlement documents and as-built drawings which are in Seller's possession;

(f)     The Designated Contracts and FCC Permit shall be in full force and effect with no defaults thereunder and shall not be subject to any further appeal by or before any Governmental Authority;

(g)     Seller shall have delivered to Buyer the Closing Documents referred to in Section 2.3; and

(h)     Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

**Section 6.3  Conditions to Obligation of Seller.** The obligation of Seller to effect the transactions contemplated hereby to occur at the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     Each of the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(b)     Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(c)     Buyer shall have delivered to Seller the Closing Documents referred to in Section 2.4;

(d)     Buyer shall have delivered the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement) less the Escrow Amount; and

(e)     Buyer shall have delivered its written notice to the Escrow Agent, pursuant to Section 2.6(a), directing the Escrow Agent to deliver to Seller the Escrow Amount and the Escrow Agent shall have delivered the Escrow Amount to Seller.

24

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 29 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 30 of 59

## ARTICLE VII
## TERMINATION

**Section 7.1 Termination.**

(a)    This Agreement may be terminated at any time prior to the Closing:

   (i)    by mutual consent of Buyer and Seller:

   (ii)    by either Buyer or Seller if the Bankruptcy Court has not entered the Sale Order within thirty (30) days of the Execution Date; provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the Sale Order not being entered or before such date;

   (iii)    by either Buyer or Seller if the Closing shall not have occurred within two hundred ten (210) days of the FCC issuing public notice of this Agreement and the transactions contemplated herein and hereby (the "Outside Date"); provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

   (iv)    by either Buyer or Seller if a Governmental Authority shall have issued an order, decree, or ruling or taken any other action, in each case permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become a Final Order;

   (v)    by Buyer, if it is not then in material breach of this Agreement, if Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.2 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Seller by Buyer; and

   (vi)    by Seller, if Seller is not then in material breach of this Agreement, if Buyer has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.3 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Buyer by Seller; and

   (vii)    by Buyer, in the event of a Material Adverse Effect.

(b)    Notwithstanding the provisions of paragraph (a), if any of the conditions to Buyer's obligation to close are not satisfied, Buyer has the right to waive the unsatisfied conditions and proceed with the Closing, without prejudice to any rights Buyer may have with respect to any breach of representation, warranty or covenant by Seller.

25

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 30 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 31 of 59

Section 7.2 **Effect of Termination**. Upon termination of this Agreement pursuant to Section 7.1, the undertakings of the parties set forth herein shall forthwith be of no further force and effect; provided, however, that this Section 7.2 and Sections 9.2 (Public Announcements), 9.4 (Expenses), 9.5 (Notices), 9.6 (Confidentiality), 9.7 (Entire Agreement; Amendment; Waiver), 9.8 (Severability), 9.9 (Successors and Assigns; Third Party Beneficiaries), 9.10 (Governing Law), 9.11 (Captions), 9.15 (No Director or Affiliate Liability), and 9.16 (No Personal Liability), and the obligations thereunder and the rights and remedies for any breaches of this Agreement occurring prior to such termination, in each case, shall survive any such termination. In the event of termination, all amounts owed to Buyer under the Services Agreement or this Agreement shall be paid by Seller, and Seller shall agree to Buyer's request to the Bankruptcy Court for an administrative claim under the Bankruptcy Code with respect to such amounts.

Section 7.3 **Survival**. The representations and warranties of Seller and Buyer set forth in this Agreement, the other Transaction Documents, and any certificate delivered in connection with this Agreement or any of the other Transaction Documents shall not survive the Closing. The covenants and other agreements of Seller and Buyer set forth in this Agreement and in the other Transaction Documents shall survive the Closing until fully performed.

## ARTICLE VIII
## OFFSET AMOUNTS

Section 8.1    **Costs Relating to the Purchased Assets**. Subject to the terms, conditions and limitations of this Article VIII, Buyer shall be able to include in the Offset Amounts any costs arising from or in connection with its performance of the Services Agreement or items for which Seller is responsible hereunder or under the Services Agreement (such costs, or cost estimates for such items are collectively referred to herein as the "Offset Costs").

Section 8.2    **Limitations**. Notwithstanding anything to the contrary set forth in this Agreement, Buyer's sole recourse with respect to any Offset Costs shall be to offset such costs against the Purchase Price in accordance with Section 2.2, provided that in the event this Agreement is terminated in accordance with Article VII hereof, Seller shall promptly reimburse such Offset Costs actually paid by Buyer, or the parties shall instruct the Escrow Agent to distribute such amount to Buyer from portion of the Escrow Amount that would otherwise be retained by Seller under Section 2.5.

Section 8.3    **Claim Procedures**. Buyer shall promptly provide written notice of any Offset Claim upon discovery of any matter for which it is entitled to payment hereunder, with such notice to contain the information set forth in the following sentence. The Offset Claim shall specify in reasonable detail the amount of the Offset Costs, if known, and contain a reference to this Article VIII. Failure to provide an Offset Claim shall not release the Seller from any obligations hereunder except to the extent Seller is materially prejudiced by such failure and shall not relieve Seller from obligations under this Article VIII. If the Seller does not notify the Buyer that it disputes such claim within fifteen (15) days following receipt of the Offset Claim, the claim specified therein shall be deemed an obligation of the Seller hereunder (subject to the limitations set forth in this Article VIII, as applicable). Buyer will reasonably cooperate and assist the Seller in determining the validity of any claim for payment by the Buyer and in otherwise resolving such matters. Such assistance and cooperation will include providing reasonable access, during normal business hours

and upon reasonable advance notice, to and copies of information, records and documents relating to such matters, providing access, during normal business hours and upon reasonable advance notice, to employees to assist in the investigation, defense and resolution of such matters.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1 **Post-Closing Access**. Buyer shall preserve the financial records and other books and records, if any, relating to the Purchased Assets and Assumed Liabilities for a period of three years from the Closing Date. During such three-year period (as may be extended), Buyer shall keep such financial records and other books and records reasonably accessible and not destroy or dispose of such materials without the prior written consent of Debtor, and will permit Seller, Debtor and their respective authorized representatives reasonable access thereto, including making any copies at the Estate's expense. Such records may be sought under this Section 9.1 for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the Bankruptcy Case or the audit, accounting, tax, litigation, United States federal or securities disclosure under other applicable Law or other similar needs of Seller, the Estate or Debtor. In the event that any Tax Return becomes the subject of any audit or investigation, Buyer shall provide access to such financial data and other books and records as may be necessary to enable Seller, the Estate or Debtor to defend any such audit or investigation. The access shall be pursuant to this Section 9.1 and shall include access to any computerized information systems that contain the books and records referred hereto. Seller and Debtor shall promptly reimburse, or cause the Estate to reimburse, Buyer for Buyer's reasonable out-of-pocket expenses associated with requests made by Seller or Debtor under this Section 9.1, but no other charges shall be payable by Seller, the Estate or Debtor to Buyer in connection with such requests.

Section 9.2 **Public Announcements**. Prior to the entry of the Sale Order by the Bankruptcy Court, neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, except as may be required by such party or its Affiliate under applicable Law or stock exchange rules or Regulations or as may be mutually agreed in advance in writing.

Section 9.3 **Further Assurances**. From and after the date of this Agreement, each party shall execute and deliver such instruments, documents, or other writings as the other party may reasonably request in order to confirm and carry out and to effectuate fully the intent and purposes of this Agreement. For the avoidance of doubt, if, notwithstanding any of the provisions of this Agreement or the Sale Order, Buyer is unable to use or enjoy any rights incidental to the ownership of the Purchased Assets, including the Incidental Rights, the parties shall cooperate, as may be required following the closing of the Estate and the Bankruptcy Case, to ensure that Buyer shall be able to enjoy such rights.

Section 9.4 **Expenses**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the consummation of the transactions contemplated hereby shall be borne solely and entirely by the party that has incurred such expenses. In the event of a dispute between or among the parties in connection with this Agreement and the transactions contemplated hereby, each of the parties hereto hereby agrees that

27

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 32 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 33 of 59

the prevailing party shall be entitled to reimbursement by the other party or parties of reasonable expenses, including legal expenses, incurred in connection with any related action or proceeding. For the avoidance of doubt, any cost and expense associated with any filing required to provide public notice of the release of Liens with respect to Debtor shall be borne by the Seller.

**Section 9.5 Notices.**

(a)    All notices, requests, consents, waivers and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given (i) if transmitted by facsimile, upon written confirmation of delivery, (ii) if personally delivered, upon delivery or refusal of delivery, (iii) if mailed by registered or certified United States mail, return receipt requested, postage prepaid, upon delivery or refusal of delivery, or (iv) if sent by an overnight delivery service nationally recognized in the United States, upon delivery or refusal of delivery. All notices, consents, waivers or other communications required or permitted to be given hereunder shall be addressed to the respective party to whom such notice, consent, waiver or other communication relates at the following addresses:

Notices to Seller:

Michael Katzenstein, Trustee,
Bankruptcy Estate of Paniolo Cable Company,
LLC c/o FTI Consulting, Inc.
Three Times Square, 9th Floor
New York, New York 10036
Fax: (212) 841-9350

with a copy to:

Goodsill Anderson Quinn & Stifel LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Attention: Jonathan C. Bolton
Fax: (808) 547-5880

Notices to Buyer:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street
Attention: Mark Fahner
Fax: (513) 721-7358

with copies to:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street

28

Attention: Christopher J. Wilson, General Counsel
Fax: (513) 721-7358

and

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Attention: Andrew M. Ray, Esq.
Fax: (202) 373-6001

(b)     Either party may at any time change its address for notice from time to time by giving notice to the other party in accordance with this Section 9.5.

**Section 9.6 Confidentiality.** Buyer and Seller each hereby affirms its respective obligations under the non-disclosure agreement, dated September 27, 2019, by and between Cincinnati Bell Inc. and Ducera Partners LLC and its affiliates in its capacity as an advisor to the Seller regarding the confidentiality of all information designated as such therein.

**Section 9.7 Entire Agreement; Amendment; Waiver.** This Agreement and the Exhibits and Schedules attached hereto constitute the entire understanding among the parties with respect to the subject matter hereof and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in a writing signed by Seller and Buyer. Any provision of this Agreement may be waived only in a writing signed by the party to be charged with such waiver. No course of dealing among the parties shall be effective to amend or waive any provision of this Agreement.

**Section 9.8 Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced under applicable Law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

**Section 9.9 Successors and Assigns; Third Party Beneficiaries.** Nothing expressed or referred to in this Agreement is intended to or shall be construed to give or to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its terms and provisions are for the sole and exclusive benefit of the parties to this Agreement and their permitted successors and assigns. For the avoidance of doubt, notwithstanding the foregoing, the parties hereto agree and acknowledge that Sections 9.15 and 9.16 are intended to benefit such Persons that are set forth and are the subject of such Sections and, accordingly, such Persons shall be third party beneficiaries of this Agreement. In addition, the Persons that are set forth and are the subject of Sections 9.15 and 9.16 shall be entitled to enforce such Sections and pursue any

U.S. Bankruptcy Court - Hawaii  #18-01318  Dkt # 313-4  Filed 11/30/20  Page 34 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 35 of 59

legal or equitable right, remedy, or claim under or with respect to such Sections in the event of a breach of such Sections by any party hereto.

### Section 9.10 Governing Law.

(a)        This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York (without reference to its rules as to conflicts of law). For so long as Debtor is subject to the jurisdiction of the Bankruptcy Court, all parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, including matters arising in connection with the Assignable Contracts, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Debtor is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court sitting in the State of New York with respect to any action or proceeding arising out of or relating to this Agreement.

(b)        Each of the parties hereby waives trial by jury in any claim, action, suit, arbitration, inquiry, proceeding or investigation to which such party is a party involving, directly or indirectly, any matter in any way arising out of, related to or in connection with the transactions contemplated in this Agreement.

**Section 9.11 Captions**. The captions in this Agreement are for purposes of reference only and shall not limit or otherwise affect the interpretation hereof.

**Section 9.12 Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf, facsimile transmission or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**Section 9.13 Enforcement of Agreement**. Subject to the restrictions contained herein, the parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (i) during the Bankruptcy Case, in the sole and exclusive jurisdiction of the Bankruptcy Court and (ii) upon the closing, dismissal or conversion of the Bankruptcy Case, in any state or federal court in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.14 Time of Essence; Specified Dates**. Time is of the essence for this Agreement and in the performance of the obligations and covenants to be performed or satisfied by the parties. Wherever a date specified in this Agreement falls on a day other than a Business Day, the date shall be extended to the next succeeding Business Day.

**Section 9.15 No Director or Affiliate Liability**. Except with respect to obligations of Seller provided in this Agreement or any of the Transaction Documents, neither any direct or

indirect holder of equity interests in Debtor, nor any past, present or future director, officer, employee, agent or Affiliate of Debtor or of any such holder, shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or any of the Transaction Documents, and Buyer hereby waives and releases all claims of any such liability or obligation.

**Section 9.16   No Personal Liability.** Notwithstanding anything in this Agreement or any other Transaction Document to the contrary, Buyer acknowledges and agrees that (i) Seller is acting hereunder solely in his capacity as the Bankruptcy Court appointed chapter 11 trustee of the Estate in the Bankruptcy Case and that Seller shall not have any personal liability to Buyer and Buyer shall not have any recourse against Seller, in his individual capacity; and (ii) the Buyer's sole recourse (if any) shall be against the Estate.

**Section 9.17   No Successor Liability.** Except where expressly prohibited under law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, to the fullest extent permitted by Law, Buyer shall not be deemed to (a) be the successor of the Seller, (b) have, de facto or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller, or (d) be liable for any acts or omissions of the Seller other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, Buyer shall not be liable for any claims against the Seller or any of its predecessors or Affiliates, and except as provided in the Agreement, Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Seller arising on or prior to the Closing Date, including liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Business on or prior to the Closing Date.

[SIGNATURE PAGE FOLLOWS]

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 36 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 37 of 59

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

_____

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:_____
Name: Leigh Fox
Title:  Chief Executive Officer

*[Signature page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:

Name:

Title:

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed in its corporate name by its duly authorized officer, all as of the date first above written, solely to acknowledge its obligations pursuant to Section 5.3(a) of this Agreement.

**HSBC SECURITIES (USA), INC.**

By:     /s/ Thomas Curran

Name:  Thomas Curran

Title:   Managing Director

# EXHIBIT "H"

## OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT

This Operational Support and Sales Services Agreement (this "Agreement") is entered into as of November 30, 2020, but effective only as of the Effective Date (as defined below), by and between Michael Katzenstein, Chapter 11 Trustee for the Bankruptcy Estate of Paniolo Cable Company, LLC, a Delaware limited liability company ("Trustee") and Hawaiian Telcom, Inc., a Hawaii corporation ("HT" or "Service Provider"). The Trustee and HT are each referred to as a "Party" and are collectively referred to as the "Parties".

### RECITALS:

A.      WHEREAS, the Parties have entered into that certain Asset Purchase Agreement dated November 30, 2020 ("APA") pursuant to which the Trustee will sell to HT, and HT will buy from the Trustee, the Purchased Assets as defined in the APA (referred to herein as "the Paniolo Network") that are currently owned by Paniolo Cable Company, LLC ("Debtor"), which transaction ("Proposed Transaction") requires the prior consent of the Federal Communications Commission ("FCC Consent");

B.      WHEREAS, Service Provider is a provider of telecommunications services, with experience in operating and maintaining telecommunications networks, including submarine cables;

C.      WHEREAS, prior to receiving FCC Consent, the Trustee wishes to secure from Service Provider, and Service Provider wishes to provide to the Trustee, certain operational support and sales services in connection with the Trustee's operation of the Paniolo Network;

NOW THEREFORE, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1.      "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party. For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.*, limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.2.      "Agreement" is defined in the Preamble.

1.3.      "APA" is defined in Recital A.

1.4.      "Bankruptcy Event" means any proceeding (other than the Paniolo Bankruptcy Proceeding) instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an

order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.

1.5. "Business Day" means any official working day other than a legal or bank holiday in the State of New York. Unless otherwise specifically indicated as a "Business Day" the word "days" as used in this Agreement means calendar days.

1.6. "Capacity" means a designated unit of available network bandwidth including, but not limited to, TDM, Ethernet or optical networking services that the Paniolo Network equipment is capable of providing without incremental capital investment, between Demarcation Points within the Paniolo Network.

1.7. "Capacity Contracts" means agreements for the provision of Capacity and related services pursuant to terms and conditions agreed to between the Service Provider and a Customer and approved by the Trustee. For the avoidance of doubt, the Trustee is expressly prohibited from entering into any Capacity Contracts without the prior approval of the Service Provider.

1.8. "Claims" is defined in Section 6.2.

1.9. "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party. Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party.

1.10. "Customer" means a potential customer that is introduced by Service Provider or Service Provider Affiliate to Trustee and that enters a Capacity Contract with Trustee for Capacity on the Paniolo Network.

1.11. "Debtor" is defined in Recital A.

1.12. "Default" is defined in Section 10.

1.13. "Effective Date" means the latter of: (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.14. "FCC Consent" is defined in Recital A.

1.15. "Fiber Strand" means a single strand of fiber on the Paniolo Network.

1.16. "Force Majeure Event" is defined in Article 11.

1.17. "HT" is defined in the preamble and includes its successors and permitted assigns.

2

1.18.  "Indemnified Parties" is defined in Section 6.1.

1.19.  "Indemnifying Party" is defined in Section 6.1.

1.20.  "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21.  "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.22.  "Leased SIC Fiber" means the Paniolo Network Fiber Pairs, leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1 of the Master Relationship Agreement (as defined below).

1.23.  "Master Relationship Agreement" means that certain Master Relationship Agreement, dated as of March 6, 2020, by and between Sandwich Isles Communications and Debtor.

1.24.  "Network Inventory" is defined in Section 3.5.

1.25.  "Network Inventory Cap" is defined in Schedule B.

1.26.  "Network Inventory Fees" means the fees payable to Service Provider for provision of the Network Inventory as set forth in Section D of Schedule A attached hereto, excluding Service Provider Expenses.

1.27.  "Network Migration Cap" is defined in Schedule B.

1.28.  "Network Migrations Fees" means the fees payable to Service Provider for the provision of Network Migration Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.29.  "Network Migration Services" is defined in Section 3.6.

1.30.  "Network Operations Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section A of Schedule A attached hereto, excluding Service Provider Expenses.

1.31.  "Network Operations Support Services" is defined in Section 3.1.

1.32.  "NOC" is defined in Section 3.1.

3

1.33.  "North American Zone Maintenance Authority Agreement" or "NAZ Agreement" means that certain multi-party agreement entered into by Sandwich Isles Communications on April 1, 2012, as amended on January 1, 2019, and subsequently assumed by the Trustee.

1.34.  "On-site Technical Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.35.  "On-site Technical Support Services" is defined in Section 3.2.

1.36.  "On-site Technical Support Services Cap" is defined in Schedule B.

1.37.  "Paniolo Bankruptcy Proceeding" means *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 in the United States Bankruptcy Court for the District of Hawaii.

1.38.  "Paniolo Network" is defined in Recital A.

1.39.  "Party" refers to each of the Trustee and Service Provider, and their respective permitted successors and assigns.

1.40.  "Pre-existing Infrastructure Repair" is defined in Section 3.2(b).

1.41.  "Pre-existing Infrastructure Repair Estimate" is defined in Section 3.2(b).

1.42.  "Pre-existing Infrastructure Repair Cap" is defined in Section 3.2(b).

1.43.  "Proposed Transaction" is defined in Recital A.

1.44.  "Sales Agent Services" is defined in Section 3.4.

1.45.  "Sales Agent Fees" means the fees payable to Service Provider for the provision of Sales Agent Services as set forth in Section E of Schedule A attached hereto.

1.46.  "Sandwich Isles Communications" means Sandwich Isles Communications, Inc., a Hawaii corporation, and its successors and permitted assigns.

1.47.  "Service Provider Expenses" means all of Service Provider's non-labor expenses, such as vehicle costs, tools, business insurance, and other expenses.

1.48.  "Settlement Agreement" means that certain Rule 9019 Settlement Agreement entered into by SIC and Debtor on March 3, 2020.

1.49.  "SIC" mean Sandwich Isles Communications and its Affiliates.

1.50.  "Submarine Cable" mean the fiber-optic cable extending underwater between the beach manholes for those cable segments connecting Kauai to Oahu, Oahu to Molokai, Molokai to Maui, and Maui to Hawaii.

4

1.51.  "Submarine Cable Repair Expenses" mean the expenses payable to third-parties to repair the Submarine Cable pursuant to Sections 3.3 and Schedule A.

1.52.  "Submarine Cable Storage Agreement" means that certain Agreement for the Storage of Spare Plant for the Paniolo Cable System, dated October 22, 2008, by and between Transoceanic Cable Ship Company, Inc. and its successors and assigns, and Sandwich Isles Communications.

1.53.  "Submarine Cable Support Services" is defined in Section 3.3.

1.54.  "Submarine Cable Support Fees" means the fees payable to Service Provider for the provision of Submarine Cable Support Services as set forth in Section C of Schedule A attached hereto, excluding Service Provider Expenses.

1.55.  "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.56.  "Term" is defined in Section 2.1.

1.57.  "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided to Sandwich Isles Communications in connection with the Leased SIC Fiber, pursuant to Section 3.1 of the Master Relationship Agreement.

1.58.  "Trustee" is defined in the Preamble.

## ARTICLE 2
## TERM

2.1.  Term.  This Agreement is effective as of the Effective Date and shall remain in force until terminated pursuant to Section 2.2 ("Term").

2.2.  Termination.  This Agreement may be terminated by either Party upon the Default of the other Party and will terminate automatically (a) upon the closing of the Proposed Transaction or (b) upon termination pursuant to Section 7.1 of the Asset Purchase Agreement.

2.3.  Effect of Termination.  Termination of this Agreement shall not affect the rights or obligations of either Party that have accrued before the date of termination or expiration, and all terms that by their nature should survive expiration or termination of this Agreement shall remain in effect.

## ARTICLE 3
## OPERATIONAL SUPPORT AND SALES SERVICES

3.1.  Network Operations Support Services.

(a)  Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide operational support services, including network operational center ("NOC")

5

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 45 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 46 of 59

services, network monitoring and management services, provisioning and configuration services, facility security services, and customer support services, as detailed on Schedule A ("Network Operations Support Services"). Service Provider may provide such Network Operations Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

        (b)    The Trustee shall use commercially reasonable efforts to provide Service Provider with electronic and physical access to the Paniolo Network facilities and equipment from the parties who are currently managing the Paniolo Network, including but not limited to, consultants to the Trustee and SIC, as well as all physical plants, central offices, or any other facility or infrastructure used in connection with the Paniolo Network (which shall include enforcing the provisions of the Settlement Agreement).

        3.2.    On-site Technical Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide routine on-site technical support services requiring and involving the dispatch of a qualified technician, including site access and escort services, network equipment troubleshooting services, and fiber splicing and repair services, and other routine maintenance as necessary and as detailed in Schedule A ("On-site Technical Support Services"). Service Provider may provide such On-site Technical Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

        3.3.    Submarine Cable Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide submarine cable support services as necessary and detailed in Schedule A, including the coordination and facilitation of any required submarine cable repairs using the NAZ Agreement and the inventory of spare cable held under the Submarine Cable Storage Agreement ("Submarine Cable Support Services"). For the avoidance of doubt, the Trustee shall be responsible for all Submarine Cable Repair Expenses, including any and all repairs arising out of pre-existing conditions of the Submarine Cable(s), as outlined under Article V of the APA.

        3.4.    Sales Agent Services. Subject to the terms, conditions, and restrictions of this Agreement, and as set forth in Schedule A, Service Provider is authorized to market Capacity on Trustee's behalf through such reasonable means, as appropriate, including advertising, participation in trade shows, and responses to inquiries ("Sales Agent Services"). Service Provider shall have the right to designate any agreement signed by Trustee as an Assigned Contract under Section 2.1(d)(iv) of the APA.

        3.5.    Network Inventory. Subject to the terms, conditions, and restrictions of this Agreement and the scope and responsibilities as set forth in Schedule A, the Service Provider shall document the utilization of Paniolo Network fiber and conduits and prepare an inventory of provisioned circuits in use on the Paniolo Network ("Network Inventory"). The Parties agree that an accurate Network Inventory is required to provide the Network Operations Support Services, Submarine Cable Support Services, On-site Technical Support Services, and Sales Agent Support Services. The Parties further acknowledge and agree that the Network Inventory is necessary for the timely and proper grooming and migration of SIC's consumption of network assets to align with the Settlement Agreement and Master Relationship Agreement between the Trustee and SIC.

6

Trustee shall use commercially reasonable efforts (which shall include enforcing the terms of the Settlement Agreement) in support of Service Provider's preparation of the Network Inventory.

3.6.    Network Migration Services.

(a)    Subject to the terms, conditions, and restrictions of this Agreement, and using information provided by the Trustee and the Network Inventory prepared by the Service Provider under this Agreement, the Service Provider shall perform the migration of existing Fiber Strands and network circuits consumed by SIC onto the Leased SIC Fiber and Transport Services in connection with the SIC Fiber in accordance with the provisions of the Settlement Agreement and Master Relationship Agreement. The Service Provider will develop a network plan, engineering designs, applicable work orders, circuit designs, network inventory, and implementation plan or method of procedure, to complete the migration. Work shall be performed in accordance with industry best practices in maintenance windows coordinated by the Service Provider, acting on behalf of the Trustee. In the event SIC does not have the equipment necessary to interface with the Leased SIC Fiber and related Transport Services, Service Provider and Trustee shall cooperate to determine an appropriate migration scope to achieve the necessary interface, prior to the closing of the Proposed Transaction.

(b)    Network Migration Services Fees shall be billed to the Trustee on a time and material basis using the labor rates set forth on Schedule A, and payable as set forth in Schedule B hereof.

3.7.    Assigned Claims. Pursuant to the Asset Purchase Agreement, Trustee agreed to assign to Buyer all Assigned Claims (as defined in the Asset Purchase Agreement). During the term hereof, Service Provider shall have the right, on behalf of Trustee, to pursue such Assigned Claims, and Trustee shall reasonably cooperate with Service Provider in Service Provider's pursuit of such Assigned Claims.

3.8.    Communications.    Service Provider shall ensure that all communications to Customers, including marketing and sales materials or statements, clearly identify Trustee as the provider of Capacity. No Customer communication shall state or imply that Service Provider owns or controls the Paniolo Network.

3.9.    Other Services. Service Provider will provide other services requested by Trustee from time to time as agreed upon by the Parties.

3.10.    Performance Standard. In addition to any specific performance standards set forth in Schedule A, Service Provider shall perform all Services in a professional manner consistent with industry standards and best practices.

3.11.    Service Provider Expenses. Service Provider is solely responsible for all Service Provider Expenses.

3.12.    Facilities and Personnel. Services Provider represents that it has and shall maintain adequate facilities, resources, and personnel to perform its obligations hereunder.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 47 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 48 of 59

3.13. <u>Records.</u> Service Provider shall keep reasonable books and records of all Services provided under this Agreement and shall make such books and records available to Trustee upon reasonable notice and during normal business hours.

3.14. <u>Network Access: Information Access.</u> Trustee shall use commercially reasonable efforts provide Service Provider with access to the Paniolo Network and any information relating to the Paniolo Network as reasonably requested by and necessary for Service Provider to provide Services hereunder. Service Provider shall not be liable for any impairment in service caused by its not receiving information or access as required hereunder.

3.15. <u>No Transfer of Control.</u> Nothing in this Agreement is intended to transfer *de facto* or *de jure* control (as those terms are construed by the U.S. Federal Communications Commission) of the Paniolo Network. Service Provider acknowledges and agrees that it provides all Services hereunder at the direction of the Trustee, and that the Trustee shall retain ownership and control of the Paniolo Network until consummation of the Proposed Transaction.

3.16. <u>Relationship.</u> The relationship between Trustee and Service Provider established by this Agreement is that of independent contractors, and nothing herein shall be construed as creating a relationship of employer and employee, partners, joint venturers, franchisor and franchisee, co-owners, or contractor and subcontractor.

## ARTICLE 4
## FEES; TAXES

4.1. <u>Service Fees.</u> In exchange for providing services, Trustee shall pay Service Provider the fees in US dollars, excluding applicable taxes, as detailed in Schedule A.

4.2. <u>Invoicing.</u> Service Provider shall invoice Trustee upon the Effective Date and at one (1) month intervals thereafter throughout the Term unless otherwise indicated in Schedule B herein.

4.3. <u>Payment Terms.</u> Payment shall be made for the services as detailed in Schedule B.

4.4. <u>Taxes.</u> From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement. The Parties shall cooperate to minimize adverse tax consequences.

## ARTICLE 5
## LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES

5.1. <u>LIMITED WARRANTY.</u> EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

8

5.2.    Limitation on Liability.  Subject to Section 5.3, no Party shall be liable under this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

5.3.    Limitation on Liability Not Applicable.  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)    For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, other agents or employees;

(b)    For fraud and/or fraudulent misrepresentation;

(c)    For misuse of Confidential Information;

(d)    Under Article 7 (Indemnification);

(e)    For payment of sums properly due and owing to the other in the course of normal performance; or

(f)    For matters which cannot be excluded under applicable Law.

5.4.    Subject to Section 5.2 and Section 5.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

5.5.    The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

## ARTICLE 6
## INDEMNIFICATION

6.1.    Each Party (as "Indemnifying Party") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "Indemnified Parties") as provided herein.

6.2.    Trustee shall indemnify Service Provider Indemnified Parties from and against all third-party liability, loss, cost, damage, expense, or cause of action of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "Claims"), arising from Trustee's gross negligence or willful misconduct in connection with performance by Trustee of its obligations (or breach thereof).

6.3.    Service Provider shall indemnify Trustee Indemnified Parties from and against all Claims (including, for the avoidance of doubt, Customer Claims), arising from Service Provider's performance of its obligations (or breach thereof) hereunder or from Service Provider's statements,

9

representations, assumption of obligations, or other communications or commitments made by Service Provider to a Customer without the approval of Trustee.

6.4. In connection with the indemnification provided pursuant to this Article 6, the Indemnified Party shall: (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations; and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; provided that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written consent. In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 7
## INSURANCE

7.1 During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella policies):

(a) Workers' Compensation, as provided for under any Worker's compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b) Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c) "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d) Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e) "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

(f) Umbrella form excess liability insurance with limits of not less than $5,000,000.

7.2 Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured and loss payee for their acts or omissions under the Agreement.

10

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 313-4 Filed 11/30/20 Page 50 of 58
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-7 Filed 05/27/22 Page 51 of 59

7.3     Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

7.4     Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

7.5     Each Party's insurance will be primary for their own acts or omissions.

7.6     Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

7.7     Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent). Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

## ARTICLE 8
## NOTICES

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9). Deliveries made after normal business hours or on a non-Business Day shall be deemed delivered on the next Business Day.

If to the Trustee:          Michael Katzenstein, Trustee
                            Bankruptcy Estate of Paniolo Cable Company, LLC
                            c/o FTI Consulting, Inc.
                            Three Times Square, 9th Floor
                            New York, New York 10036

With a copy to:          Goodsill Anderson Quinn & Stifel LLP
                            999 Bishop Street, Suite 1600
                            Honolulu, Hawaii 96813
                            Attn: Johnathan C. Bolton

If to Service Provider:     Cincinnati Bell Inc.
                            221 East Fourth Street
                            Cincinnati, Ohio 45202
                            Attn: Mark J. Fahner

With a copy to:          Morgan Lewis & Bockius LLP
                            1111 Pennsylvania Avenue, N.W.
                            Washington, DC 20004
                            Attn: Andrew M. Ray

11

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

## ARTICLE 9
## CONFIDENTIALITY

9.1.  Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used. A Party shall not disclose the other Party's Confidential Information without the prior written consent of the disclosing Party, except that each Party may disclosure the other Party's Confidential Information to its employees with a need to know for purposes of performance and to its professional advisors; provided that such employees and professional advisors are under an obligation of confidentiality consistent with this Section 9.1. A receiving Party may also disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)  Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)  The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity except as authorized in this Agreement. For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law. Notwithstanding the foregoing, Service Provider shall have a license to use the trade names and trademarks of the Trustee in order to perform its rights and duties hereunder.

9.2.  The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 10
## DEFAULT

10.1.  A "Default" shall be deemed to have occurred under this Agreement if a Party:

(a)  violates any applicable Law with respect to its rights and obligations under this Agreement;

(b)  fails to perform any of its material obligations under this Agreement or the APA; or

12

(c)    undergoes a Bankruptcy Event.

10.2.    In the event of any Default hereunder, the non-Defaulting Party may terminate this Agreement upon written notice to the Defaulting Party; provided, however, that the non-Defaulting party must first provide the Defaulting Party with a default notice specifying in reasonable detail the nature of such breach, and such breach shall have continued without cure for a period of thirty (30) days after the Defaulting Party's receipt of such written notice of breach. For the avoidance of doubt, a Party's failure to make any payment that has not been disputed in good faith in writing within thirty (30) days of receiving a notice of payment due or an invoice, when due hereunder, shall be deemed a material breach of this Agreement.

10.3.    The non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity.

10.4.    A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

## ARTICLE 11
## FORCE MAJEURE

Solely with respect to the matters governed by this Agreement, and without effecting any other agreements between the Parties, in no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay any amount due) due to causes beyond its control (a "Force Majeure Event") including: acts of God, fire, explosion, vandalism, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

## ARTICLE 12
## GOVERNING LAW; DISPUTE RESOLUTION

12.1.    This Agreement is governed by the laws of the State of New York, without regard to conflict of laws principles.

12.2.    The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions between authorized senior representatives with the power to resolve the dispute. All negotiations conducted by such representatives shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations. If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

12.3.    Failing resolution of a dispute in accordance with Section 12.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any disputes arising out of this Agreement shall be adjudicated in the Paniolo

Bankruptcy Proceeding, and each Party hereby agrees to the personal and exclusive jurisdiction of such court. The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

## ARTICLE 13
## REPRESENTATIONS, WARRANTIES AND FURTHER OBLIGATIONS

13.1.    Each Party represents and warrants that as of the Effective Date:

(a)    it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)    this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)    its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

13.2.    During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

13.3.    During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 14
## GENERAL PROVISIONS

14.1.    <u>Binding Agreement.</u>  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns.

14.2.    <u>Waiver.</u>  A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

14.3.    <u>Assignment.</u>  Neither Party may assign this Agreement without the prior written consent of the other Party. Any purported assignment in contravention of this Section 14.3 shall be void.

14

14.4.  Interpretation.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)  the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(b)  whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(c)  the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(d)  when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day.

14.5.  Joint Participation.  The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

14.6.  Entire Agreement.  This Agreement, together with the Asset Purchase Agreement, constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

14.7.  Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by both Parties.

14.8.  Invalidity.  If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced due to any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent.

14.9.  Third Party Beneficiaries.  Except as otherwise expressly provided, nothing in this Agreement expressly or impliedly provided any third party with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 55 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 56 of 59

14.10. <u>Further Actions.</u>  The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of this Agreement.

14.11. <u>Counterparts and Electronic Signatures.</u>  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

[*The rest of this page is left intentionally blank*]

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 56 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 57 of 59

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____

HAWAIIAN TELCOM, INC.

By: _____

Title: Leigh Fox

Date: Chief Executive Officer

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____


HAWAIIAN TELCOM, INC.

By: _____

Title: _____

Date: _____

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 58 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 59 of 59

# EXHIBIT H

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE        1307
THEODORE D. C. YOUNG    5735
TRISHA H.S.T. AKAGI        10186
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Facsimile:  (808) 521-9210
Email:  mheihre@cades.com
         tyoung@cades.com
         takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone:  +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone:  +1 (202) 373-6585
Email:  andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11 |

## EXHIBIT H

SANDWICH ISLES
COMMUNICATIONS, INC.,

            Plaintiff,

    vs.

MICHAEL KATZENSTEIN, AS
CHAPTER 11 TRUSTEE;
HAWAIIAN TELCOM INC.,

            Defendants.

Adversary No. 21-90017

DEFENDANT HAWAIIAN TELCOM,
INC.'S **MOTION FOR SUMMARY
JUDGMENT**; MEMORANDUM IN
SUPPORT OF MOTION; CERTIFICATE
OF SERVICE

HEARING:
Date:    January 14, 2022
Time:    10:00 a.m.
Judge:   Honorable Robert J. Faris

### HAWAIIAN TELCOM, INC.'S
### MOTION FOR SUMMARY JUDGMENT

Defendant Hawaiian Telcom, Inc. ("HTI"), by and through its counsel,
respectfully moves this Court for summary judgment as to all claims asserted
against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or
"Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the
"Complaint").

In its Complaint, SIC seeks to enforce the following four agreements
(collectively, the "SIC Agreements"):

(1)    Rule 9019 Settlement Agreement (Post-Judgment) (the
       "Settlement Agreement") by and between the Chapter 11
       Trustee, Michael Katzenstein (the "Trustee"), the Paniolo
       Creditors, Waimana Enterprises, Inc., SIC and the SIC
       Affiliates, approved by this Court on June 4, 2020, *see*
       Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

(2)     Master Relationship Agreement ("<u>MRA</u>") by and between SIC
        and Paniolo Cable Company, LLC ("<u>Paniolo</u>" or "<u>Debtor</u>"), *see*
        CSF ¶ 4;

(3)     SIC Lease by and between SIC and Paniolo, which was
        included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

(4)     Assets IRU by and between SIC and Paniolo, which was
        included as Schedule 2 to the MRA , *see* CSF ¶ 6.

HTI is not a party to any of the SIC Agreements, nor have any of the SIC

Agreements been assigned by the Trustee to HTI.  HTI did not otherwise assume

or agree to be bound by the terms of those agreements.  It thus "goes without

saying that [the SIC Agreements] cannot bind [HTI,] a nonparty." *E.E.O.C. v.*

*Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  Accordingly, SIC's claims to

enforce the SIC Agreements and for breach of those same agreements, as against

HTI, fail as a matter of law.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil

Procedure, as made applicable to this case by Rule 7056 of the Federal Rules of

Bankruptcy Procedure and LBR 7056-1, and is supported by the attached

memorandum in support, the separately filed concise statement of undisputed

material facts and the attached declaration, as well as the pleadings and records on

file herein.

DATED:  Honolulu, Hawaii, November 16, 2021.

CADES SCHUTTE
A Limited Liability Law Partnership

/s/ *Trisha H.S.T. Akagi*
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 18-01319 |
| PANIOLO CABLE COMPANY, LLC, | (Chapter 11) |
| Debtor. | |
| SANDWICH ISLES COMMUNICATIONS, INC., | Adversary No. 21-90017 |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF MOTION** |
| vs. | |
| MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE; HAWAIIAN TELCOM INC., | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...........................................................................................1

II.  RELEVANT FACTUAL BACKGROUND .................................................2

    A.  Paniolo's bankruptcy and the Trustee's acquisition of certain SIC assets ........................................................................................2

    B.  SIC enters into the SIC Agreements ...................................................2

    C.  HTI purchases substantially all of the Debtor's assets but chose not to designate any of the SIC Agreements. ......................................3

III.  LEGAL STANDARD ...............................................................................4

IV.  ARGUMENT..............................................................................................5

    A.  Count I (declaratory judgment) fails as a matter of law. ....................6

    B.  Count II (specific performance) fails as a matter of law.....................8

        1.  Specific performance is not an independent claim. ..................8

        2.  SIC cannot maintain a claim against HTI for breach of the SIC Agreements. ..............................................................9

        3.  SIC could not maintain a claim against HTI for breach of the SIC Agreements even if HTI was an agent of the Trustee..........................................................................................9

    C.  Count III (damages) fails as a matter of law. ....................................11

V.  CONCLUSION..........................................................................................12

U.S. Bankruptcy Court Hawaii #22-90008 Dkt # 28-8 Filed 05/27/22 Page 2 of 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Unione Mediterranea Di Sicurta,*
  364 F.3d 646 (5th Cir. 2004) ...............................................................................6

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...........................................................................................5

*In re Barboza,*
  545 F.3d 702 (9th Cir. 2008) ...............................................................................5

*Baskin v. EC Paia LLC,*
  Civil No. 20-00216 WRP, 2020 WL 9762819 (D. Haw. Aug. 31,
  2020) ....................................................................................................................8

*Broussard v. Univ. of Cal. at Berkeley,*
  192 F.3d 1252 (9th Cir. 1999) .............................................................................4

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)............................................................................................4

*Dairy Rd. Partners v. Maui Gas Ventures, LLC,*
  Civ. No. 16-00611DKW-KJM, 2018 WL 1244147 (D. Haw. Mar.
  9, 2018) ................................................................................................................9

*In re Dehon, Inc.,*
  352 B.R. 546 (Bankr. D. Mass. 2006) ..................................................................7

*Double C Entmt., Inc. v. Palace Theatre Operating Grp., LLC,*
  Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606 (W.D. Ky.
  Nov. 25, 2011) ...................................................................................................11

*E.E.O.C. v. Waffle House, Inc.,*
  534 U.S. 279 (2002)........................................................................................6, 8

*In re Family Snacks, Inc.,*
  257 B.R. 884 (B.A.P. 8th Cir. 2001) ....................................................................7

*JMB Mfg., Inc. v. Child Craft, LLC*,
    799 F.3d 780 (7th Cir. 2015) ..................................................................10

*Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*,
    115 Hawai'i 201, 166 P.3d 961 (2007)....................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986)....................................................................................5

*RSMCFH, LLC v. FareHarbor Holdings, LLC*,
    361 F. Supp. 3d 981 (D. Haw. 2019)..........................................................9

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ......................................................................4

*Stanley v. Univ. of S. Calif.*,
    178 F.3d 1069 (9th Cir. 1999) ..................................................................11

*In re Thane Int'l, Inc.*,
    586 B.R. 540 (Bankr. D. Del. 2018)............................................................7

*Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.*,
    909 F. Supp. 618 (E.D. Ark. 1995)...........................................................10

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ....................................................................5

*Walz v. Todd & Honeywell, Inc.*,
    195 A.D.2d 455 (N.Y. App. Div. 1993) ...................................................10

**Other Authorities**

Fed. R. Civ. P. 56(a)......................................................................................4

## MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

Defendant Hawaiian Telcom, Inc. ("HTI") respectfully moves this Court for summary judgment as to all claims asserted against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or "Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the "Complaint").  In its Complaint, SIC seeks to enforce, and damages for the alleged breaches of, the following four agreements (collectively, the "SIC Agreements"):

(1)    Rule 9019 Settlement Agreement (Post-Judgment) (the "Settlement Agreement") by and between the Chapter 11 Trustee, Michael Katzenstein (the "Trustee"), the Paniolo Creditors,[1] Waimana Enterprises, Inc., SIC and the SIC Affiliates,[2] approved by this Court on June 4, 2020, *see* Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

(2)    Master Relationship Agreement ("MRA") by and between SIC and Paniolo Cable Company, LLC ("Paniolo" or "Debtor"), *see* CSF ¶ 4;

(3)    SIC Lease by and between SIC and Paniolo, which was included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

(4)    Assets IRU by and between SIC and Paniolo, which was included as Schedule 2 to the MRA, *see* CSF ¶ 6.

---

[1] The "Paniolo Creditors" consist of HSBC Securities (USA) Inc., Sunrise Partnership Limited Partnership and Deutsche Bank Trust Company Americas. *See* CSF ¶ 2.

[2] The "SIC Affiliates" include Clearcom, Inc. Pa Makani LLC and HoʻOpaʻa Insurance Corp.  *See* CSF ¶ 3.

Fatal to SIC's claims against HTI is the fact that HTI is not a party to any of the SIC Agreements nor did HTI assume or otherwise agree to be bound by the terms of any of those agreements. CSF ¶¶ 1-6. Thus, as against HTI, SIC's claims to enforce and for breaches of the SIC Agreements fail as a matter of law.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Paniolo's bankruptcy and the Trustee's acquisition of certain SIC assets

On January 30, 2019, the Court entered its Order for Relief in an Involuntary Case and appointed the Trustee. CSF ¶ 7.

On or about February 4, 2020, the U.S. Marshal for the District of Hawaii levied upon certain real and personal property assets of SIC (the "A.2 Assets") pursuant to a *Writ of Execution to the United States Marshal* issued by this Court in the related adversary proceeding of *Michael Katzenstein v. Sandwich Isles Communications, Inc.* (Adv. Pro. 19-90022) (the "AP"). *See* CSF ¶ 8. On March 6, 2020, the United States Marshal conducted a sale of the A.2 Property via public auction (the "Execution Sale"). *See* CSF ¶ 9. Shortly thereafter, on March 16, 2020, the Court entered its order ratifying, approving, and confirming the sale of the A.2 Property to the Debtor, as the highest auction bidder. *See* CSF ¶ 10.

### B.    SIC enters into the SIC Agreements

On June 4, 2020, the Court entered its Order Granting Michael Katzenstein, as Chapter 11 Trustee's Motion to Approve Settlement Agreement Pursuant to

Federal Rule of Bankruptcy Procedure 9019.  CSF ¶ 11.  The order approved the Settlement Agreement by and between the Trustee, the Paniolo Creditors, Waimana Enterprises, Inc., SIC, and the SIC Affiliates.  CSF ¶ 12.

In connection with the Settlement Agreement, SIC and the Trustee entered into the MRA.  CSF ¶ 13.  Schedule 1 to the MRA is the SIC Lease by and between the Trustee as Lessor and SIC as Lessee.  CSF ¶ 4.  Schedule 2 to the MRA is the Assets IRU, also by and between the Trustee and SIC.  CSF ¶ 5.

**C.     HTI purchases substantially all of the Debtor's assets but chose not to designate any of the SIC Agreements.**

On November 30, 2020, the Trustee filed his Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee and Expense Reimbursement, and (F) Granting Related Relief (the "Sale Motion").  CSF ¶ 14.  On December 28, 2020, the Court entered its order approving the Sale Motion (the "Sale Order").  CSF ¶ 15.

The Sale Order authorized and approved the sale of substantially all of Debtor's assets pursuant to the Asset Purchase Agreement ("APA"), which was attached to the Sale Order as Exhibit A.  CSF ¶ 16.  Schedule 1.1(a) of the APA

identified "Assignable Contracts," certain contracts of the Debtor that HTI, as the purchaser, could elect to assume but had no obligation to do so. *See* CSF ¶¶ 18. Included in the list of Assignable Contracts were the SIC Agreements. *See* CSF ¶ 19.

On August 31, 2021, the sale authorized by the Sale Order (the "Sale") closed after the Federal Communications Commission approved the transaction. *See* CSF ¶ 20. At Closing, HTI did not include any of the SIC Agreements as Designated Contracts to be assumed by HTI. *See* CSF ¶ 21.

## III.  **LEGAL STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999). A "party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as

to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (quotations omitted). The "mere allegations or denials of [the party's] pleading" are not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

An issue is "'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. For an inference to be reasonable, there must be "sufficient probative evidence to permit a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy." *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

## IV. <u>ARGUMENT</u>

In its Complaint, SIC seeks to enforce the SIC Agreements against HTI, *see* Compl. ¶¶ 46, 49, as well as damages for the Trustee's alleged breaches of the SIC Agreements, *see id.* ¶¶ 53-54. Since HTI is neither a party to the SIC Agreements

nor did HTI agree to be bound by the SIC Agreements, all of SIC's claims against HTI fail as a matter of law.

### A.   Count I (declaratory judgment) fails as a matter of law.

In Count I of the Complaint, SIC seeks "a declaratory judgment finding and declaring that the Settlement Agreement, Master Relationship Agreement, Lease and Indefeasible Right to Use remain enforceable and in full force and effect against defendant Hawaiian Telcom." Compl. ¶ 46. However, "[i]t goes without saying that a contract cannot bind a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir. 2004) ("Under general principles of contract law, it is axiomatic that courts cannot bind a non-party to a contract, because that party never agreed to the terms set forth therein." (quotation marks and citation omitted)).  It is indisputable that HTI is not a party to any of the SIC Agreements. *See* CSF ¶¶ 1-6.

Nor did HTI become a party to the SIC Agreements through assignment.  To the contrary, the APA specifically provided that the SIC Agreements were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election.  *See* CSF ¶ 18.  HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI. *See* CSF ¶ 21.

To the extent that SIC argues that the SIC Agreements were implicitly assumed and assigned to HTI by virtue of the post-closing services purportedly rendered by SIC, bankruptcy law is clear that there are no implied assumptions of executory contracts. *See, e.g.*, *In re Family Snacks, Inc.*, 257 B.R. 884, 904 (B.A.P. 8th Cir. 2001) ("Implied assumption has no place in the law of executory contracts. Indeed, Section 365(d) presumes nonassumption by inaction, except in certain specified cases, such as nonresidential real property leases."); *In re Dehon, Inc.*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006) (stating that "[i]t is well-established that the doctrine of 'implied assumption' has little, if any merit" and listing cases holding that an executory contract cannot be implicitly assumed). This is true even where the non-debtor party to an executory contract continues to perform under the contract. *See In re Dehon, Inc.*, 352 B.R. at 560 ("Even where the non-debtor party to a contract continues to provide services under the contract and the debtor continues to accept the benefits of such performance, the contract will not be considered to have been assumed absent an order of the court approving the assumption."); *In re Thane Int'l, Inc.*, 586 B.R. 540, 547 (Bankr. D. Del. 2018) (rejecting the argument that the purchaser impliedly assumed or was assigned an executory contract because it allegedly "enjoyed the benefits" of the contract post-closing; assumption and assignment cannot be done informally).

Accordingly, notwithstanding SIC's allegations that it and/or the Trustee intended that the purchaser of the Transferred Assets would be bound by one or more of the SIC Agreements, *see, e.g.*, Compl. ¶¶ 13, 15, no such obligation is found anywhere in the Sale Order or APA.[3]  *See* CSF ¶ 22.

As a non-party to the SIC Agreements, HTI cannot be bound by the terms of those agreements and Count I, accordingly, fails as a matter of law.  *See, e.g.*, *Waffle House, Inc.*, 534 U.S. at 294 (finding that EEOC, a non-party to the subject contract, was not bound by the arbitration clause in that contract).

### B.   Count II (specific performance) fails as a matter of law.

#### 1.   Specific performance is not an independent claim.

Count II likewise fails as a matter of law.  In Count II, SIC seeks "specific performance, enforcing the [SIC Agreements] against the defendants."  Compl. ¶ 49.   However, "specific performance is an equitable remedy in a breach of contract action and not an independent claim."  *Baskin v. EC Paia LLC*, Civil No. 20-00216 WRP, 2020 WL 9762819, at *2 (D. Haw. Aug. 31, 2020).   For that reason alone, summary judgment should be granted in HTI's favor as to Count II.  *See id.* (dismissing with prejudice claim for specific performance).

---

[3] Having failed to raise this issue prior to entry of the Sale Order, SIC "is deemed to have consented to the Sale under the terms of the APA[.]"  Sale Order ¶ 2 (p. 27).

2.     SIC cannot maintain a claim against HTI for breach of the SIC Agreements.

Even if Count II could be construed as a claim for breach of the SIC Agreements, it would still fail as a matter of law.  Under Hawaii law, to prevail on a breach of contract claim, a party must prove "(1) the contract at issue; (2) the parties to the contract; (3) whether plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by defendants; and (5) when and how defendants allegedly breached the contract."  *RSMCFH, LLC v. FareHarbor Holdings, LLC*, 361 F. Supp. 3d 981, 991 (D. Haw. 2019) (quotation marks and citation omitted).  However, as discussed *supra*, the SIC Agreements cannot be enforced against HTI since HTI is not a party to any of the SIC Agreements, nor were any of the SIC Agreements assigned to HTI as part of the Sale.  *See supra* Section IV.A.  Therefore, SIC cannot maintain a claim against HTI for breach of the SIC Agreements.  *Cf. Dairy Rd. Partners v. Maui Gas Ventures, LLC*, Civ. No. 16-00611DKW-KJM, 2018 WL 1244147, at *17 (D. Haw. Mar. 9, 2018) (noting that "specific performance is by definition limited to the enforcement of contract duties" and dismissing claim for specific performance where there was no enforceable contract).

3.     SIC could not maintain a claim against HTI for breach of the SIC Agreements even if HTI was an agent of the Trustee.

SIC alleges that HTI is an agent of the Trustee.  *See, e.g.*, Compl. ¶ 43.

Setting aside the lack of evidence regarding the scope of HTI's purported agency, any claim against HTI, as the purported agent of the Trustee, for breach of the SIC Agreements would still fail because HTI is not a party to the SIC Agreements.

"It is well settled that when an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of the contract unless there is clear and explicit evidence of the agent's intention to be bound[.]" *Walz v. Todd & Honeywell, Inc.*, 195 A.D.2d 455, 455 (N.Y. App. Div. 1993) (citation omitted); *see also JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 786 (7th Cir. 2015) ("Under Indiana law, an agent acting within the scope of his authority is not personally liable in carrying out a contractual obligation of the principal."); *Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.*, 909 F. Supp. 618, 625 (E.D. Ark. 1995) ("[A]n agent for a disclosed principal cannot be liable for a breach of contract by its disclosed principal to which it is not a party."); *accord Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Hawai'i 201, 214, 166 P.3d 961, 974 (2007) ("[T]he only way that an agent making a contract on behalf of a disclosed principal would become a party to the agreement would be if the agent manifests an intent to become a party . . . ."). This is true even where the breach was a result of the agent's wrongful conduct. *See Vandiver Food Stores, Inc.*, 909 F. Supp. at 625 ("[A]n agent acting within the scope of its authority, is not liable *ex contractu* for the breach of the contract between its disclosed principal

and a third party, even when the breach was a result of its own wrongful conduct[.]"(citing *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808 (2d Cir. 1971)).

Here, there is no evidence that HTI intended to be bound by any of the SIC Agreements. To the contrary, HTI chose not to become a party to, or otherwise be bound by, the SIC Agreements when it decided not to accept assignment of any of the SIC Agreements as part of the Sale. *See* CSF ¶ 21. Therefore, even assuming, for sake of argument, that HTI was acting as the Trustee's agent with respect to the SIC Agreements, SIC still would not be able to maintain a claim against HTI for breach of the SIC Agreements. *See, e.g.*, *Stanley v. Univ. of S. Calif.*, 178 F.3d 1069, 1078 (9th Cir. 1999) ("[W]e conclude that the district court was correct to grant summary judgment for Garrett on the contract claims, because he acted merely as USC's agent and was not a party to the contract."); *Double C Entertainment, Inc. v. Palace Theatre Operating Group, LLC*, Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606, at *2 (W.D. Ky. Nov. 25, 2011) (dismissing breach of contract claims against agent and noting that agent was not a party to the subject contract).

**C.  Count III (damages) fails as a matter of law.**

Count III (damages) fails for the same reasons as Count II.  In Count III of the Complaint, SIC seeks monetary damages for the Trustee's alleged breaches of

the MRA.  *See* Compl. ¶¶ 50-54.  As discussed *supra*, the MRA is not enforceable against HTI, *see supra* Section IV.A, and, as such, HTI cannot be held liable for the Trustee's alleged breach of the MRA, *see supra* Section IV.B.  Therefore, Count III which seeks monetary damages for the Trustee's alleged breaches of the MRA, as against HTI, fails as a matter of law.

## V.     CONCLUSION

SIC's claims against HTI to enforce and for breach of the SIC Agreements fail as a matter of law.  HTI respectfully requests that the Court grant the Motion in its entirety.

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/  *Trisha H.S.T. Akagi*
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE          1307
THEODORE D. C. YOUNG    5735
TRISHA H.S.T. AKAGI        10186
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Facsimile:   (808) 521-9210
Email:  mheihre@cades.com
        tyoung@cades.com
        takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone:  +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone:  +1 (202) 373-6585
Email:  andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |

| SANDWICH ISLES COMMUNICATIONS, INC., | Adversary No. 21-90017 |
|---|---|
| Plaintiff, | |
| vs. | Judge: Honorable Robert J. Faris |
| MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE; HAWAIIAN TELCOM INC., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, true and correct copy of the foregoing document was duly served on the following parties via CM/ECF, or U.S. Postal Service, as indicated below:

**Via CM/ECF**

Lex R. Smith on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC. lsmith@ksglaw.com, jkeane@ksglaw.com;myw@ksglaw.com

Jonathan C. Bolton on behalf of Defendant MICHAEL KATZENSTEIN jbolton@goodsill.com, pbabbit@goodsill.com

**VIA U.S. Postal Service**

Maria Y. Wang
on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC.
Kobayashi Sugita & Goda, LLP
999 Bishop Street, 26th Floor
Honolulu, HI 96813

DATED:  Honolulu, Hawaii, November 16, 2021.

CADES SCHUTTE
A Limited Liability Law Partnership

/s/  Trisha H.S.T. Akagi
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

# EXHIBIT I

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Connect America Fund | )   WC Docket No. 10-90 |
| | ) |
| Sandwich Isles Communications, Inc. | ) |
| | ) |
| Petition for Waiver of the Definition of "Study | )   CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) |
| and Sections 36.611 and 69.2(hh) of the | ) |
| Commission's Rules | ) |

## MEMORANDUM OPINION AND ORDER

**Adopted: June 30, 2017**                         **Released: July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

1.      Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement. Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2] Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

## I.    BACKGROUND

2.      DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5] Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

State land.[6] Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8] However, DHHL "does not have regulatory authority over telecommunications carriers."[9] In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10] Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11] The terms of the Exclusive License provide that "broad band [*sic*] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12] In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3. In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14] In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] *Id.* at 2.

[11] Exclusive License at 2.

[12] *Id.* at 1.

[13] DHHL Letter at 2; *see also* Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] *See generally Sandwich Isles Communications, Inc.*, Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (*Sandwich Isles Improper Payments Order*). The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support. *See generally Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee*, Notice of Apparently Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (*Sandwich Isles NAL* or *NAL*). In the *NAL*, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations. *Id.* at 12974, para. 84. The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue. *Id.*; *see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations*, Public Notice, WC Docket No. 16-405, DA 17-168 (2017). Sandwich Isles submitted its response to the *NAL* on February 3, 2017. *See* Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4.     In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18]  On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19]  In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21]  In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5.     Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6.     Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58.  This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed 05/27/22  Page 4 of 14

7. Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8. Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II. DISCUSSION

9. The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services. Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A. Section 253(a) Analysis

10. *Section 253(a) Applies.* Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a). First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28] We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies. As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29] Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30] Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31] And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33] Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3. We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.*; *see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27). In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

4

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34] It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36] In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

11.    Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands. For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39] Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

12.    Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government. It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41] That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42] But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply. Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

13.    We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a). In the *Minnesota Order*, the Commission found

---

(Continued from previous page) ————————————————————
because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law. *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed 05/27/22  Page 6 of 14

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44] The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45] Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands. It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors. Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands. For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies. Such a conclusion is entirely consistent with congressional intent. As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

14.     Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49] In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*. There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50] The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51] As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52] Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19. The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply. *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost. *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed  05/27/22  Page 7 of 14

15. *The Exclusive License Violates Section 253(a).* Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54] Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55] We reject this argument. DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority). More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16. The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58] The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59] As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60] And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17. Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62] However, this fact does not render the Exclusive License lawful. On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g., Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g., N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also Hee Reply Comments at 1.

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18.     Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

**B.      Section 253(b) Analysis**

19.     We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20.     Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21.     Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

U.S. Bankruptcy Court - Hawaii  #22-90008   Dkt # 28-9   Filed  05/27/22   Page 9 of 14

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72] Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73] However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74] And Waimana does not even reference Section 253(b) in its reply comments.

**C.      Section 253(c) Analysis**

22.      Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75] That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76] However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL. Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77] In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23.      While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79] The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80] By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities. Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands. Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 187 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

U.S. Bankruptcy Court - Hawaii  #22-90008   Dkt # 28-9   Filed  05/27/22   Page 10 of 14

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24.     Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83] Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84] Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

### D.     Preemption Under Section 253(d)

25.     Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85] That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86] We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands. We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88] We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

### E.     Waimana's and Sandwich Isles' Remaining Arguments

26.     None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License. First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90] Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91] Waimana, however, fails to cite any support for this claim. Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed 05/27/22  Page 11 of 14

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27. Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 28-9 Filed 05/27/22 Page 12 of 14

## III. ORDERING CLAUSES

28.     Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

29.     IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed  05/27/22  Page 13 of 14

### STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re:      *Connect America Fund et al.*, WC Docket No. 10-90 et al.

This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-9  Filed 05/27/22  Page 14 of 14

# EXHIBIT J

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-10   Filed  05/27/22   Page 1 of 5

STATE OF HAWAI‘I
DEPARTMENT OF HAWAIIAN HOME LANDS

January 18, 2022


To:        Chairman and Members, Hawaiian Homes Commission

From:      Cedric Duarte, ICRO

Subject:   For Information Only – Update on issues related to Telecommunications
           and Broadband services on Hawaiian Home Lands

RECOMMENDED ACTION

None.  For information only.

Discussion

This informational briefing is to update the Hawaiian Homes Commission (HHC) on
the status of the Department of Hawaiian Home Lands (DHHL) issues related to
Telecommunications and Broadband services on Hawaiian Home Lands.

PURPOSE


BACKGROUND

DHHL has informed its lessees, tenants, and permittees that under Federal law they may
obtain broadband telecommunications services from any provider of their choice.

For many years, Sandwich Isle Communications, Inc. (SIC) was the exclusive provider of
broadband telecommunications services under DHHL License No. 372 (License 372)
which was issued to SIC's parent company, Waimana Enterprises, Inc. on May 9, 1995.

On June 30, 2017, the Federal Communications Commission (FCC) adopted a
Memorandum Opinion and Order determining that all exclusivity claims arising from
License 372 are preempted by Federal law and are therefore unenforceable.

Subsequently, on August 31, 2021, Hawaiian Telcom (HT) completed the purchase of
inter-island submarine and middle-mile terrestrial fiber infrastructure assets from the
bankruptcy estate of the Paniolo Cable Company, a firm previously within the Waimana
Enterprises, Inc family of companies.

HT's purchase of the bankrupt Paniolo Cable Company assets did not include any
previously negotiated commercial agreements with SIC. Use of the inter-island submarine

- 1 -

and middle-mile system by SIC to provide broadband telecommunications services to Hawaiian Home Lands will end on March 31, 2022, unless a new agreement can be reached.

The FCC's 2017 Order, combined with HT's purchase of telecommunications assets on DHHL lands, means that DHHL lessees, tenants, and permittees now have more options for broadband telecommunications services. In addition, a new conduit use agreement between SIC and Charter Communications, which does business as Spectrum in Hawai'i, will also open additional services.

Current SIC customers may choose to continue their current service or select services from other providers, including Hawaiian Telcom, Spectrum, or other carriers who can provide broadband telecommunications services.

DHHL will receive at least $90 million from the Infrastructure Investment and Jobs Act to provide high-speed internet access to the Native Hawaiian community. In 2021, the Department received the last of five neighbor islands licenses from the FCC to access the 2.5 GHz band spectrum for the development of wireless broadband networks. Details on the Department's expansion plan for broadband services are anticipated for late 2022.

ITEM NO. C-3

DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII



WILLIAM J. AILA, JR
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

# STATE OF HAWAII
## DEPARTMENT OF HAWAIIAN HOME LANDS
P. O. BOX 1879
HONOLULU, HAWAII 96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:   Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from who you mave have telephone and internet services.

In the past, DHHL lessees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, lessees on Hawaiian Home Lands are now able to choose who to receive these services from.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your lot. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.

Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission

cc:



DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII

WILLIAM J. AILA, JR
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

## STATE OF HAWAII
## DEPARTMENT OF HAWAIIAN HOME LANDS
P. O. BOX 1879
HONOLULU, HAWAII 96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:   Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from whom many of you have telephone and internet services.

In the past, DHHL General Lessees and Permittees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, tenants on Hawaiian Home Lands are now able to choose who to receive these services from and would not be in violation of their Lease, License, or Right-Of-Entry agreement.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your business. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.


Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission


cc:

# EXHIBIT K



**Hawaiian Telcom**

HAWAII'S TECHNOLOGY LEADER

---

**Ellen Robinson**
Director, Carrier Sales

1177 Bishop Street
Honolulu, HI 96813
Ellen.Robinson@hawaiiantel.com
808-546-6143

March 11, 2022

Wendy Hee
President
Waimana Enterprises, Inc.
P.O. Box 893128
Mililani, Hawaii 96789

Dear Ms. Hee:

We received your February 10, 2022 letter and invoices from Waimana Enterprises, Inc. ("Waimana"), totaling $6,263,591.65 for "License 372 Access Fee" and other unidentified expenses Waimana claims are attributable to Hawaiian Telcom's use of Waimana's "License 372." As you know, however, any claims to exclusivity Waimana may have once had under License 372 have been rendered unenforceable under the Federal Communications Commission's Memorandum Opinion and Order dated July 3, 2017 (the "Preemption Order"). In a letter to your attorney, the Department of Hawaiian Homelands ("DHHL") similarly confirmed and clarified in writing that License 372 does not give Waimana or Sandwich Isles Communications, Inc. ("SIC") any rights to limit or restrict Hawaiian Telcom's access to and use of the Paniolo assets located on DHHL lands. And, as you are further aware, consistent with the provisions of the FCC's Preemption Order, DHHL has in fact granted Hawaiian Telcom its own independent right of entry agreement for the Paniolo premises. Hawaiian Telcom's right of entry is not dependent on Waimana's remaining interests in the 372 License, and it certainly does not require or condition Hawaiian Telcom's independent use and enjoyment of the Paniolo premises on the payment of any rent, access fee, or other tribute to Waimana.

Furthermore, Waimana and SIC's repeated assertions that Hawaiian Telcom's purchase of the Paniolo assets did not include access rights are similarly false. Those rights were indeed transferred to Hawaiian Telcom through the Bankruptcy Court's sale order. Therefore, consistent with above, Hawaiian Telcom is not required to negotiate an agreement with Waimana to access premises for which it already has been granted access.

Finally, demands made by SIC regarding access to or use of Paniolo assets have nothing to do with SIC's continuing breach and failure to pay Hawaiian Telcom under existing contracts ($1,527,585.38 outstanding as of February 16, 2022). Such contracts and services provided thereunder are wholly unrelated to Hawaiian Telcom's 2021 acquisition of the Paniolo network,

some of which contracts have been in place since 1997, 2011 and 2014, with SIC's defaults dating back to August 2020.

Hawaiian Telcom still remains hopeful that SIC and its affiliates will come to the table and negotiate new commercial arrangements for use of the Paniolo network. Should you have any questions or wish to discuss contract negotiations or payment, please contact me at ellen.robinson@hawaiiantel.com or (808) 546-6143.

Sincerely,

Ellen Robinson
Director, Carrier Sales
Hawaiian Telcom


cc: (VIA EMAIL)
Al Hee, SIC;
Breanne Kahalewai, SIC;
Department of Hawaiian Home Lands;
Hawai'i Public Utilities Commission;
Division of Consumer Advocacy, Department of Commerce and Consumer Affairs;
Department of Justice;
Rural Utilities Service; and
Federal Communications Commission

# EXHIBIT L



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 18-01319 (RJF) |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 |
| | |
| | Hearing: |
| | Date: June 1, 2020 |
| | Time: 2:00 p.m. |
| | Judge: Robert J. Faris |

**ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11
TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT
PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

The *Motion to Approve Settlement Agreement Pursuant to Federal Rule of
Bankruptcy Procedure 9019* [Dkt. no. 252] (the "Motion") filed by Michael

Katztenstein, as Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate of

EXHIBIT L

PANIOLO CABLE COMPANY, LLC (the "Debtor"), was considered by the Honorable Robert J. Faris, United States Bankruptcy Judge, at 2:00 p.m. on June 1, 2020 (the "Hearing").  Appearances of counsel are noted in the record.

The Court, after finding that due and adequate notice of the Motion having been given, after finding that there were no objections to the Motion; after finding that the *Rule 9019 Settlement Agreement (Post-Judgment)* by and between the Trustee, the Paniolo Creditors,[1] Waimana Enterprises, Inc., Sandwich Isles Communications, Inc. and the SIC Affiliates meets the requirements of *Martin v. Kane (In re A & C Properties.),* 784 F.2d 1377 (9th Cir.) *cert. denied*, 479 U.S. 854 (1986), for the reasons set forth on the record of the Hearing, has decided that the Motion should be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that:

1.      The Motion is GRANTED for the reasons set forth therein.

2.      The terms and conditions of the *Rule 9019 Settlement Agreement (Post-Judgment)* are APPROVED.

3.      The Court reserves jurisdiction over the parties to the *Rule 9019 Settlement Agreement (Post-Judgment)* for the purposes of interpretation, implementation and enforcement thereof.

**END OF ORDER**

---

[1] Defined terms not defined herein shall have the meanings ascribed to them in the Motion.

Submitted by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

## RULE 9019 SETTLEMENT AGREEMENT (POST-JUDGMENT)

This Rule 9019 Settlement Agreement is entered into, effective as of March 6, 2020 (this "<u>Agreement</u>") by and among:

(i)      The Paniolo Creditors[1] by and through the acknowledgement of Deutsche Bank Trust Company Americas, as Purchasers Agent and Collateral Agent, which is not a Party as such term is defined herein in such capacity (the "<u>Paniolo Creditors</u>");

(ii)     Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC ("<u>Paniolo Trustee</u>");

(iii)    Waimana Enterprises, Inc.[2]("<u>Ownership</u>") and SIC Affiliates (hereinafter defined); and

(iv)    Sandwich Isles Communications, Inc. ("<u>SIC</u>", together with the SIC Affiliates and Ownership, the "<u>SIC Parties</u>");

The Paniolo Creditors, the Paniolo Trustee, Ownership and SIC shall collectively be referred to herein as the "Parties," and each, individually, as a "Party."

### RECITALS

A.     The Parties have negotiated in good faith and at arm's length with the objective of restructuring the business and financial affairs of Paniolo Cable Company, LLC ("<u>Paniolo Cable</u>") and addressing the rights under the judgment granted the Paniolo Trustee against SIC in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.,* pending in *In re Paniolo Cable Company, LLC, Debtor,* Case No. 19-01319 (RJF), in the United States Bankruptcy Court (the "<u>Bankruptcy Court</u>") for the District of Hawaii (the "<u>Judgment</u>").

B.     Ownership directly or indirectly owns or controls 100% of the equity interests of SIC, and certain affiliates of SIC, including Clearcom, Inc. ("<u>Clearcom</u>"), Pa Makani LLC ("<u>Pa Makani</u>") and Ho'Opa'a Insurance Corp. ("<u>Ho'Opa'a</u>," together with Clearcom and Pa Makani,

---

[1] The Paniolo Creditors consist of HSBC Securities (USA) Inc., which holds legal or beneficial ownership of 94.6% ($176.3 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt, 100% ($28.8 million) of Paniolo's Series B secured debt and 100% ($643,400) of Paniolo's Series C unsecured debt plus unpaid interest and fees; Sunrise Partnership Limited Partnership, which holds legal or beneficial ownership of 5.4% ($10 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt plus unpaid interest and fees; and Deutsche Bank Trust Company Americas, which is owed $61,699 by Paniolo Cable (plus attorneys' fees and costs) in fees and expenses incurred under the Amended and Restated Note Purchase Agreement.

[2] Members of the Hee family and the family trusts own and control ownership of SIC.

and other affiliates, including Waimana Enterprises, Inc. ("Waimana"), collectively, the "SIC Affiliates").

C.      SIC is party to the SIC Lease and the Joint Use Agreement.[3]

D.      Pursuant to a submarine cable landing license issued by the Federal Communications Commission (the "FCC"), Paniolo Cable owns and, pursuant to the SIC Lease and JUA (each as hereinafter defined) operates a submarine cable system and related terrestrial assets (the "Paniolo System") connecting certain islands in the State of Hawaii.

E.      Pursuant to various licenses from the FCC, the Hawaii Public Utilities Commission, the State of Hawaii Department of Hawaiian Home Lands ("DHHL") and other regulatory agencies (the "Licenses and Entitlements"), SIC and the SIC Affiliates own and operate certain facilities, including an incumbent local exchange carrier, and provide telecommunications (including wireless and broadband) services to subscribers residing on the Hawaiian Home Lands.  Such services are currently dependent upon access to the Paniolo System.  SIC leases access to the Paniolo System from Paniolo Cable via a long-term lease (as hereinafter defined, the "SIC Lease").  In addition, Paniolo Cable and SIC are parties to a Joint Use Agreement (as hereinafter defined, the "JUA") which facilitates SIC's delivery of services to its customers and maintenance and operation of the Paniolo System.

F.      SIC owes the Paniolo Trustee approximately $256 million, plus interest and fees as provided for in the Judgment.

G.      The Parties agree that replacement of the SIC Lease and of the JUA as set forth in the Master Relationship Agreement and provided herein, and a sale of substantially all of Paniolo Cable's assets free and clear of all liens and encumbrances (the "Paniolo 363 Sale") are in their best interests and that of their constituencies.

H.      The Parties agree that certain of the measures set forth herein are subject to necessary approvals by applicable government authorities and the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties to this Agreement hereby agrees as follows:

1.      Additional Definitions.  In addition to the definitions set forth in the Recitals, the following terms shall have the following meanings:

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

"Definitive Documentation" means the Master Relationship Agreement, and such other documents necessary to consummate the settlement contemplated in this Agreement, each in form and substance satisfactory to the Parties, including each of the following:

---

[3] Capitalized terms shall have the meanings as defined herein unless the context requires otherwise.

     a.    The Master Relationship Agreement, to be approved by the presiding judge in the Paniolo Bankruptcy Case.

     b.    All Licenses and such other assets held by SIC and specific Licenses and assets held by SIC Affiliates, including those itemized on Exhibit "3" attached hereto that are necessary to provide telecommunication services in the Hawaiian Home Lands, including but not limited to: (a) the license to provide telecommunications services to Hawaiian Home Lands between DHHL as licensor and Waimana as licensee, granting certain exclusive rights and privileges relating to a telecommunications network on Hawaiian Home Lands, partial assignments thereof from Waimana to Pa Makani and Clearcom, and (b) any contracts between and among SIC and any of the SIC Affiliates relating to the telecommunication services or Paniolo Cable..

     c.    The Assignment of Judgment.

     d.    The Schedule A.1 Acknowledgement.

     e.    The Schedule A.2 IRU.

     f.    [Other]

"Joint Use Agreement" means that certain Joint Use Agreement dated July 19, 2007 by and among Paniolo Cable and SIC.

"Master Relationship Agreement" means that certain Master Relationship Agreement, substantially in the form attached hereto as Exhibit 1, which shall be assumable and assignable under Bankruptcy Code §365. For the avoidance of doubt, the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease, and shall include (a) a lease to SIC of a maximum of two (2) fiber pairs on the Paniolo Cable System (the "Initially Leased Fiber") at no cost (other than charges for space and power), (b) an option for SIC to acquire additional capacity on the Paniolo Cable System upon negotiation of fees mutually agreeable to the Paniolo Trustee (or its successors) and SIC (the "Additional Fiber"), (c) granting an Indefeasible Right of Use (IRU) of SIC equipment and property rights (including the Schedule A.2 assets) to the Paniolo Trustee or his designee (and their successors) (the "Schedule A.2 Assets IRU") and provisions to assure SIC of the rights to use the Schedule A.2 Assets as necessary to continue SIC retail telecommunications services to the residents of the Hawaiian Home Lands,[4] and (d) annual rent payments by SIC of not more than $1 per annum,[5] plus reasonable OA&M for the Initially Leased Fiber. SIC shall have no right to assign or sublease any of its interest in the Initially Leased Fiber except to the Ownership and only for the purposes of providing retail services to end users on Hawaiian Home Lands. The Initially Leased Fiber shall be used during the term of the Master Relationship Agreement exclusively to provide retail telecommunications services to SIC end-user

---

[4]    For the avoidance of doubt, the Initially Leased Fiber may be used only to provide telecommunication services to end-users (including individuals and commercial businesses) located on Hawaiian Home Lands that do not re-sell access to the Leased Fiber.

[5]    This nominal amount shall only applied to the Initially Leased Fiber. Charges for space and power and for the Additional Fiber shall be charged to SIC at market rates.

customers, including non-profit organizations, and commercial users (but not resellers) of the Initially Leased Fiber residing on the Hawaiian Home Lands.  Any assignment, sublease or use other than to provide retail telecommunications services to SIC end-user customers residing on the Hawaiian Home Lands during the term of the Master Relationship Agreement shall constitute an event of default under the Master Relationship Agreement and shall, with immediate effect, cancel SIC's rights in respect of the Initially Leased Fiber, but in no event shall affect the rights of the Paniolo Trustee (or any of his successors in interest) in the Schedule A.2 Assets IRU.

"Mililani Lease" means the lease or an IRU of the Mililani Property which the Paniolo Trustee shall execute as lessor as grantor to a third party granting such access and non-exclusive possession of the necessary areas of buildings located on the Mililani Property for purposes to conduct operations of the Paniolo cable network. The charge for such use shall be at a rate equal to the pro rata portion of reasonable expenses incurred in the operation of the Paniolo cable network on the Mililani Property.  The use of the property shall be limited by any law, zoning or land use classification and to operations relating to Paniolo Cable.  The third party's use of the property for any other operations shall be with the consent of the owner of the Mililani Property and subject to charge at market rates.  The Mililani Option shall be subject to the Mililani Lease and shall not be terminable by the Optionee or its successors.

"Mililani Property" means the real estate, fixtures and the other property located at 77-808 Kamehameha Highway, Mililani, Hawaii 96789, more specifically described in Transfer Certificate of Title No. 600,112, issued to Sandwich Isles Communications, Inc., a Hawaii corporation, Tax Map Key No. (1) 9-5-2-3.

"Mililani Property Option" means that certain option to purchase granted by Paniolo Trustee to Ownership or its designee ("Optionee") and providing the Optionee with the right to purchase the Mililani Property, as is, where is, subject to the Mililani Lease, and the remaining portion of the Judgment on or prior to May 15, 2020 (the "Option Date") for $2 million cash only (without offset or reduction), Optionee to bear all costs of such purchase. For the avoidance of doubt, the option may only be exercised by delivery of $2 million in cash to the Paniolo Trustee by the Option Date.

"Paniolo 363 Sale" means a sale of all or substantially all of Paniolo Cable's assets free and clear of liens and encumbrances and amendment, assumption and assignment of certain contracts pursuant to Bankruptcy Code sections 363 and 365, and entry into the Mililani Lease, subject to approval by the Bankruptcy Court and all regulatory authorities.

"Person" means any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, governmental unit or other entity.

"Schedule A.1 Acknowledgement" means an acknowledgement executed by SIC acknowledging Paniolo Cable's ownership and, if requested by the Paniolo Trustee, an assignment, transfer and conveyance by SIC, free and clear of the claims and liens of any other person, to the Paniolo Trustee, at no cost, those certain assets listed in Schedule A.1, which are assets currently titled in or owned by Paniolo Cable but in the possession or under the control of SIC.

"SIC Lease" means that certain Paniolo Cable Network Lease dated July 19, 2007 pursuant to which Paniolo Cable leased Paniolo System capacity to SIC.

"Transferred Equipment and Property Rights" means the equipment and property rights, including those described in Schedule A.2 to Exhibit A attached hereto and those described in the Schedule A.2 Assets IRU, and the Mililani Property, to transferred by SIC in conjunction with the US Marshal Sale, in partial consideration for entering into the Master Relationship Agreement, and generally consisting of all assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, security systems, network management systems, cross connects and cross connect panels, vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, as to be further specified by the Paniolo Trustee for a stand-alone commercial operation and use of the Paniolo Cable System.

"US Marshal Sale" means the sale of the Transferred Equipment and Property Rights, including such other SIC assets as may be deemed appropriate by the Paniolo Trustee, under that certain Writ of Execution and related writs issued in enforcement of the Judgment.

2.    Several Obligations.  The obligations of the Parties hereunder are several and not joint and no Party hereto shall be responsible for the failure of any other Party hereto to perform its obligations hereunder.

3.    The Parties' Obligations to Close.  Subject to the terms and conditions of this Agreement:

(a)    The Parties agree to use their commercially reasonable efforts to promptly prepare and execute the Definitive Documentation.

(b)    In the event SIC breaches this Agreement, the Paniolo Trustee shall have the right to continue to execute on the Judgment, including without limitation, exercise of any available post-judgment remedies.

(c)    The Parties agree to use their commercially reasonable efforts to effect the assignment of the Transferred Equipment and Property Rights under the terms and conditions set forth in the Master Relationship Agreement, to obtain all necessary and appropriate regulatory and third-party approvals of the transactions, including the Licenses and Entitlements, contemplated in this Agreement, each as promptly as practicable, and to do all things reasonably necessary and appropriate in furtherance thereof.

(d)    The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Equipment and

Property Rights. The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Assets and Equipment and Property Rights. The SIC Parties (1) expressly confirm that all of the A.2 Assets are present in the locations set forth on the list of Schedule A.2 Assets attached to the Notice of Execution filed with the Bankruptcy Court for the purposes of confirming the inventory prepared by the Substitute Custodian, and (2) agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(e)     The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(f)     Provided that the Paniolo Trustee is the successful bidder for the Mililani Property at the US Marshal Sale, the Paniolo Trustee agrees to promptly file a motion seeking confirmation of such sale and requesting that the Bankruptcy Court determine such sale extinguishes all liens and claims against the Mililani Property inferior to the Paniolo Trustee's judgment lien. Notwithstanding the failure or refusal of the Bankruptcy Court to make such a determination, the terms of the Mililani Property Option shall not be modified except upon written agreement of the Parties.

(g)     The SIC Parties expressly agree and covenant to provide all access to the Transferred Assets and Equipment and to exercise best efforts to cooperate with the Paniolo Trustee in the orderly transfer of such assets to the Paniolo Trustee and in the inspection, due diligence and dissemination of information (including authorizing and directing employees and agents of the SIC Parties to provide information) to facilitate the marketing and sale of assets and assignment of contracts under or related to the Paniolo 363 Sale provided it does cause the SIC Parties to expend any funds. Failure to honor the consent and fully cooperate with the Paniolo Trustee shall constitute a default under this settlement and the SIC Parties shall forfeit their rights hereunder.

(h)     The Parties agree that, subject to Bankruptcy Court approval, the Paniolo Trustee will conduct a sales process for the Paniolo 363 Sale, including assumption and assignment of executory contracts and nonresidential releases pursuant to orders of the Bankruptcy Court governing procedures and deadlines, of substantially all of Paniolo's assets. The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to entry of such orders or to the rights of any secured creditor of Paniolo to credit bid and shall waive any rights to appeal such orders. The SIC Parties expressly agree and covenant to provide all access to such assets and to exercise best efforts to cooperate with the purchaser and assignee under Paniolo 363 Sale in the orderly transfer of such assets to such purchaser and assignee. Any purchaser or assignee approved by the Court shall be bound by the terms of the Master Relationship Agreement.

(i)     Ownership and SIC affiliates shall agree not to object or cause to be filed any legal proceedings to the Paniolo 363 Sale. After consummation of the Paniolo 363 Sale and all orders approving same become final and non-appealable, Ownership and SIC affiliates shall have no further duties hereunder.

6

4.     <u>Effectiveness of this Agreement</u>.  The effectiveness of this Agreement, and the respective obligations of a Party under this Agreement, is conditioned upon the receipt of the signature hereto of each of the other Parties.

5.     <u>Amendments</u>.  No amendment, waiver or extension of any term or provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

6.     <u>Termination</u>.  Notwithstanding anything to the contrary set forth herein, unless as otherwise provided in this Agreement, this Agreement and all of the obligations and undertakings of the Parties set forth in this Agreement shall terminate and expire upon the earliest to occur of (a) December 31, 2020; or (b) written agreement among the Parties to terminate this Agreement.

7.     <u>Representations and Warranties</u>.  Each of the Parties represents and warrants to the others that:

(i)     if an entity, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership or other power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)     to its knowledge, the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part and the execution, delivery and performance by it of this Agreement do not and shall not (A) violate any provision of law, rule or regulation applicable to it or any of its affiliates or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries; or (B) conflict with, result in the breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its affiliates is a party or under its certificate of incorporation, bylaws or other governing regulations or instruments;

(iii)     except as otherwise expressly provided herein, the execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, the consent or approval of notice to, or any other action with respect to, any Federal, state or other governmental authority or regulatory body;

(iv)     this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors generally; and

(v)     it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

8.     <u>Representation and Warranty Regarding Third Parties</u>. Except as set forth in Exhibit 2 hereto, the SIC Parties hereby represent and warrant to the other parties that there are no agreements of any nature (including without limitation, grants of Indefeasible Rights of Use (IRUs), wholesale contracts, or commercial agreements) permitting persons or entities other

than SIC to use capacity on the Paniolo Cable System other than the two pairs of fiber reserved to SIC for the purposes stated herein.

9.   Payment of Expenses.  Except as may be recoverable from the estate after notice and opportunity for hearing and as otherwise provided herein, each Party shall be responsible for its own expenses incurred in connection with this Agreement.

10.   Good Faith.  Each of the Parties agrees to cooperate in good faith with each other to facilitate the performance by the parties of their respective obligations hereunder and the purposes of this Agreement.

11.   Amendments and Modifications.  Except as otherwise expressly provided in this Agreement, this Agreement shall not be amended, modified or supplemented, except in writing signed by the Parties.

12.   No Waiver.  Each of the Parties expressly acknowledges and agrees that, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair or restrict the ability of any party to this Agreement to protect and preserve all of its rights, remedies and interests, including, without limitation, with respect to its claims against the Debtors in the event of a termination of this Agreement.

13.   Further Assurances.  Each of the Parties hereby further covenants and agrees to execute and deliver all further documents and agreements and take all further action that may be reasonably necessary or desirable in order to enforce and effectively implement the terms and conditions of this Agreement.

14.   Complete Agreement.   This Agreement constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous negotiations, agreements and understandings with respect to the subject matter hereof.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the signatories hereto.

15.   Notices.   All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be (a) transmitted by hand delivery, or (b) mailed by first class, registered or certified mail, postage prepaid, or (c) transmitted by overnight courier, or (d) transmitted by telecopy or electronic mail, and in each case:

if to Paniolo Creditors:

   Norton Rose Fulbright (US) LLP
   2200 Ross Avenue – Suite 3600
   Dallas, Texas 75201
   Attn. Toby L. Gerber
   toby.gerber@nortonrosefulbright.com

   -and-

   Harris, Wiltshire & Grannis LLP
   1919 M Street, N.W., Suite 800
   Washington, D.C.  20036-3537 Attn: Kent Bressie

if to Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC:

>Mr. Michael Katzenstein
>FTI Consulting Inc.
>Three Times Square – Ninth Floor
>New York, NY  10036

>-with a copy to-

>Goodsill Anderson Quinn & Stifel
>A Limited Liability Law Partnership
>1099 Alakea Street, Suite 1800
>Honolulu, Hawaii 96813
>Attn: Johnathan C. Bolton

if to  [Ownership]:

>Mr. Al Hee
>In care of
>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

>-with a copy to-

>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

if to Sandwich Isles Communications, Inc.:

>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

Notices mailed or transmitted in accordance with the foregoing shall be deemed to have been given upon receipt.

16.     <u>Governing Law</u>.  This Agreement shall be governed in all respects by the laws of the State of New York, except to the extent such law is preempted by the Bankruptcy Code.

17.     <u>Jurisdiction</u>.   By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States Bankruptcy Court for the District of

U.S. Bankruptcy Court - Hawaii  #2290089  Dkt # 2712  Filed 06/07/22  Page 123 of 168

Hawaii (the "Bankruptcy Court"). By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably accepts and submits itself to the jurisdiction of the Bankruptcy Court, or a court of competent jurisdiction in the State of New York, as applicable under the preceding sentence, with respect to any such action, suit or proceeding.

18.     Consent to Service of Process.   Each of the signatories hereto irrevocably consents to service of process by mail at the address listed with the signature of each such party on the signature pages to this Agreement.  Each of the signatories hereto agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories hereto.

19.     Specific Performance.   It is understood and agreed by each of the signatories to this Agreement that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to specific performance, injunction, rescission or other equitable relief as remedy for any such breach.

20.     Headings.   The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

21.     Successors and Assigns.   This Agreement is intended to bind and inure to the benefit of the signatories hereto and their respective successors, permitted assigns, heirs, executors, administrators and representatives.   The agreements, representations and obligations of the undersigned parties under this Agreement are, in all respects, several and not joint.

22.     Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart.

23.     No Third-Party Beneficiaries.   Unless expressly stated in this Agreement, this Agreement shall be solely for the benefit of the signatories hereto, and no other Person or entity shall be a third-party beneficiary hereof.

24.     No Solicitations.   This Agreement is not intended to be, and each signatory hereto acknowledges that it is not, a solicitation of the acceptance or rejection of any plan of reorganization for the Company pursuant to Section 1125 of the Bankruptcy Code.

25.     Consideration.  It is hereby acknowledged by each of the signatories hereto that no consideration (other than the obligations of the other parties under this Agreement) shall be due or paid to the parties for their agreement to support the Plan in accordance with the terms and conditions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed and delivered by its duly authorized officers as of the date first written above.

[SIGNATURE PAGES TO FOLLOW]

THE REMAINDER OF THIS PAGE IS BLANK

EXECUTION COPY

PANIOLO CREDITORS

ACKNOWLEDGED BY:
DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS PURCHASERS AGENT AND
COLLATERAL AGENT

By: _____
    Name:   Erika Wershoven
    Title:   Vice President

By: _____
    Name:   Deirdre Lewis
    Title:   Vice President

MICHAEL KATZENSTEIN, CHAPTER 11
TRUSTEE OF PANIOLO CABLE COMPANY, LLC,
DEBTOR

By: _____
    Michael Katzenstein, Chapter 11 Trustee

**PANIOLO CREDITORS**

**ACKNOWLEDGED BY:**
**DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, AS PURCHASERS AGENT AND**
**COLLATERAL AGENT**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**MICHAEL   KATZENSTEIN,   CHAPTER   11**
**TRUSTEE  OF  PANIOLO  CABLE  COMPANY,**
**LLC, DEBTOR**

By: _____
     Michael Katzenstein, Chapter 11 Trustee

**WAIMANA ENTERPRISES, INC. AND THE SIC AFFILIATES**

By: _____
Name: ALBERT S.N. HEE
Title: AUTHORIZED AGENT

**SANDWICH ISLES COMMUNICATIONS, INC.**

By: _____
Name: ALBERT S.N. HEE
Title: AUTHORIZED AGENT

ALL ATTACHMENTS
TO THE SETTLEMENT
AGREEMENT HAVE BEEN
FILED UNDER SEAL

| Information to identify the case: | | |
|---|---|---|
| Debtor 1 | **Paniolo Cable Company, LLC** | United States Bankruptcy Court |
| | Name | District of Hawaii |
| Debtor 2 (Spouse, if filing) | | Case number: **18–01319** |
| | Name | Chapter: **11** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion to Approve Settlement Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019 (Related Doc # 252) Date of Entry: 6/4/2020. (JN)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date: June 4, 2020                                  Michael B. Dowling
                                                    Clerk
Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

# EXHIBIT M

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-13   Filed  05/27/22   Page 1 of 15

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>       Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11) |
| MICHAEL KATZENSTEIN, as<br>CHAPTER 11 TRUSTEE,<br><br>       Plaintiff,<br><br>v.<br><br>SANDWICH ISLES<br>COMMUNICATIONS, INC.,<br><br>       Defendant. | Adversary No. 19-90022<br><br>NOTICE OF EXECUTION |

<u>**NOTICE OF EXECUTION**</u>

EXHIBIT M

7885164.1

U.S. Bankruptcy Court Hawaii #19-90022 Dkt # 86 Filed 02/04/20 Page 1 of 45
U.S. Bankruptcy Court Hawaii #22-90002 Dkt # 28-13 Filed 05/27/22 Page 2 of 45

Notice is hereby given that pursuant to law and by virtue of a *Writ of*

*Execution to the United States Marshal*, issued out of the above-entitled Court in

the above-entitled case, the U.S. Marshal for the District of Hawaii, did levy upon

certain real and personal property assets of Defendant/Judgment Debtor

SANDWICH ISLES COMMUNICATIONS, INC., in and to the real and personal

property described in Exhibit "A", attached hereto.

DATED:  Honolulu, Hawai'i, ~~January~~ February 4 , 2020.


CHARLES L. GOODWIN
For United States Marshal
District of Hawai'i

By: _____ cousm
        Deputy U.S. Marshal

2

### Real Property

*Oahu-Mililani*

PINE SPUR:

All of those certain parcel(s) of land situate at Waipio, Waikele, Waikakalaua, Ulu, Auiole Poopalupalu, Hopenui, Kahuaiki, Hanuhanu, Kanupoo, Kapakahi and Ewa, District of Ewa, City and County of Honolulu, State of Hawaii, described as follows:

| LOT | AREA | MAP |
|---|---|---|
| 1-A-1 | 1.083 acres | 18 |
| 1-A-2 | 0.032 acre | 18 |
| 1-A-3 | 0.083 acre | 18 |
| 1-A-4 | 0.431 acre | 18 |
| 8-A-1 | 0.245 acre | 20 |
| 8-A-2 | 17.863 acres | 20 |
| 8-A-3 | 0.902 acre | 20 |
| 8-A-4 | 3.191 acres | 20 |
| 8-A-5 | 0.084 acre | 20 |
| 8-A-6 | 0.014 acre | 20 |
| 8-A-7 | 0.396 acre | 20 |
| 8-A-8 | 20.694 acres | 20 |
| 8-A-9 | 1.250 acres | 20 |
| 8-A-10 | 0.014 acre | 20 |
| 8-A-11 | 0.457 acre | 20 |
| 8-A-12 | 13.807 acres | 20 |
| 8-A-13-A | 1.603 acres | 52 |
| 540 | 58.560 acres | 68 |
| 541 | 0.278 acre | 68 |
| 542 | 28.304 acres | 68 |
| 5399-A | 2.718 acres | 687 |
| 5400-A | 0.043 acre | 687 |
| 5401-A | 5.185 acres | 687 and |
| 5402-A | 5.605 acres | 687 |

as shown on the aforementioned Maps, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1000 of John Ii Estate, Limited;

TOGETHER WITH AND SUBJECT TO THE FOLLOWING:

As to Lot 1-A-2:   Together with access to a public highway, namely, Kamehameha Highway, by means of Lot 1-A-1 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9104, filed July 11, 1949.

7864979.1

U.S. Bankruptcy Court Hawaii #22-90002 Dkt # 263 Filed 05/27/22 Page 4 of 45
U.S. Bankruptcy Court Hawaii #19-00002 Dkt # 34 Filed 02/04/20 Page 6 of 15

As to Lot 8-A-4:     Together with access to a public highway, namely, Kamehameha Highway, by means of Lots 8-A-5, 8-A-6, 8-A-7, 8-A-10, 8-A-11 and 8-A-15 as shown on Map 20 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9106, filed July 11, 1949.

As to Lot 541:     Together with access to a public highway over Lot 540 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 542:     Together with access to a public highway over Lots 540 and 541 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 5399-A:     Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5400-A:     Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20 of said Land Court Application No. 1 000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5401-A:     Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5402-A:     Together with access to a public road over Lots 1-A-1 and 1-A-4 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

Being land(s) described in Transfer Certificate of Title No. 600,112 issued to SANDWICH ISLES COMMUNICATIONS, INC., a Hawaii corporation.

## Schedule A.2 Assets

*Kaua‘i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office.  Unknown Manholes. |
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |

*Oahu – Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu – Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building to the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations.  Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards the Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii – Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards the Laiopua central office. |

*Hawaii – Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area.  Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the  Waiakea Area and Akolea Area.  Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item – to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the<br>    Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance polities and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| | |
|---|---|
| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

# EXHIBIT N

Of Counsel:
SULLIVAN MEHEULA LEE, LLLP

WILLIAM MEHEULA        2277
D. KAENA HOROWITZ      9836
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaii 96813
Telephone:  (808) 628-7535
Facsimile:  (808) 533-2467
Email:  meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiffs
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC and CLEARCOM, INC.

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000617
27-MAY-2022
11:44 AM
Dkt. 1 CMPS

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, and CLEARCOM, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> DEPARTMENT OF HAWAIIAN HOME LANDS, HAWAIIAN HOMES COMMISSION; HAWAIIAN HOMES COMMISSION TRUSTEES WILLIAM J. AILA, JR., PATRICIA KAHANAMOKU-TERUYA, RUSSELL KAUPU, RANDY AWO, PAULINE NAMUʻO, ZACHERY HELM, DENNIS NEVES, MICHAEL KALEIKINI, DAVID B. KAʻAPU, IN THEIR OFFICIAL CAPACITY; <br><br> Defendants. | CIVIL NO. <br> (Other Civil Action) <br><br> COMPLAINT; EXHIBITS "A" – "K"; SUMMONS |

EXHIBIT N

<u>COMPLAINT</u>

Plaintiffs Waimana Enterprises Incorporated ("**Waimana**"), Pa Makani LLC ("**Pa Makani**") and Clearcom, Inc. ("**Clearcom**") for their Complaint against Defendant Department of Hawaiian Home Lands ("**DHHL**"), Hawaiian Homes Commission ("**HHC**"); Hawaiiian Homes Commission Trustees William J. Aila, Jr., Patricia Kahanamoku-Teruya, Russell Kaupu, Randy Awo, Pauline Namu`O, Zachery Helm, Dennis Neves, Michael Kaleikini, David B. Ka`Apu, In Their Official Capacity ("**Trustees**") allege and aver as follows.

1.       Waimana is the primary owner and holder of License 372 that requires Waimana to provide all infrastructure necessary to provide modern telecommunications services on Hawaiian Home Lands ("**HHL**"), no matter how remote their residence may be.  License 372 was issued to a native Hawaiian corporation in 1995 and the term is in perpetuity.  Many of its customers do not have electricity or water and one family lives in a tent.  License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana's monthly charge to the customer will be no more than is charged for comparable service in the adjacent non-HHL areas.   The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes.  It is essential to sustaining, expanding and upgrading non-voice telecommunications service to the HHL residents in the future that the requirements of License 372 be continued.

2.       Plaintiff Waimana is a corporation organized and existing under the laws of the State of Hawai'i.

3.       Plaintiff Pa Makani is a limited liability company organized and existing under the laws of the State of Hawai'i.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-14   Filed  05/27/22   Page 3 of 16

4.     Plaintiff Clearcom is a corporation organized and existing under the laws of the State of Hawai'i.

5.     Defendant DHHL is an agency of the State of Hawai'i organized under the Constitution and laws of the State of Hawai'i.

6.     Pursuant to section 202, Hawaiian Homes Commission Act ("**HHCA**"), DHHL is headed by Defendant HHC, whose nine Defendant Trustees are appointed by the Governor with the advice and consent of the Senate.  Three of the trustees are residents of the City and County of Honolulu; two are residents of the County of Maui, with one being a resident of the island of Moloka'i; two are residents of the County of Hawai'i, one being a resident of East Hawai'i and the other a resident of West Hawai'i; one is a resident of the County of Kaua'i; and the ninth trustee member is the Chairman William A`ila, who is appointed by the Governor from among the members of the Commission.  The Chairman of the Commission serves as the full-time administrator of the DHHL.

7.     HAR §10-2-19 states Duties of commissioners as trustees. As trustees, it shall be the duty of commissioners to:

> (1) Act exclusively in the interest of beneficiaries under the act;
> (2) Hold and protect the trust property for beneficiaries under the act;
> (3) Exercise such care and skill as a person of ordinary prudence would exercise in dealing with one's own property in the management of Hawaiian home lands; and
> (4) Adhere to the terms of the trust as set forth in the act.

8.     Non-party Sandwich Isles Communications, Inc. ("**SIC**") is a native Hawaiian corporation organized and existing under the laws of the State of Hawai'i.

9.     Non-party Hawaiian Tel Inc. ("**HTI**") is a corporation organized under the laws of the State of Hawai'i.

3

10.     Section 207(c)(1)(A) of the HHCA states: "The department is authorized to <u>grant</u> <u>licenses as easements for</u> railroads, <u>telephone lines</u>, electric power and light lines, gas mains, <u>and</u> <u>the like</u>."  Emphasis added.

11.     Section 204(2) of the HHCA states "In the management of any retain available lands … the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon to a native Hawaiian, or organization or associations owned or controlled by native Hawaiians, for commercial, industrial or other business purposes …"

12.     Plaintiffs are native Hawaiian organizations as noted in License 372 and the Partial Assignments.

13.     Section 206 of the HHCA states:

"OTHER OFFICERS NOT TO CONTROL HAWAIIAN HOME LANDS; EXCEPTIONS.  The powers and duties of the governor … in respect to the lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

14.     The Hawaii Public Utilities Commission ("**PUC**") is a division of the Governor's administration and therefore has no authority on HHL.

15.     Waimana is the owner and holder of License No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to authorization from the HHC (hereinafter "**License 372**").  A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

16.     License 372 granted Waimana a right to provide "telecommunication services of all types" to HHL, <u>see</u> Exhibit A at 1:

Licensor determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to <u>local,</u> <u>intrastate, interstate and international telephone</u>; video on demand interactive

4

communication; cable television; medical and educational links; and electronic data transmission) <u>to LICENSOR'S lands</u> in a timely manner;

The added underscored words identify the type and area of telecommunication services assigned to SIC in the Partial Assignment of License, discussed below.  The right to provide all other types of telecommunication services were retained by Waimana.

17.     Under HHCA 207(c)(1), License 372 is an interest in real property issued to Waimana pursuant to HHCA 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.

18.     By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the "**SIC Partial Assignment**").  A true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is attached hereto as **Exhibit "C"**.

19.     The SIC Partial Assignment is expressly limited to "***IntraLata and Intrastate telecommunication services***", which means "limited to local, intrastate, interstate and international telephone" on HHL ("**voice only service**").  Consistent with that voice only service limitation and area of service limitation, SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice only services on HHL.

20.     Waimana caused other subsidiaries including Plaintiffs Clearcom, Inc. and Pa Makani LLC to provide other telecommunications services (internet, wireless etc.) both on and off HHL.

21.     By instrument dated December 30, 2011, Waimana partially assigned License 372 to Pa Makani (the "**Pa Makani Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***wireless communications services of all types***" under License 372.  DHHL consented to the Pa Makani Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "D",**

5

22.     By instrument dated May 29, 2014, Waimana partially assigned License 372 to Clearcom (the "**Clearcom Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***broadband communications services of all types***" under License 372.  DHHL consented to the Clearcom Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "E",**

23.     License 372 in relevant part also provides:

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the [1] <u>exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR</u>, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and [2] <u>including also the right of entry upon the Easement and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area</u>.[1]

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, <u>in perpetuity</u>, commencing on May 1, 1995, unless sooner   terminated as hereinafter provided,

4.     <u>ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.</u> LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost.  LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

---

[1] Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL.  ("**License 372 Service Right**").

Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "the <u>easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area</u>."  ("**License 372 Easement**").

6

5.    LEVEL OF TELECOMMUNICATION SERVICES.  LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.    COST OF TELECOMMUNICATIONS SERVICES.  LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7.    JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational opportunities for beneficiaries of LICENSOR each year.  For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.    EMPLOYMENT.  LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.    CAPITAL EXPENDITURES/CONTRACTS. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

19.    BREACH.  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.[2]

---

[2] Although DHHL initially sent Waimana and SIC a notice of violation in March 2020 that notice was effectively withdrawn by DHHL in January 2021 when Waimana and SIC requested a contested case hearing, and since then, DHHL has not sent Plaintiffs any such notice of breach.

7

24.     Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing and underground conduits to beneficiary lessee residences on License 372 Easement.  SIC used those facilities for the provision of voice only services.  Plaintiffs developed other telecommunications facilities.

25.     Paniolo Cable Company Inc. ("**Paniolo**") developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai.  Paniolo's facilities were connected to and housed in existing facilities on License 372 Easement, pursuant to SIC's joint use agreement with Paniolo.  All of Paniolo's facilities were leased to SIC at a time when Paniolo was a third-party mainland undersea cable company not owned or controlled by Waimana nor any affiliate of Waimana.  Paniolo had no interest in any HHL, as the License 372 Easement was licensed to Waimana pursuant to its rights under License 372.  The assets owned by Paniolo and leased to SIC including the assets on the License 372 Easement are hereinafter referred to as the "**Paniolo Assets**."

26.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

27.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

28.     With the money judgment, on February 4, 2020, Katzenstein filed a Notice of Execution in Case No. 19-90022 (Dkt 36), which is attached hereto as **Exhibit "K,"** that

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-14   Filed  05/27/22   Page 9 of 16

identified levied SIC property described in Exhibit "A" as **Real Property**, which is real property

in Mililani on Oahu, and **Schedule A-2 Assets**, (collectively, "**SIC Property**").

29.     Schedule A-2 at the end of the section entitled "Licenses" stated:

 -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2
assets, including without limitation <u>SIC's interest in License Agreement No. 372 issued
by the State of Hawaii Department of Hawaiian Home Lands</u>.

-All existing and pending entitlements (including without limitation, SIC's interests in
memoranda of agreement, <u>easements</u>, leases, <u>license agreements</u>, letters of approval,
special area management permits, rights of way or rights of interest, necessary to build,
construct, repair, maintain and operate the Schedule A.2 assets.

Emphasis added.

30.     On March 6, 2020, pursuant to the Writ of Execution, the Trustee at a public

auction purchased the SIC Property.

31.     By Rule 9019 Settlement Agreement effective as of March 6, 2020 31, and

approved and order by the Bankruptcy Court on June 4, 2020, the Court approved the 9019

Settlement Agreement between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana,

Pa Makani and Clearcom) which referenced, adopted and approved the Master Relationship

Agreement ("**MRA**"), a copy of the MRA is attached hereto as **Exhibit "F."**  Schedule 2, section

2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain Department
of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with
(b) the easements, leases, license agreements, letters of approval, special area
management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate
and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation
and maintenance of the Paniolo Network (or were necessary for the construction of the
Paniolo Network). <u>SIC hereby agrees to assign, transfer, or convey to Paniolo all
Entitlements **(other than the DHHL License)** that may by their terms be so assigned or
transferred and to the extent such assignment, transfer, or conveyance would not, in
Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands. To
the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall
(i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to
Paniolo the broadest possible right to use the Entitlement.</u> For the avoidance of doubt, <u>the</u>

9

> Parties acknowledge and agree that **DHHL License will not be assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

Emphasis added.

32.     Thereafter, the 9019 Settlement Agreement and MRA were not assumed by HTI, which raises the issue as to whether the SIC Property transferred to HTI included "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A-2.

33.     However, regardless how this issue is ultimately decided, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which is Waimana's right to provide (post FCC Order non-exclusive) telecommunications services other than voice only service on HHL and Plaintiffs' License 372 Easement areas.

34.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "G,"** confirming that, "The Buyer [HTI] will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in emails dated January 6, 2021, to alhee@waimana.com that states that License 372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that any purchaser of the assets would require a license from DHHL."  And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "H,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-14  Filed  05/27/22  Page 11 of 16

35.     Moreover, even if HTI obtains a new license from DHHL, such easement cannot be in the same areas already granted to Plaintiffs in License 372 as that would constitute a breach of License 372 by Defendants and breach of fiduciary duty, by Defendants.

36.     DHHL's 8/19/21 filing also disclosed the Limited Right-of Entry granted to HTI, which violates Plaintiffs' License 372 rights.[3]

37.     On August 31, 2021, the APA sale to HTI closed.

38.     Plaintiffs are not aware whether DHHL has granted HTI any right to provide telecommunications services on HHL, and if DHHL is contemplating doing so, DHHL would breach fiduciary duties to its beneficiaries if that license does not include the same strict obligations that Waimana assumed in License 372 including paragraphs 6-9 of License 372.

39.     DHHL would also breach fiduciary duties owed to Plaintiffs if it allowed use of the same easement areas licensed to Plaintiffs who are native Hawaiian corporations and a limited liability company as acknowledged in License 372, the Pa Makani Partial Assignment and the Clearcom Partial Assignment.

40.     DHHL may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 ("**FCC Order**"), attached hereto as **Exhibit "I,"** allows DHHL to provide access to the License 372 Easement on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the License 372 Service Right.  However, the order does not require Plaintiffs to share use of their License 372 Easement.  The FCC Order only preempts the portion of the License that:

---

[3] In section 13 of the Limited Right-of Entry, HTI refused to defend and indemnity DHHL for any claim brought by Waimana.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-14   Filed  05/27/22   Page 12 of 16

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16.

    41.    DHHL also breached duties owed to Plaintiffs by petitioning the FCC to terminate the exclusive service right in License 372 by effectively withdrawing the rural company exception to Plaintiffs detriment.

    42.    Nonetheless, under the severability provision of the License 372 at paragraph 22, while the exclusive aspect of License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate, and FCC does not have jurisdiction to invalidate Plaintiffs' License 372 Easement or invalidate the non-exclusive License 372 Service Right. Plaintiffs require exclusive possession to perform their telecommunications obligations required under License 372. Thus, Plaintiffs' right to exclusive possession of their License 372 Easement areas survived the FCC Order, as did their rights and obligations to provide non-voice telecommunications services on HHL. An internal DHHL memo to the HHC dated January 18, 2022, a copy of which is attached hereto as **Exhibit "J",** states "DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice"; confirming that the FCC Order dealt with License 372 Service Right.

    43.    DHHL also breached duties owed to Plaintiffs by revoking DHHL's issued Eligible Telecommunications Carrier ("**ETC**") certifications that had allowed Plaintiffs to obtain support payments from funds administered by the FCC and transferring DHHL's authority to issue ETC's to the PUC thereby giving up HHCA Section 206 jurisdiction to the detriment of Plaintiffs and other native Hawaiian utility companies.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-14   Filed  05/27/22   Page 13 of 16

44. The only area qualified to receive support payments in Hawaii is HHL thus by transferring DHHL's authority to issue ETC's to the PUC, DHHL gave up HHCA Section 206 jurisdiction to the detriment of Plaintiffs and other native Hawaiian companies that are eligible to receive funds for providing services to residents on HHL.

45. Oceanic Communications, now Charter Communications, has an agreement to provide high speed data (internet) and video (cable TV) to HHL with Clearcom.

46. Without notice to Plaintiffs, DHHL initiated at least one meeting with Charter to find out if Charter's agreement to use License 372 assets could be used by others to circumvent License 372.

## COUNT I – BREACH OF CONTRACT

47. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 46 hereinabove.

48. The elements of breach of contract are: (1) a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to plaintiff. 17B C.J.S. Contracts § 830, Westlaw (database updated October 2021). Haw. State Fed. Credit Union v. Kahapea, 150 Hawaiʻi 155 n.7, 497 P.3d 1103 (App. 2021)

49. Here, (1) License 372, the Pa Makani Partial Assignment and the Clearcom Partial Assignment are contracts; (2) Plaintiffs have performed under these contracts or their non-performance has been excused; (3) DHHL breached these contract by entering into the Limited Right-of-Entry, allowing HTI to carry non-voice telecommunications, making filings in the Bankruptcy Court, potentially negotiating a new license with HTI that violate Plaintiffs rights under License 372 and Partial Assignments to Pa Makani and Clearcom, causing the FCC Order

13

and terminating Plaintiffs ETC and then transferring ETC jurisdiction for HHL to the PUC; and (4) said breaches have harmed Plaintiffs in amounts to be determined at trial.

COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

50. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 49 hereinabove.

51. The covenant of good faith and fair dealing is implied in the License 372 and Partial Assignments to Pa Makani and Clearcom where DHHL is obligated to be faithful to an agreed common purpose and consistently with the justified expectations of Plaintiffs. Clark Realty Corp. v. Henry F. Akona Tr., 142 Hawaiʻi 486, 421 P.3d 694 (App. 2018).

52. Here, Plaintiffs entered into License 372 and partial assignments in perpetuity to provide telecommunications services to HHL beneficiaries based on the promise that the easements were exclusive to areas they developed and used to provide said services.

53. DHHL breached this covenant and continue to do so to the detriment of Plaintiffs and all native Hawaiians in amounts to be determined at trial

COUNT III – BREACH OF FIDUCIARY DUTIES

54. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 53 hereinabove

55. Defendants owed trust fiduciary duties to Plaintiffs as native Hawaiian corporations and a limited liability company.

56. Defendants breach those fiduciary duties by entering into the Limited Right-of Entry, allowing HTI to carry non-voice telecommunications, making filings in the Bankruptcy Court noted above, potentially negotiating a new license with HTI, causing the FCC Order and

14

terminating Plaintiffs ETC and transferring ETC jurisdiction to the PUC, all of which impairs

Plaintiffs right and obligation to provide benefits to HHL beneficiaries set forth in License 372.

57.     Said breach caused harm to Plaintiffs and all HHL beneficiaries in amounts to be

determined at trial.

COUNT IV – DECLARATORY RELIEF

58.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 57 hereinabove.

59.     Plaintiffs are entitled to a declaratory relief determination that the SIC Partial

Assignment only provided SIC with the right to provide voice only service on HHL and no other

telecommunications services throughout Hawaii, including wireless that was assigned to Pa

Makani and broadband that was assigned to Clearcom.

60.     Plaintiffs are entitled to a declaratory relief determination that the SIC Partial

Assignment did not provide to SIC the License 372 Easement areas developed by Waimana, Pa

Makani and Clearcom.

WHEREFORE, Plaintiffs prays the Court grant the following relief:

1.     For damages in an amount to be determined at trial.

2.     Declaratory relief set forth in Count IV.

3.     For plaintiffs' reasonable costs and attorneys' fees incurred herein.

4.     For such other and further relief as the Court deems just.

DATED:  Honolulu, Hawai'i, May 27, 2022.

/s/ William Meheula
WILLIAM MEHEULA
D. KAENA HOROWITZ
Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, and CLEARCOM, INC.

15

# EXHIBIT O

CLARE E. CONNORS          7936
Attorney General, State of Hawai'i

CRAIG Y. IHA             7919
RYAN K. P. KANAKAOLE     9613

Deputy Attorneys General
Department of the Attorney
 General, State of Hawai'i
425 Queen Street
Honolulu, Hawai'i  96813
Telephone:  (808) 587-2978
Facsimile:  (808) 586-1372
Email:      ryan.kp.kanakaole@hawaii.gov
Attorneys for the Department of Hawaiian Home Lands,
State of Hawai'i

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAIʻI

| In re | Case No. 18-01319 (RJF) |
|---|---|
| PANIOLO CABLE COMPANY, LLC, | (Chapter 11) |
| Debtor. | <u>Hearing</u><br>Date:   December 21, 2020<br>Time:  2:00 p.m.<br>Judge:  Hon. Robert J. Faris<br><br>[Related Docket Entry: Dkt. #313] |

DEPARTMENT OF HAWAIIAN HOME LANDS' STATEMENT OF POSITION ON MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) APPROVING THE OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT, (E) <u>APPROVING A BREAK-UP FEE; AND (F) GRANTING RELATED RELIEF</u>

EXHIBIT O

State of Hawaiʻi, Department of Hawaiian Home Lands ("DHHL") submits this Statement of Position Regarding Michael Katzenstein, as Chapter 11 Trustee's Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-up Fee, and (F) Granting Related Relief filed on November 30, 2020 ("Motion to Approve Sale").  Dkt. #313.

DHHL controls and manages the lands upon which all buildings, manholes, and other fixtures of the Debtor's Schedule A.2 Assets are located.  *Id.* at 24-25. As noted in the Motion to Approve Sale, these assets are on DHHL's lands pursuant to a license, which is in default; and DHHL will need grant a new license to Hawaiian Telcom, Inc. (the "Buyer").  DHHL offers its comments on this issue below.

## I.    BACKGROUND

In 1920, Congress enacted the Hawaiian Homes Commission Act ("HHCA"), which set aside approximately 203,500 acres of public lands for a homesteading program for native Hawaiians; these lands were given the status of Hawaiian Home Lands.  *Ahuna v. Dept. of Hawaiian Home Land*, 64 Haw. 327, 336-38, 640 P.2d 1161, 1167-68 (1982).  Hawaiian Home Lands were to be under

the control of the body then called the Hawaiian Homes Commission. *Id.* When

Hawai'i entered the Union, the State acquired title to the Hawaiian Home Lands.

*Kepo'o v. Watson*, 87 Hawai'i 91, 97-98, 952 P.2d 379, 385, 86 (1998). Both legal

title and management responsibilities over Hawaiian Home Lands are in the hands

of the State. *Id.* DHHL, led by the Hawaiian Homes Commission, is the state

agency charged with administering Hawaiian Home Lands. HHCA § 202.

This involuntary Chapter 11 bankruptcy proceeding was initiated on

November 13, 2018 against Paniolo Cable Company, LLC (the "Debtor"). Dkt.

#1. On January 30, 2019, the Court entered its *Order for Relief* in this matter and

appointed Michael Katzenstein (the "Trustee") as Trustee of Debtor's Bankruptcy

Estate (the "Estate"). Dkt. #48.

An Adversary Proceeding in this matter was opened on June 24, 2019.

*Katzenstein v. Sandwich Isles Communications, Inc.*, Adversary Case No. 19-

90022 ("Adversary Proceeding"), Dkt. #1.

On December 17, 2019, this Court entered a judgment in favor of Trustee

and against Defendant Sandwich Isles Communications, Inc. ("SIC") to recover

from SIC the amount of $256,553,854.00 ("Money Judgment"). Adversary

Proceeding, Dkt. #28.

On January 6, 2020, this Court entered a *Writ of Execution to the United*

*States Marshal* directing the U.S. Marshal to levy upon SIC's property to satisfy

the Money Judgment (the "Writ of Execution"). Adversary Proceeding, Dkt. #32.

On February 4, 2020, a *Certificate of Execution* was entered certifying that the U.S. Marshal executed upon all of the right, title, and interest of, *inter alia*, certain personal property assets of SIC (the "A.2 Assets"). Adversary Proceeding, Dkt. #37 at 2, 6-15. The inventory of A.2 Assets identifies buildings, manholes, conduits, subducts, and other fixtures located on Hawaiian Home Lands. *Id.* at 6-15; see also Dkt. #313 at 24-25. The inventory of A.2 Assets also included SIC's interest in License Agreement No. 372 issued by DHHL to build, construct, repair, and maintain a telecommunications network on Hawaiian Home Lands ("License No. 372"). *See* Adversary Proceeding, Dkt. #37 at 15.

Pursuant to the Writ of Execution, a public auction of SIC's property, including the A.2 Assets, was held on March 6, 2020 (the "Execution Sale"). Adversary Proceeding, Dkt. #65 at 2-3. The A.2 Assets were sold to the Trustee as the highest bidder at the Execution Sale. *Id.*

Through the instant motion, the Trustee seeks this Court's approval of the sale of Debtor's Assets, including the A.2 Assets, to the Buyer.

## II. DHHL'S STATEMENT OF POSITION

DHHL does not object to the Motion to Approve Sale. However, DHHL submits the following comment:

A. The Buyer will need to acquire a new license for the use of DHHL lands.

DHHL confirms what is noted by the Trustee in the Motion to Approve Sale – that the Buyer will need to acquire a new license for the use of Hawaiian Home

U.S. Bankruptcy Court - Hawaii #22-90018 Dkt #2815 Filed 05/17/22 Page 45 of 56

Lands upon which certain A.2 Assets are located. *See* Dkt. #313 at 24-25; Dkt. #313-3 at 11-12. The new license would authorize the Buyer to build, construct, repair, maintain and operate the A.2 Assets located on Hawaiian Home Lands previously covered by License No. 372, which is default. DHHL further clarifies that the new license to the Buyer is subject to approval by the Hawaiian Homes Commission. DHHL anticipates that the negotiation and approval process for Buyer to acquire a new license will take several months.

DATED: Honolulu, Hawai'i, December 16, 2020.

CLARE E. CONNORS
Attorney General, State of Hawai'i


/s/ Ryan K. P. Kanakaole
CRAIG Y. IHA
RYAN K. P. KANAKAOLE
Deputy Attorneys General
Attorneys for DHHL

# EXHIBIT P

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-16   Filed  05/27/22   Page 1 of 33

CLARE E. CONNORS    7936
Attorney General, State of Hawai'i
CRAIG Y. IHA            7919
RYAN K. P. KANAKAOLE    9613
Deputy Attorneys General
Department of the Attorney
  General, State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone: (808) 587-2978
Facsimile: (808) 586-1372
Email:       ryan.kp.kanakaole@hawaii.gov

ASHFORD & WRISTON
A Limited Liability Law Partnership LLP
JAMES K. MEE    2995-0
KEVIN W. HERRING    6722-0
999 Bishop Street
First Hawaiian Center, 14th Floor
Honolulu, Hawaii 96813
Telephone: (808) 539-0440
Facsimile: (808) 533-4945
Email: jmee@awlaw.com

Attorneys for the Department of Hawaiian Home Lands,
State of Hawai'i

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| In re | ) | Case No. 18-01319 (RJF) |
| | ) | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC | ) | |
| | ) | Status Conference |
| Debtor. | ) | Date: August 23, 2021 |
| | ) | Time: 2:00 p.m. |
| | ) | Judge: Hon. Robert J. Faris |
| | ) | |
| _____ | ) | [Related Docket Entry: Dkt. #425] |

# EXHIBIT P

## DEPARTMENT OF HAWAIIAN HOME LANDS' RESPONSE REGARDING MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE'S STATUS REPORT AND REQUEST FOR STATUS CONFERENCE, <u>FILED HEREIN ON AUGUST 16, 2021 (DKT #425)</u>

State of Hawai'i, Department of Hawaiian Home Lands ("DHHL") submits this response regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference ("Status Report"). Dkt. 425.

In the Status Report, the Trustee indicates that disagreements have arisen between the Trustee and Sandwich Isles Communications ("SIC") regarding SIC fulfilling obligations under the Settlement Agreement and the Sale Order. Further, several exhibits were attached to the Status Report which seem to imply that SIC may still claim exclusive control of the Paniolo assets due to DHHL's License 372 originally issued to Waimana Enterprise, Inc.

DHHL is filing this response:

(1) to inform the Court of the present status of negotiations between DHHL and Hawaiian Telcom ("Buyer") regarding issuance of a new license that would permit Buyer's long-term use of DHHL lands to operate the Paniolo system, as well as interim agreements which authorize Buyer to maintain and operate the Paniolo system.

(2)  to inform the Court of DHHL'S belief that SIC's apparent claim of exclusivity under License 372 is not correct.

(3) to express its concern that SIC's incorrect claim of exclusivity may have an adverse on service to DHHL beneficiaries and others on the Hawaiian Home Lands.

## I.   BACKGROUND

On May 9, 1995, DHHL entered into a license with Waimana Enterprises, Inc. for development of broad band telecommunications services on the Home Lands.  ("License 372").  License 372 stated it was an "exclusive" license.

Subsequently, there were partial assignments of  License 372 to Waimana affiliates SIC, Pa Makani LLC dba Sandwich Isles Wireless, Clearcom, Inc. dba Sandwich Isles Broadband, and Debtor.  SIC also entered into a joint use agreement with Debtor for a portion of the assets covered by License 372.

In 2017, the Federal Communications Commission ("FCC") issued an order determining that the exclusivity provisions of License 372 violated Section 253(a) of the Communications Act, 47 U.S.C. § 151 *et seq.*, and were accordingly preempted and non-enforceable under Section 253(d) of the Act.  *See* Ex. "B" attached to the Declaration of James K. Mee (the <u>Mee Decl.</u>) (the "FCC Order").

This Chapter 11 proceeding was commenced in 2018.  Subsequently, the Trustee filed Michael Katzenstein as Chapter 11 Trustee's Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset

Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee, and (F) Granting Related Relief ("Motion to Approve Sale"). (Docket #313.)

DHHL filed a Statement of Position (Docket #341), stating that DHHL did not object to the sale of the Paniolo assets to Buyer under the terms of the Motion to Approve Sale. DHHL further stated that the Buyer would need to enter into a new license for the use of Hawaiian Home Lands upon which certain of the Paniolo assets were located, which would authorize Buyer to build, construct, repair, maintain and operate the assets located on Hawaiian Home Lands. (Docket #341 at 4-5.)

## II. DHHL AND BUYER HAVE ENTERED INTO A RIGHT OF ENTRY AGREEMENT ALLOWING BUYER TO MAINTAIN AND OPERATE THE PANIOLO ASSETS LOCATED ON HAWAIIAN HOME LANDS ON AN INTERIM BASIS, AND ARE IN THE PROCESS OF NEGOTIATING A NEW LONG-TERM LICENSE.

DHHL and Buyer are presently negotiating a new license that would allow Buyer, on a long-term basis, to maintain and operate the Paniolo assets on the Hawaiian Home Lands. As the first step in that process, on July 26, 2021, DHHL's Chairman issued an initial 30-day Limited Right of Entry that allow Buyer to engage in due diligence activities prior to acquisition of the assets. The

U.S. Bankruptcy Court Hawaii #21-90001 Dkt # 2-35   Filed 05/27/22   Page 4 of 33

Limited Right of Entry is good for a period of thirty days. The issuance of the Limited Right of Entry recited, among other things, that it was in contemplation of the parties entering into negotiations for a new license. The terms of the Limited Right of Entry include, among other things, that DHHL and Buyer contemplated entering into negotiations for a new license. *See* Ex. "B" to Mee Decl., at 2.

Subsequently, at a regular meeting held on August 16, 2021, the Hawaiian Homes Commission approved a longer Right of Entry, to be on a month-to-month basis for a period of up to one year. Mee Decl. at ¶ 5. The final form of that Right of Entry agreement is presently being prepared and should be finalized and executed shortly. Mee Decl. at ¶ 6.

Concurrently, DHHL and Buyer are engaged in negotiations regarding a new long-term license. A proposed form of license was transmitted by counsel for DHHL to counsel for Buyer on August 5, 2021. Mee Decl. at ¶ 7.

Once a form of license is agreed upon by the parties, the proposed license will go through a beneficiary consultation process. Once that process is complete and beneficiary comments have been considered, the Hawaiian Homes Commission will make the final determination whether to approve the license. Mee Decl. at ¶ 8.

### III. LICENSE 372 IS NOT EXCLUSIVE, AND DOES NOT GIVE SIC EXCLUSIVE RIGHTS IN THE HAWAIIAN HOME LANDS, NOR PRECLUDE DHHL FROM ISSUING ANOTHER LICENSE TO BUYER.

The Exhibits to the Trustee's Status Report include several comments made by SIC which imply that, despite the clear wording and effect of the FCC Order, SIC still claims exclusive rights under License 372, and that DHHL is restricted in some fashion from entering into a new license with Buyer. For example, SIC states incorrectly that "[t]he assets on Hawaii Home Lands cannot be operated without Sandwich Isles' license." Letter of May 14, 2021, from SIC to Buyer. Exhibit "A" to Status Report. In an email dated June 2, 2021 from Al Hee of SIC to Buyer's consultant Winslow Tanabe, Mr. Hee incorrectly states that "[a]ll DHHL easements are part of the Waimana License which is not transferable." In another email from Mr. Hee to Mr. Tanabe of July 19, 2021, Mr. Hee incorrectly states that "HT [Buyer] does not own or control the property under the COs it purchased. HHL does subject to Waimana's license."

The quoted SIC statements are not correct for several reasons, including: first, it is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings; and second, the FCC Order expressly ruled that the exclusivity provisions of License 372 violated Section 253 of the Communications Act, 47 U.S.C. § 151 et

U.S. Bankruptcy Court Hawaii #22-90019 Dkt # 28-26 Filed 05/27/22 Page 6 of 33

seq., and were accordingly preempted and non-enforceable under Section 253(d) of the Act.  Exhibit "C" attached hereto.  As stated by the FCC:

> [W]e find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands . . . to Waimana Enterprises, Inc. . . . and then assigned to its subsidiary, Sandwich Isles Communications, Inc. . . . violates Section 253 of the Communications Act . . . we preempt enforcement of its exclusivity provision pursuant to 253(d) of the Act.

Exhibit "C" at 1.

Accordingly, since any rights of SIC under License 372 are not exclusive, DHHL is fully authorized to enter into the process and issue another license to the Buyer.

## IV. SIC SHOULD NOT BE ALLOWED TO DO ANYTHING WHICH MIGHT DISRUPT OR AFFECT THE QUALITY OF SERVICES BEING PROVIDED TO THE HOME LANDS.

The Trustee's Status Report recites a number of areas where SIC is apparently not cooperating in the transfer of control of the Paniolo network to the Buyer, which is acting as Servicer of the system prior to Closing of the transactions.  Also, according to the Status Report, SIC has apparently indicated that, post-closing, it will attempt to maintain "dead-hand control" via the provisions of License 372.  The Trustee states that SIC's actions "represent a clear

U.S. Bankruptcy Court Hawaii #23-90009 Dkt # 36  Filed 05/27/22  Page 8 of 33

and present danger to the operations, safety and security of the Paniolo Cable Network." (Dkt. 425 at 12-13.)

The present situation as outlined in the Status Report causes great concern for DHHL. Thousands of DHHL beneficiaries as well as others on Hawaiian Home Lands are presently serviced by the SIC system, which is connected to and dependent upon the "middle mile" Paniolo system.

DHHL respectfully requests that the Court make it clear that SIC is not permitted to take any action which jeopardizes the Paniolo network, including failing to cooperate in the prompt and lawful transfer of assets to Buyer, or SIC's provision of services to the Home Lands.

DATED:     Honolulu, Hawai'i, August 19, 2021.

CLARE E. CONNORS
Attorney General, State of Hawaii

CRAIG Y. IHA
RYAN K.P. KANAKAOLE


     /s/ Kevin W. Herring
JAMES K. MEE
KEVIN W. HERRING

Attorneys for the Department of
 Hawaiian Home Lands, State of Hawai'i

EXHIBIT "A"

STATE OF HAWAII
DEPARTMENT OF HAWAIIAN HOME LANDS

# LIMITED RIGHT-OF-ENTRY NO. 22-008

This LIMITED RIGHT-OF-ENTRY NO. 22-008 ("LROE"), dated _____July 26____,
2021 (*Effective Date*) is made by and between the State of Hawaii, **DEPARTMENT OF
HAWAIIAN HOME LANDS**, whose place of business is 91-5420 Kapolei Parkway, Kapolei,
Hawaii, 96707 (*PERMITTOR*) and **HAWAIIAN TELCOM, INC.**, a Hawaii corporation,
whose address is 1177 Bishop Street, Suite 32, Honolulu, Hawaii 96813, (*PERMITTEE*).

## RECITALS

**WHEREAS**, on November 13, 2018, an involuntary proceeding under Chapter 11 of the
Bankruptcy Code was filed against Paniolo Cable Company, LLC ("Debtor") in the United
States Bankruptcy Court for the District of Hawaii ("Bankruptcy Court"), Case No. 18-01310
(RJF); and

**WHEREAS**, the submarine and terrestrial assets of the Debtor were sold by the Trustee
of the Debtor ("Trustee") to the PERMITTEE, via an Asset Purchase Agreement dated
November 30, 2020 (the "APA"); and

**WHEREAS**, the sale of the assets of the Debtor (collectively the "Assets") under the
terms and conditions of the APA was approved by the Bankruptcy Court by its "Order (A)
Authorizing and Approving the Sale of the Debtor's Assets Free and clear of All Liens, Claims,
Interests, and encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the
Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in
Connection with the Sale, (D) Approving the Operational Support and Sales Services
Agreement, (E) Approving a Break-Up Fee, and (F)) Granting Related Relief; Exhibits "A" and
"B"," filed December 28, 2020 ("Sale Order"); and

**WHEREAS**, pursuant to the APA and Sale Order, the Trustee and the PERMITTEE are
presently moving to a closing of the transaction, contingent on receiving certain approvals from
the Federal Communications Commission; and

**WHEREAS**, as a part of the sale, the Trustee and PERMITTEE also entered into an
Amended Operational Support and Sales Agreement dated December 21, 2020 ("Operations
Agreement"), allowing PERMITTEE to maintain and operate the Assets of the Debtor until the
closing of the transaction; and

**WHEREAS**, a portion of the Assets being acquired by the PERMITTEE and presently
being maintained and operated by PERMITTEE are physically located on the lands of the
PERMITTOR;

**WHEREAS**, while ownership is imminent, PERMITTEE has not yet acquired the
Assets and PERMITTEE has requested this LROE to obtain access it needs to inspect and

**EXHIBIT** _A_

assess existing infrastructure and immediately adjoining peripheral areas and complete any other due diligence related to Assets and the sales transaction; and

WHEREAS, the "Premises" for this LROE means the portions of PERMITTOR's land currently being used by the PERMITTEE to maintain and operate the Assets under the Operations Agreement and peripheral areas thereto for PERMITTEE's due diligence work, as more specifically described in Exhibit "A" attached hereto; and

WHEREAS, based on the best available information, Exhibit "A" attached hereto identifies the portion of the Premises currently being used by the PERMITTEE to maintain and operate the Assets, and after its due diligence, PERMITTEE will inform PERMITTOR if the PERMITTEE believes other additional areas of PERMITTOR's land are being used for such maintenance and operation; and

WHEREAS, this LROE is not intended to affect existing rights PERMITTEE has under the Operations Agreement and the Sales Order or will acquire pursuant to the Sales Order, which allow and will allow PERMITTEE to continue to maintain and operate the Assets; and

WHEREAS, PERMITTOR and PERMITTEE have agreed to work collaboratively and expediously in a manner consistent with the rights and duties of the PERMITTEE and the rights and duties of the PERMITTOR for the issuance of a new license and

WHEREAS, as an interim measure, PERMITTOR is issuing this initial Limited Right of Entry to PERMITTEE (i) in order to allow PERMITTEE to conduct its due diligence investigations, and (ii) in furtherance of negotiations between PERMITTOR and PERMITTEE regarding the issuance of a new License and such other agreement(s) which would memorialize the continued maintenance and operation activities of PERMITTEE up to, and from, the closing of the transaction;

NOW, THEREFORE, PERMITTOR hereby grants this limited right of entry upon the following terms and conditions:

1.  **GRANT**. PERMITTOR grants to PERMITTEE, its employees, consultants, contractors, invitees, agents, and representatives (collectively, Permittee's Representatives), a non-exclusive, revocable right to enter the Premises.

2.  **TERM**. This LROE commences on the Effective Date and will continue thereafter for a period of thirty (30) days.

3.  **PERMITTED USE**. PERMITTEE may use the Premises only for conducting its due diligence investigations. PERMITTEE shall not use the Premises for any other purpose(s), except with PERMITTOR'S prior written consent and except for maintenance and operation of the Assets on the Premises as set forth in the Operations Agreement.

4.  **FEES**. PERMITTEE is not required to pay any fees for its use of the Premises, but PERMITTEE will bear its own costs, expenses, and liabilities arising from its use of the Premises. There is no processing and documentation fee for this LROE.

2

5. **MAINTENANCE, SECURITY**. PERMITTEE shall keep the Premises in a strictly clean and sanitary and orderly condition, and shall not cause, make, permit, or suffer any waste, spoil, nuisance, nor any unlawful, improper, illegal, or offensive use of or on the Premises. PERMITTEE shall be solely responsible for the security of the Premises and all of PERMITTEE'S property kept in or on the Premises.

6. **CONSTRUCTION AND IMPROVEMENTS**. PERMITTEE may not construct, alter, amend, place, or install any improvements or fixtures on the Premises or any improvements thereon except with PERMITTOR'S prior written approval or as permitted by the Operations Agreement.

7. **COMPLIANCE WITH LAWS**. PERMITTEE shall comply with all rules, regulations, ordinances and/or laws of the State of Hawaii and any other municipal and/or Federal Government authority applicable to the Premises and improvements thereon.

8. **LIMITED RIGHT TO ENTER**. Because of the high security nature of the portions of the Premises where the Assets are located, PERMITTOR, its employees, agents, consultants, contractors and representatives, will not have free access to enter such areas of the Premises. As to the balance of the Premises, PERMITTOR, its employees, agents, consultants, contractors and representatives, may at all reasonable times freely access and enter such portion of the Premises for the purpose of, but not limited to, examining the same or for the performance of any public or official duties; provided that PERMITTOR shall not interfere unreasonably with PERMITTEE'S permitted use(s) of the Premises under the Operations Agreement.

9. **NO ASSIGNMENT OR SUBLEASE**. PERMITTEE may not in any manner transfer, assign, mortgage, pledge, sublease, or sublet any rights in or to the Premises, in whole or part, or otherwise hold or agree so to do for the benefit of any other person or persons or organization of any kind.

10. **NO LIENS OR ENCUMBRANCES**. PERMITTEE shall not by any act or omission, directly or indirectly, create, incur, assume, cause, or suffer to exist any liens or encumbrances on or with respect to its interests and rights of use in the Premises. PERMITTEE shall promptly notify PERMITTOR of any such liens and encumbrances and, at its own expense, take such action as may be necessary to immediately and fully discharge or release any such lien or encumbrance.

11. **EXPIRATION**. Upon termination of this LROE, PERMITTEE may continue with its activities under and pursuant to the Operations Agreement, however, will no longer have access to the peripheral areas of the Premises.

1. **INSURANCE**. PERMITTEE shall provide proof of a comprehensive commercial general liability insurance policy of no less than $2,000,000.00 for each occurrence, naming the Department of Hawaiian Home Lands (DHHL) as an additional

3

insured prior to commencement of work and throughout the term of this ROE. The specification of these limits as contained herein shall not be construed in any way to be a limitation on the amount of liability of PERMITTEE for fees, interest or other charges under this ROE.

PERMITTEE shall provide certificate(s) of insurance necessary to evidence compliance with the insurance provisions of this ROE. PERMITTEE shall keep such insurance in effect and the certificate(s) on deposit with PERMITTOR during the entire term of this ROE.

In addition:

a.    Failure of PERMITTEE to provide and keep in force such insurance shall be regarded as material default under this ROE. PERMITTOR shall be entitled to exercise any or all of the remedies provided in this ROE for default of PERMITTEE.

b.    The procuring of such required insurance policies shall not be construed to limit PERMITTEE'S indemnification obligations under this ROE.

c.    PERMITTOR is a self insured State agency. PERMITTEE'S insurance shall be primary. Any insurance maintained by PERMITTOR and/or the State of Hawaii shall apply in excess of, and shall not contribute with, insurance provided by PERMITTEE.

Such insurance policy shall (a) be issued by an insurance company or surety company authorized to do business in the State of Hawaii or approved in writing by the Chairman, Hawaiian Homes Commission; (b) name the State of Hawaii and its DEPARTMENT OF HAWAIIAN HOME LANDS as an insured; (c) provide that the DEPARTMENT OF HAWAIIAN HOME LANDS shall be notified at least thirty (30) days prior to any termination, cancellation or material change in the insurance coverage; and (d) cover all injuries, losses or damages arising from, growing out of or caused by any acts or omissions of PERMITTEE, its officers, agents, employees, invitees or licensees in connection with PERMITTEE'S use or occupancy of the Premises; provided that PERMITEE shall not be required to cover injuries, losses or damages caused by the sole negligence of DEPARTMENT OF HAWAIIAN HOME LANDS or pre-existing conditions.

PERMITTEE shall insure during the term of this ROE the Assets as required by the Operations Agreement.

PERMITTEE shall furnish to PERMITTOR upon the execution of this ROE, certificates showing such insurance policy or policies to be in favor of PERMITTOR and to be in force, and shall furnish like certificates upon each renewal thereof. In the event of loss, damage or destruction, PERMITTOR shall retain from the proceeds of the policies such amounts deemed by it to be necessary to cover the loss, damage or destruction of or to the improvements and the balance of such proceeds, if any, shall be delivered to PERMITTEE.

4

The procuring of this policy shall not release or relieve PERMITTEE of its responsibility under this ROE as set forth herein or limit the amount of its liability under this ROE.

PERMITTEE shall provide proof of liability insurance satisfactory to PERMITTOR within a reasonable time before the Effective Date.

13. **DEFENSE AND INDEMNITY.** PERMITTEE agrees to save, defend, and hold harmless the State of Hawaii, its Department of Hawaiian Home Lands, its officers, employees, and agents from and against all liability, loss, damage, cost, and expenses, including all attorneys' fees and costs, and all claims, suits, demands therefore arising out of or resulting from the acts or omissions of PERMITTEE or PERMITTEE's employees, officers, agents, or subcontractors under this Limited Right of Entry Permit, provided that PERMITTEE's obligations under this paragraph do not apply to any claims, suits, demands, liability, loss, damage, cost and expenses, including attorneys' fees and costs, asserted by Sandwich Isles Communications (SIC), or its related companies or subsidiaries, or any person or entity claiming by or through any of them, for trespass, tortious interference with a business advantage, breach of contract, or similar allegation or any claim arising from or based on any putative exclusive agreement between DHHL and SIC.

14. **HAZARDOUS MATERIAL.** PERMITTEE shall not cause or permit the escape, disposal, or release of any hazardous materials. PERMITTEE shall not allow the storage or use of such materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such materials, nor allow to be brought onto the premises any such materials except to use in the ordinary course of PERMITTEE'S business, and then only after written notice is given to the PERMITTOR of the identity of such materials and upon PERMITTOR'S consent, which consent may be withheld at the PERMITTOR'S sole and absolute discretion. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of hazardous materials by PERMITTEE, then PERMITTEE shall be responsible for the costs thereof. In addition, PERMITTEE shall execute affidavits, representations and the like from time to time at PERMITTOR'S request concerning PERMITTEE'S best knowledge and belief regarding the presence of hazardous materials on the Premises placed or released by PERMITTEE.

PERMITTEE agrees to indemnify, defend, and hold harmless PERMITTOR, its officers, employees, and agents from and against all liability, loss, damage, cost, and expense, including all attorney's fees, and all claims, suits, and demands therefore, arising out of or resulting from any use or release of hazardous materials on the premises occurring while PERMITTEE is in possession, or elsewhere if caused by PERMITTEE or persons acting under PERMITTEE. These covenants shall survive the expiration or earlier termination of the LROE.

For the purpose of this LROE, the term "hazardous material" as used herein shall include any substance, waste or material designated as hazardous or toxic or radioactive or other similar term by any present or future federal, state or local statutes, regulation or ordinance, such as the Resource Conservation and Recovery Act, as amended, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and the Federal Clean Water Act, as amended from time to time, and also including but not limited to petroleum, petroleum based substances, asbestos, polychlorinated-byphenyls ("PCB"),

5

formaldehyde, and also including any substance designated by federal, state or local regulations, now or in the future, as presenting a risk to human health or the environment.

Prior to the termination of the LROE, PERMITTEE may be required to conduct a Level One (1) Hazardous Waste Evaluation and conduct a complete abatement and disposal, if necessary, satisfactory to the standards required by the Federal Environmental Protection Agency, the Department of Health and PERMITTOR.

The foregoing shall not apply to PERMITTEE's routine day-to-day maintenance and operation activities pursuant to the Operations Agreement.

15.   **ENTIRE AGREEMENT**. This LROE contains all of the terms and agreements between the parties relating to the subject matter hereof and supersedes and cancels any and all other conflicting prior agreements, promises, and negotiations between them. Nothing contained herein shall limit any claims by PERMITTOR against PERMITTEE arising under prior agreements, nor limit PERMITTEE'S continuing obligations under prior agreements, including insurance, indemnity, and hazardous waste obligations.   This LROE may be executed in counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute one agreement.

16.   **PERMITTEE REPRESENTATIONS**. PERMITTEE currently uses and occupies the Premises where the Assets are located and is familiar with the quality and condition of such portion of the Premises, has had an opportunity to inspect such portion of the Premises, and to evaluate and determine for itself the suitability of the such Premises for its intended purposes. As to the entire Premises, PERMITTEE accepts the Premises as-is, where-is, with all faults, defects, and conditions, whether known or unknown.

17.   **SPECIAL CONDITIONS**.

A.     The LROE document shall be subject to other standard terms and conditions of similar documents issued by DHHL and will be subject to the review and approval by the Office of the Attorney General, State of Hawaii; and

B.     This LROE is subject to other terms and conditions that may be deemed prudent by the Chairman of the Hawaiian Homes Commission.

[REMAINDER OF PAGE BLANK -- SIGNATURE PAGE FOLLOWS]

6

IN WITNESS WHEREOF, PERMITTOR and PERMITTEE have caused this LROE to be executed by the duly authorized officers/individuals as of the day and year first above written.

State of Hawaii
DEPARTMENT OF HAWAIIAN HOME LANDS

APPROVED AS TO FORM:

By _____
    William J. Aila, Jr., Chairman
    Hawaiian Homes Commission

_____
Deputy Attorney General
State of Hawaii

                        PERMITTOR

HAWAIIAN TELCOM, INC.
  a Hawaii corporation

By: _____
    Su Hwa Shin Meisenzahl
Its: President & General Manager

                        PERMITTEE

7

Exhibit "A"

| Location | Function | TMK / Description |
|---|---|---|
| Anahola (Kauai) | Central Office | (4) 4-18-15 (Parcel 22 and 23) and access easement adjacent |
| Kekaha (Kauai) | Terminal Building / CLS | 7743 Iwipolena Rd, Kekaha, HI 96752 (Parcel ID 120170050000) |
| Nanakuli (Oahu) | Terminal Building / CLS | 8-9-7 Portion 2 (Lot A) |
| Waimanalo (Oahu) | Terminal Building / CLS | 4-1-08: Portion 3 (Lot 55 Waimanalo Resident Lots, Unit 9) |
| Oneiliʻi (Molokai) | Cable Landing | 2-5-4-6:19 (parcel ID 540060190000) |
| Kalamaula (Molokai) | Terminal Building / CLS | 2nd Div 5-2-09: :Portion 22 and 14 |
| Puunene (Maui) | Terminal Building / CLS | Northwest portion of parcel ID 380080360000 (Near 1350 Mehameha Loop, Kahului, HI 96753) |
| Waiehu (Maui) | Central Office | 2nd Div 3-2-21:14 (Portion of Lot 14 Waiehu Kou Subdivision) |
| Kawaihae (Hawaii) | Cable Landing/Beach MH | 3-6-1-4:20 (Parcel ID 610040200000) |
| Puukapu (Hawaii) | Terminal Building / CLS | 3rd 6-4-04:009 portion (Lot 23 Puukapu Pasture Lots Section I) and land between Puukapu Pasture Lots Section I and Kuhio Village |
| Laiopua (Hawaii) | Central Office | Lot 227 - Villages of Laiopua (Village 3) |
| Hilo (Hawaii) | Central Office | 2-1-025:090 - Portion of Lot 89 Panaewa House & Farm Lots Section 1 |

| Location | Function | TMK / Description |
| --- | --- | --- |
| Near Ka Waihona O Ka Naauao PCS at 89-195 Farrington Hwy | Meet-Me Cabinet for Nanakuli Terminal Bldg | Includes cabinet located on Parcel ID 890010040000 and the area for the lines to connect to the main site. |
| Near Hawaiian Telcom Waimanalo CO at 41-1032 Kalanianaole Hwy | Meet-Me Cabinet for Waimanalo Terminal Bldg | Includes cabinet located on Parcel ID 410210310000 and the area for the lines to connect to the main site. |
| NE of intersection of Kahiwa St and Mauna Loa Hwy | Meet-Me Cabinet for Kalamaula Terminal Bldg | Includes cabinet located on the parcel to be identified and the area for the lines to connect to the main site. |
| Southernmost corner of Parcel ID 320230550000 on Kahekili Hwy just NW of Hoauna St Intersection | Meet-Me Cabinet for Waiehu Central Office | Includes cabinet located on Parcel ID 320230550000 and the area for the lines to connect to the main site. |

2

# EXHIBIT "B"

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Connect America Fund | ) | WC Docket No. 10-90 |
| | ) | |
| Sandwich Isles Communications, Inc. | ) | |
| | ) | |
| Petition for Waiver of the Definition of "Study | ) | CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) | |
| and Sections 36.611 and 69.2(hh) of the | ) | |
| Commission's Rules | ) | |

### MEMORANDUM OPINION AND ORDER

Adopted: **June 30, 2017**                                    Released: **July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

     1.     Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement. Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2] Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

### I.    BACKGROUND

     2.     DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5] Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

**EXHIBIT D**

State land.[6] Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8] However, DHHL "does not have regulatory authority over telecommunications carriers."[9] In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10] Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [sic] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11] The terms of the Exclusive License provide that "broad band [sic] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12] In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3.    In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14] In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] Id. at 2.

[11] Exclusive License at 2.

[12] Id. at 1.

[13] DHHL Letter at 2; see also Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] See generally Sandwich Isles Communications, Inc., Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (Sandwich Isles Improper Payments Order). The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support. See generally Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee, Notice of Apparent Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (Sandwich Isles NAL or NAL). In the NAL, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations. Id. at 12974, para. 84. The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue. Id.; see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations, Public Notice, WC Docket No. 16-405, DA 17-168 (2017). Sandwich Isles submitted its response to the NAL on February 3, 2017. See Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4.      In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18]  On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19]  In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21]  In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5.      Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6.      Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58.  This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

7.    Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8.    Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II.    DISCUSSION

9.    The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services. Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A.    Section 253(a) Analysis

10.    *Section 253(a) Applies.* Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a). First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28] We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies. As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29] Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30] Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31] And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33] Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3. We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.; see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27). In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

4

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34] It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36] In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

11.     Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands.  For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39]  Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

12.     Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government.  It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41]  That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42]  But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply.  Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

13.     We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a).  In the *Minnesota Order*, the Commission found

(Continued from previous page) ———————————————————
because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law. *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44]  The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45]  Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands.  It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors.  Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands.  For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies.  Such a conclusion is entirely consistent with congressional intent.  As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

14.     Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49]  In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*.  There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50]  The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51]  As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52]  Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19.  The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply.  *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost.  *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

15.     *The Exclusive License Violates Section 253(a).*  Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54]  Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55]  We reject this argument.  DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority).  More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16.     The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58]  The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59]  As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60]  And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17.     Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62]  However, this fact does not render the Exclusive License lawful.  On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g.*, *Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g.*, *N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also* Hee Reply Comments at 1.

U.S. Bankruptcy Court - Hawaii   #23-90069   Dkt # 243-263   Filed 06/27/21   Page 37 of 138

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18. Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

## B.    Section 253(b) Analysis

19. We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20. Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21. Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72] Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73] However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74] And Waimana does not even reference Section 253(b) in its reply comments.

### C.    Section 253(c) Analysis

22.    Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75] That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76] However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL. Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77] In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23.    While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79] The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80] By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities. Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands. Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 187 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24.     Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83] Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84] Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

### D.     Preemption Under Section 253(d)

25.     Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85] That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86] We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands. We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88] We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

### E.     Waimana's and Sandwich Isles' Remaining Arguments

26.     None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License. First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90] Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91] Waimana, however, fails to cite any support for this claim. Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27.     Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 282-8  Filed 08/29/22  Page 32 of 34

## III. ORDERING CLAUSES

28.    Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

29.    IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

12

## STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re: *Connect America Fund et al.*, WC Docket No. 10-90 et al.

This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.

13

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>　　　　　Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br>MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S **MOTION TO APPROVE SETTLEMENT AGREEMENT** PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019<br><br>Hearing:<br>Date:  June 1, 2020<br>Time:  2:00 p.m.<br>Judge: Hon. Robert J. Faris |

**MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S
MOTION TO APPROVE SETTLEMENT AGREEMENT
PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>         Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br>MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S **MOTION TO APPROVE SETTLEMENT AGREEMENT** PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019<br><br>Hearing:<br>Date:  June 1, 2020<br>Time:  2:00 p.m.<br>Judge: Hon. Robert J. Faris |

## MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S
## MOTION TO APPROVE SETTLEMENT AGREEMENT
## PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019

MICHAEL KATZENSTEIN, as Chapter 11 Trustee (the "Trustee") of the

Bankruptcy Estate of PANIOLO CABLE COMPANY, LLC (the "Debtor"), by

and through his attorneys, Goodsill Anderson Quinn & Stifel, a Limited Liability

Law Partnership LLP, files this motion (the "Motion") seeking approval of that

certain *Rule 9019 Settlement Agreement (Post-Judgment)* by and between the

Trustee, the Paniolo Creditors,[1] Waimana Enterprises, Inc., Sandwich Isles

Communications, Inc. and the SIC Affiliates.[2]

A redacted copy of the *Rule 9019 Settlement Agreement (Post-Judgment)* is

being filed as Exhibit "A" to the Motion. A full and complete copy of the

agreement will be provided at the hearing on the Motion to parties with standing

who have signed a non-disclosure agreement in a form acceptable to the Trustee.

This Motion is made pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure, Local Bankruptcy Rule 9019-1(a) and is supported by the

Memorandum in Support of Motion, the Declaration of Michael Katzenstein, the

exhibits attached thereto, the record and files in the main case and Adversary

---

[1] The "Paniolo Creditors" consist of HSBC Securities (USA) Inc., which holds legal or beneficial ownership of 94.6% ($176.3 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt, 100% ($28.8 million) of Paniolo's Series B secured debt and 100% ($643,400) of Paniolo's Series C unsecured debt plus unpaid interest and fees; Sunrise Partnership Limited Partnership, which holds legal or beneficial ownership of 5.4% ($10 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt plus unpaid interest and fees; and Deutsche Bank Trust Company Americas, which is owed $61,699 by the Debtor (plus attorneys' fees and costs) in fees and expenses incurred under the Amended and Restated Note Purchase Agreement.

[2] The SIC Affiliates include Clearcom, Inc., Pa Makani LLC and Ho'Opa'a Insurance Corp.

Proceeding No. 19-90022 styled *Michael Katzenstein, as Chapter 11 Trustee v. Sandwich Isles Communications, Inc*., and the argument and evidence to be presented at any hearing on this Motion.

Dated:  Honolulu, Hawaiʻi, April 24, 2020.

  */s/Johnathan C. Bolton*
JOHNATHAN C. BOLTON
CHRISTOPHER P. ST. SURE

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

MICHAEL KATZENSTEIN, as Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate of PANIOLO CABLE COMPANY, LLC (the "Debtor"), by and through his attorneys, Goodsill Anderson Quinn & Stifel, a Limited Liability Law Partnership LLP, files this motion (the "Motion") seeking approval of that certain *Rule 9019 Settlement Agreement (Post-Judgment)* by and between the Trustee, the Paniolo Creditors,[1] Waimana Enterprises, Inc., Sandwich Isles Communications, Inc. and the SIC Affiliates.[2]

A redacted copy of the *Rule 9019 Settlement Agreement (Post-Judgment)* is being filed as Exhibit "A" to the Motion. A full and complete copy of the agreement will be provided at the hearing on the Motion to parties with standing who have signed a non-disclosure agreement in a form acceptable to the Trustee.

This Motion is made pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rule 9019-1(a) and is supported by the Memorandum in Support of Motion, the Declaration of Michael Katzenstein, the exhibits attached thereto, the record and files in the main case and Adversary

---

[1] The "Paniolo Creditors" consist of HSBC Securities (USA) Inc., which holds legal or beneficial ownership of 94.6% ($176.3 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt, 100% ($28.8 million) of Paniolo's Series B secured debt and 100% ($643,400) of Paniolo's Series C unsecured debt plus unpaid interest and fees; Sunrise Partnership Limited Partnership, which holds legal or beneficial ownership of 5.4% ($10 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt plus unpaid interest and fees; and Deutsche Bank Trust Company Americas, which is owed $61,699 by the Debtor (plus attorneys' fees and costs) in fees and expenses incurred under the Amended and Restated Note Purchase Agreement.

[2] The SIC Affiliates include Clearcom, Inc., Pa Makani LLC and Ho'Opa'a Insurance Corp.

Proceeding No. 19-90022 styled *Michael Katzenstein, as Chapter 11 Trustee v.*

*Sandwich Isles Communications, Inc*., and the argument and evidence to be

presented at any hearing on this Motion.

Dated:  Honolulu, Hawaiʻi, April 24, 2020.

 __/s/Johnathan C. Bolton_____
JOHNATHAN C. BOLTON
CHRISTOPHER P. ST. SURE

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

**Date Signed:**
**June 4, 2020**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br>ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019<br><br><u>Hearing</u>:<br>Date: June 1, 2020<br>Time: 2:00 p.m.<br>Judge: Robert J. Faris |

**ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

The *Motion to Approve Settlement Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019* [Dkt. no. 252] (the "<u>Motion</u>") filed by Michael Katztenstein, as Chapter 11 Trustee (the "<u>Trustee</u>") of the Bankruptcy Estate of

7988341.1

PANIOLO CABLE COMPANY, LLC (the "Debtor"), was considered by the Honorable Robert J. Faris, United States Bankruptcy Judge, at 2:00 p.m. on June 1, 2020 (the "Hearing"). Appearances of counsel are noted in the record.

The Court, after finding that due and adequate notice of the Motion having been given, after finding that there were no objections to the Motion; after finding that the *Rule 9019 Settlement Agreement (Post-Judgment)* by and between the Trustee, the Paniolo Creditors,[1] Waimana Enterprises, Inc., Sandwich Isles Communications, Inc. and the SIC Affiliates meets the requirements of *Martin v. Kane (In re A & C Properties.),* 784 F.2d 1377 (9th Cir.) *cert. denied*, 479 U.S. 854 (1986), for the reasons set forth on the record of the Hearing, has decided that the Motion should be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that:

1.      The Motion is GRANTED for the reasons set forth therein.

2.      The terms and conditions of the *Rule 9019 Settlement Agreement (Post-Judgment)* are APPROVED.

3.      The Court reserves jurisdiction over the parties to the *Rule 9019 Settlement Agreement (Post-Judgment)* for the purposes of interpretation, implementation and enforcement thereof.

**END OF ORDER**

---

[1] Defined terms not defined herein shall have the meanings ascribed to them in the Motion.

Submitted by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

## RULE 9019 SETTLEMENT AGREEMENT (POST-JUDGMENT)

This Rule 9019 Settlement Agreement is entered into, effective as of March 6, 2020 (this "Agreement") by and among:

(i)     The Paniolo Creditors[1] by and through the acknowledgement of Deutsche Bank Trust Company Americas, as Purchasers Agent and Collateral Agent, which is not a Party as such term is defined herein in such capacity (the "Paniolo Creditors");

(ii)    Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC ("Paniolo Trustee");

(iii)   Waimana Enterprises, Inc.[2]("Ownership") and SIC Affiliates (hereinafter defined); and

(iv)    Sandwich Isles Communications, Inc. ("SIC", together with the SIC Affiliates and Ownership, the "SIC Parties");

The Paniolo Creditors, the Paniolo Trustee, Ownership and SIC shall collectively be referred to herein as the "Parties," and each, individually, as a "Party."

### RECITALS

A.      The Parties have negotiated in good faith and at arm's length with the objective of restructuring the business and financial affairs of Paniolo Cable Company, LLC ("Paniolo Cable") and addressing the rights under the judgment granted the Paniolo Trustee against SIC in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.,* pending in *In re Paniolo Cable Company, LLC, Debtor,* Case No. 19-01319 (RJF), in the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Hawaii (the "Judgment").

B.      Ownership directly or indirectly owns or controls 100% of the equity interests of SIC, and certain affiliates of SIC, including Clearcom, Inc. ("Clearcom"), Pa Makani LLC ("Pa Makani") and Ho'Opa'a Insurance Corp. ("Ho'Opa'a," together with Clearcom and Pa Makani,

---

[1] The Paniolo Creditors consist of HSBC Securities (USA) Inc., which holds legal or beneficial ownership of 94.6% ($176.3 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt, 100% ($28.8 million) of Paniolo's Series B secured debt and 100% ($643,400) of Paniolo's Series C unsecured debt plus unpaid interest and fees; Sunrise Partnership Limited Partnership, which holds legal or beneficial ownership of 5.4% ($10 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt plus unpaid interest and fees; and Deutsche Bank Trust Company Americas, which is owed $61,699 by Paniolo Cable (plus attorneys' fees and costs) in fees and expenses incurred under the Amended and Restated Note Purchase Agreement.

[2] Members of the Hee family and the family trusts own and control ownership of SIC.

and other affiliates, including Waimana Enterprises, Inc. ("Waimana"), collectively, the "SIC Affiliates").

C.    SIC is party to the SIC Lease and the Joint Use Agreement.[3]

D.    Pursuant to a submarine cable landing license issued by the Federal Communications Commission (the "FCC"), Paniolo Cable owns and, pursuant to the SIC Lease and JUA (each as hereinafter defined) operates a submarine cable system and related terrestrial assets (the "Paniolo System") connecting certain islands in the State of Hawaii.

E.    Pursuant to various licenses from the FCC, the Hawaii Public Utilities Commission, the State of Hawaii Department of Hawaiian Home Lands ("DHHL") and other regulatory agencies (the "Licenses and Entitlements"), SIC and the SIC Affiliates own and operate certain facilities, including an incumbent local exchange carrier, and provide telecommunications (including wireless and broadband) services to subscribers residing on the Hawaiian Home Lands.  Such services are currently dependent upon access to the Paniolo System.  SIC leases access to the Paniolo System from Paniolo Cable via a long-term lease (as hereinafter defined, the "SIC Lease").  In addition, Paniolo Cable and SIC are parties to a Joint Use Agreement (as hereinafter defined, the "JUA") which facilitates SIC's delivery of services to its customers and maintenance and operation of the Paniolo System.

F.    SIC owes the Paniolo Trustee approximately $256 million, plus interest and fees as provided for in the Judgment.

G.    The Parties agree that replacement of the SIC Lease and of the JUA as set forth in the Master Relationship Agreement and provided herein, and a sale of substantially all of Paniolo Cable's assets free and clear of all liens and encumbrances (the "Paniolo 363 Sale") are in their best interests and that of their constituencies.

H.    The Parties agree that certain of the measures set forth herein are subject to necessary approvals by applicable government authorities and the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties to this Agreement hereby agrees as follows:

1.    Additional Definitions.  In addition to the definitions set forth in the Recitals, the following terms shall have the following meanings:

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

"Definitive Documentation" means the Master Relationship Agreement, and such other documents necessary to consummate the settlement contemplated in this Agreement, each in form and substance satisfactory to the Parties, including each of the following:

---

[3] Capitalized terms shall have the meanings as defined herein unless the context requires otherwise.

a.     The Master Relationship Agreement, to be approved by the presiding judge in the Paniolo Bankruptcy Case.

b.     All Licenses and such other assets held by SIC and specific Licenses and assets held by SIC Affiliates, including those itemized on Exhibit "3" attached hereto that are necessary to provide telecommunication services in the Hawaiian Home Lands, including but not limited to: (a) the  license to provide telecommunications services to Hawaiian Home Lands between DHHL as licensor and Waimana as licensee, granting certain exclusive rights and privileges relating to a telecommunications network on Hawaiian Home Lands, partial assignments thereof from Waimana to Pa Makani and Clearcom, and (b) any contracts between and among SIC and any of the SIC Affiliates relating to the telecommunication services or Paniolo Cable..

c.     The Assignment of Judgment.

d.     The Schedule A.1 Acknowledgement.

e.     The Schedule A.2 IRU.

f.     [Other]

"Joint Use Agreement" means that certain Joint Use Agreement dated July 19, 2007 by and among Paniolo Cable and SIC.

"Master Relationship Agreement" means that certain Master Relationship Agreement, substantially in the form attached hereto as Exhibit 1, which shall be assumable and assignable under Bankruptcy Code §365.  For the avoidance of doubt, the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease, and shall include (a) a lease to SIC of  a maximum of two (2) fiber pairs on the Paniolo Cable System (the "Initially Leased Fiber") at no cost (other than charges for space and power), (b) an option for SIC to acquire additional capacity on the Paniolo Cable System upon negotiation of fees mutually agreeable to the Paniolo Trustee (or its successors) and SIC (the "Additional Fiber"), (c) granting an Indefeasible Right of Use (IRU) of SIC equipment and property rights (including the Schedule A.2 assets) to the Paniolo Trustee or his designee (and their successors) (the "Schedule A.2 Assets IRU") and provisions to assure SIC of the rights to use the Schedule A.2 Assets as necessary to continue SIC retail telecommunications services to the residents of the Hawaiian Home Lands,[4] and (d) annual rent payments by SIC of not more than $1 per annum,[5] plus reasonable OA&M for the Initially Leased Fiber.  SIC shall have no right to assign or sublease any of its interest in the Initially Leased Fiber except to the Ownership and only for the purposes of providing retail services to end users on Hawaiian Home Lands.  The Initially Leased Fiber shall be used during the term of the Master Relationship Agreement exclusively to provide retail telecommunications services to SIC end-user

---

[4]     For the avoidance of doubt, the Initially Leased Fiber may be used only to provide telecommunication services to end-users (including individuals and commercial businesses) located on Hawaiian Home Lands that do not re-sell access to the Leased Fiber.

[5]     This nominal amount shall only applied to the Initially Leased Fiber.  Charges for space and power and for the Additional Fiber shall be charged to SIC at market rates.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 271   Filed  06/04/20   Page 6 of 16

customers, including non-profit organizations, and commercial users (but not resellers) of the Initially Leased Fiber residing on the Hawaiian Home Lands. Any assignment, sublease or use other than to provide retail telecommunications services to SIC end-user customers residing on the Hawaiian Home Lands during the term of the Master Relationship Agreement shall constitute an event of default under the Master Relationship Agreement and shall, with immediate effect, cancel SIC's rights in respect of the Initially Leased Fiber, but in no event shall affect the rights of the Paniolo Trustee (or any of his successors in interest) in the Schedule A.2 Assets IRU.

"Mililani Lease" means the lease or an IRU of the Mililani Property which the Paniolo Trustee shall execute as lessor as grantor to a third party granting such access and non-exclusive possession of the necessary areas of buildings located on the Mililani Property for purposes to conduct operations of the Paniolo cable network. The charge for such use shall be at a rate equal to the pro rata portion of reasonable expenses incurred in the operation of the Paniolo cable network on the Mililani Property. The use of the property shall be limited by any law, zoning or land use classification and to operations relating to Paniolo Cable. The third party's use of the property for any other operations shall be with the consent of the owner of the Mililani Property and subject to charge at market rates. The Mililani Option shall be subject to the Mililani Lease and shall not be terminable by the Optionee or its successors.

"Mililani Property" means the real estate, fixtures and the other property located at 77-808 Kamehameha Highway, Mililani, Hawaii 96789, more specifically described in Transfer Certificate of Title No. 600,112, issued to Sandwich Isles Communications, Inc., a Hawaii corporation, Tax Map Key No. (1) 9-5-2-3.

"Mililani Property Option" means that certain option to purchase granted by Paniolo Trustee to Ownership or its designee ("Optionee") and providing the Optionee with the right to purchase the Mililani Property, as is, where is, subject to the Mililani Lease, and the remaining portion of the Judgment on or prior to May 15, 2020 (the "Option Date") for $2 million cash only (without offset or reduction), Optionee to bear all costs of such purchase. For the avoidance of doubt, the option may only be exercised by delivery of $2 million in cash to the Paniolo Trustee by the Option Date.

"Paniolo 363 Sale" means a sale of all or substantially all of Paniolo Cable's assets free and clear of liens and encumbrances and amendment, assumption and assignment of certain contracts pursuant to Bankruptcy Code sections 363 and 365, and entry into the Mililani Lease, subject to approval by the Bankruptcy Court and all regulatory authorities.

"Person" means any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, governmental unit or other entity.

"Schedule A.1 Acknowledgement" means an acknowledgement executed by SIC acknowledging Paniolo Cable's ownership and, if requested by the Paniolo Trustee, an assignment, transfer and conveyance by SIC, free and clear of the claims and liens of any other person, to the Paniolo Trustee, at no cost, those certain assets listed in Schedule A.1, which are assets currently titled in or owned by Paniolo Cable but in the possession or under the control of SIC.

"SIC Lease" means that certain Paniolo Cable Network Lease dated July 19, 2007 pursuant to which Paniolo Cable leased Paniolo System capacity to SIC.

"Transferred Equipment and Property Rights" means the equipment and property rights, including those described in Schedule A.2 to Exhibit A attached hereto and those described in the Schedule A.2 Assets IRU, and the Mililani Property, to transferred by SIC in conjunction with the US Marshal Sale, in partial consideration for entering into the Master Relationship Agreement, and generally consisting of all assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, security systems, network management systems, cross connects and cross connect panels, vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, as to be further specified by the Paniolo Trustee for a stand-alone commercial operation and use of the Paniolo Cable System.

"US Marshal Sale" means the sale of the Transferred Equipment and Property Rights, including such other SIC assets as may be deemed appropriate by the Paniolo Trustee, under that certain Writ of Execution and related writs issued in enforcement of the Judgment.

2.      Several Obligations.  The obligations of the Parties hereunder are several and not joint and no Party hereto shall be responsible for the failure of any other Party hereto to perform its obligations hereunder.

3.      The Parties' Obligations to Close.  Subject to the terms and conditions of this Agreement:

(a)     The Parties agree to use their commercially reasonable efforts to promptly prepare and execute the Definitive Documentation.

(b)     In the event SIC breaches this Agreement, the Paniolo Trustee shall have the right to continue to execute on the Judgment, including without limitation, exercise of any available post-judgment remedies.

(c)     The Parties agree to use their commercially reasonable efforts to effect the assignment of the Transferred Equipment and Property Rights under the terms and conditions set forth in the Master Relationship Agreement, to obtain all necessary and appropriate regulatory and third-party approvals of the transactions, including the Licenses and Entitlements, contemplated in this Agreement, each as promptly as practicable, and to do all things reasonably necessary and appropriate in furtherance thereof.

(d)     The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Equipment and

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 271  Filed  06/04/20  Page 8 of 16

Property Rights. The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Assets and Equipment and Property Rights. The SIC Parties (1) expressly confirm that all of the A.2 Assets are present in the locations set forth on the list of Schedule A.2 Assets attached to the Notice of Execution filed with the Bankruptcy Court for the purposes of confirming the inventory prepared by the Substitute Custodian, and (2) agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(e)    The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(f)    Provided that the Paniolo Trustee is the successful bidder for the Mililani Property at the US Marshal Sale, the Paniolo Trustee agrees to promptly file a motion seeking confirmation of such sale and requesting that the Bankruptcy Court determine such sale extinguishes all liens and claims against the Mililani Property inferior to the Paniolo Trustee's judgment lien. Notwithstanding the failure or refusal of the Bankruptcy Court to make such a determination, the terms of the Mililani Property Option shall not be modified except upon written agreement of the Parties.

(g)    The SIC Parties expressly agree and covenant to provide all access to the Transferred Assets and Equipment and to exercise best efforts to cooperate with the Paniolo Trustee in the orderly transfer of such assets to the Paniolo Trustee and in the inspection, due diligence and dissemination of information (including authorizing and directing employees and agents of the SIC Parties to provide information) to facilitate the marketing and sale of assets and assignment of contracts under or related to the Paniolo 363 Sale provided it does cause the SIC Parties to expend any funds. Failure to honor the consent and fully cooperate with the Paniolo Trustee shall constitute a default under this settlement and the SIC Parties shall forfeit their rights hereunder.

(h)    The Parties agree that, subject to Bankruptcy Court approval, the Paniolo Trustee will conduct a sales process for the Paniolo 363 Sale, including assumption and assignment of executory contracts and nonresidential releases pursuant to orders of the Bankruptcy Court governing procedures and deadlines, of substantially all of Paniolo's assets. The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to entry of such orders or to the rights of any secured creditor of Paniolo to credit bid and shall waive any rights to appeal such orders. The SIC Parties expressly agree and covenant to provide all access to such assets and to exercise best efforts to cooperate with the purchaser and assignee under Paniolo 363 Sale in the orderly transfer of such assets to such purchaser and assignee. Any purchaser or assignee approved by the Court shall be bound by the terms of the Master Relationship Agreement.

(i)    Ownership and SIC affiliates shall agree not to object or cause to be filed any legal proceedings to the Paniolo 363 Sale. After consummation of the Paniolo 363 Sale and all orders approving same become final and non-appealable, Ownership and SIC affiliates shall have no further duties hereunder.

4. <u>Effectiveness of this Agreement</u>. The effectiveness of this Agreement, and the respective obligations of a Party under this Agreement, is conditioned upon the receipt of the signature hereto of each of the other Parties.

5. <u>Amendments</u>. No amendment, waiver or extension of any term or provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

6. <u>Termination</u>. Notwithstanding anything to the contrary set forth herein, unless as otherwise provided in this Agreement, this Agreement and all of the obligations and undertakings of the Parties set forth in this Agreement shall terminate and expire upon the earliest to occur of (a) December 31, 2020; or (b) written agreement among the Parties to terminate this Agreement.

7. <u>Representations and Warranties</u>. Each of the Parties represents and warrants to the others that:

(i)       if an entity, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership or other power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)      to its knowledge, the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part and the execution, delivery and performance by it of this Agreement do not and shall not (A) violate any provision of law, rule or regulation applicable to it or any of its affiliates or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries; or (B) conflict with, result in the breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its affiliates is a party or under its certificate of incorporation, bylaws or other governing regulations or instruments;

(iii)     except as otherwise expressly provided herein, the execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, the consent or approval of notice to, or any other action with respect to, any Federal, state or other governmental authority or regulatory body;

(iv)     this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors generally; and

(v)      it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

8. <u>Representation and Warranty Regarding Third Parties</u>. Except as set forth in Exhibit 2 hereto, the SIC Parties hereby represent and warrant to the other parties that there are no agreements of any nature (including without limitation, grants of Indefeasible Rights of Use (IRUs), wholesale contracts, or commercial agreements) permitting persons or entities other

than SIC to use capacity on the Paniolo Cable System other than the two pairs of fiber reserved to SIC for the purposes stated herein.

9. <u>Payment of Expenses</u>. Except as may be recoverable from the estate after notice and opportunity for hearing and as otherwise provided herein, each Party shall be responsible for its own expenses incurred in connection with this Agreement.

10. <u>Good Faith</u>. Each of the Parties agrees to cooperate in good faith with each other to facilitate the performance by the parties of their respective obligations hereunder and the purposes of this Agreement.

11. <u>Amendments and Modifications</u>. Except as otherwise expressly provided in this Agreement, this Agreement shall not be amended, modified or supplemented, except in writing signed by the Parties.

12. <u>No Waiver</u>. Each of the Parties expressly acknowledges and agrees that, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair or restrict the ability of any party to this Agreement to protect and preserve all of its rights, remedies and interests, including, without limitation, with respect to its claims against the Debtors in the event of a termination of this Agreement.

13. <u>Further Assurances</u>. Each of the Parties hereby further covenants and agrees to execute and deliver all further documents and agreements and take all further action that may be reasonably necessary or desirable in order to enforce and effectively implement the terms and conditions of this Agreement.

14. <u>Complete Agreement</u>. This Agreement constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous negotiations, agreements and understandings with respect to the subject matter hereof. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the signatories hereto.

15. <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be (a) transmitted by hand delivery, or (b) mailed by first class, registered or certified mail, postage prepaid, or (c) transmitted by overnight courier, or (d) transmitted by telecopy or electronic mail, and in each case:

if to Paniolo Creditors:

    Norton Rose Fulbright (US) LLP
    2200 Ross Avenue – Suite 3600
    Dallas, Texas 75201
    Attn. Toby L. Gerber
    toby.gerber@nortonrosefulbright.com

    -and-

    Harris, Wiltshire & Grannis LLP
    1919 M Street, N.W., Suite 800
    Washington, D.C. 20036-3537 Attn: Kent Bressie

if to Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC:

    Mr. Michael Katzenstein
    FTI Consulting Inc.
    Three Times Square – Ninth Floor
    New York, NY  10036

    -with a copy to-

    Goodsill Anderson Quinn & Stifel
    A Limited Liability Law Partnership
    1099 Alakea Street, Suite 1800
    Honolulu, Hawaii 96813
    Attn: Johnathan C. Bolton

if to  [Ownership]:

    Mr. Al Hee
    In care of
    Kobayashi Sugita & Goda, LLP
    999 Bishop Street, 26th Floor
    Honolulu, Hawaii  96813
    Attn: Lex R. Smith

    -with a copy to-

    Kobayashi Sugita & Goda, LLP
    999 Bishop Street, 26th Floor
    Honolulu, Hawaii  96813
    Attn: Lex R. Smith

if to Sandwich Isles Communications, Inc.:

    Kobayashi Sugita & Goda, LLP
    999 Bishop Street, 26th Floor
    Honolulu, Hawaii  96813
    Attn: Lex R. Smith

Notices mailed or transmitted in accordance with the foregoing shall be deemed to have been given upon receipt.

    16.    <u>Governing Law</u>.  This Agreement shall be governed in all respects by the laws of the State of New York, except to the extent such law is preempted by the Bankruptcy Code.

    17.    <u>Jurisdiction</u>.   By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States Bankruptcy Court for the District of

Hawaii (the "Bankruptcy Court"). By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably accepts and submits itself to the jurisdiction of the Bankruptcy Court, or a court of competent jurisdiction in the State of New York, as applicable under the preceding sentence, with respect to any such action, suit or proceeding.

18.     Consent to Service of Process.  Each of the signatories hereto irrevocably consents to service of process by mail at the address listed with the signature of each such party on the signature pages to this Agreement.  Each of the signatories hereto agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories hereto.

19.     Specific Performance.  It is understood and agreed by each of the signatories to this Agreement that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to specific performance, injunction, rescission or other equitable relief as remedy for any such breach.

20.     Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

21.     Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the signatories hereto and their respective successors, permitted assigns, heirs, executors, administrators and representatives.  The agreements, representations and obligations of the undersigned parties under this Agreement are, in all respects, several and not joint.

22.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart.

23.     No Third-Party Beneficiaries.  Unless expressly stated in this Agreement, this Agreement shall be solely for the benefit of the signatories hereto, and no other Person or entity shall be a third-party beneficiary hereof.

24.     No Solicitations.  This Agreement is not intended to be, and each signatory hereto acknowledges that it is not, a solicitation of the acceptance or rejection of any plan of reorganization for the Company pursuant to Section 1125 of the Bankruptcy Code.

25.     Consideration.  It is hereby acknowledged by each of the signatories hereto that no consideration (other than the obligations of the other parties under this Agreement) shall be due or paid to the parties for their agreement to support the Plan in accordance with the terms and conditions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed and delivered by its duly authorized officers as of the date first written above.

[SIGNATURE PAGES TO FOLLOW]

THE REMAINDER OF THIS PAGE IS BLANK

PANIOLO CREDITORS

ACKNOWLEDGED BY:
DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS PURCHASERS AGENT AND
COLLATERAL AGENT

By: _____
    Name:   Erika Wershoven
    Title:    Vice President

By: _____
    Name:   Deirdre Lewis
    Title:    Vice President

MICHAEL    KATZENSTEIN,    CHAPTER    11
TRUSTEE OF PANIOLO CABLE COMPANY, LLC,
DEBTOR

By: _____
    Michael Katzenstein, Chapter 11 Trustee

99528193.3

11

**PANIOLO CREDITORS**

**ACKNOWLEDGED BY:**
**DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, AS PURCHASERS AGENT AND**
**COLLATERAL AGENT**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**MICHAEL KATZENSTEIN, CHAPTER 11**
**TRUSTEE OF PANIOLO CABLE COMPANY,**
**LLC, DEBTOR**

By: _____
      Michael Katzenstein, Chapter 11 Trustee

WAIMANA ENTERPRISES, INC. AND THE SIC
AFFILIATES

By: _____
    Name: ALBERT S.N. HEE
    Title: AUTHORIZED AGENT

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____
    Name: ALBERT S.N. HEE
    Title: AUTHORIZED AGENT

ALL ATTACHMENTS
TO THE SETTLEMENT
AGREEMENT HAVE BEEN
FILED UNDER SEAL



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Chapter 11 |
| PANIOLO CABLE COMPANY, LLC, | Case No. 18-01319 (RJF) |
| Debtor. | <u>Hearing</u>:<br>Date: December 21, 2020<br>Time: 2:00 p.m.<br>Judge: Hon. Robert J. Faris |

## ORDER (A) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) APPROVING THE OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT, (E) APPROVING A BREAK-UP FEE, AND (F) GRANTING RELATED RELIEF; EXHIBITS "A" AND "B"

i.        Following that certain Chapter 11 Involuntary Petition dated as of November 13, 2018, against Paniolo Cable Company, LLC (the above-captioned debtor and debtor-in-possession (collectively, the "<u>Debtor</u>")), on November 29, 2018, certain creditors of the Debtor filed a motion for entry of an order appointing a Chapter

- 1 -

11 trustee. This Court subsequently issued an order, dated February 11, 2019, approving the appointment of Michael Katzenstein, as Chapter 11 Trustee (the "Trustee") of the Debtor.

ii.     In connection with that certain Adversary Proceeding No. 19-90022, *Katzenstein Trustee v. Sandwich Isles Communications, Inc.*, on March 4, 2020, certain assets and rights of the Transferred Equipment and Property Rights were marshalled, sold and otherwise transferred from Sandwich Isles Communications, Inc. ("SIC") to Debtor, free and clear of any continuing right, title, lien or encumbrance on the part of SIC or anyone claiming by and through SIC (the "US Marshal Sale") (excluding, for the avoidance of doubt, any pre-existing liens by the United States or any lien on the proceeds of any sale of assets), which US Marshal Sale was confirmed by this Court on March 16, 2020.

iii.     Pursuant to this Court's order dated June 4, 2020, this Court, inter alia, approved that certain Settlement Agreement ("Settlement Agreement"), effective as of March 26, 2020, by and among the Paniolo Creditors, Paniolo Trustee, Ownership, SIC, and SIC Affiliates (each as defined therein) pursuant to Federal Rule of Bankruptcy Procedure 9019. As more fully set forth in the Settlement Agreement, the Settlement Parties made certain representations and warranties (the "Settlement Agreement Representations") and covenants (the "Settlement Agreement Covenants") which included, among other things, the duty to cooperate further with the Debtor with

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 2 of 48

respect to the US Marshal Sale, the transfer of the Assets and rights transferred therein, and any proposed sale by Debtor to Buyer herein. Pursuant to the Settlement Agreement, all right title and interest of SIC, SIC Affiliates, or any person claiming by or through SIC or SIC Affiliates in Debtor's assets, including those transferred as part of the US Marshal Sale, were terminated.

iv.　　　In connection with the Settlement Agreement, Debtor and SIC entered into that certain Master Relationship Agreement and its Schedules and Exhibits, as of March 6, 2020, the (collectively, the "MRA"), pursuant to which the Debtor and SIC rearranged their business affairs among themselves.

v.　　　Upon consideration of the motion (the "Motion")[1] of the Trustee, dated November 30, 2020 for the entry of an order (this "Sale Order") (a) authorizing and approving the sale (the "Sale") of certain of the Debtor Assets, including the Schedule A.1 Assets, Schedule A.2 Assets, Assigned Claims, Assigned Contracts (each as defined in the APA and, collectively, the "Purchased Assets") and the transfer of the Incidental Rights, including the Assigned Rights and Assigned Permits (each as defined in the APA, and together with the Purchased Assets, the "Transferred Assets") and assumption of the Assumed Liabilities, but excluding the Excluded Assets and Excluded Liabilities, all as more fully set forth in the Asset Purchase Agreement

---

[1] Capitalized terms used but not otherwise defined herein are to be given the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the APA, as applicable.

U.S. Bankruptcy Court - Hawaii　#18-01319　Dkt # 366　Filed　12/28/20　Page 3 of 48

attached hereto as **Exhibit A** (the "<u>APA</u>"), dated as of November 30, 2020, 2020 between the Trustee, as seller (the "<u>Seller</u>") and Hawaiian Telecom, Inc., a Hawaii corporation, as buyer ("<u>HTI</u>" or the "<u>Buyer</u>"), free and clear of all liens, claims, interests and encumbrances, except the Permitted Liens and those expressly to be assumed by the Buyer under the APA; (b) approving the APA; (c) approving the Debtor's assumption and assignment of certain executory contracts and unexpired leases to the Buyer; (d) approving the Operational Support and Sales Services Agreement attached hereto as **Exhibit B** (the "<u>Services Agreement</u>"); (e) approving a Break-Up Fee in the event that the Court approves a higher and better Acquisition Proposal; and (f) granting related relief; and this Court having entered an *Order (I) Approving Bid and Auction Procedures, Including Stalking Horse Protections; (II) Authorizing and Scheduling an Auction for the Sale of Assets; (III) Approving the Sale of Assets; and (IV) Granting Related Relief* Docket No. 222, as extended by Docket No. 270 (the "<u>Bidding Procedures Order</u>"); and the Trustee having determined that the highest or otherwise best offer for the Transferred Assets was made by the Buyer pursuant to the APA; and this Court having conducted a hearing on December 21, 2020 (the "<u>Sale Hearing</u>"), at which time all parties in interest were provided an opportunity to be heard with respect to the Motion and to consider the approval of the Sale pursuant to the terms and conditions of the APA and the granting of all other relief sought in the Motion, and this Court having jurisdiction to consider the Motion

- 4 -

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, the Motion being a core proceeding in accordance with 28 U.S.C. § 157(b); and venue of this case being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; the Statement [Dkt. no. 336] of the Office of the United States Trustee, the Objection [Dkt. no. 347] of the United States on behalf of the RUS (which was withdrawn at the Sale Hearing), the Statement [Dkt. no. 341] of the Department of Hawaiian Home Lands of Hawaii, and the Statement of Concerns [Dkt. no. 348] of SIC having been filed in response to the Motion; and the Court having considered (i) the Motion and the declarations and exhibit attached hereto; (ii) the arguments of counsel made, and evidence adduced, related thereto; (iii) the record of the Sale Hearing; and (iv) all filings of record in this case; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the Sale, and the other transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties-in-interest; and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed  12/28/20   Page 5 of 48

**IT IS HEREBY FOUND AND DETERMINED THAT**:[2]

<u>**Statutory Predicates; Final Order**</u>

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.

B.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  Venue of this Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases of the relief requested in the Motion are sections 105, 363, 365, 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Bankruptcy Rules 6004-1 and 9013-1.

D.     The Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed 12/28/20   Page 6 of 48

expressly finds that there is no just reason for delay in the implementation of the Sale Order and expressly directs entry of the Sale Order as set forth herein which shall not be subject to any stay.

## Notice

E.       This Court previously entered the Bidding Procedures Order approving, among other things, the Bidding Procedures, the proposed bid protections to a Stalking Horse Bidder, and the Assumption and Assignment Procedures (as defined in the Bidding Procedures Order).

F.       As evidenced by the certificates of service previously filed with this Court [Docket Nos. 324, 325, 326, 327, 330, 331 and 360], demonstrated by the evidence presented at, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, and the Assumption and Assignment Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) all parties that have been identified by the Trustee in good faith prior to entry of the Bidding Procedures Order as having the interest and ability to acquire all or part of the Transferred Assets; (b) all entities known to have any right, authority over, lien, claim or encumbrance in or upon any of the Transferred Assets,

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 7 of 48

including without limitation the United States of America, or who may otherwise deprive Seller from transferring title to or Buyer from enjoying all rights to any of the Transferred Assets; (c) any entity to whom a duty is or may be owed, which may be a liability extinguished by the Sale Order; (d) all state, local and other governmental taxing authorities in the states in which the Trustee has tax liabilities, or for which taxing liability for the Transferred Assets may be established; (e) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Buyer; (f) the Office of the United States Trustee; (g) the Internal Revenue Service; (h) the Securities & Exchange Commission; (i) the Office of the Attorney General for the State of Hawaii; (j) the U.S. Department of Agriculture's Rural Utilities Service ("RUS"); (k) SIC; (l) the Department of Hawaiian Home Lands; (m) State of Hawaii Land Use Commission; (n) State of Hawaii Department of Land and Natural Resources; (o) the Delaware Department of State; and (p) all other persons and entities that have filed a request for service of filings in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties"). The notices described above, in the Motion, and Bidding Procedures Order were good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of rights, authority over, liens, claims, or encumbrances on the Transferred Assets, and rights which are or may constitute liabilities extinguished

- 8 -

by this Order, and no other or further notice of the Motion, the Sale, the Sale Hearing, the potential assumption and assignment of the Designated Contracts (as defined below) is, or shall be, required.

G.   The notice provided of the Bidding Procedures, the Motion and the Sale Hearing provided all interested parties with timely and proper notice of the Sale, the Bid Deadline and the Sale Hearing.  Further, a reasonable opportunity to object to and to be heard regarding the relief granted by the Sale Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

H.   In accordance with the Bidding Procedures Order, and as evidenced by the certificates of service previously filed with this Court [Docket No. 274, 330], the Trustee filed and has served the *Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtor's Assets and the Proposed Cure Cost with Respect Thereto* [Docket No. 273] (the "Cure Notice") regarding the potential assumption and assignment of certain Contracts (as defined in the Cure Notice) and of the amount necessary to cure any defaults pursuant to section 365(b) of the Bankruptcy Code (all such amounts in connection with any Contract, the "Cure Amounts") upon the non-Debtor counterparties (each a "Non-Debtor Counterparty" and collectively, the "Non-Debtor Counterparties") to the Contracts.  The service and provision of the Cure Notice was good, sufficient, and appropriate under the circumstances and no further

- 9 -

notice need be given in respect of assumption and assignment of certain contracts designated by the Buyer pursuant to the APA or subsequently entered into by Debtor after the date of this Sale Order (each an "Assumable Contract" and to the extent so designated by Buyer pursuant to the APA, the "Designated Contracts"), including with respect to adequate assurance of future performance or establishing a Cure Amount for the respective Contracts. All Non-Debtor Counterparties to each Assumable Contract set forth in the Cure Notice have had an adequate opportunity to object to assumption and assignment of the applicable Assumable Contract and the Cure Amount set forth in the Cure Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline (the "Cure/Assignment Objection Deadline") to file an objection to the Cure Amount set forth in the Cure Notice and the assumption and assignment to the Buyer of any Assumable Contract (collectively, a "Cure/Assignment Objection") has expired, and to the extent any such entity timely filed a Cure/Assignment Objection, all such objections have been resolved, withdrawn or overruled. To the extent that any such party did not timely file a Cure/Assignment Objection by the Cure/Assignment Objection Deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the

- 10 -

Assumable Contract, and (ii) the amount set forth in the Cure Notice shall be deemed the Cure Amount necessary to "cure" all "defaults", each within the meaning of section 365(b) of the Bankruptcy Code.

I.       On April 22, 2020, the Trustee filed *Michael Katzenstein, as Chapter 11 Trustee's Motion for Order Extending Bid and Auction Procedure Deadlines for the Sale of Substantially All of Debtor's Assets* [Docket No. 245].  On June 3, 2020, the Bidding Procedures were extended and modified by the Court's *Order Granting Michael Katzenstein, as Chapter 11 Trustee's Motion for Order Extending Bid and Auction Procedure Deadlines for the Sale of Substantially All of Debtor's Assets* [Docket No. 270] (the "Extension Order").  The Extension Order also established July 13, 2020, as the Bid Deadline for the submission of bids by Potential Bidders and July 31, 2020, as the date on which the Auction would take place if more than one Qualified Bid was received with regard to the Transferred Assets.  After the expiration of the Bid Deadline, the Debtor did not receive any Qualified Bids.

J.       The Court hereby finds that the Trustee has complied with the notice provision of Section 16.3 of the MRA.

K.      No further or other notice beyond that described in the foregoing Paragraphs E through J is or shall be required in connection with the relief granted in the Sale Order.

- 11 -

### Highest or Otherwise Best Offer and Sound Business Purpose

L.      The Trustee conducted the sale process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order, as modified by the Extension Order and the terms of the Sale Order.  The Purchased Assets were adequately marketed by the Trustee and his advisors, and the sale process set forth in the Bidding Procedures Order, and otherwise conducted by the Trustee, afforded a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Purchased Assets.  The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arms' length negotiations, and were substantively and procedurally fair to all parties.

M.      In marketing the Purchased Assets, the Trustee negotiated allocations of the Purchase Price among the Purchased Assets in order to establish the highest and best offer for each.

N.      Throughout this case, the Trustee, on behalf of the bankruptcy estate, the creditors, and the Buyer have recognized the public importance of maintaining connectivity for certain telecommunications services to the Hawaiian Home Lands. Consistent with FCC regulations and Buyer's status as an incumbent local exchange carrier in Hawaii, the Purchased Assets will continue to be available to

- 12 -

telecommunications service providers that provide retail communications services on the Hawaiian Homelands, on a non-discriminatory basis.

O.      The terms contained in the APA constitute the highest and best offer for the Transferred Assets, including the allocation among the Purchased Assets, and provide fair and reasonable consideration to the Debtor's estate for the Transferred Assets and the assumption of the Assumed Liabilities and Permitted Liens, and the consideration provided by the Buyer under the APA constitutes reasonably equivalent value for each of the Purchased Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Trustee's determination, in consultation with its advisors, that the consideration provided by the Buyer under the APA constitutes the highest or otherwise best offer for the Transferred Assets constitutes a valid and sound exercise of the Trustee's business judgment.

P.      Approval of the Motion and the APA, the consummation of the Sale contemplated thereby, entry into the Services Agreement, and entry into the Transaction Documents, are in the best interests of the Debtor, its creditors, its estate, and all parties-in-interest.  The Trustee has demonstrated compelling circumstances and good, sufficient, and sound business reasons and justifications for entering into the APA, the Services Agreement and the Transaction Documents, and the performance of the Debtor's obligations under the APA and the Services Agreement,

- 13 -

and the granting of the Motion because, among other reasons: (a) the APA constitutes the highest or otherwise best offer for the Transferred Assets; (b) the APA and the Closing (as defined in the APA) thereon will present the best opportunity to realize the value of the Transferred Assets; (c) any other available transaction would not have yielded as favorable an economic result; (d) entry into the Services Agreement, and management by the Buyer, an experienced telecommunications network operator, represents the best opportunity to preserve the value of the Transferred Assets until the Closing of the Sale, and the best certainty to reach Closing; and (e) the public interest is served in that consistent with FCC regulations and its status as an incumbent local exchange carrier in Hawaii, the Purchaser will continue to make available the Purchased Assets to telecommunications service providers that provide retail communications services on the Hawaiian Homelands, on a non-discriminatory basis.

Q. Entry of the Sale Order and the approval of the APA, the Services Agreement and the Transaction Documents and all of the provisions thereof is a condition precedent to the Buyer's consummation of the Sale.

R. The Buyer is the highest and best bidder for the Transferred Assets. The Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the APA, and

- 14 -

the Sale and the APA likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

## Sale and Transfer Free and Clear of Interests or Claims

S.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied and, upon entry of the Sale Order, other than Assumed Liabilities and Permitted Liens, subject to this Sale Order and the terms and conditions of the APA, the Trustee is authorized to transfer all of the Debtor's right, title and interest to the Transferred Assets free and clear of (i) any and all liens, encumbrances, claims, mortgages, restrictions, hypothecations, charges, instruments, collective bargaining agreements, leases or subleases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, easements, servitudes, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of first refusal, offsets, contracts, recoupment, rights of recovery, rights of use or possession, liability for unpaid sales, use, franchise, excise, or any other taxes, liability for unpaid federal or state universal service contributions, liability for any unpaid regulatory fees, assessments, contributions or other payments assessed by or otherwise owed to the FCC, any state commission or other governmental entity, and

- 15 -

charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, (ii) all claims as defined in Bankruptcy Code section 101(5), including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, obligations, demands, restrictions, or liabilities relating to any act or omission of the Debtor, SIC, or any other person prior to the Closing, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, releases into the surface waters, ground waters, soil, subsurface strata and ambient air (collectively, the "Environment") of any substance, chemical, material, or waste now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "regulated substance," "contaminant," or "pollutant" (or words of similar import) within the meaning of or regulated or addressed under any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment relating to pollution or protection of the Environment (each an "Environmental Law"), any environmental claim or environmental notice, or taxes, assessments or imposts of any kind, decrees of any court or foreign or domestic governmental entity, consent rights, options, contract rights, covenants, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed 12/28/20   Page 16 of 48

exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtor, SIC, SIC's Affiliates or any of the Debtor's, SIC's, or SIC's Affiliates, or SIC's predecessors or affiliates, claims, and (iv) the Excluded Liabilities as set forth in the APA, in each case with respect to items (i), (ii), (iii) and (iv), whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability ((i), (ii), (iii) and (iv) collectively, the "Interests or Claims"). The Buyer would not have entered into the APA if the transfer of the Transferred Assets was not free and clear of all Interests or Claims as set forth in the APA and the Sale Order, or if in the future the Buyer would or could be liable for any such Interests or Claims.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 17 of 48

T.      Upon entry of the Sale Order, the Trustee is authorized to transfer all of the Debtor's right, title and interest in and to the Transferred Assets free and clear of all Interests or Claims (except as otherwise expressly assumed in, or permitted by, the APA or the Sale Order) because one or more of the provisions set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied, including that, except as otherwise expressly provided in the APA or the Sale Order, such Interests or Claims shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have against those particular Transferred Assets subject to such Interests or Claims, and subject to any claims and defenses the Debtor and the Trustee may possess with respect to such Interests or Claims.  Each entity with an Interest or Claim (other than an Assumed Liability or Permitted Lien) that is attached to the Transferred Assets to be transferred on the Closing Date:  (i) has, subject to the terms and conditions of the Sale Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Interests or Claims against the Transferred Assets who did not object or who withdrew their objections to the APA or the Motion are deemed to have consented to the transactions contemplated thereby pursuant to section 363(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in

- 18 -

this Sale Order establishes any rights or interests in the Transferred Assets (other than the Debtor's rights and interests in such Transferred Assets and the Buyer's rights and interests in the Transferred Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds, if any, from the Sale of the Transferred Assets.[3]

U.    A sale of the Transferred Assets other than one free and clear of all Interests or Claims, and without entry of the Services Agreement, would yield substantially less value for the Debtor's estate, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the APA and approved herein free and clear of all Interests or Claims, except for the Assumed Liabilities and Permitted Liens, and entry of the Services Agreement is in the best interests of the Debtor, its estate and creditors, and all other parties-in-interest.

## Assumption and Assignment of the Designated Contracts

V.    The Assumption and Assignment Procedures set forth in the Bidding Procedures Order are adequate, sufficient and appropriate under the circumstances.

W.    The assumption and assignment of the Designated Contracts pursuant to the Assumption and Assignment Procedures and the APA is in the best interests of the Debtor and its estate and represents the reasonable exercise of the Trustee's

---

[3] The Trustee intends to use the proceeds from the Sale to repay the amounts due to the Debtor's post-petition lender, HSBC Bank USA, National Association under the Senior Secured Superpriority Chapter 11 Debtor Credit Agreement, as amended.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 19 of 48

sound business judgment. The Designated Contracts being assigned to the Buyer are an integral part of the Transferred Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Designated Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtor's estate.

X. The Debtor has met all requirements of section 365(b) of the Bankruptcy Code for each of the Designated Contracts. The Debtor or the Buyer will have (i) cured or provided adequate assurance of cure of any default existing prior to the consummation of the Sale pursuant to the APA under all of the Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty to Designed Contract for actual pecuniary loss to such entity resulting from a default prior to the Closing under any of the Designated Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The proposed Cure Amounts set forth on the Cure Notices or any other cure amount reached by agreement after any Cure/Assignment Objection are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code section 365(b), under each Designated Contract. The assignment of the Designated Contracts is free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Liens). No section of any of the Designated Contracts that would prohibit, restrict,

or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Designated Contracts in connection with the Sale shall have any force or effect, except as expressly permitted in the APA and the Sale Order.

Y.    The Buyer has demonstrated adequate assurance of future performance under the relevant Designated Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Buyer's promise to perform the obligations under the Designated Contracts arising after the Closing shall constitute adequate assurance of its future performance of and under the Designated Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  Pursuant to section 365(f) of the Bankruptcy Code, the Designated Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Z.    No defaults exist in the Debtor's performance under any of the Designated Contracts as of the date of the Sale Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  Any Cure/Assignment Objection that was heard at the Sale Hearing (to the extent not withdrawn), was considered by this Court, and is overruled on the merits with prejudice.  This Court finds that, with respect to all Assumable Contracts, the

- 21 -

payment of the proposed Cure Amounts in accordance with the terms of the APA is appropriate and is deemed to fully satisfy the Debtor's obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtor to the Buyer of each of the Designated Contracts. To the extent any Assumable Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the Sale Order that are applicable to the Transferred Assets.

## Good Faith Finding

AA.   The Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in section 101 of the Bankruptcy Code.

BB.   The APA, including the Purchase Price and allocation among the Purchased Assets, was negotiated, proposed and entered into by the Debtor and the Buyer without collusion or fraud, in good faith and from arm's-length bargaining positions.

CC.   The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Trustee and the Buyer and Buyer's agents, representatives and affiliates have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 22 of 48

contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Trustee and its professionals marketed the Purchased Assets and conducted the marketing and sale process in substantial compliance with the Bidding Procedures Order.

DD. The Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. In particular, (a) the Buyer recognized that the Trustee was free to deal with any other party interested in purchasing the Transferred Assets subject to the terms of the APA; (b) the Buyer in no way induced or caused the chapter 11 filing; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtor; (e) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; and (f) the Buyer has not acted in a collusive manner with any person.

## No Fraudulent Transfer or Successor Liability

EE. The aggregate consideration from the Buyer for the Purchased Assets and the allocated consideration among the Purchased Asserts as set forth in the APA: (a) as such consideration relates to the Purchased Assets, constitutes fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent

- 23 -

Transfer Act, the Uniform Fraudulent Conveyance Act and other similar state laws or laws of the United States; (b) is the best value obtainable for the Purchased Assets; (c) will provide a greater recovery to creditors than would be provided by any other available alternative; and (d) as such consideration relates to the Purchased Assets, constitutes reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, and the laws of the United States; any state, tribe, territory, or possession of the United States; and the District of Columbia, as applicable).

FF.    Neither the Trustee, the Debtor nor Buyer entered into or has agreed to enter into the APA with any fraudulent or otherwise improper purpose, including, without limitation, the purpose of hindering, delaying or defrauding any creditors of the Debtor.

GG.  The transfer of the Transferred Assets, including the Assumed Liabilities and the Permitted Liens, by the Buyer, except as otherwise set forth in the APA, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtor's business prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting

- 24 -

antitrust, successor, transferee or vicarious liability. Pursuant to the APA, the Buyer is not purchasing all of the Debtor Assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities or any contract that is not included as a Designated Contract, and the Buyer is not holding itself out to the public as a continuation of the Debtor or related to SIC or any of SIC's Affiliates. The Buyer is not a mere continuation of or successor to the Debtor, SIC or any of SIC's Affiliates, or Debtor's estate in any respect. The APA does not amount to a consolidation, merger or *de facto* merger of the Buyer on the one hand, and any of the Debtor, SIC or SIC's Affiliates on the other hand, and there is no continuity of enterprise between any of the Debtor, SIC or SIC's Affiliates on the one hand, and the Buyer on the other hand. The Buyer would not have entered into the APA if the transfer of the Transferred Assets was not made free and clear of any successor liability whatsoever to the Buyer. None of the transactions contemplated by the APA, including, without limitation, the assumption and assignment of the Designated Contracts, is being undertaken for the purpose of escaping liability for any of the Debtor's debts or hindering, delaying, or defrauding any creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

- 25 -

## Validity of Transfer and Authorizations

HH.    The Transferred Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  The Debtor has all right, title and interest in the Transferred Assets required to transfer and convey such Transferred Assets to the Buyer.  The Trustee has full corporate power and authority to execute and deliver the APA, and all other documents contemplated thereby, and has all corporate authority necessary to consummate the transactions contemplated by the APA.  No consents or approvals, other than those expressly provided for in the APA, are required for the Trustee to consummate the transactions contemplated by the APA on behalf of the Debtor.

II.    The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

## No *Sub Rosa* Plan

JJ.    Because time is of the essence, the Seller has good business reasons to sell the Transferred Assets prior to obtaining the Bankruptcy Court's confirmation of a plan of reorganization.  The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation of the Debtor.  The Sale Order does not dictate or direct

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed  12/28/20   Page 26 of 48

the distribution of the cash proceeds of the Sale of the Purchased Assets. The Sale Order, the APA, and the transactions contemplated therein do not constitute a *sub-rosa* plan.

### Best Interest of Creditors

KK.   Given all of the circumstances of this Chapter 11 Case and the adequacy and fair value of the consideration provided by the Buyer under the APA, the Sale constitutes a reasonable and sound exercise of the Trustee's business judgment, is in the best interests of the Debtor, its bankruptcy estate, its creditors, and all other parties in interest in this Chapter 11 Case, and should be approved.

LL.   Time is of the essence in consummating the transactions contemplated by the APA. Cause has been shown as to why the Sale Order should not be subject to any stay provided by Bankruptcy Rule 6004(h).

**IT IS HEREBY ORDERED THAT:**

1.   The relief requested in the Motion, as implemented by the Bidding Procedures Order and the Sale of the Transferred Assets to the Buyer pursuant to the APA, is granted and approved as set forth herein.

2.   Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Any party who did not object or who withdrew its objection is deemed to have consented to the Sale under the

- 27 -

terms of the APA pursuant to section 363(f)(2) or section 365 of the Bankruptcy Code, or any other applicable provision of the Bankruptcy Code and pursuant to the Bidding Procedures Order.  Notice of the Motion, the Sale Hearing, and the Sale was fair and equitable under the circumstances, and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

### Approval of the APA

3.     The APA, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale contemplated thereby, is hereby approved as provided herein.

4.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is authorized to perform its obligations under and comply with the terms of the APA, pursuant to and in accordance with the terms and conditions of the APA and the Sale Order.

5.     The Trustee, the Debtor and its affiliates, officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate and implement, the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions and execute such other documents as may be (a) necessary or appropriate to the performance of the obligations contemplated by the APA, including, without limitation, making any state or local filings necessary or

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed  12/28/20   Page 28 of 48

advisable in connection with the Sale, and (b) as may be reasonably requested by the Buyer to implement the APA, in accordance with their terms thereof, without further order of this Court.

6.      The Sale Order and the APA shall be binding in all respects upon, and shall inure to the benefit of, the Trustee, the Debtor, the Debtor's bankruptcy estate, its affiliates, all creditors, all holders of equity interests in the Debtor, all holders of any Interests or Claims (whether known or unknown) against the Debtor, any holders of Interests or Claims against or on all or any portion of the Transferred Assets or against Debtor, SIC, or SIC's Affiliates, all counterparties to any executory contract or unexpired lease of the Debtor, Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in this Chapter 11 Case or upon a conversion of this Chapter 11 Case to chapter 7 under the Bankruptcy Code.  The terms and provisions of the APA and the Sale Order will inure to the benefit of the Trustee, the Debtor, its bankruptcy estate, and its creditors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties, including all persons asserting any Interests or Claims in the Transferred Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the

- 29 -

Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding. In the event that Seller receives a Superior Proposal which is approved by this Court, payment of the break-fee is appropriate in light of the substantial legal, environmental and asset due diligence and other efforts expended by Buyer in connection with the proposed transaction, including negotiating the APA and Transaction Documents, all of which generated substantial value to the Estate.

## Sale and Transfer of the Transferred Assets

7.   Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing and pursuant to and except as otherwise set forth in the APA and this Sale Order, the Transferred Assets will be transferred to the Buyer free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Liens) that existed prior to the Closing of any person, including, without limitation, all such Interests or Claims specifically enumerated in the Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests or Claims to attach to the cash proceeds of the Sale, in the order of their relative priority, and with the same validity, force, and effect the holder of such Interests or Claims had against the Purchased Assets prior to the Closing, subject to any claims and defenses that the Debtor and

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 30 of 48

its bankruptcy estate may possess with respect thereto. For the avoidance of doubt, nothing in the Sale Order establishes any rights or interests in the Transferred Assets (other than the Debtor's rights and interests in such Transferred Assets and the Buyer's rights and interests in the Transferred Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sale of the Purchased Assets.

8.    On the Closing Date, the Sale Order will be broadly construed, and will constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of all of the Transferred Assets or bills of sale transferring good and marketable title in such Transferred Assets to the Buyer, as is where is, free and clear of all Claims and Interests pursuant to the terms, conditions, and exceptions set forth in the Sale Order and the APA. For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Transferred Assets and such Excluded Assets shall remain property of the Debtor's estate.

9.    Subject to the terms and conditions of the Sale Order, the transfer of Transferred Assets to the Buyer pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in the Sale Order and the APA, constitute a legal, valid, and effective transfer of the Transferred Assets, and will vest the Buyer with all of the Debtor's right, title, and interest in and to the Transferred Assets as set

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed 12/28/20   Page 31 of 48

forth in the Sale Order and the APA, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or permitted by, the APA and this Sale Order).

10.     Except to the extent expressly included in the Assumed Liabilities or Permitted Liens or to enforce the APA, or as provided in this Sale Order, upon the Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and permanently enjoined from asserting against the Buyer, and its permitted successors, designees, and assigns, or property, or the Transferred Assets conveyed in accordance with the APA, any Interests or Claims of any kind or nature whatsoever arising prior to Closing, including, without limitation, under any theory of successor or transferee liability, *de facto* merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

11.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant included within or relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Buyer solely on account of the filing or pendency of this Chapter 11 Case or the consummation of the transactions contemplated by the APA and the Sale Order.  Upon the Closing, the Buyer will be deemed to be

- 32 -

substituted nunc pro tunc for the Debtor as party to the applicable Incidental Rights, provided that Buyer shall not be deemed successor and, pursuant to Paragraph FF above and Paragraphs 30 through 33, below, Buyer shall have no successor liability thereto. Nothing in this paragraph shall limit a Governmental Unit's authority to deny, revoke, suspend, or refuse to renew any permit, license, or similar grant for reasons other than the filing or pendency of this Chapter 11 Case or the consummation of the transactions contemplated by the APA and the Sale Order.

12.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Designated Contracts are forever barred from raising or asserting against the Debtor and its estate or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the date that such Designated Contracts are assumed or arising by reason of or in connection with the Closing.

## Good Faith of the Buyer

13.    The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Sale contemplated by the APA is undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 33 of 48

shall not affect the validity of the Sale (including the assumption and assignment of the Designated Contracts), unless such authorization and consummation of the Sale are duly and properly stayed pending such appeal.

14.     Neither the Trustee, the Debtor, the Buyer nor any affiliate or representative, agent, or advisor of either the Debtor or Buyer have engaged in any collusion with other bidders or other parties or have taken any other action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise.    The consideration provided by the Buyer for the Transferred Assets under the APA is fair and reasonable and is not less than the value of such assets, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

15.     The Buyer is not an "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

### Assumption and Assignment of the Designated Contracts

16.     The Seller has satisfied the requirements of Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

17.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in the Sale Order and the APA of the Assumable Contracts, is hereby

- 34 -

approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

18.     The Seller is hereby authorized to enter into additional agreements in accordance with the APA and the Services Agreement, and upon agreement of Buyer, to include such additional agreements as Designated Contracts hereunder. The Seller is hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Buyer, effective upon the Closing Date, the Designated Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise expressly assumed in, or permitted by, the APA or conditioned by the terms contained within this Sale Order) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Designated Contracts to the Buyer.

19.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer will be fully and irrevocably vested in all right, title, and interest of each Designated Contract and the Trustee and the estate will be relieved from any liability for any breach of a Designated Contract occurring after assignment to Buyer.

20.     The Designated Contracts will be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms pursuant to the APA, notwithstanding any provision in any such

- 35 -

Designated Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

21.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, at the Closing, the Cure Amounts (if any) relating to any Designated Contract will be paid in accordance with the APA.

22.    The payment of the applicable Cure Amounts (if any), or any other cure amount reached by agreement after any Cure/Assignment Objection, will effect a cure of all defaults and all other obligations or liabilities under any Designated Contract existing, occurring, arising, or accruing prior to the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such non-debtor counterparty resulting from such default.

23.    Upon the Closing, the Buyer will be assigned the Designated Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Designated Contracts will not be a default thereunder.  Other than the payment of the relevant Cure Amounts (if any) in accordance with the APA, neither the Debtor and its estate nor the Buyer will have any further liabilities to the non-debtor counterparties to the Designated Contracts, other than Buyer's obligations under the Designated Contracts that accrue or become due and payable on or after the date that such Designated Contracts are assumed.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed  12/28/20   Page 36 of 48

24.     Except as otherwise agreed in writing between the Debtor and the non-debtor counterparties to the Designated Contracts, stated on the record of the Sale Hearing, set forth in the Sale Order, or determined by Court order, the Cure Amounts for the Designated Contracts in effect as of the date hereof are hereby fixed at the amounts set forth on Cure Notice, and the non-debtor counterparties to such Designated Contracts are forever bound by such Cure Amounts and, other than with respect to enforcement for payment of such Cure Amounts, are hereby enjoined from taking any action against the Trustee, the Debtor and its bankruptcy estate, the Buyer, and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, or the Transferred Assets with respect to any claim for cure under any Assumable Contract.

25.     The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assumable Contract shall not be a waiver of such terms or conditions, or of the Trustee's, Debtor's and the Buyer's rights to enforce every term and condition of the Designated Contracts.

26.     Any provisions in any Designated Contract that prohibit or condition the assignment of such Designated Contract or allow the party to such Designated Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Designated Contract constitute unenforceable anti-assignment provisions that are void, and of

- 37 -

no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Designated Contracts have been satisfied.

27.     Any party having the right to consent to the assumption or assignment of any Assumable Contract that failed to object to such assumption or assignment is deemed to have waived any objections and consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

28.     Upon the Closing, the Buyer will be deemed to be substituted for the Debtor as a party to the each Designated Contract and the Trustee, the Debtor and its estate will be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Designated Contracts.

29.     The Buyer has provided adequate assurance of future performance under each relevant Designated Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

### <u>No Successor Liability</u>

30.     Except as otherwise set forth in the APA or this Sale Order, neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Claim or Interest that arose or occurred prior to the Closing, or otherwise are able to be asserted against the Debtor, SIC or SIC's Affiliates, or is related to the Transferred Assets prior to the Closing.  The Buyer is not and shall not

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 38 of 48

be deemed a "successor" to the Debtor, SIC or SIC's Affiliates, or Debtor's estate, have not, *de facto* or otherwise, merged with or into the Debtor, SIC or SIC's Affiliates, or be a mere continuation or substantial continuation of the Debtor, SIC or SIC's Affiliates, or the enterprise of the Debtor, SIC or SIC's Affiliates, under any theory of law or equity as a result of any action taken in connection with the APA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Transferred Assets.

31.     The Buyer is not a "successor" to the Debtor, SIC or SIC's Affiliates, or the Debtor's estate by reason of any theory of law or equity, and the Buyer shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of the Debtor, SIC or SIC's Affiliates, and/or Debtor's estate, other than the Assumed Liabilities, with respect to the Transferred Assets or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability.  Except to the extent the Buyer assumes Assumed Liabilities and is ultimately permitted to assume the Assumed Liabilities pursuant to the APA, or as otherwise provided in this Sale Order, neither the purchase of the Transferred Assets by the Buyer nor the fact that the Buyer is using any of the Transferred Assets previously used by the Debtor, SIC, or SIC's Affiliates will cause the Buyer to be deemed a successor in any respect to the Debtor's, SIC's or SIC's Affiliates' business or incur any liability

- 39 -

derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, Environmental Law or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine. Pursuant to the APA, the Buyer is not purchasing all of the Debtor's assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as a continuation of the Debtor, SIC or SIC's Affiliates. The Buyer is not a mere continuation of or successor to the Debtor, SIC, or SIC's Affiliates or the Debtor's estate in any respect.

32.     The Buyer has given substantial consideration under the APA, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Claims or Interests in or against the Debtor, or the Transferred Assets. Upon consummation of the Sale Transaction, the Buyer shall not be deemed to (i) be the successor to the Debtor, SIC or SIC's Affiliates; (ii) have, de facto or otherwise, merged with or into the Debtor, SIC or SIC's Affiliates; or (iii) be a mere continuation, alter ego or substantial continuation of the Debtor, SIC or SIC's Affiliates.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 40 of 48

33.     Except to the extent specifically agreed by the Buyer in the APA or this Sale Order, the Buyer shall not have any liability, responsibility or obligation for any Claims or Interests of the Debtor, SIC or SIC's Affiliates, or Debtor's estate, including any claims, liabilities or other obligations related to the Transferred Assets prior to Closing Date.  The Buyer is not purchasing all of the Debtor's assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities.   Under no circumstances shall the Buyer be deemed a successor of or to the Debtor for any encumbrances against, in or to the Debtor or the Transferred Assets.  For the purposes of this section of this Sale Order, all references to the Buyer shall include the Buyer's affiliates, subsidiaries and shareholders.

## Additional Provisions

34.     In connection with the Closing, a certified copy of the Sale Order evidencing the release, cancelation and termination provided herein of any Interests or Claims of record on the Transferred Assets may be filed, recorded with or provided to the appropriate filing agents, filing officers, administrative agencies or units, governmental departments, secretaries of state, federal, state and local officials and all other persons, institutions, agencies and entities who may be required by operation of law, the duties of their office or contract, including, for the avoidance of doubt, the Department of Hawaiian Home Lands.

- 41 -

35.     The Closing of the Sale is contingent on certain regulatory approvals. The APA conditions the obligations of the Buyer to consummate the Sale upon the occurrence of certain conditions, including the regulatory approvals and the absence of certain material changes.

36.     As soon as practicable after the entry of this Order and prior to the Closing, the Debtor is hereby authorized to enter into the Services Agreement with the Buyer in substantially the form attached hereto as **Exhibit B**, with any changes as may be agreed to by the Parties thereto.

37.     As soon as practicable after the entry of this Order and prior to the Closing, the Debtor is hereby authorized to enter into the Transaction Documents with any changes as may be agreed to by the Parties thereto.

38.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests or Claims against or in the Transferred Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Transferred Assets (unless otherwise assumed in, or permitted by, the APA), or otherwise, then: (a) the Trustee is hereby authorized, on behalf of the Debtor, to execute and file such statements, instruments, releases and other

- 42 -

documents on behalf of the person or entity with respect to the Transferred Assets; and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of the Sale Order, which, once filed, registered or otherwise recorded, will constitute conclusive evidence of the release of all Interests or Claims in the Transferred Assets of any kind or nature (except as otherwise assumed in, or permitted by, the APA); *provided that*, notwithstanding anything in the Sale Order or the APA to the contrary, the provisions of the Sale Order will be self-executing, and neither the Trustee nor Buyer will be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Sale Order. For the avoidance of doubt, upon consummation of the Sale, the Buyer is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to the Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of the Sale Order. The Sale Order shall be binding upon and shall govern the acts

of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

39. All persons or entities that are currently in possession of some or all of the Transferred Assets in contravention of the US Marshal Sale, the Settlement Agreement or MRA, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets except as Debtor and Buyer may otherwise agree. All persons or entities that on the Closing may be, in possession of some or all of the Transferred Assets, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets to the Buyer upon the Closing or on such earlier date as the Trustee may direct in order for Buyer to perform its obligations under the Services Agreement.

- 44 -

40.     The Sale Order shall be effective as a determination that, upon the Closing, all Claims or Interests of any kind or nature whatsoever existing as to the Transferred Assets prior to the Closing (other than the Assumed Liabilities and Permitted Liens) have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected as set forth in the Sale Order, including, without limitation, any liability for accrued but unpaid taxes, fees, assessments or imposts.

41.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof and the Sale Order without further order of this Court; *provided* that no such modification, amendment or supplement may be made without further order of this Court if it is materially adverse to the Debtor or the Debtor's estate.  The Trustee and the Debtor are authorized to perform each of its covenants and undertakings as provided in the APA, Services Agreement and Transaction Documents prior to or after the Closing without further order of this Court.

42.     The APA shall be of full force and effect, regardless of Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business.

- 45 -

43.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Trustee or the Debtor any notice provided for in the APA, (b) to allow the Buyer to take any and all actions permitted by the APA and Services Agreement, and (c) to allow Debtor and Buyer to take any and all actions permitted under this Sale Order.

44.     No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Debtor's conveyance of the Transferred Assets.

45.     Nothing in the Sale Order shall be deemed to waive, release, extinguish or estop the Trustee, the Debtor or its estate from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Transferred Asset.

46.     The failure specifically to include or make reference to any particular provisions of the APA in the Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA as conditioned by this Sale Order is authorized and approved in its entirety.

47.     Absent a subsequent order of this Court to the contrary, the Sale Order shall be binding in all respects upon any other trustees, examiners, "responsible persons" or other fiduciaries appointed in this Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366   Filed   12/28/20   Page 46 of 48

48.     Nothing in this Sale Order shall be deemed to modify the obligations of the Buyer under federal statutes and regulations designed to protect public health and safety, including but not limited to any Environmental Law, with respect to the Buyer's operation, maintenance, transfer, disposal, or abandonment of any Purchased Assets after Closing.

49.     Notwithstanding any other provision of this Order or any other Order of this Court, no sale, transfer or assignment of any rights and interests of the Debtor in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such sale, transfer or assignment pursuant to the Cable Landing License Act of 1921, Executive Order 10,530, and the rules and regulations promulgated under such statutes. The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

50.     Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is

- 47 -

hereby expressly waived and shall not apply. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.

51.     In the event of any conflict between the Sale Order and the APA, the Sale Order shall control in all respects.

52.     This Court shall retain exclusive jurisdiction over any matters related to or arising from the Settlement Agreement and the implementation of the Sale Order, including without limitation, the enforcement of the US Marshal Sale, and Settlement Agreement Representations and Settlement Agreement Covenants.

## END OF ORDER

Submitted by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

- 48 -

CLARE E. CONNORS    7936
Attorney General, State of Hawai'i
CRAIG Y. IHA              7919
RYAN K. P. KANAKAOLE    9613
Deputy Attorneys General
Department of the Attorney
  General, State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone:  (808) 587-2978
Facsimile:  (808) 586-1372
Email:       ryan.kp.kanakaole@hawaii.gov

ASHFORD & WRISTON
A Limited Liability Law Partnership LLP
JAMES K. MEE   2995-0
KEVIN W. HERRING    6722-0
999 Bishop Street
First Hawaiian Center, 14th Floor
Honolulu, Hawaii 96813
Telephone:  (808) 539-0440
Facsimile:  (808) 533-4945
Email:  jmee@awlaw.com

Attorneys for the Department of Hawaiian Home Lands,
State of Hawai'i

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| In re | ) | Case No. 18-01319 (RJF) |
| | ) | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC | ) | |
| | ) | Status Conference |
| Debtor. | ) | Date:  August 23, 2021 |
| | ) | Time:  2:00 p.m. |
| | ) | Judge:  Hon. Robert J. Faris |
| | ) | |
| | ) | [Related Docket Entry:  Dkt. #425] |

## DEPARTMENT OF HAWAIIAN HOME LANDS' RESPONSE REGARDING MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE'S STATUS REPORT AND REQUEST FOR STATUS CONFERENCE, <u>FILED HEREIN ON AUGUST 16, 2021 (DKT #425)</u>

State of Hawai'i, Department of Hawaiian Home Lands ("DHHL") submits this response regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference ("Status Report"). Dkt. 425.

In the Status Report, the Trustee indicates that disagreements have arisen between the Trustee and Sandwich Isles Communications ("SIC") regarding SIC fulfilling obligations under the Settlement Agreement and the Sale Order. Further, several exhibits were attached to the Status Report which seem to imply that SIC may still claim exclusive control of the Paniolo assets due to DHHL's License 372 originally issued to Waimana Enterprise, Inc.

DHHL is filing this response:

(1) to inform the Court of the present status of negotiations between DHHL and Hawaiian Telcom ("Buyer") regarding issuance of a new license that would permit Buyer's long-term use of DHHL lands to operate the Paniolo system, as well as interim agreements which authorize Buyer to maintain and operate the Paniolo system.

(2) to inform the Court of DHHL'S belief that SIC's apparent claim of exclusivity under License 372 is not correct.

(3) to express its concern that SIC's incorrect claim of exclusivity may have

an adverse on service to DHHL beneficiaries and others on the Hawaiian Home

Lands.

## I.   BACKGROUND

On May 9, 1995, DHHL entered into a license with Waimana Enterprises,

Inc. for development of broad band telecommunications services on the Home

Lands.  ("License 372").  License 372 stated it was an "exclusive" license.

Subsequently, there were partial assignments of  License 372 to Waimana

affiliates SIC, Pa Makani LLC dba Sandwich Isles Wireless, Clearcom, Inc. dba

Sandwich Isles Broadband, and Debtor.  SIC also entered into a joint use

agreement with Debtor for a portion of the assets covered by License 372.

In 2017, the Federal Communications Commission ("FCC") issued an order

determining that the exclusivity provisions of License 372 violated Section 253(a)

of the Communications Act, 47 U.S.C. § 151 *et seq.*, and were accordingly

preempted and non-enforceable under Section 253(d) of the Act.  *See* Ex. "B"

attached to the Declaration of James K. Mee (the Mee Decl.) (the "FCC Order").

This Chapter 11 proceeding was commenced in 2018.  Subsequently, the

Trustee filed Michael Katzenstein as Chapter 11 Trustee's Motion for Entry of an

Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and

Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset

Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee, and (F) Granting Related Relief ("Motion to Approve Sale"). (Docket #313.)

DHHL filed a Statement of Position (Docket #341), stating that DHHL did not object to the sale of the Paniolo assets to Buyer under the terms of the Motion to Approve Sale. DHHL further stated that the Buyer would need to enter into a new license for the use of Hawaiian Home Lands upon which certain of the Paniolo assets were located, which would authorize Buyer to build, construct, repair, maintain and operate the assets located on Hawaiian Home Lands. (Docket #341 at 4-5.)

## II. DHHL AND BUYER HAVE ENTERED INTO A RIGHT OF ENTRY AGREEMENT ALLOWING BUYER TO MAINTAIN AND OPERATE THE PANIOLO ASSETS LOCATED ON HAWAIIAN HOME LANDS ON AN INTERIM BASIS, AND ARE IN THE PROCESS OF NEGOTIATING A NEW LONG-TERM LICENSE.

DHHL and Buyer are presently negotiating a new license that would allow Buyer, on a long-term basis, to maintain and operate the Paniolo assets on the Hawaiian Home Lands. As the first step in that process, on July 26, 2021, DHHL's Chairman issued an initial 30-day Limited Right of Entry that allow Buyer to engage in due diligence activities prior to acquisition of the assets. The

Limited Right of Entry is good for a period of thirty days. The issuance of the Limited Right of Entry recited, among other things, that it was in contemplation of the parties entering into negotiations for a new license. The terms of the Limited Right of Entry include, among other things, that DHHL and Buyer contemplated entering into negotiations for a new license. *See* Ex. "B" to Mee Decl., at 2.

Subsequently, at a regular meeting held on August 16, 2021, the Hawaiian Homes Commission approved a longer Right of Entry, to be on a month-to-month basis for a period of up to one year. Mee Decl. at ¶ 5. The final form of that Right of Entry agreement is presently being prepared and should be finalized and executed shortly. Mee Decl. at ¶ 6.

Concurrently, DHHL and Buyer are engaged in negotiations regarding a new long-term license. A proposed form of license was transmitted by counsel for DHHL to counsel for Buyer on August 5, 2021. Mee Decl. at ¶ 7.

Once a form of license is agreed upon by the parties, the proposed license will go through a beneficiary consultation process. Once that process is complete and beneficiary comments have been considered, the Hawaiian Homes Commission will make the final determination whether to approve the license. Mee Decl. at ¶ 8.

### III. LICENSE 372 IS NOT EXCLUSIVE, AND DOES NOT GIVE SIC EXCLUSIVE RIGHTS IN THE HAWAIIAN HOME LANDS, NOR PRECLUDE DHHL FROM ISSUING ANOTHER LICENSE TO BUYER.

The Exhibits to the Trustee's Status Report include several comments made by SIC which imply that, despite the clear wording and effect of the FCC Order, SIC still claims exclusive rights under License 372, and that DHHL is restricted in some fashion from entering into a new license with Buyer. For example, SIC states incorrectly that "[t]he assets on Hawaii Home Lands cannot be operated without Sandwich Isles' license." Letter of May 14, 2021, from SIC to Buyer. Exhibit "A" to Status Report. In an email dated June 2, 2021 from Al Hee of SIC to Buyer's consultant Winslow Tanabe, Mr. Hee incorrectly states that "[a]ll DHHL easements are part of the Waimana License which is not transferable." In another email from Mr. Hee to Mr. Tanabe of July 19, 2021, Mr. Hee incorrectly states that "HT [Buyer] does not own or control the property under the COs it purchased. HHL does subject to Waimana's license."

The quoted SIC statements are not correct for several reasons, including: first, it is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings; and second, the FCC Order expressly ruled that the exclusivity provisions of License 372 violated Section 253 of the Communications Act, 47 U.S.C. § 151 et

2764847v2

6

seq., and were accordingly preempted and non-enforceable under Section 253(d) of the Act. Exhibit "C" attached hereto. As stated by the FCC:

> [W]e find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands . . . to Waimana Enterprises, Inc. . . . and then assigned to its subsidiary, Sandwich Isles Communications, Inc. . . . violates Section 253 of the Communications Act . . . we preempt enforcement of its exclusivity provision pursuant to 253(d) of the Act.

Exhibit "C" at 1.

Accordingly, since any rights of SIC under License 372 are not exclusive, DHHL is fully authorized to enter into the process and issue another license to the Buyer.

## IV. SIC SHOULD NOT BE ALLOWED TO DO ANYTHING WHICH MIGHT DISRUPT OR AFFECT THE QUALITY OF SERVICES BEING PROVIDED TO THE HOME LANDS.

The Trustee's Status Report recites a number of areas where SIC is apparently not cooperating in the transfer of control of the Paniolo network to the Buyer, which is acting as Servicer of the system prior to Closing of the transactions. Also, according to the Status Report, SIC has apparently indicated that, post-closing, it will attempt to maintain "dead-hand control" via the provisions of License 372. The Trustee states that SIC's actions "represent a clear

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 432  Filed 08/19/21  Page 7 of 8

and present danger to the operations, safety and security of the Paniolo Cable Network." (Dkt. 425 at 12-13.)

The present situation as outlined in the Status Report causes great concern for DHHL. Thousands of DHHL beneficiaries as well as others on Hawaiian Home Lands are presently serviced by the SIC system, which is connected to and dependent upon the "middle mile" Paniolo system.

DHHL respectfully requests that the Court make it clear that SIC is not permitted to take any action which jeopardizes the Paniolo network, including failing to cooperate in the prompt and lawful transfer of assets to Buyer, or SIC's provision of services to the Home Lands.

DATED:     Honolulu, Hawai'i, August 19, 2021.

CLARE E. CONNORS
Attorney General, State of Hawaii

CRAIG Y. IHA
RYAN K.P. KANAKAOLE


    /s/ Kevin W. Herring
JAMES K. MEE
KEVIN W. HERRING

Attorneys for the Department of
  Hawaiian Home Lands, State of Hawai'i

1852357

KOBAYASHI SUGITA & GODA, LLP
LEX R. SMITH            3485-0
MARIA Y. WANG          8842-0
999 Bishop Street, 26th Floor
Honolulu, Hawaii 96813
Tel:  808-535-5700
Fax:  808-535-5799
lrs@ksglaw.com; myw@ksglaw.com

Attorneys for Interested Party
SANDWICH ISLES COMMUNICATIONS, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br>SANDWICH ISLES<br>COMMUNICATIONS INC'S<br>MEMORANDUM IN OPPOSITION<br>TO MOTION OF HAWAIIAN<br>TELCOM, INC TO ENFORCE SALE<br>ORDER [DKT #459];<br>DECLARATION OF LEX R. SMITH;<br>EXHIBITS "A" – "E"<br><br><br><br><u>Hearing</u>:<br>Date:   November 1, 2021<br>Time:  2:00 p.m.<br>Judge: Honorable Robert J. Faris |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aickin v. Ocean View Investments Co., Inc.,
    84 Hawai'i 447, 935 P.2d 992 (1997) ............................................................16, 18

Golf Carts, Inc. v. Mid-Pacific Country Club,
    53 Haw. 357, 493 P.2d 1338 (1972) ....................................................................15

Kahawaiolaa v. Hawaiian Sun Investments, Inc.,
    146 Hawai'i 424, 463 P.3d 1081 (2020)..............................................................17

Katzenstein and Hawaiian Telcom,
    Adv. No. 21-90017 .................................................................................................19

**Other Authorities**

Rule 65 ...........................................................................................................................1

Rule 9019 .......................................................................................................................1

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 480   Filed  10/18/21   Page 2 of 22

**Page**

INTRODUCTION ...................................................................................1

1.  THE SETTLEMENT AGREEMENT, MASTER RELATIONSHIP AGREEMENT, AND THE SCHEDULES ATTACHED TO IT ARE THE FOUNDATION OF THIS COURT'S ORDERS AUTHORIZING AND APPROVING THE SALE TO HAWAIIAN TELCOM ................................5

2.  THE COURT APPROVED MASTER RELATIONSHIP AGREEMENT CONTAINS A CLEAR DISPUTE RESOLUTION PROVISION ..............................................7

3.  THE MASTER RELATIONSHIP AGREEMENT MANDATED THAT THE TRUSTEE MIGRATE SIC'S TRAFFIC ON THE NETWORK TO FREE FIBERS PROMISED TO SIC.  THE TRUSTEE DELEGATED THAT RESPONSIBILITY TO HAWAIIAN TEL .........................................8

4.  WHEN HAWAIIAN TEL DEMANDED PAYMENT FOR THE COLOCATION SPACE, SIC POINTED OUT THAT THE TRUSTEE AND HAWAIIAN TEL WERE REQUIRED TO RECONFIGURE SIC'S TRAFFIC FIRST ................................10

5.  THE ENTIRE DISPUTE IS CAUSED BY TRUSTEE'S VIOLATION OF THE DEADLINE FOR CONDUCTING THE SALE ......................................................11

6.  DHHL'S DECLARATION IS TO ENSURE CONTINUED SERVICE - NOTHING MORE .........................................13

7.  THE TRUSTEE AND HAWAIIAN TELCOM HAVE NO BASIS TO CLAIM THE AGREEMENTS WITH SIC ARE TERMINATED ................................................14

CONCLUSION ...................................................................................19

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 480   Filed  10/18/21   Page 3 of 22

**SANDWICH ISLES COMMUNICATIONS INC'S MEMORANDUM IN OPPOSITION TO MOTION OF HAWAIIAN TELCOM, INC TO ENFORCE SALE ORDER [DKT #459]**

## INTRODUCTION

Hawaiian Telcom asks the Court to assume the "SIC Parties" in default, and requests the Court "direct the SIC Parties to provide the necessary and material operational information as HTI requested in its August 31, 2021 letter, to **turn over** certain Transferred Assets, and to remove the SIC Parties' personal property, waste and e-waste from the Paniolo premises and the Paniolo Network."  See Motion at pdf 20 and 21 of 70 (emphasis added).  Without citation movant claims that a "separate adversary proceeding is not required . . . ."  Id. at pdf 22 of 70.

This Court cannot grant injunctive relief against the SIC Parties without some modicum of due process, such as an evidentiary hearing.   See FBKR 7065, incorporating Rule 65.  The Court cannot grant the requested relief at a non-evidentiary motions hearing.   Indeed, the contract the court approved regarding the SIC parties expressly provides:

> After consummation of the Paniolo 363 Sale and all orders approving same become final and non-appealable, Ownership and SIC affiliates shall have no further duties hereunder.

Rule 9019 Settlement Agreement Page 6, Section 3(i)

More to the point, Hawaiian Telcom, the Trustee and the Department of Hawaiian Home Lands are seeking rulings they are not entitled to based on an

unsupported assemblage of false accusations. The Court should carefully examine, and reject, the many statements in the parties' memoranda that are unsupported by any fact.

The truth is that Hawaiian Telcom bought only the formerly-SIC-owned assets described in Exhibit "A2." No order of this Court nor anything else gives Hawaiian Telcom any right to any SIC-owned asset not specifically identified on Exhibit A2. Hawaiian Telcom is trying to get the Court to order SIC to give Hawaiian Telcom assets that (1) were never executed upon by the Trustee; and therefore (2) Paniolo never sold to Hawaiian Telcom; because (3) Paniolo never owned them and had no right or ability to sell them.

The truth is that the Trustee entered, with Court approval and authorization, a series of agreements that guaranteed SIC the ability to serve its customers without interruption regardless of the purchaser. Among other things the agreements included a lease in perpetuity of 2 fiber pairs in the undersea cable. The Trustee needed those agreements in order to facilitate the Trustee's effort to sell Paniolo's assets; and the Trustee used those agreements for that exact purpose. Those agreements contained an express dispute resolution procedure. After the Trustee had taken advantage of its agreements to find the best possible sale, he (in concert with Hawaiian Telcom) purported to "terminate" his obligations under the agreements, violating all of his promises under them. It is Hawaiian Telcom and

2

the Trustee who are seeking to "frustrate[d] the intent and directives of the Sale Order" by taking the benefits of SIC's agreements, while denying SIC the benefits they promised.  See SIC vs Katzenstein, (and Hawaiian Telcom); adv proceeding no. 21-90017, commenced October 12, 2021.

The alleged obligations that Hawaiian Telcom seeks to enforce are contained in the very agreements Hawaiian Telcom disingenuously claims were terminated. SIC stands ready to perform any obligations that are determined to exist, upon Hawaiian Telcom and the Trustee withdrawing their repudiation of their own obligations under those agreements and, to the extent there are disagreements, participating in the dispute resolution process spelled out in the MRA..

The truth is that Waimana Enterprises Ltd. continues to hold a valid, proper and enforceable license over the Hawaiian Home Lands that remains in full force and effect.   SIC holds a partial assignment of that license that continues to be owned by SIC.  Hawaiian Telcom did not buy SIC's license.  Hawaiian Telcom has no right or authority to evict SIC or Waimana or Clearcom from the property that remains licensed to them.  Again, Hawaiian Telcom is asking the Court to take actions that are contrary to law.  The Court has no authority to evict SIC. Hawaiian Telcom's is deliberately trying to mislead the Court by comparing Hawaiian Home Lands with fee simple property in Hawaii.  Hawaiian Telcom operates and maintains other property on Hawaiian Home Lands.  It is

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 480   Filed  10/18/21   Page 6 of 22

knowledgeable of the special conditions resultant from Hawaiian Home Lands

being trust lands. Additionally, Hawaiian Telcom no longer owns any of the poles

on which their aerial cable is attached. They therefore are very knowledgeable of

shared rights. Waimana Enterprises Inc. holds License 372 from the Hawaiian

Homes Commission. That license has been partially assigned to SIC. (it has also

been partially assigned to Clearcom Inc. and Pa Makani LLC). SIC's interest in

License 372 was deliberately **not** the subject of the Trustee's execution sale of

certain specified SIC-owned assets to Paniolo. Thus, Hawaiian Telcom does not

own that license.[1] SIC, Pa Makani and Clearcom still hold their rights under

License 372 in Hawaiian Home Lands. Hawaiian Telcom's statements, such as the

following, are simply made to deliberately mislead the Court:

> It is important for safety, environmental and economic
> reasons that the SIC Parties promptly remove all of the
> foregoing items from the Paniolo premises without
> further delays. As the Sale
> Order transferred the Paniolo property to HTI free and
> clear, there is no basis for the SIC Parties to continue to
> occupy these premises through the continued storage of
> these items

In truth and in fact, the "SIC Parties" hold valid licenses and have every right to

store, operate and maintain their assets on the licensed property and in facilities

---

[1] Under Schedule 2 of the Master Relationship Agreement (that Hawaiian Telcom and the Trustee are erroneously claiming they terminated) SIC did not transfer the license but did give Paniolo the right to use it: "For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL."

that were not part of the A2 assets.  This is an example of the false bases on which

this motion has been made.  The Trustee and Hawaiian Telcom are baselessly

screaming "obstruction" and "no cooperation" in an effort to deny SIC the benefits

that were promised.

1.  **THE SETTLEMENT AGREEMENT, MASTER RELATIONSHIP
    AGREEMENT, AND THE SCHEDULES ATTACHED TO IT ARE
    THE FOUNDATION OF THIS COURT'S ORDERS AUTHORIZING
    AND APPROVING THE SALE TO HAWAIIAN TELCOM**

This Court's orders authorizing the settlement are founded upon the

Trustee's repeated express promises that SIC would receive the benefits of the

Settlement Agreement, MRA and schedules thereto.  The Trustee's counsel

represented to the Court, the Settlement Agreement and related documents would:

> allow for replacement of the existing Paniolo Network
> Cable Lease ("SIC Lease") and Joint Use Agreement
> ("JUA") between the Debtor and SIC with a new Master
> Relationship Agreement which **will help to facilitate the
> sale of substantially all of the Debtor's assets in this
> case**

(emphasis added). See dkt # 316 Quoted from Trustee Katzenstein's Memorandum
in Support of Motion To Approve Settlement, at page 2; See also Settlement
Agreement (Exhibit "B ") page 2 recital G

Accordingly, the Trustee's counsel represented to the Court that the Trustee

entered these Agreements because they are:

> vital to SIC's ability to continue to provide
> telecommunication services to the residents of the
> Hawaiian Home Lands, a matter

5

of public policy for both the State of Hawaii and the USA. As a result, the Settlement Agreement and related documents, **provided SIC with virtually all rights of use and benefits of ownership of the A.2 Assets.**

(emphasis added).  Id at 7.

The Trustee promised:

> **"Any purchaser or assignee approved by the Court shall be bound by the terms of the Master Relationship Agreement."**

See Settlement Agreement (Exhibit "B") at Section 3(h) (emphasis added)

In  his motion asking the Court to approve the sale to Hawaiian Telcom, the Trustee represented that SIC's access to the network would continue because of the Settlement and MRA:

> SIC's access to and use of the A.2 Assets was not interrupted and **will continue into the future**.

Trustee's Memorandum in Support of Its Motion To Sell To Hawaiian Telcom, page 7 (emphasis added).

> **The assets** are being sold subject to an indefeasible right of use (IRU) granted to Paniolo which will be assigned to Buyer, and **subject to a below market (actually de minimus cost) leaseback to SIC for use in SIC's retail service to residents of the Hawaiian Home Lands**

Id., page 25 (emphasis added).

> Paniolo's obligations to provide Leased Fiber and Transport Services O&M Services pursuant to Section 3.3 will be effective as of the date a sale of under Section 363 of the Bankruptcy Code of all or substantially all of

6

Paniolo's assets that comprise Paniolo Network is
consummated and approved by the Bankruptcy Court.

Court approved Master Relationship Agreement Section 3.5

Hawaiian Telcom's filing in support of the Trustee's Motion to Approve the

Sale to was made without any exceptions.  There can be no doubt that the Court's

Order approving the sale to Hawaiian Telcom was based on the Trustee's repeated

representations that the MRA and exhibits, (which the buyer is now trying to

repudiate) would remain  in place.

## 2.  THE COURT APPROVED MASTER RELATIONSHIP AGREEMENT CONTAINS A CLEAR DISPUTE RESOLUTION PROVISION

The MRA recognized that there could be disagreements in the course of the

transition to a new owner.  Accordingly it described how those disagreements

would be addressed:

> 13.2. The Parties will attempt to resolve any
> dispute arising out of this Agreement promptly through
> discussions at the operational level. In the event that a
> resolution is not achieved, the disputing Party shall
> provide the other Party with written notice of the same
> and the Parties shall attempt to resolve such dispute
> between the **respective vice presidents of operations
> (or equivalent position with the power to resolve the
> dispute) of the disputing Parties**. All negotiations
> conducted by such officers shall be confidential and shall
> be treated as compromise and settlement negotiations for
> purposes of federal and state rules and regulations. If the
> disputing Parties fail to resolve such dispute within thirty
> (30) days of the non-disputing Party's receipt of the

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 480   Filed  10/18/21   Page 10 of 22

written notice, either such Party may initiate legal action as set forth below.

(a) Failing resolution of a dispute in accordance with Section 13.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any legal action, suit or proceeding with respect to any matter under or arising out of or in any way connected with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the courts of the State of Hawaii, and each Party hereby agrees to the personal and exclusive jurisdiction of such courts. The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

See Master Relationship Agreement Section 13.2 (emphasis added)).

Although the parties have disagreed on various matters, neither party ever invoked the process for resolving the disagreements.

A careful reading of the dispute resolution clause supports the intent that the purchaser of the Paniolo assets would be bound by the MRA and its dispute resolution procedure. The highlighted portion specifies a VP of operations. The Trustee never indicated it would operate the Paniolo assets. Doing so would require an VP of operations or equivalent.

## 3. THE MASTER RELATIONSHIP AGREEMENT MANDATED THAT THE TRUSTEE MIGRATE SIC'S TRAFFIC ON THE NETWORK TO FREE FIBERS PROMISED TO SIC. THE TRUSTEE DELEGATED THAT RESPONSIBILITY TO HAWAIIAN TEL

Under the Master Relationship Agreement, SIC's traffic on the network needed to be moved to the two fiber pairs that the Trustee agreed would be leased

8

at no cost to SIC.  Paniolo (presumably acting through the Trustee or buyer) agreed

to be responsible for that migration:

> Paniolo shall be responsible for the cost, if any, of reconfiguring current SIC traffic onto the Leased Fiber; provided further that Paniolo shall have the sole discretion to determine how and when such reconfiguration shall be implemented.

The Trustee delegated this responsibility to Hawaiian Telcom in the

Operational Support and Sales Agreement that was approved by the Court:

> 3.5 … The Parties further acknowledge and agree that the Network Inventory [that Hawaiian Telcom agreed to prepare] is necessary for the timely and proper grooming and migration of SIC's consumption of network assets to align with the **<u>Settlement Agreement and Master Relationship Agreement</u>** between the Trustee and SIC. Trustee shall use commercially reasonable efforts (which shall include enforcing the terms of the Settlement Agreement) in support of Service Provider's preparation of the Network Inventory

> 3.6 … the Service Provider **<u>shall</u>** perform the migration of existing Fiber Strands and network circuits consumed by SIC onto the Leased SIC Fiber and Transport Services in connection with the SIC Fiber in accordance with the provisions of the Settlement Agreement and Master Relationship Agreement. The Service Provider will develop a network plan, engineering designs, applicable work orders, circuit designs, network inventory, and implementation plan or method of procedure, to complete the migration. Work shall be performed in accordance with industry best practices in maintenance windows coordinated by the Service Provider, acting on behalf of the Trustee. In the event SIC does not have the equipment necessary to interface with the Leased SIC Fiber and related Transport Services, Service Provider

9

and Trustee shall cooperate to determine an appropriate
migration scope to achieve the necessary interface, prior
to the closing
of the Proposed Transaction.

Operational Support Agreement approved by the Court, Sections 3.5 and

3.6.

The Operational Support Agreement ended with the closing of the sale

(Operational Support Agreement Section 2.2).  The Trustee and Hawaiian telcom

failed to perform this requirement.

## 4. WHEN HAWAIIAN TEL DEMANDED PAYMENT FOR THE COLOCATION SPACE, SIC POINTED OUT THAT THE TRUSTEE AND HAWAIIAN TEL WERE REQUIRED TO RECONFIGURE SIC'S TRAFFIC FIRST

The MRA provides that SIC will pay for colocation space beginning January

of 2021.  However, SIC's agreement to make these payments was based on the

Trustee's agreement to reconfigure SIC's use of the network, which would have

reduced the amount of colocation space SIC needed by 90%.

When Hawaiian Telcom demanded payment for colocation space, SIC

responded that it would not because the Trustee and Hawaiian Telcom had not

performed their responsibility to reconfigure SIC's traffic.  Exhibit "C."  Neither

party pursued the procedures spelled out in the MRA to resolve their disagreement

on this issue.

10

Instead, the Trustee did nothing until the day of closing the sale to Hawaiian Telcom and then sent a letter purporting to terminate the parties' agreement with no dispute resolution process at all. The Trustee's letter says:

> Specifically, Sandwich Isles Communications, Inc. ("SIC") has defaulted on its obligations under the SIC Lease by, among other things, failing to pay Paniolo the amounts due under the MRA for monthly invoices beginning January 1, 2021 for Collocation Space

Exhibit "D"

Under the terms of the MRA the Trustee's notice was ineffective because the Trustee did not follow the dispute resolution provisions spelled out in the MRA

The fact that the Trustee's letter was given in bad faith is confirmed by the fact that he had SIC's position and rather than invoke the dispute resolution process he waited for months and then gave an 11th hour notice of termination.

5. **THE ENTIRE DISPUTE IS CAUSED BY TRUSTEE'S VIOLATION OF THE DEADLINE FOR CONDUCTING THE SALE**

In the Settlement Agreement, the Trustee promised that the sale of the Paniolo assets would be conducted pursuant to the deadlines set by the Court:

> Trustee will conduct a sales process for the Paniolo 363 Sale, including assumption and assignment of executory contracts and nonresidential releases **pursuant to orders of the Bankruptcy Court governing procedures and deadlines**, of substantially all of Paniolo's assets.
>
> Settlement Agreement (Exhibit "B"), Section 3(h).

11

The procedures and deadlines governing the sale of assets were set forth in the Court's order dated June 3, 2020, and were never extended:

| Event | New Date |
|---|---|
| Deadline to file Notice of Cure Costs | June 5, 2020 |
| Bid Deadline | July 13, 2020 |
| Auction (if needed) | July 31, 2020 |
| File Notice of Sale | August 10, 2020 |
| Objection Deadline (including Cure Cost Objections and Adequate Assurance Objections) | August 17, 2020 |
| Reply Deadline | August 24, 2020 |
| Sale Hearing | September 3, 2020 |
| Closing | September 14, 2020 |
| | |

See dkt #270 Order establishing these deadlines is attached hereto as Exhibit "D."

The Trustee took almost an extra year after the above deadlines to close the sale to Hawaiian telcom.   The Trustee's breach of his promise toc "conduct a sales process … **pursuant to orders of the Bankruptcy Court governing procedures and deadlines**" is the cause of the dispute regarding colocation fees.  If the Trustee had timely performed his agreement, all of this would have been resolved long

before January of 2021.  The Trustee (and Hawaiian Telcom) cannot take advantage of their own breach which caused this entire issue.

Moreover, SIC never agreed to pay operational costs of the network and definitely cannot be held responsible for the time period after the September 14, 2020.  SIC has billed the Trustee for these costs, but the Trustee has ignored those bills.  SIC is entitled to a set-off against any claims made by the Trustee or Hawaiian Telcom, for all of the operational costs borne by SIC.  The amount of the operating costs for which SIC is entitled to reimbursement exceeds the amount claimed in colocation charges.  Accordingly, it is actually the Trustee and Hawaiian Telcom who owe SIC.

6.    **<u>DHHL'S DECLARATION IS TO ENSURE CONTINUED SERVICE - NOTHING MORE</u>**

Hawaiian Telcom and the Paniolo Trustee has spent a considerable amount of time deliberately misleading DHHL that service can only be continued with Hawaiian Telcom's version of the sale.  This is completely false.  As the Trustee has repeatedly represented to this Court, under the Settlement Agreement and MRA service to SIC's customers will continue uninterrupted.  It is Hawaiian Telcom's attempts to close the purchase without the agreements that jeopardizes service.  Hawaiian Telcom has not told anyone, including the Court, how service to SIC customers will continue uninterrupted without the Settlement Agreement and MRA.

13

Furthermore, SIC continues to own the lines and conduits connecting each homesteader without which service cannot be received. The Paniolo Trustee and Hawaiian Telcom deliberately chose not to acquire those SIC assets. Hawaiian Telcom is orchestrating a massive public relations scheme to deflect the truth by claiming SIC non-cooperation threatens continued service. SIC's cooperation, in accordance with the Settlement Agreement and MRA, resulted in Hawaiian Telcom's purchase. Under the agreements, continued service is not dependent on SIC's cooperation.

7. **THE TRUSTEE AND HAWAIIAN TELCOM HAVE NO BASIS TO CLAIM THE AGREEMENTS WITH SIC ARE TERMINATED**

Even if it were ultimately determined (after the Master Relationship Agreement Section 13.2 is followed) that SIC is owes some money under the Master Relationship Agreement, the Trustee and Hawaiian Telcom have no basis to terminate the Master Relationship Agreement and Schedules thereto.

> 'A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different insubstance from that which was contracted for.'

14

<u>Golf Carts, Inc. v. Mid-Pacific Country Club</u>, 53 Haw. 357, 493 P.2d 1338 (1972) quoting <u>Yucca Mining & Petroleum Co. v. Howard C. Phillips Oil Co</u>., 69 N.M. 281, 285, 365 P.2d 925, 927 (1961).

In <u>Golf Carts, Inc</u>., as in the instant case, there was a disagreement over the interpretation of the contract. The Hawaii Supreme Court held that expressing disagreement with the other party's interpretation of the contract, does not justify termination of the contract (even if the interpretation is ultimately held to be incorrect):

> "In the instant case, termination by appellee was clearly not justified. A difficulty arose over the percentage of receipts appellee was to be entitled to, a secondary consideration under the agreement. The terms of that portion of the contract were disputed by the parties. Appellant offered to continue its performance while the issue as to the correct amount of proceeds appellee was to receive was resolved separately. It has been held that 'an offer to perform made in accordance with the promisor's interpretation of the contract, if made in good faith although it may be erroneous, is not such a clear refusal to perform as to constitute an anticipatory breach.' <u>Walker v. Shasta Minerals & Chemical Co</u>., 352 F.2d 634, 638 (10th Cir. 1965). Surely such a demonstrated desire to continue to fulfill appellant's obligation under the contract did not amount to a distinct, unequivocal, and absolute refusal to perform. As such, it cannot be said that appellant's actions constituted a breach or repudiation, justifying appellee's termination."

> 53 Haw. at 360

Similarly, in the instant case, SIC expressed disagreement about whether Paniolo's promise of reconfiguration was a condition precedent to SIC's promise

15

to begin paying for collocation space. SIC never repudiated the contract and therefore there was no permissible basis to terminate

In Aickin v. Ocean View Investments Co., Inc., 84 Hawai'i 447, 935 P.2d 992 (1997) the Hawaii Supreme Court again held that a contract could not be terminated because the alleged breach was "not so substantial and fundamental as to defeat the object of the parties in making the agreement."

> A material default or breach does not result simply because a party to a contract violates one of the agreement's provisions. In Golf Carts, Inc. v. Mid–Pacific Country Club, 53 Haw. 357, 493 P.2d 1338 (1972), this court defined a material breach, albeit in a different context:
>
> > A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract or **the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for**.

84 Haw. at 460, 935 P.2d at 1005 (emphasis added).

In the instant case, the object of the parties is clear from the Trustee's own words. The Trustee sought to make easier his task of selling the Paniolo network (a purpose that the Trustee has already fully enjoyed) and SIC sought to assure service for decades into the future through the free lease offered by the Trustee.

16

Neither of these purposes has been harmed in any way by SIC's disagreement about whether payments for collocation only begin after the Trustee (or Hawaiian Telcom) has fulfilled its obligation to reconfigure SIC's traffic on the network. If any money is owed, it will be paid after the dispute resolution process has been complied with. The fact that a dispute exists does not authorize termination of the agreement.

The rule that "a material default or breach does not result simply because a party to a contract violates one of the agreement's provisions" and that it does not justify termination of the agreement unless it goes "to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for" was recently confirmed in Kahawaiolaa v. Hawaiian Sun Investments, Inc., 146 Hawai'i 424, 463 P.3d 1081 (2020). Since the MRA and related agreements call for application of Hawaii law, the result is clear. The MRA, Lease and related agreements are not terminated.

The Hawaii Supreme Court recognized in Aickin

> The facts of this case indicate that the parties
> contemplated a long-term relationship, in which Lessees
> would provide needed services to the area, in return for
> the right to conduct business on the premises for an
> extended period of time. Furthermore, Lessees have
> testified that Lessor was not damaged or inconvenienced
> by the delay, and Lessor has adduced no evidence to the
> contrary. Accordingly, we hold that the circuit court

17

erred in COL D when it held that Lessees' failure to
register the underground storage tank was a material
default under the terms of the lease.

Similarly, the parties to the MRA also intended the agreement would last for

decades into the future.  A dispute over a few months' collocation fees is not a

basis to terminate the MRA or any part of it.

The Hawaii Supreme Court further recognized, that imposing a forfeiture

under such circumstances is improper:

> the potential harshness inherent in abruptly declaring a
> lease at an end, especially where the party in breach
> stands to suffer substantial loss from its termination,
> makes courts reluctant to enforce forfeiture clauses or to
> allow other involuntary termination of leases, and has
> resulted in the widely accepted "material breach" rule.
> Nearly all courts hold that, regardless of the language of
> the lease, to justify a cancellation, forfeiture, or other
> premature termination of a lease, the breach must have
> been "material," "serious," "substantial," or the like....

Aickin, 84 Haw. at 461, 935 P.2d at 1006, quoting University of Hawaii
Professional Assembly v. University of Hawaii, 66 Haw. 214, 219, 659 Pl.2d 720,
724 (1983).

This could not be more true in the instant case.  Because of a dispute over

the beginning date for collocation payments, the Trustee and Hawaiian Telcom

seek to deprive residents of the Hawaiian Home Lands the assurance the MRA

provided that they would have telecommunications service for decades into the

future including a free lease of capacity on the undersea and underground cable.

18

**CONCLUSION**

Hawaiian Telcom is trying to get things that the Trustee never sold to them (such as exclusive access to the premises licensed to SIC). They are seeking to enforce SIC's agreements that **Hawaiian Telcom itself has improperly repudiated**! The Court should recognize Hawaiian Telcom's conduct for what it is.

The facts of Hawaiian Telcom's wrongful conduct are further set out in the adversary proceeding filed by SIC last week, <u>Sanwich Isles Communications vs. Katzenstein and Hawaiian Telcom</u>, Adv. No. 21-90017, The Court is urged to review the exhibits attached thereto in order to gain a more complete understanding of what is being attempted.

Dated: <u>October 18, 2021</u>.   Respectfully submitted,


     /s/ Lex R. Smith
     LEX R. SMITH
     MARIA Y. WANG
     Attorneys for Interested Party SANDWICH
     ISLES COMMUNICATIONS, INC.

19

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                             8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Order Granting Pro Hac Vice Admittance Pending)*
One Federal Street
Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:    andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Order Granting Pro Hac Vice Admittance Pending)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:    melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>          Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br>**MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**<br><br><u>Final Hearing</u>:<br>Date:    May 2, 2022<br>Time:    2:00 p.m.<br>Judge:  Honorable Robert J. Faris |

## MOTION BY HAWAIIAN TELCOM, INC. FOR
## INTERIM AND FINAL RELIEF
## ENFORCING THE COURT'S SALE ORDER

Since the Court granted in part Hawaiian Telcom, Inc.'s ("HTI" or the "Buyer") prior motion seeking to enforce the Court's sale order, Sandwich Isles Communications, Inc. ("SIC") and its affiliates (collectively, the "SIC Parties") have repeatedly misrepresented, and acted in direct contravention of, that order and the Court's prior orders. As detailed in the supporting memorandum hereto, SIC has wrongly claimed that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's] property surrounding and under the Paniolo assets." *See Declaration of Lynette Yoshida* filed simultaneously herewith (the "Yoshida Decl."), Ex. Y-33 (letter from SIC counsel suggesting that the real property belonged to SIC). SIC's counsel has also sent letters to the four police chiefs stating that this Court "has confirmed that no real estate was transferred to Hawaiian Telcom" and that the assets purchased by HTI "are located on real estate granted to Waimana/SIC." *Id.*, Ex. Y-34 to Y-37. The SIC Parties have even claimed that the terms "central offices" and "terminal buildings," as used by the Court in its prior order to describe the physical structures transferred to HTI through the court-approved sale, do not refer to the whole structure, but only portions of the buildings, and thus other portions (as determined by SIC) can still be occupied by SIC. Most recently, in clear violation of the exclusive jurisdiction retained by this

2

Court in its order approving the sale, the SIC Parties have gone so far as to initiate a civil lawsuit against HTI in the State of Hawaii Circuit Court of the First Circuit (the "State Court Action"), seeking to forcibly evict HTI from the Paniolo buildings and premises HTI purchased through the sale.

A summary of SIC's recent, extensive misconduct includes:

(a) removing, destroying, or otherwise tampering with HTI locks on the perimeter fences surrounding the buildings purchased by HTI;

(b) installing SIC locks or devices on these perimeter fences, and barring and physically blocking HTI personnel from accessing its buildings and the surrounding premises;

(c) barricading the interior doors and otherwise rendering inaccessible areas of the buildings purchased by HTI in Anahola and Hilo;

(d) drilling out locks on doors to the buildings in Anahola and Hilo;

(e) welding access gates shut, and installing concrete fixtures in the access roadway, in an attempt to permanently render the premises surrounding the buildings inaccessible to all, including but not limited to HTI, its contractors and suppliers (such as electric utility personnel), and any fire and safety first responders;

(f) making false police reports that HTI is trespassing on SIC land; and

(g) calling the police on HTI personnel attempting to enter the premises surrounding the buildings purchased by HTI.

3

Such misconduct should not be taken lightly. Not only have the SIC Parties either violated or misrepresented the terms of the Court's orders, and not only have the SIC Parties prevented HTI from rightfully enjoying the benefit of its arms-length purchase, but the SIC Parties' ongoing actions have also impaired HTI's ability to provide for its customers, and have posed a severe threat to the security and safety of HTI's personnel and the Paniolo telecommunications cable network. *See* Yoshida Decl. ¶ 44. The SIC Parties' calls and correspondence to the four police chiefs reflect their desire to use intimidation and *in terrorem* tactics against HTI's employees and contractors. The SIC Parties' conduct is not only wrongful, but has become progressively harmful and alarming.

This motion therefore seeks the entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") which, subject to the entry of the Final Order (defined below), compels the SIC Parties, their principals, affiliates, employees and contractors (including for avoidance of doubt but without limitation Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family) to:

1.     Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following buildings and appurtenant fixtures that HTI purchased from the Paniolo estate (the structures, together with the associated systems, infrastructure,

4

and appurtenances supporting a particular structure including, without limitation the conduits, manholes, hand holes, cross connects, meet-me cabinets, and the fences installed by SIC and/or Paniolo surrounding such buildings, the "Paniolo Buildings") and on the easement areas surrounding the Paniolo Buildings (the "Paniolo Premises"):

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

2. Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

3. Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access

5

gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

4.      Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

5.      Fully adhere to, and refrain from interfering with, HTI's security protocols to which all parties accessing the Paniolo Buildings and Paniolo Premises are subject.

The Motion further seeks entry of a final order, substantially in the form attached hereto as **Exhibit 2** (the "Final Order"), which includes:

(a)      the same relief sought in the Interim Order, on a final basis;

(b)      a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings;

(c)      a confirmation from the Court that the SIC Parties are not permitted to obstruct HTI's access to the Paniolo Buildings and Paniolo Premises in any way, or impose any fees on HTI for access to, or use of, the Paniolo Buildings and Paniolo Premises;

(d)      a confirmation from the Court that, through the Court's order approving the sale of assets to HTI (the "363 Sale"), HTI assumed the obligation to control and

6

maintain security for the Paniolo Premises, subject to the requirements of the Federal Communications Commission (the "FCC") and the LOA (defined below), and enjoining the SIC Parties from interfering with HTI's efforts to provide such security;

(e)     a finding that the SIC Parties, through the filing and prosecution of the State Court Action, have violated the exclusive jurisdiction provisions of the 363 Sale Order and that the Court retains exclusive jurisdiction to adjudicate the issues raised by the SIC Parties in the State Court Action with respect to the Transferred Assets; and

(f)     compelling the SIC Parties to remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

This Motion is brought pursuant to 11 U.S.C. §§ 105 and 363(f), Rule 9013 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Local Bankruptcy Rules for the District of Hawaii, and is supported by the memorandum in support of the Motion, attached declarations and exhibits, and the records and files herein.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637   Filed  03/29/22   Page 7 of 8

DATED:    Honolulu, Hawaii, <u>March 29, 2022</u>.

                    CASE LOMBARDI & PETTIT

                        <u>/s/ Ted N. Pettit</u>
                    TED N. PETTIT
                    DAVID G. BRITTIN
                    And
                    MORGAN, LEWIS & BOCKIUS LLP
                    ANDREW J. GALLO
                    MELISSA Y. BOEY

                    Attorneys for HAWAIIAN TELCOM, INC.

8

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>        Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br>**MEMORANDUM IN SUPPORT OF MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER** |

**MEMORANDUM IN SUPPORT OF MOTION BY
HAWAIIAN TELCOM, INC. FOR
INTERIM AND FINAL RELIEF
<u>ENFORCING THE COURT'S SALE ORDER</u>**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................1

JURISDICTION.................................................................................................8

RELEVANT FACTUAL BACKGROUND...........................................................8

    A.    Through the Marshal Sale, the Trustee obtained the
           Paniolo Buildings and the Access and Easement Rights
           that it did not already own..............................................................9

    B.    In the 363 Sale, the Trustee then sold to HTI all of the
           Transferred Assets, including all of the Paniolo Buildings,
           all of the Access and Easement Rights, and all other
           Marshal Sale Assets ....................................................................13

    C.    The Trustee terminated contractual arrangements with SIC
           prior to the 363 Sale ...................................................................18

    D.    The SIC Parties have no right to use and occupy the
           Paniolo Buildings.........................................................................19

    E.    The obligation to control and maintain security for the
           Paniolo Premises was assumed by HTI through
           the 363 Sale ................................................................................20

    F.    The DHHL has issued a Right of Entry Agreement to HTI ........23

    G.    HTI's First Enforcement Motion ..................................................24

    H.    The SIC Parties impede HTI's access to and within the
           Paniolo Buildings and the Paniolo Premises ...............................26

    I.    SIC and Waimana have initiated the State Court Action
           seeking, *inter alia*, to permanently evict HTI from the
           Paniolo Buildings and the Paniolo Premises ...............................29

ARGUMENT ...................................................................................................31

    A.    HTI acquired, and now possesses control and ownership
           over, the entirety of the Paniolo Buildings, including the
           perimeter fences .........................................................................32

           1.    HTI acquired the Paniolo Buildings..................................32

           2.    HTI also acquired the perimeter fences
                 surrounding the Paniolo Buildings ...................................36

B.    HTI acquired Access and Easement Rights associated with the Paniolo Premises, and the SIC Parties should be prohibited from interfering with HTI's Access and Easement Rights in any manner ......................................................38

    1.    Waimana obtained the 372 License, and partially assigned different portions of the 372 License to SIC, Pa Makani, and Clearcom..................................................39

    2.    DHHL separately granted to SIC certain access and easement rights for the construction and operation of Paniolo Buildings ..............................................40

    3.    HTI purchased, along with the Paniolo Buildings, the necessary Access and Easement Rights on each corresponding Paniolo Premise .........................................42

    4.    In violation of the 363 Sale Order, the SIC Parties have blocked and impeded HTI's access to the Paniolo Premises ..............................................46

C.    HTI assumed the obligation of maintaining security over the Paniolo Premises ..........................................................50

D.    Through the filing of the State Court Action, SIC and Waimana have breached the 363 Sale Order and the Marshal Sale Order..................................................................54

CONCLUSION .........................................................................56

# I.    **INTRODUCTION**

Hawaiian Telcom, Inc. ("HTI" or the "Buyer") purchased substantially all of the assets of Paniolo Cable Company, LLC ("Paniolo") from the Trustee in an arms'-length, good-faith sale approved by this Court pursuant to section 363 of the Bankruptcy Code (the "363 Sale").  The "Transferred Assets", as defined in the Court's order approving the 363 Sale[1] [Dkt. 366] (the "363 Sale Order"), comprised assets that had traditionally been owned by Paniolo directly, as well as assets formerly owned by SIC that the Trustee obtained and brought into the bankruptcy estate via a marshal sale (the "Marshal Sale") confirmed by an order of this Court (the "Marshal Sale Order").  The Trustee has previously informed the Court regarding certain difficulties it faced in working with SIC and its affiliates (including Waimana Enterprises Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family, collectively, the "SIC Parties") on the turnover of assets to the Trustee.  *See Michael Katzenstein, Chapter 11 Trustee's, Status Report and Request for Status Conference* [Dkt. 425] (the "Trustee's Status Report").  HTI has similarly approached this Court on a prior occasion, requesting enforcement of the 363 Sale Order and SIC's attendant requirements to turn over Transferred Assets, shortly after

---

[1] *Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in connection with the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee, and (F) Granting Related Relief* [Dkt. 366].

the sale closed in August 2021.  Since the Court's decision in connection with HTI's

first *Motion to Enforce Sale Order* [Dkt. 459] (the "First Enforcement Motion"), the

misconduct that occasioned the Trustee's Status Report and HTI's First Enforcement

Motion has not only continued, but has intensified.

Pursuant to the 363 Sale Order, the Transferred Assets that HTI acquired

included certain central offices and terminal buildings (the structures, together with

the associated systems, infrastructure, and appurtenances supporting a particular

structure including, without limitation the conduits, manholes, hand holes, cross

connects, meet-me cabinets and the fences installed by SIC and/or Paniolo

surrounding such buildings, the "Paniolo Buildings").  The SIC Parties are now

attempting to interfere with HTI's ownership and enjoyment of the Paniolo

Buildings by taking the indefensible position that the acquisition by HTI of the

Paniolo Buildings did not include all of the rooms contained within such buildings

or the fences erected to surround the Paniolo Buildings.  SIC has wrongfully asserted

ownership and control over certain rooms within the Paniolo Buildings – which they

have misleadingly characterized as "warehouses" in an attempt to assert that rooms

within the buildings are separate and distinct from the buildings themselves.  *See*

*Declaration of Lynette Yoshida* filed simultaneously herewith (the "Yoshida Decl."),

Ex. Y-31 ("I also understand the Court's order did not list the warehouses located at

many of our sites where your central offices are located as part of the purchase.

Please put back SIC's lock on the Hilo warehouse which was removed."). SIC has also repeatedly interfered with locks on the fences around the Paniolo Buildings in an effort to deny HTI access.

Similarly, each Paniolo Building is located on, and surrounded by, an easement granted or permitted by the Department of Hawaiian Home Lands ("DHHL")[2] for the purpose of locating a central office building and obtaining access thereto (each such easement area, a "Paniolo Premise").[3] These access easements, necessary for HTI to access its operations within the Paniolo Buildings, were also transferred to the Trustee through the Marshal Sale, and then sold to HTI as Transferred Assets in the 363 Sale. In its ruling on the First Enforcement Motion, the Court noted that due to "gaps in the existing record," it could not, at that time, determine whether the Trustee (and HTI) had acquired **exclusive** rights of occupancy. *See Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order* [Dkt. 537] (the "First Enforcement Order") at 10.

Notwithstanding the Court's rulings, the SIC Parties have doubled down on their position that they hold an exclusive right to occupy and control the Paniolo Premises – and not HTI. The SIC Parties have declared, in its letters to the four

---

[2] As further detailed in this pleading, this easement is an express written easement for the Paniolo Premises at Anahola, Nanakuli, Waimanalo, Kalamau, Waiehu, Puukapu, Laiopua, and Hilo, and is an implied easement for the Paniolo Premises at Kekaha and Puunene. *See infra* III.(B)(2).
[3] A summary of Paniolo Premises has been attached hereto as **Exhibit A.**

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-1   Filed  03/29/22   Page 6 of 59

police departments, that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's] property surrounding and under the Paniolo assets." Yoshida Decl., Ex. Y-34 to Y-37. The SIC Parties have also claimed that this Court "confirmed that no real estate was transferred to Hawaiian Telcom" through the 363 Sale, and that the assets purchased by HTI "are located on the real estate granted to Waimana/SIC". *Id.* These statements by the SIC Parties are clear misstatements of the First Enforcement Order. Most recently, in clear violation of this Court's retention of "exclusive jurisdiction" over disputes related to the Marshal Sale and 363 Sale, SIC and its affiliate Waimana Enterprises Inc. ("Waimana") have also filed a lawsuit against HTI in the State of Hawaii Circuit Court of the First Circuit (the "State Court Action"), which takes the position that the Marshal Sale and 363 Sale did not include "any rights to occupy" the Paniolo Buildings and Paniolo Premises and thus seeks to, among other things, evict HTI for trespass and remove HTI from the Paniolo Buildings and Paniolo Premises. *See* Complaint, filed on March 18, 2022, at Case No. 1CCV-22-0000321 (the "Complaint").[4] This legal position held by SIC and Waimana directly conflicts with this Court's rulings in the Marshal Sale Order and the 363 Sale Order.

---

[4] A copy of the Complaint has been attached here for the Court's convenience at **Appendix H.**

4

Accordingly, this motion supplements the record, as requested by the Court in the First Enforcement Order, and requests further relief from the Court to enforce its 363 Sale Order, on an interim and final basis.

The Interim Order, attached hereto as **Exhibit 1**, seeks to compel the SIC Parties, their principals, affiliates, employees and contractors (including for avoidance of doubt but without limitation Waimana, Pa Makani LLC, Clearcom, Inc., and members of the Hee family) to, subject to the entry of the Final Order:

1.      Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| | |
|----|----|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

2.      Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

5

3. Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

4. Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

5. Fully adhere to, and refrain from interfering with, HTI's security protocols to which all parties accessing the Paniolo Buildings and Paniolo Premises are subject.

The Final Order, attached hereto as **Exhibit 2**, seeks:

(a) the same relief sought in the Interim Order, on a final basis;

(b) a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings;

(c) a confirmation from the Court that the SIC Parties are not permitted to obstruct HTI's access to the Paniolo Buildings or Paniolo Premises in any way, or

6

impose any fees on HTI for access to, or use of, the Paniolo Buildings or Paniolo Premises;

(d)     a confirmation from the Court that through the 363 Sale Order, HTI assumed the obligation to control and maintain security for the Paniolo Premises, in compliance with and subject to the requirements of the Federal Communications Commission (the "FCC"), and enjoining the SIC Parties from interfering with HTI's efforts to provide such security;

(e)     a finding that the SIC Parties, through the filing and prosecution of the State Court Action, have violated the exclusive jurisdiction provision of the 363 Sale Order, and that the Court retains exclusive jurisdiction to adjudicate the issues raised by the SIC Parties in the State Court Action with respect to the Transferred Assets; and

(f)     compelling the SIC Parties to remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

In light of the substantial risk to national security, to the ability of first responders to access the Paniolo Premises when needed, to the operations of HTI, and to the safety of HTI personnel, this Motion seeks interim and final orders enforcing the 363 Sale Order and providing the relief requested herein.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-1   Filed  03/29/22   Page 10 of 59

## II. <u>JURISDICTION</u>

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding as it relates to the administration of a debtor's bankruptcy estate pursuant to 28 U.S.C. § 157(b)(2)(a), relates to an order approving the sale of property pursuant to 28 U.S.C. § 157(b)(2)(n), and relates to the liquidation of the assets of the estate pursuant to 28 U.S.C § 157(b)(2)(o). The enforcement and interpretation of orders issued in core proceedings, such as the 363 Sale Order at issue here, are also considered core proceedings within the bankruptcy court's jurisdiction. *See*, *e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-55 (2009) (holding that the "bankruptcy court plainly had jurisdiction to interpret and enforce its own prior orders . . . ."). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. <u>RELEVANT FACTUAL BACKGROUND</u>

Pursuant to this Court's orders in connection with the Marshal Sale (as defined below) and the 363 Sale, HTI acquired the Transferred Assets, which included (a) the Paniolo Buildings; (b) rights of access to the Paniolo Premises necessary to access the Paniolo Buildings and operate the Paniolo network[5] (the "<u>Access and Easement Rights</u>"); (c) all of SIC's rights under that certain License Agreement No.

---

[5] The Paniolo network, which is a submerged marine fiber and terrestrial fiber telecommunications cable network, is hereinafter collectively referred to as the "<u>Paniolo Network</u>."

8

372 issued by the DHHL (the "372 License") with respect to the Paniolo Network, and (d) a certain cable landing license issued by the FCC, under which HTI was required to retain and assume the obligation to establish and maintain specific security requirements over the Paniolo Premises and the operation of the Paniolo Network.

### A. Through the Marshal Sale, the Trustee obtained the Paniolo Buildings and the Access and Easement Rights that it did not already own.

To satisfy a judgment in excess of $256 million against SIC and in favor of Michael Katzenstein, Chapter 11 Trustee ("Trustee"), the U.S. Marshal for the District of Hawai'i levied upon certain SIC assets identified on the exhibit to the Trustee's Certificate of Execution ("Marshal Sale Assets"). *See Judgment,* available at Dkt. 28 in the *Katzenstein v. Sandwich Isles Commc'ns, Inc.*; Adv. Pro. No. 19-90022 (Bankr. D. Haw.) (the proceeding, the "SIC AP"). The Marshal Sale Assets included those certain "Schedule A.2 Assets" listed on Schedule A.2 to the Certificate of Execution. *See Certificate of Execution* (with the exhibits thereto, the "Certificate of Execution"), *available at* Dkt. 37 in the SIC AP, at 6 *et seq*. Schedule A.2 is organized by location, with each page of the schedule identifying certain Paniolo Buildings and related SIC assets that were levied upon on the corresponding Paniolo Premises. *Id.* Each of the following buildings are identified on Schedule A.2:

"Anahola Central Office – Central office located in Anahola, Hawaii, including access rights to the land on which the central office resides."

"Nanakuli Terminal Building – Terminal building locate in Nanakuli, Hawaii including access rights to the land on which the terminal building resides."

"Waimanalo Terminal Building – Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides."

"Kalamaula Terminal Building – Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides."

"Waiehu Central Office – Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides."

"Laiopua Central Office – Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides."

"Hilo Central Office – Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides."[6]

*Id.* at 6-9, 11-13.

Not only does Schedule A.2 list the buildings, but it also lists all systems and appurtenances necessary to operate the buildings, including HVAC Systems and "all

---

[6]As explained further below, only 7 of the 10 Paniolo buildings are included on Schedule A.2. This is because three of the Paniolo Buildings were owned directly by Paniolo prior to the Marshal Sale. Those three buildings (along with the seven acquired through the Marshal Sale) were all transferred by the Trustee to HTI as part of the 363 Sale.

other environmental assets" supporting each building; generators and the infrastructure providing power to the buildings and all "ancillary equipment" necessary to operate these systems and to make the equipment in the building "function within the network." *Id.* Such "ancillary equipment" expressly included "any equipment that is necessary for the performance or monitoring of . . . Security" for the Paniolo Network. *Id.*

Schedule A.2 also includes a schedule of "Other Related Assets" that were acquired by the Trustee in the Marshal Sale. Certificate of Execution at 14-15. These assets included "[a]ll keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices" (collectively, the "Paniolo Keys"). *Id.* at 15.

Further, "Other Related Assets" on Schedule A.2 that were acquired by the Trustee through the Marshal Sale also expressly lists the following:

> "--[a]ll licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, **including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands**.
> --**All existing and pending entitlements** (including without limitation, **SIC's interests** in memoranda of agreement, **easements,** leases, **license agreements**, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets."

*Id.* at 15 (emphasis added).

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-1   Filed  03/29/22   Page 14 of 59

This Court confirmed the sale of the Marshal Sale Assets to the Trustee through the Marshal Sale Order, dated March 16, 2020 [SIC AP, Dkt. 65]. As the provisions of the Marshal Sale Order make clear, the Marshal Sale transferred the Marshal Sale Assets to the Trustee (including the Paniolo Buildings and the Access and Easement Rights listed on Schedule A.2), and it did so by specifically divesting SIC of any further rights in these assets. The Marshal Sale Order provides as follows:

> 6. [SIC] and all persons claiming any interest in the Property, by or through [SIC's] interest in the Property,[7] are forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the Property and every part thereof, and to the proceeds therefrom arising up to the date of closing.

> 7. Any and all other encumbrances affecting the Property, or any part thereof (except for any holders of liens or security interest that are senior in priority to the judgment lien of [the Trustee]) are perpetually barred of and from any and all right, title and interest, and claims at law or in equity, in the Property or any part thereof. Any liens or security interests that are junior to the judgment lien of [the Trustee] shall be extinguished by the Execution Sale.

*Id.* ¶¶ 6-7.[8] The Marshal Sale Order further provides that "[t]his Court maintains

---

[7] "Property" is defined in the Marshal Sale Order as the real property and the A.2. Assets which were both sold to the Trustee as the highest bidder.

[8] The fact that the Trustee acquired SIC's easement rights as part of the Marshal Sale has also been admitted by SIC numerous times. One example can be found in related proceedings pursuant to which the United States Government, acting on behalf of the Rural Utilities Service ("RUS"), applied for a writ of execution to enforce its own lien against SIC's assets. In that dispute, SIC took the position that "Paniolo's judgment was entered and recorded prior to [RUS's] and accordingly constitutes a lien on **all of** SIC's real property assets, which . . . include **the easements, rights of way, and other real estate interests** that allow all of SIC's assets on Hawaiian Home Lands." *SIC's Objection to Application for Writ of Execution,* available at Dkt. 263 in *U.S.A. v.*

12

jurisdiction for of [sic] the purposes of interpretation, implementation and enforcement of this Order." *Id.* ¶ 8.

**B.** **In the 363 Sale, the Trustee then sold to HTI all of the Transferred Assets, including all of the Paniolo Buildings, all of the Access and Easement Rights, and all other Marshal Sale Assets.**

On December 28, 2020, the Court entered the 363 Sale Order, approving the sale of substantially all of Paniolo's assets to HTI pursuant to the terms of the *Asset Purchase Agreement,* dated November 30, 2020, by and between the Trustee, Paniolo, and HTI (the "APA"). *See* Ex. A to the 363 Sale Order [Dkt. 366-1]. In the 363 Sale Order, the Court made explicit findings that HTI constituted a bona-fide, good faith purchaser, that the terms and conditions of the APA constituted the highest and best offer, and that consummation of the 363 Sale was "in the best interests of the Debtor, its creditors, its estate, and all parties in interest." 363 Sale Order ¶¶ O, P. The assets and rights sold to HTI (the "Transferred Assets") included assets traditionally titled or owned by Paniolo and identified in Schedule 2.1(a)(i) of the APA ("A.1 Assets"), and also formerly SIC-owned assets the Trustee acquired post-petition through the Marshal Sale and identified in Schedule 2.1(a)(ii) to the APA ("A.2 Assets"). *Id.* ¶ 7-12; APA at 2. The A.1 Assets included the Paniolo

---

*Sandwich Isles Commc'ns, Inc.*, Case No. 18-145 (D. Haw.) at 7-8 (emphasis added). Further, SIC continued, RUS could not levy on the full breadth of its writ (the writ was for all of SIC's assets), because some of the easements and real estate interests sought by the RUS had already been sold to the Paniolo Trustee. *See id.*

13

Buildings at Kekaha, Puunene and Puukapu, along with systems and associated appurtenances such as HVAC, conduits, generators and manholes, and "access rights to the land on which the terminal building[s] reside[]." APA at 232-237.

The list of A.2 Assets being transferred through the 363 Sale was substantively identical to the list of A.2 Assets transferred to the Trustee pursuant to the Marshal Sale (and therefore included the Paniolo Buildings and the Access and Easement Rights listed therein). *Compare* APA, Schedule 2.1(a)(ii) (p. 238 *et seq.*) *with* Certificate of Execution at 6 *et seq.* The APA defined these assets as follows:

> **The following assets and rights obtained by the Trustee from SIC in the Marshal Sale held March 6, 2020, free and clear of the claims and liens of any other person ("Schedule A.2")[:]**
>
> Transferred Equipment and Property Rights (as defined in the Settlement Agreement) transferred by SIC in conjunction with the US Marshal Sale, and generally consisting of **all** assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate **(including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access)** conduits, manholes, handholes, rights of way, **easements**, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, **security systems,** network management systems, cross connects and cross connect panels, vehicles, trailers and tools. . . for a stand-alone commercial operation and use of the Paniolo Cable System.

*Id.* at 238 (emphasis added). In other words, the Transferred Assets included all of

14

the Marshal Sale Assets on Schedule A.2, including (a) the seven Paniolo Buildings listed on Schedule A.2 at Anahola, Waiehu, Laiopua, Hilo, Nanakuli, Waimanalo, and Kalamaula, along with appurtenances located within the Paniolo Premises such as HVAC, conduits, generators manholes, "access rights to the land on which the [central offices and terminal buildings] reside[]", and the ancillary security equipment necessary for operating the Paniolo Network; (b) SIC's Access and Easement Rights for all ten of the Paniolo Premises, and (c) all of the Paniolo Keys. *Id.* at 238-245.

The Transferred Assets also specifically included Paniolo's Submarine Cable Landing License (FCC File No. SCL-LIC-20070223-00003, the "SCL License") issued by the FCC. The SCL License is expressly identified in Schedule 1.1(b) of the APA as an "Assigned Permit", and thus is included within the "Incidental Rights" purchased by HTI under Section 2.1 of the APA, and within the scope of "Transferred Assets" under the 363 Sale Order. *See* APA at 2, 5, 6 and Schedule 1.1(b) to the APA; 363 Sale Order ¶ v.

With respect to the 363 Sale, the Court made specific findings that all conditions of 363(f) of the Bankruptcy Code have been satisfied, *see* 363 Sale Order ¶ S, and that the Trustee was therefore "authorized to transfer all of the Debtor's right, title and interest to the Transferred Assets free and clear of all Interests and Claims," *id.* ¶ T. This Court also made explicit findings that the "Buyer would not

15

have entered into the APA if the transfer of the Transferred Assets was not free and clear of all Interests or Claims . . . or if in the future the Buyer would or could be liable for any such Interests or Claims." *Id.* ¶ S.

Further, the Court found that:

> "A sale of the Transferred Assets other than one free and clear of all Interests or Claims . . . would yield substantially less value for the Debtor's estate, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the APA and approved herein free and clear of all Interests or Claims . . . is in the best interests of the Debtor, its estate and creditors, and all other parties-in-interest.

*Id.* ¶ U.

On August 31, 2021, the 363 Sale closed (the "Closing"). *See Notice of (A) Closing and Consummation of Sale of the Debtor's Assets, and (B) Assumption and Assignment of Certain Designated Contracts in Connection with the Sale* [Dkt. 440] at 1-2.

Pursuant to the terms of the 363 Sale Order, the transfer of the Transferred Assets and the extinguishment of any interests or claims held by any party in or against the Transferred Assets, became binding on all parties-in-interest, including the SIC Parties, upon Closing. *See* 363 Sale Order ¶¶ S, T, 6. Expressly included within those interests and claims extinguished by the 363 Sale were "licenses", "restrictive covenants", "rights of use or possession", "restrictions on the use . . . or other exercise of any attributes of ownership", "consent rights", and all "obligations, contractual rights and claims . . . of the Debtor, **SIC [and] SIC's Affiliates**". *Id.* ¶

16

S (emphasis added).

The 363 Sale Order also expressly provides for a permanent injunction against third parties asserting any continuing claim or interest in the Transferred Assets. All third parties, including, expressly the SIC Parties, are required to surrender possession of the Transferred Assets to HTI:

> 10. Except to the extent expressly included in the Assumed Liabilities or Permitted Liens or to enforce the APA, or as provided in this Sale Order, upon the Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and permanently enjoined from asserting against the Buyer, and its permittee successors, designees, and assigns, or property, or the Transferred Assets conveyed in accordance with the APA, any Interests or Claims of any kind or nature whatsoever arising prior to the closing, including, without limitation, under any theory of successor or transferee liability, de facto merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated . . .

> 39. All persons or entities that are currently in possession of some or all of the Transferred Assets in contravention of the US Marshal Sale, the Settlement Agreement or MRA, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets except as Debtor and Buyer may otherwise agree.

*Id.* ¶¶ 10 & 39. The 363 Sale Order also provides that this Court retained "**exclusive jurisdiction** over any matters related to or arising from the Settlement Agreement and the **implementation of the Sale Order**, including without limitation, the **enforcement of the US Marshal Sale**, and Settlement Agreement

17

Representations and Settlement Agreement Covenants." *Id.* ¶ 52 (emphasis added).

## C. The Trustee terminated contractual arrangements with SIC prior to the 363 Sale.

Historically, SIC's rights to use certain Paniolo assets, including portions of the Paniolo Buildings, had been granted to SIC via contract – specifically, that certain Paniolo Cable Network Lease, dated July 19, 2007 and that certain Joint Use Agreement dated July 19, 2007. *See Rule 9019 Settlement Agreement (Post-Judgment)* (the "Settlement Agreement"), filed at Dkt. 252, Ex. A. Prior to entering into the APA with HTI, the Trustee and SIC renegotiated the prior occupancy and use arrangement, and replaced it with a lease agreement whereby the Trustee agreed to provide to SIC (but not the other SIC Parties) certain transport services on the Paniolo Network, and further granted to SIC (but not the other SIC Parties) colocation space within the Paniolo Buildings and conduit access to place SIC fiber or copper telecommunications cables within certain of Paniolo's conduits. *See* Schedule I to *Master Relationship Agreement*, dated as of March 6, 2020, by and between SIC and the Debtor (the "SIC Lease"), filed under seal at Ex. 1 to the Settlement Agreement. Prior to the Closing, the Trustee terminated the SIC Lease (and thus all of SIC's contractual rights of occupancy and use) as a result of SIC's payment default and other defaults. *See Declaration of Michael Katzenstein* ¶¶ 11, 18, filed at Dkt. 19-3 in *Sandwich Isles Commc'ns, Inc. v. Michael Katzenstein, et al.,* Adv. Pro. 21-90017 (Bankr. D. Haw.) (the adversary proceeding, the "2021

18

AP"). This Court has affirmed the finding of a default thereunder, as well as the resulting termination of the SIC Lease. *See* 2021 AP at Dkt. 56 (audio file of court hearing), Dkt. 63 (final judgment).

### D. The SIC Parties have no right to use or occupy the Paniolo Buildings.

As a result of the Trustee's termination of the SIC Lease, at the time of Closing the SIC Parties no longer held any contractual or easement rights to occupy the Paniolo Buildings. Furthermore, the DHHL, as grantor of the Access and Easement Rights, has previously informed this Court of its position that SIC's rights in any of the Transferred Assets had been extinguished through the 363 Sale. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference, Filed Herein on August 16, 2021* [Dkt. 432] at 6 ("[I]t is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings . . . .") The Hawaii Public Utilities Commission (the "PUC") has also recently taken the same view. *See* Order No. 38269,[9] at Docket No. 2022-0037 at 7 ("[I]t appears that the bankruptcy court case terminated SIC's rights to occupancy

---

[9] This order was recently issued by the PUC in order to institute an emergency investigative proceeding regarding SIC's "fitness, willingness, and ability to continue providing telecommunications services" on the Hawaiian Home Lands. The order is publicly available at the following link, but a copy has been attached hereto as **Appendix G** for the Court's convenience: https://dms.puc.hawaii.gov/dms/DocumentViewer?pid=A1001001A22C11B63803A00670.

19

and use of the Paniolo Network.")

Immediately upon Closing, HTI contacted the SIC Parties and offered new contractual arrangements for them to remain on the Paniolo Network. *See* Masutomi Decl. ¶¶ 33-34; Exs. M-26, M-27. HTI proposed an industry-standard framework for such commercial agreement,[10] which included nominal rates for transport services and occupancy charges at rates SIC had previously agreed to with the Trustee. Thus far, however, the SIC Parties have been disinclined to negotiate, and thus no occupancy agreement is currently in place between HTI and the SIC Parties for the SIC Parties' occupancy or use of the Paniolo Buildings. Yoshida Decl. ¶ 45.

**E.      The obligation to control and maintain security was assumed by HTI through the 363 Sale.**

Prior to the 363 Sale, it was the Trustee, not SIC, which held sole responsibility for controlling and managing security for the Paniolo Premises. *See* SIC Lease § 2.8. The Trustee later delegated this responsibility to HTI under that

---

[10] Modern telecommunications require that a call or message initiated by a customer on one network will inevitably need to be routed through other carriers on its way to reaching its intended recipient. In this case, the Paniolo Network is a "middle mile" network, and exists to transport signals originated by customers on a last-mile network (such as the network currently operated by SIC), to another destination, where it is then handed off to the last-mile network of the intended recipient. Carriers routinely enter into such contractual arrangements with each other to route traffic through different networks, to obtain services from each other, and to arrange any needed use of their respective infrastructure by the other. Such intercarrier usage and occupancy arrangements are subject to the guidelines established by federal and state telecommunications law applicable to intercarrier relationships. HTI has publicly stated numerous times that per its obligations under federal telecommunications law applicable to it, HTI will continue to offer all carriers, including any of the SIC Parties and any other carrier offering services to the Hawaiian Home Lands, access to these middle-mile services on the Paniolo Network on a non-discriminatory basis. *See, e.g.,* Dkt. 359 at 2 (HTI filing).

certain *Operational Support and Services Agreement* approved by the Court in the 363 Sale Order.  *See* Ex. B to 363 Sale Order, § 3.1.   HTI thereafter implemented its own security protocols to fulfill the terms of the *Operational Support and Services Agreement*, and all of third-party security vendor relationships, including those that had previously been managed by SIC, were transferred to HTI as a part of that process.  Yoshida Decl. ¶ 4.

When the 363 Sale closed, and the Paniolo security apparatus (keys, fences, equipment, etc.) and security obligations transferred to HTI under the 363 Sale Order,  what first began as HTI's **contractual** security obligation (on the Trustee's behalf) became HTI's continuing **regulatory** obligation.  This is because the Court's approval of the 363 Sale, and the Closing thereof, had been conditioned on HTI successfully obtaining approval from the FCC for the 363 Sale.  363 Sale Order ¶ 49.  Additionally, because the Paniolo Network would be integrated into HTI's other operations and could potentially carry sensitive government information, the 363 Sale had to be reviewed by the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom"),[11] as the FCC's rules require referral of applications to assign submarine

---

[11] This Committee was established pursuant to Executive Order 13913, issued April 4, 2020.  It is chaired by the Department of Justice, but also includes the Department of Homeland Security and the Department of Defense.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-1   Filed  03/29/22   Page 24 of 59

cable landing licenses to Team Telecom.[12]

As a result of Team Telecom's review of the transaction, Team Telecom required HTI to enter into a certain Letter of Agreement (the "<u>LOA</u>") with the Department of Justice ("<u>DOJ</u>"), Department of Homeland Security ("<u>DHS</u>") and the Department of Defense ("<u>DOD</u>") (the DOJ, DHS, and DOD collectively, the "<u>Compliance Monitoring Agencies</u>"). *See Petition to Adopt Conditions to Authorization and License,* FCC File No. SCL-ASG-20210122-0006[13] (Team Telecom "has no objection to the [FCC] approving the above-captioned application, provided that the Commission conditions its approval on the assurances of Hawaiian Telcom, Inc. . . . to abide by the commitments and undertakings set forth in the July 23, 2021, Letter of Agreement."). Under HTI's LOA with Team Telecom, HTI's Paniolo operations are subject to certain security mandates ("<u>Security Mandates</u>"), which include (i) undertaking specific measures to restrict logical access to the network, (ii) establishing physical security measures for the premises and network

---

[12] *See* 47 C.F.R. § 1.40001(a)(1); *Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, 35 FCC Rcd 10927, 10935 ¶ 24 (2020) (the "<u>FCC Executive Branch Review Order</u>"). *See also* FCC Public Notice Report No. SCL-00303, dated February 18, 2021 (application requesting FCC consent to the assignment of the SCL License under the 363 Sale was found to be "acceptable for filing" and would be referred to relevant executive branch agencies for their review), *available at* https://licensing.fcc.gov/ibfsweb/ib.page.FetchPN?report_key=3872593. For the Court's convenience, a copy is attached hereto at **Appendix D.**

[13] This document is publicly available at https://fcc.report/IBFS/SCL-ASG-20210122-00006/12174013.pdf, but for the Court's convenience, a copy is attached hereto at **Appendix E**. The LOA begins at page 3 *et seq.*

infrastructure, (iii) performing background screens for any persons entering the premises, (iv) appointing responsible officers, (v) reporting incidents to the Compliance Monitoring Agencies, (vi) submitting annual compliance reports, and (vii) responding to (and notifying the Compliance Monitoring Agencies regarding) breaches or threatened breaches of security. *Id.* at 3 *et seq.* (copy of the LOA). HTI was further required to submit its policies and procedures implementing the Security Mandates for review and approval (or non-objection) by the Compliance Monitoring Agencies. *Id.,* LOA at § 9.

By requiring HTI's adherence to the LOA as a condition to approving the transfer of the SCL License to HTI, the FCC accordingly required that HTI assume responsibility for implementing and maintaining security, in compliance with and subject to the Security Mandates. *Id.* at §§ 8, 9. HTI now holds continuing security obligations under the LOA – and it is these obligations which are now directly impacted by the SIC Parties' recent misconduct.

**F. The DHHL has issued a Right of Entry Agreement to HTI.**

The DHHL, as grantor of the Access and Easement Rights, has previously informed this Court of its position that the SIC Parties' rights in any of the Transferred Assets had been extinguished through the 363 Sale. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference, Filed Herein on August*

23

*16, 2021* [Dkt. 432] at 6 ("[I]t is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings . . . .")  Post-Closing, the DHHL has also issued to HTI a Right of Entry Agreement (as amended, the "ROE").  Masutomi Decl., Exs. M-24, M-25 (ROE and amendment thereto).  This ROE confirmed HTI's Access and Easement Rights for all ten Paniolo Premises now owned by HTI.  *Id.,* Ex. M-24 (ROE) at § 4.  In alignment with the LOA under the SCL License, the ROE similarly places all responsibility for Paniolo Premise security on HTI.  *Id.* at § 5.  Additionally, the ROE further clarifies that HTI remains responsible for all insurance and hazardous materials on the Paniolo Premises.  *Id.* at §§ 12, 14.

The DHHL's counsel has also provided written notice to SIC stating that notwithstanding anything in the 372 License to the contrary, HTI holds the responsibility for securing the Paniolo Premises, and the SIC Parties do not have any rights to limit or restrict HTI's access to and use of the Paniolo Assets on the Hawaiian Homelands.  *See* Yoshida Decl., Ex. Y-29.

## G.    HTI's First Enforcement Motion.

On October 2, 2021, HTI filed the First Enforcement Motion asking the Court to compel the SIC Parties to (1) turn over information related to the Paniolo Network ("Information Requests"); (2) remove trash and other items from the Paniolo

24

buildings acquired by HTI ("<u>Removal Requests</u>"); and (3) turn over spare tools and equipment ("<u>Spare Parts Requests</u>").  *See* Dkt. 459.

On November 19, 2021, the Court entered the First Enforcement Order, which granted the Spare Parts Requests and denying without prejudice the Information Requests and Removal Requests.   First Enforcement Order at 8-11.  *See also Judgment on the First Enforcement Order* [Dkt. 559].  In connection with the Spare Parts Request, the Court held that spare parts and equipment associated with the submarine system were undoubtedly "Transferred Assets" under the 363 Sale Order, and thus SIC was required to turn over such assets to HTI.  First Enforcement Order at 11.  In contrast, with the Information Requests, SIC was not required to turn over requested information to HTI as the Court could not determine from the record whether such information was within the scope of "Transferred Assets."  *Id.* at 8-9.

In connection with the Removal Requests, the position of the SIC Parties was that they held a license from the DHHL which allowed it to occupy the land and facilities on which its network operates.  *Id.* at 9.  Accordingly, SIC contended that it had the right to store its property, including its rubbish, on facilities shared with HTI.  *Id.*

The Court found that it did not have sufficient factual evidence in the record to issue a determination on this issue:

> First, the license from the Department of Hawaiian Homelands to SIC's affiliates and the sublicenses are not in the record.  Second, although

25

the record is clear that the trustee acquired certain "central offices" and "terminal buildings" by virtue of the execution sale, it is not clear that the Trustee acquired exclusive rights of occupancy. . . . Third, it is not clear what contract or arrangement currently governs the relationship between Hawaiian Telcom and SIC. The Master Relationship Agreement and related agreements clarified the situation, but Hawaiian Telcom chose not to acquire the Master Relationship Agreement or the related agreements . . . . Simply put, I cannot determine on the existing record whether Hawaiian Telcom has the exclusive right to occupy the premises in which SIC's property is located.

*Id.* at 9-10.

Contrary to the SIC Parties' later declarations (detailed below), nowhere in the First Enforcement Order does the Court even implicitly "confirm" that "no real estate was transferred" to HTI through the 363 Sale or that HTI's purchase of the Paniolo assets exclude "access rights across [SIC]'s property." Yoshida Decl., Ex. Y-34 to Y-37 (SIC's letters mischaracterizing the First Enforcement Order). In fact, the terms "real estate" and "access rights" do not even appear in the First Enforcement Order.

### H. The SIC Parties impede HTI's access to and within the Paniolo Buildings and the Paniolo Premises.

Upon the Closing, and now being directly responsible for security over the Paniolo Premises under SCL License and the ROE, HTI provided SIC with the same access and security protocols it had previously implemented on behalf of the Trustee under the *Operational Support and Services Agreement*. Yoshida Decl. ¶ 4. These temporary protocols were implemented under the assumption that SIC would

26

expediently and in good faith negotiate (and then execute and abide by) a standard colocation agreement with HTI, as is customary in the industry, and that SIC would at all times continue to adhere to the Security Mandates. *Id.* Under these protocols, HTI allowed unescorted access to the Paniolo Premises for those SIC personnel who had been screened and had notified HTI of their need for access, and implemented a "daisy-chain" perimeter locking system to allow SIC screened personnel to unlock the perimeter access gate without needing HTI assistance. *Id.* SIC personnel would first simply notify HTI of their need for access, and HTI would turn off the alarm system so that access via the daisy-chain locking system would not trigger an alarm or first-responder visit. *Id.* HTI also permitted SIC unescorted access to the Paniolo Buildings, by remotely unlocking the applicable Paniolo Building access doors and turning off the applicable alarms after being notified of SIC's need for access. *Id.* SIC, however, has not entered into any sort of colocation agreement with HTI post-Closing. *Id.* ¶ 45.

Shortly after the Court entered the First Enforcement Order, SIC instead began engaging in blatant misconduct, including (1) bypassing HTI's lock on the perimeter fence of the Paniolo Building in Kekaha by installing its own lock that prevented HTI's access to the same; (2) barricading the interior doors to the warehouse rooms of the Paniolo Buildings in Anahola and Hilo; and (3) threatening to change additional locks on or within the other of the Paniolo Premises. Yoshida

27

Decl. ¶¶ 3, 5. Consequently, in response to the heightened safety and security risks represented by these actions, on December 22, 2021, HTI discontinued some of the accommodations it had previously extended to SIC, and thereafter required SIC to comply with HTI's standard security protocol applicable to third parties without a valid colocation agreement – in other words, SIC was required to obtain escorted access to enter any of the Paniolo Buildings. *Id.* ¶ 6.

After entry of the Court's First Enforcement Order, the SIC Parties also began asserting that (i) the Court determined that HTI had not acquired the right to use or access the land under or leading up to the Paniolo Premises, *see*, *e.g.*, Yoshida Decl., Ex. Y-33 to Y-37, (ii) SIC and/or Waimana controlled said land, *see id.*, Exs. Y-34 to Y-37, and (iii) the 363 Sale Order did not include the warehouse rooms of the Paniolo Buildings in Anahola and Hilo, *see*, *e.g.*, Yoshida Decl., Ex. Y-31. The SIC Parties also began continually interfering with the fences surrounding, and blocking HTI's access to, the Paniolo Premises, beginning with cutting and bypassing installed locks, and escalating to permanently welding access gates shut, installing concrete barriers at the access gates, drilling out building locks, physically blocking entrances, and calling the police on HTI personnel. *See* Appendix C (summary of the incidents). Despite repeated demands by HTI that the SIC Parties immediately cease such egregious conduct, the SIC Parties have failed to do so (*see* Yoshida Decl. ¶ 43), and instead have claimed that HTI is the one interfering with *SIC's* property

28

(*see* Complaint, defined below, at ¶ 36). The DHHL has already directly informed the SIC Parties that HTI, and not the SIC Parties, is responsible for security on the Paniolo Premises, *see* Yoshida Decl., Ex. Y-29, but the SIC Parties' actions to impede HTI's access have continued unabated.

**I.     SIC and Waimana have initiated the State Court Action seeking, *inter alia,* to permanently evict HTI from the Paniolo Buildings and the Paniolo Premises.**

On March 18, 2022, SIC and Waimana (the "Plaintiffs") initiated the State Court Action by filing a complaint against HTI (the "Complaint") in the State of Hawaii Circuit Court of the First Circuit (Case No. 1CCV-22-0000321). A copy of the Complaint has been attached here for the Court's reference at **Appendix H**. The Complaint is premised upon SIC's misinterpretation of this Court's orders and what transpired in proceedings before this Court. The Complaint defines "Licensed Property" broadly, covering the "telecommunications facilities, including Central Offices, warehouses and security fencing . . . and underground conduits throughout [the Hawaiian Home Lands]" developed by SIC under License 372, which definition clearly covers the Paniolo Premises and may also be construed to cover the Paniolo Buildings. *See* Complaint ¶ 9. The Plaintiffs have alleged that the Trustee "did not acquire any interest in License[d] Property" as a result of the Marshal Sale, and "knew that he could not obtain rights to the Licensed Property." *Id.* ¶¶ 13, 16. Accordingly, the Trustee "could not, and did not, sell to [HTI] any rights to occupy

29

the Licensed Property." *Id.* ¶ 19.

The Plaintiffs have also alleged that HTI "is a trespasser on the Licensed Property" and "has no license nor any other right to use the Licensed Property under and surrounding its facilities on HHL." *Id.* ¶¶ 25-27; *see also id.* ¶¶ 16-23. The Complaint also twists the underlying facts, asserting that HTI has "changed the locks on **SIC warehouses**, continues to damage **SIC's security fencing** . . . cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to **Waimana and SIC's facilities** located on Waimana and SIC's licensed lands." *Id.* ¶ 36 (emphasis added). The Complaint thus seeks "an injunction barring Hawaiian Tel from access to the Licensed Property" (*id.* ¶ 43), damages for HTI's alleged use of the Licensed Property (*id.*), "disgorgement of HTI profits" (*id.* ¶¶ 43, 46), punitive and other damages and other relief (*id.*).

The Complaint cites to DHHL's initial pleading filed in connection with the 363 Sale, *id.* ¶ 18, but notably leaves out any mention of DHHL's later pleading filed with this Court, which expressed the DHHL's understanding that "any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings," and that SIC's claim of exclusivity under License 372 was patently incorrect. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status*

30

*Conference, Filed Herein on August 16, 2021* [Dkt. 432].

## IV.  **ARGUMENT**

This Motion seeks enforcement of this Court's 363 Sale Order through multiple forms of interim and final relief.

Given the SIC Parties' recent conduct, which has become increasingly belligerent and harmful over time, HTI seeks interim relief on an expedited basis to enforce the injunction in the 363 Sale Order and prevent SIC from engaging in misconduct on the ground – the cutting of locks, the blocking of access, calling the police – until the Court issues a final ruling on the merits of this Motion.[14]

The final relief, as sought in this Motion, seeks a determination by the Court of SIC and HTI's respective rights in connection with (a) the use, ownership and control of the Paniolo Buildings, (b) access over the Paniolo Premises, and (c) security control over the Paniolo Premises.  In particular, HTI seeks a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings through its 363 Sale purchase; a confirmation from the Court that HTI purchased the Access and Easement Rights to the Paniolo Premises (and accordingly, enjoining the SIC Parties from obstructing HTI's access to the Paniolo Buildings and Paniolo Premises, or from attempting to charge HTI any fees for

---

[14] During this interim period, the SIC Parties would still have reasonable access to the Paniolo Buildings and Paniolo Premises, subject to HTI's existing security protocols that are currently applicable to all parties entering the Paniolo Buildings and Paniolo Premises.

31

access to or use of the Paniolo Buildings and Paniolo Premises); a confirmation from the Court that HTI assumed the obligation of maintaining the security of the Paniolo Buildings and Paniolo Premises (and accordingly, enjoining SIC from interfering with HTI's fulfillment of those obligations). HTI also seeks a finding that SIC and Waimana have violated the 363 Sale Order through the filing of the State Court Action.

## A. HTI acquired, and now possesses control and ownership over, the entirety of the Paniolo Buildings, including the perimeter fences.

### 1. HTI acquired the Paniolo Buildings.

While SIC may have owned and controlled certain Paniolo Buildings in the past, the Trustee acquired that ownership and control through the Marshal Sale, and sold each of the Paniolo Buildings to HTI through the 363 Sale. The SIC Parties no longer have any entitlement to use or occupancy of any portion of the Paniolo Buildings.[15] In spite of this, the SIC Parties today are continuing to occupy certain rooms, which they have misleadingly characterized as "warehouses," within the Paniolo Buildings at Anahola and Hilo. Yoshida Decl. ¶¶ 3, 5, 48; *see* Complaint

---

[15] Even though SIC's occupancy was terminated by the Trustee for SIC's default under previous contractual arrangements, and SIC thus has no current contractual rights of occupancy governing its use of the Paniolo assets, on October 1, 2021, HTI notified the SIC Parties, DHHL, and numerous other state and federal agencies of HTI's intent to allow the SIC Parties to remain until March 31, 2022. *See* Masutomi Decl., Exs. M-21, M-22. This date was provided to give the SIC Parties reasonable notice and sufficient time to negotiate with HTI for a new occupancy agreement, and to provide SIC's customers (whose connectivity may be at risk due to SIC's defaults and actions) with reasonable notice and sufficient time to obtain alternate connectivity arrangements. *Id.* HTI has now extended this date to April 30, 2022. *Id.*, Ex. M-23.

32

¶ 14 (alleging that the Trustee did not want to purchase "the warehouses" through the Marshal Sale). The SIC Parties have recently gone so far as to barricade the internal doors to those rooms, and have also changed the locks to the external doors to the same, prohibiting entry by HTI, on the grounds that this Court's prior orders did not expressly list the "warehouse" rooms as part of the 363 Sale. Yoshida Decl. ¶¶ 3, 5, 18, 31.

Such conduct by the SIC Parties is a violation of the Court's 363 Sale Order. The Schedule A.2 Marshal Sale Assets included the "Anahola Central Office" described as "Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides" and the "Hilo Central Office" described as "Central Office located in Hilo, Hawaii, including access rights to the land on which the central office resides." Certificate of Execution at 6, 13. None of the Marshal Sale documents reflect any sort of carveouts ever made as to warehouse rooms or any other portions of these Paniolo Buildings to be reserved for SIC's use. *Id.* While SIC has characterized certain rooms in these buildings as "warehouses," in an attempt to make them sound as external structures, SIC's building plans for the Paniolo Buildings in Anahola and Hilo show that what SIC calls a "warehouse" is just another room within the central office buildings acquired by HTI. *See* Masutomi Decl., Ex. M-17 (Anahola); Ex. M-15 (Hilo). There is no separate portion of the building referred to as "central office" or a "warehouse." To the contrary, the plans

33

refer to the entire Paniolo Premise on which the buildings are located as the "Anahola Central Office" and "Hilo Central Office," respectively – the same terms that are used on Schedule A.2. *Id.*

SIC holds no basis for continuing to use any "warehouse" rooms within these buildings for storage; Schedule A.2 clearly evidences that the Trustee acquired the entirety of the Paniolo Buildings in Anahola and Hilo from SIC, along with other related assets. Certificate of Execution at 6, 13. The scope of the assets listed on Schedule A.2 includes not only the building but related assets such as power infrastructure for the building, air conditioning systems, fiber distribution panels, support structures, manholes and entrance conduits, and other equipment and infrastructure. *Id.* The inclusion of all of these related assets further supports the conclusion that the Trustee, and subsequently HTI, acquired the buildings in their entirety. The same is true for the other Paniolo Buildings acquired through the Marshal Sale – specifically, the Paniolo Buildings at Laiopua, Waiehu, Kalamaula, Waimanalo, and Nanakuli. *See id.* at 6-13.

This conclusion is further supported by the fact that Schedule A.2 also included **all of** the Paniolo Keys, being "[a]ll keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices." *Id.* at 15. It would be illogical and commercially unreasonable to provide that the

34

Trustee acquired all the keys to all of Paniolo Buildings and the perimeter fences, but that SIC retained some ownership of and ability to control certain rooms within these Paniolo Buildings.[16]

The Trustee later conveyed the Marshal Sale Assets to HTI through the 363 Sale. This is made clear by the description of the A.2 Assets as the "Transferred [Assets] and Property Rights . . . transferred by SIC in conjunction with the US Marshal Sale . . . ." APA, Schedule 2.1(a)(ii). All of the contents of Schedule A.2, as included in the Marshal Sale, is also included in the APA. *Compare* Certificate of Execution at 6 *et seq., with* APA at 238 *et seq.* Additionally, like the Trustee in the Marshal Sale, HTI in the 363 Sale acquired the Paniolo Keys. APA at 245. The right of HTI to control the entirety of the A.2 Assets, which covered the Paniolo Buildings and all rooms contained within them, was thus properly transferred to HTI through the 363 Sale. To the extent SIC had any lingering or residual interest in the A.2 Assets, pursuant to the 363 Sale Order and section 363(f) of the Bankruptcy Code, HTI acquired the Paniolo Buildings and their related rights free and clear of all interests, claims and encumbrances. 363 Sale Order ¶ S; 11 U.S.C. § 363(f). To the extent the SIC Parties attempt to claim that the use and/or occupancy is by a party other than SIC, for the same reasons noted above, the 363 Sale Order extinguished

---

[16] HTI has also been paying for all of the electric utility bills associated with all of the Paniolo Buildings, notwithstanding that the SIC Parties are continuing to occupy portions of the Paniolo Buildings and have incurred utility costs in connection therewith. Masutomi Decl. ¶ 30.

35

any such claim by any SIC Party.

SIC's refusal to surrender certain rooms within the Paniolo Buildings in Anahola and Hilo is thus a clear violation of both the Marshal Sale Order and the 363 Sale Order. *See* Sale Order ¶ 39. HTI respectfully requests that the Court confirm, pursuant to the terms of the 363 Sale Order, that HTI owns the entirety of the Paniolo Buildings, and requests that the Court impose upon SIC an obligation to cease occupancy of any "warehouse" rooms. HTI further requests that the Court enjoin the SIC Parties from blocking HTI's access to any portion of the Paniolo Buildings.

## 2. HTI also acquired the perimeter fences surrounding the Paniolo Buildings.

Each of the Paniolo Premises is surrounded by a perimeter fence which provides security for each of the Paniolo Buildings. The perimeter fences are shown on nine of the ten construction plans[17] approved by the DHHL. *See* Masutomi Decl., Exs. M-12 to M-20. Under Hawaii law, a structure affixed to the real estate is a fixture, and not personal property. *Conner v. Aila*, Case No. 19-00233 JMS-KJM, 2019 WL 4047609, at *4 (D. Haw. Aug. 27, 2019) (concluding that the plaintiffs' assertion that their house on Hawaiian Home Lands was personal property separate from the land, contradicted Hawaii law) (*citing Ahoi v. Pacheco*, 22 Haw. 257, 258

---

[17] The perimeter fence is not shown on the construction plans for the Laiopua Central Office. *See* Masutomi Decl., Ex. M-11.

(1914)). *See also Armstrong v. Kapohaku*, 5 Haw. 185, 189 (1884).

In this instance, the perimeter fences were constructed pursuant to rights derived from SIC's interest in the 372 License and are an integral and necessary part of the operation of the Paniolo Buildings and the Paniolo Network. The Marshal Sale specifically transferred all such rights, including the entirety of SIC's interest in the 372 License necessary to operate the Schedule A.2 assets, to the Trustee. Certificate of Execution at 15. As noted above, the Marshal Sale also included the keys to all locks, specifically "including keys to any fences on the perimeter of the [Paniolo Buildings]," *id.*, and all ancillary "Security" equipment necessary to operate the Paniolo Network in each of the Paniolo Buildings. *Id.* at 6-13.

The Trustee then conveyed both the A.1 Assets and A.2 Assets to HTI through the 363 Sale. The assets acquired by HTI include all improvements and fixtures constructed by SIC and/or Paniolo within the Paniolo Premises from the perimeter fence line in, and the SIC Parties have no legal basis to inhibit access, change locks, or affix new boxes to HTI's fences. Furthermore, SIC's actions, including cutting locks on the fences and otherwise impeding HTI's access to the Paniolo Buildings through the fences, violates the injunctive provisions of the 363 Sale Order, as such actions constitute clear attempts by the SIC Parties to maintain control over the property purchased (the fences) through the 363 Sale.

37

**B.** **HTI acquired Access and Easement Rights associated with the Paniolo Premises, and the SIC Parties should be prohibited from interfering with HTI's Access and Easement Rights in any manner.**

The SIC Parties have wrongfully taken the position that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's or its affiliates'] property surrounding and under the Paniolo assets." *See* Yoshida Decl., Exs. Y-33 to Y-37. *See also, e.g.,* Complaint ¶ 27 (HTI "has no license nor any other right to use the Licensed Property under and surrounding its facilities on [the Hawaiian Home Lands].") This assertion is not only a misrepresentation of the Court's First Enforcement Order, but is also inconsistent with the 363 Sale Order. When it purchased the Paniolo Buildings, HTI acquired Access and Easement Rights for the Paniolo Premises, as well as the right to cross adjoining DHHL-controlled land to access the Paniolo Premises, as such rights are necessary to maintain and operate the Paniolo Network and the Paniolo Buildings.

The Access and Easement Rights applicable to the Paniolo Premises, which were obtained by the Trustee in the Marshal Sale and acquired by HTI in the 363 Sale, originated from easements granted to SIC under a license issued by the DHHL to Waimana. HTI necessarily acquired the Access and Easement Rights when it acquired the Paniolo Buildings, because these rights are necessary to use and operate not only the buildings themselves, but the entire Paniolo Network. In order to provide the Court with background details and context, HTI describes below the

38

origin of the Access and Easement Rights and their eventual transfer to HTI in the 363 Sale, and is supplementing the record with copies of all documents referenced herein.

      1.      *Waimana obtained the 372 License, and partially assigned different portions of the 372 License to SIC, Pa Makani, and Clearcom.*

On May 9, 1995, the DHHL issued to Waimana a certain license agreement, numbered 372 (the "372 License"). *See* Masutomi Decl., Ex. M-1. Per the license, DHHL granted to Waimana the "right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network . . . over, across and throughout all lands under the administration and jurisdiction of [DHHL] . . . and . . . the **right of entry** upon the **easement area and adjoining land** of [DHHL] for the **construction, maintenance, operation and removal of LICENSEE'S line** and appurtenances over, **across and under the LICENSE area**." *Id.* at 2 (capitalization in original, emphases added).

On January 15, 1996, pursuant to a written assignment ("SIC Assignment"), Waimana "assign[ed], transfer[red], and set[] over to [SIC] those certain rights, title and interest necessary to provide **IntraLata and Intrastate telecommunication services**[18] in and to the [372 License]." Masutomi Decl., Ex. M-2 (emphasis

---

[18] "Telecommunications" "means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50). LATAs are "Local Access and Transport Areas" and

39

added).  Approximately sixteen years later, on December 30, 2011, Waimana assigned to Pa Makani LLC dba Sandwich Isles Wireless ("Pa Makani") "those certain rights, title and interest necessary to provide **wireless communications services** of all types . . . in and to the [372 License]." *Id.*, Ex. M-3 (emphasis added). Separately, on May 29, 2014, Waimana assigned to Clearcom, Inc. dba Sandwich Isles Broadband ("Clearcom") "those certain rights, title and interest necessary to provide **broadband services**[19] of all types, . . . in and to the [372 License]." *Id.*, Ex. M-4 (emphasis added).

2.     *DHHL separately granted to SIC certain access and easement rights for the construction and operation of Paniolo Buildings.*

Subsequent to the SIC Assignment, SIC needed to construct central offices and terminal buildings.  DHHL thus identified specific portions of its land and granted Access and Easement Rights to SIC for the location of SIC's central offices and associated appurtenances, in the form of written addenda (collectively, "SIC Addenda" and each an "SIC Addendum").  *See* Masutomi Decl., Exs. M-5 to

---

"IntraLATA service is what consumers generally know as local service[.]" *SBC Commc'ns Inc v. F.C.C.*, 407 F.3d 1223, 1226-27 (D.C. Cir. 2005).  As Hawaii has only one LATA, *see In re GTE Mobilenet of Haw., Inc.*, Dkt. 7687; 1994 WL 570365 (Haw. Pub. Utils. Comm'n Sept. 6, 1994), IntraLATA and Intrastate telecommunications services includes all telecommunications within the State, but excludes state to state or international communication services.
[19] Broadband is an information service and is regulated under Title I of the Communications Act of 1996.  *See N.Y. State Telecommunications Ass'n, Inc. v. James*, 2021 WL 2401338, at *6 (E.D.N.Y. Jun. 11, 2021).  "Information service" and "telecommunications service" are mutually exclusive.  *See id.* (citing 47 U.S.C. §§ 153(24), (53)).

M-10.[20]  Importantly, these SIC Addenda (and their delineated Access and Easement Rights) were granted under the portion of the 372 License that had been assigned to SIC; none of Waimana, Pa Makani or Clearcom were parties to any of the SIC Addenda.  *See*, *e.g., id.,* Ex. M-5 at 2.  In each SIC Addendum, the DHHL demarcated each specific Paniolo Premise, *i.e.*, the specific metes and bounds of the Access and Easement Rights granted to SIC for the identified Paniolo Building.  *Id.* at 6-10.  Each SIC Addendum was recorded in the Bureau of Conveyances of the State of Hawaii ("Bureau of Conveyances").  *Id.* at 1.  Each SIC Addendum notes that in partially assigning to SIC portions of the 372 License, Waimana "assign[ed], transfer[red], and set[] over to [SIC] those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunications services in and to License Agreement No. 372."  *Id.* at 2.  Each SIC Addendum runs to the benefit of SIC's successors in interest (i.e., the Trustee and then HTI), as each "grants and issues to [SIC], and its **legal successors and assigns**" the easements described therein.  *Id.* (emphasis added).  The SIC Addenda also noted that SIC required the easements identified therein "for [SIC's] Central Telephone office, including, but not limited to, a building and telephone switching equipment." *Id.* at 3.  Pursuant to the Access and Easement Rights granted under the respective SIC Addenda, SIC thereafter constructed, within the metes and bounds of the grant, the Paniolo Buildings in

---

[20] A summary of all of the SIC Addenda is attached hereto as **Appendix B**.

Laiopua, Kalamaula, Waimanalo, Waiehu, Hilo, Anahola and Nanakuli. Masutomi Decl., Exs. M-11 to M-15, M-17 to M-18 (building plans).

3. *HTI purchased, along with the Paniolo Buildings, the necessary Access and Easement Rights on each corresponding Paniolo Premise.*

Through the 363 Sale, HTI purchased ten specific Paniolo Buildings. Each Paniolo Building is located within a Paniolo Premise, and each of the ten Paniolo Buildings and Paniolo Premises are necessary to operate, and integral parts of, the whole Paniolo Network. Masutomi Decl. ¶¶ 25-26. Three of the Paniolo Buildings originally belonged to Paniolo, and are identified as A.1 Assets: Kekaha, Puunene, and Puukapu.[21] *See* APA, Schedule 2.1(a)(i) (describing "assets owned by Paniolo free and clear"). The remaining seven Paniolo Buildings, identified as A.2 Assets, originally belonged to SIC but were transferred to the Trustee through the Marshal Sale: Laiopua, Waiehu, Hilo, Anahola, Kalamaula, Waimanalo, and Nanakuli. *See id.,* Schedule 2.1(a)(ii) (describing "assets and rights obtained by the Trustee from SIC in the Marshal Sale . . . free and clear.").

For the latter seven Paniolo Buildings and corresponding Paniolo Premises (the A.2 Assets – Laiopua, Waiehu, Hilo, Anahola, Kalamaula, Waimanalo, Nanakuli), the Access and Easement Rights for these seven sites were originally

---

[21] For the avoidance of doubt, there currently exists two buildings at Puukapu – one SIC building, and one Paniolo Building. The Paniolo Building, not the SIC building, was an A.1 Asset acquired by HTI through the 363 Sale.

embodied within the SIC Addenda. Masutomi Decl., Exs. M-5 to M-10. Each addendum described, via metes and bounds particularity, the easement area applicable to the specific Paniolo Premise, as shown in the construction plans for those premises. *See id. See also* Masutomi Decl., Exs. M-11 to M-15, M-17 to M-18.

The Access and Easement Rights in connection with the remaining three Paniolo Buildings and Paniolo Premises (the A.1 Assets – Kekaha, Puunene, and Puukapu) arose in a slightly different manner. Similar to the A.2 Assets, there existed a SIC Addendum addressing Puukapu. *See* Masutomi Decl., Ex. M-8. For Kekaha and Puunene, while HTI has been unable to locate similar recorded easements with the Bureau of Conveyances, the pattern and practice established between SIC and DHHL at that time for easements of this type is clear, including, specifically, the approval of construction plans for the applicable Paniolo Buildings, allowing one to conclude that similar easements were granted (either formally or by some other means) by DHHL for these two locations as well. Accordingly, these two Paniolo Buildings were also constructed, maintained and operated pursuant to SIC's interest in the 372 License, as shown in that certain *Joint Use Agreement,* dated as of July 19, 2007, between Paniolo and SIC. *See* Dkt. 299-5 (Joint Use Agreement, filed by the Trustee) at ¶ 10 (stating that Paniolo was to construct demarcation buildings in Kekaha, Puunene and Puukapu); § I.A (stating that SIC

43

permits Paniolo to have the benefit and use of SIC's interest in the 372 License "in connection with the construction, installation, ownership and continuing existence of the Paniolo Cable Network System"). Moreover, as shown in the construction plans for these two sites, Paniolo, DHHL and SIC consistently treated the Paniolo Premises for these two Paniolo Buildings sites in a manner consistent with the access and occupancy easements contained within the SIC Addenda for the other Paniolo Premises. *See* Masutomi Decl., Exs. M-19 and M-20. This was confirmed by the DHHL in its recently issued ROE, which granted access to the same properties that were identified in the SIC Addenda for the eight sites and on the construction drawings for Kekaha and Puunene. *See* Exhibit A to *First Amendment to Right of Entry No. 704*, Masutomi Decl., Ex. M-25.

All of these Access and Easement Rights, for each of the ten premises, were thereafter acquired by the Trustee. As noted above, as listed in Schedule A.2, the Trustee acquired through the Marshal Sale the seven Paniolo Buildings formerly owned by SIC, along with the "access rights to the land on which [each building] resides." Certificate of Execution at 6-9 and 11-13. The Schedule A.2 assets also specifically included "[a]ll licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation[,] **SIC's interest in [the 372 License]**" and "[a]ll **existing and pending entitlements** . . . necessary to build, construct, repair, maintain and operate the Schedule A.2 assets."

44

Certificate of Execution at 15 (emphases added). In particular, the "existing and pending entitlements" included "**SIC's interest** in memoranda of agreement**, easements,** leases, license agreements, letters of approval, special area management permits**, rights of way or rights of interest**." Certificate of Execution at 15 (emphasis added). The SIC Addenda, as evidence of easements and rights of way granted to SIC, are undoubtedly covered by this language describing the scope of the Marshal Sale Assets. Further, as both Kekaha and Puunene are integral sites within the integrated Paniolo Network, the easement arrangements for these sites, whether originally possessed by either SIC or Paniolo, must also be logically and fairly contained within those "easements" and "rights" acquired by the Trustee as "necessary to build, construct, repair, maintain and operate the Schedule A.2 assets," even if no written SIC Addenda had been finalized for these two sites. SIC's Access and Easement Rights thus plainly transferred to the Trustee through the Marshal Sale. *See* Certificate of Execution at 15.

The Access and Easement Rights in all ten of the Paniolo Premises were then included as part of the 363 Sale and properly transferred to HTI. The description of the Paniolo Buildings as A.2 Assets sold to HTI specifically included "access rights to land on which the central office[s and terminal buildings] reside[]," which is the same language adopted from the description of Marshal Sale Assets. APA at 232, 235, 236. The APA goes so far as to state that the Transferred Assets, for the

45

avoidance of doubt, included but was not limited to "all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables . . . ." *Id.,* Schedule 2.1(a)(ii). Similarly, the description of the Paniolo Buildings as A.1 Assets sold to HTI specifically included "access rights to the land on which the terminal building resides." *Id.*, Schedule 2.1(a)(i). The documentation for the 363 Sale leaves no doubt that the necessary Access and Easement Rights for each of the Paniolo Premises were properly transferred to HTI, as a necessary component of the 363 Sale and of HTI's purchase of the Paniolo Buildings.[22]

> 4. *In violation of the 363 Sale Order, the SIC Parties have blocked and impeded HTI's access to the Paniolo Premises.*

The 363 Sale Order directed "SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates . . . to surrender possession of the Transferred Assets," 363 Sale Order ¶ 39, which included the Access and Easement

---

[22] With respect to seven of the eight Paniolo Premises subject to a SIC addenda, the DHHL's grant Access and Easement Rights are solely for the corresponding central office. *See* Masutomi Decl., Ex. M-5 to M-10. With respect to the Laiopua central office on the big Island of Hawaii, the SIC Addendum for this central office also included an additional grant of access for a site on Oahu that is unrelated to the Paniolo Network. *See id.,* Ex. M-5 at 2. Despite this Oahu grant being within the SIC Addendum whereby HTI obtained the Access and Easement Rights for the Paniolo Premises at Laiopua, upon request of the DHHL, HTI is prepared to execute documentation necessary to disclaim any interest in any grant of access for the unrelated Oahu site.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-1   Filed  03/29/22   Page 49 of 59

Rights to the Paniolo Premises. However, in clear violation of the 363 Sale Order, the SIC Parties have recently installed SIC locks and devices on various Paniolo Premises (barring HTI's access), have called the police on HTI personnel attempting to enter various Paniolo Premises, have physically blocked HTI personnel from accessing and entering various Paniolo Premises, have welded shut access gates and erected concrete barriers, and more. *See generally* Appendix C (summary of incidents). The SIC Parties have also alleged that "Waimana holds the land rights from Hawaiian Homes Commission for the land surrounding and under those assets purchased by [HTI]." Yoshida Decl., Ex. Y-30; *see also* Complaint ¶ 27 ("The rights to the land are held by Waimana and SIC pursuant to License 372.") If HTI wants access to the Paniolo Premises, the SIC Parties have insisted that HTI "must negotiate it with Waimana" for a contractual right of access in exchange for a fee. Yoshida Decl., Ex. Y-30; *see also* Complaint ¶ 33.

This position held by the SIC Parties is unreasonable, and does not have a basis in law or fact. Waimana assigned to each of SIC, Pa Makani and Clearcom different slices of the 372 License. *See* Masutomi Decl., Ex. M-2 to M-4. As partial assignees of separate portions of Waimana's interest in the 372 License, Waimana, SIC, Pa Makani and Clearcom did not hold joint interests, but rather each individually held distinct interests in separate portions of the 372 License. *See, e.g., Griswold v. Income Props. II*, 1995 WL 256756, at *5 (Tenn. Ct. App. May 4, 1995)

(where the holder of a leasehold interest partially assigns separate portions of the same interest to different assignees, "the assignees do not hold their interest jointly, rather each assignee holds an undivided interest in a separate portion of the [interest].") (citing 3A George W. Thompson, *Commentaries on the Modern Law of Real Property* § 1219 (1981)). HTI's Access and Easement Rights derive solely from its purchase of **SIC's interest** in the 372 License (not Waimana, Pa Makani, or Clearcom's interests), which included the SIC Addenda. *See* Certificate of Execution at 15. SIC's standalone interests in the 372 License or in the SIC Addenda have never been dependent upon any arrangement with or payment to Waimana, Pa Makani, or Clearcom, and thus HTI's rights – derived from its purchase of SIC interests – now similarly stands alone.

In any event, the 372 License has never granted to Waimana the right to control DHHL lands. The 372 License granted to Waimana the right and privilege to build, construct, repair, maintain and operate a broadband telecommunications network, and issued to Waimana a "right of entry upon the easement area and adjoining land of [DHHL]" for the construction, maintenance, operation, and removal of "LICENSEE'S line and appurtenances over, across and under the LICENSE area." Masutomi Decl., Ex. M-1 at 2 (capitalization in original). The DHHL has recently confirmed its position, in no uncertain terms, that "[t]he existence of License 372, standing alone, does not give Waimana or [SIC] any rights

48

to limit or restrict [HTI's] access to and use of the Paniolo Assets which are located on DHHL lands." Yoshida Decl., Ex. Y-29.

None of the remaining portions of the 372 License – the portions held by Pa Makani, Clearcom, or Waimana[23] – give any SIC Party the ability to exclude HTI from accessing the Paniolo Premises. Nor do the SIC Parties have any basis on which to charge HTI for any usage of the Paniolo Premises. The existence of any such ability or basis is facially unreasonable; such would render all of the Transferred Assets effectively valueless, as HTI would not be able to access the Paniolo Premises to get to the Paniolo Buildings to operate the Paniolo Network. HTI thus respectfully requests that the Court confirm: in light of HTI's acquisition of the Access and Easement Rights through the 363 Sale, that HTI is not obligated to pay any fee or otherwise obtain any further consent from the SIC Parties in order to access or use the Paniolo Premises or operate the Transferred Assets therein, that the SIC Parties are not permitted to obstruct or impede HTI's access to the Paniolo Premises in any way, and that the SIC Parties (including their employees, contractors, consultants, and other agents) must immediately cease all such conduct which has the effect of excluding or impeding HTI's access on any Paniolo Premise.

---

[23] To the extent Waimana retains any remaining interest in the 372 License, given its assignments to SIC, Pa Makani and Clearcom.

### C. HTI assumed the obligation of maintaining security over the Paniolo Premises.

Under the terms of the Court's 363 Sale Order, the obligation of maintaining the security of the Paniolo Buildings and Paniolo Premises was assumed by HTI.[24] The SIC Parties' recent misconduct, however, has made it extremely difficult for HTI to fulfill such obligations. The recent actions taken by the SIC Parties to impede access to the Paniolo Premises – cutting and replacing HTI's locks, accusing HTI of trespassing, wrongfully contacting the local police on HTI, and more (*see* a summary of incidents in Appendix C) – have not only jeopardized HTI's ability to operate the Paniolo Network, but place HTI at risk of breaching its obligations to the Compliance Monitoring Agencies with respect to the Security Mandates.

HTI's obligation to control and manage security arose from its purchase of the SCL License through the 363 Sale. This SCL License is a Transferred Asset under the 363 Sale Order – it is specifically identified in Schedule 1.1(b) of the APA as an "Assigned Permit", and thus qualifies as an "Incidental Right" purchased by HTI under Section 2.1 of the APA. *See* APA at 5-6, 10, 225. The Court's 363 Sale Order acknowledged, however, that the transfer of the SCL License would require consent of the FCC, and the FCC would potentially need to impose additional obligations on the ownership of the SCL License as a condition to granting their

---

[24] This obligation also arises independently, from the DHHL's ROE recently issued directly to HTI. *See* Ex. M-23, § 5.

consent.  *See* 363 Sale Order ¶ 49 ("The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.").

The FCC did exactly that.  As a condition to approving the transfer of the SCL License to HTI, the FCC and Team Telecom required that HTI assume responsibility for implementing and maintaining security over the Paniolo Network, in compliance with and subject to the LOA and the Security Mandates therein.  *See* FCC Public Notice Report No. SCL-00329, dated August 13, 2021,[25] at 3 (granting the application for the assignment of the SCL License from Paniolo to HTI, conditioned "on compliance by [HTI] with the commitments and undertakings set forth in the Letter of Agreement . . . dated July 23, 2021.").  Because the FCC's consent was conditioned on compliance with the LOA, the requirements of the LOA then became "Assumed Liabilities" under the APA.  *See* APA, Section 2.1(c)(i) ("<u>Assumed Liabilities</u>" include all "liabilities and obligations under the Incidental Rights accruing from and after Closing."); 363 Sale Order ¶ 7.

---

[25] This document is publicly available at https://fcc.report/IBFS/Public-Notices/12561321.pdf, but for the Court's convenience, a copy is attached hereto at **Appendix F**.

Further, HTI's assumption of the Security Mandates under the LOA neatly aligns with the purchase of other Transferred Assets under both the Marshal Sale and the 363 Sale. Not only did the Marshal Order transfer all keys for access to the Paniolo Buildings, and the keys to the perimeter fences thereto, it also transferred, for each Paniolo Building, "any equipment that is necessary for the performance or monitoring of . . . Security" needed for the operation of the Paniolo Network. Certificate of Execution at 6-15; *see also* APA at 238-245 (subsequently transferring those assets to HTI through the 363 Sale). The APA further provides that the A.2 Assets included all "security systems . . . for a stand-alone commercial operation and use of the Paniolo Cable System." APA at 238. It would be unreasonable and illogical for all of the relevant keys, security equipment, and security systems to be transferred to HTI if the responsibility and obligation to maintain security over the Paniolo Buildings and Paniolo Premises were held by, or shared with, any other party.

Notwithstanding HTI's obligation to control and maintain security on the Paniolo Premises in compliance with the Security Mandates, HTI fully recognizes that the SIC Parties may continue to require access to certain remaining infrastructure (the "Remaining Infrastructure") that remains on certain Paniolo Premises. This Remaining Infrastructure had previously been commingled with certain Transferred Assets. Specifically, at Puunene, the SIC Parties retain a

52

microwave tower on the Paniolo Premises; at Puukapu, SIC retains a network outbuilding; and at Anahola, the SIC Parties retain a wireless macrotower.[26] The SIC Parties (and all other parties in interest), however, remain subject to the terms of the 363 Sale Order, including the Court's implicit incorporation of the FCC's requirements – both the Security Mandates themselves and the FCC's assignment of security responsibility to HTI. *See* 363 Sale Order ¶ 6.

The current situation on the ground has become nearly unmanageable. HTI's employees have not only been interrupted, delayed, or entirely prevented from performing their tasks in operating and managing the Paniolo Network due to SIC obstructing HTI's access to the Paniolo Premises, but have also faced personal danger in light of SIC's attempts to involve the police on alleged "trespassing" by HTI employees on the Paniolo Premises. *See* Appendix C; *see also* Yoshida Decl. ¶¶ 26, 27 and Exs. Y-34 to Y-37. The ability of first responders to effectively respond to any emergency incidents on the Paniolo Premises has also been placed in jeopardy, in light of the permanent welding shut and concrete barriers placed at the Paniolo Premises access points. *Id.* ¶ 44. All such misconduct by the SIC Parties goes directly against the terms of the 363 Sale Order, and has made it extremely difficult for HTI to properly secure the premises in compliance with Security

---

[26] In respect of the other seven Paniolo Premises, HTI does not believe that the SIC Parties have any need for access or occupancy, as HTI purchased all the improvements and infrastructure on those Paniolo Premises.

53

Mandates, despite HTI's best efforts. *Id.* Accordingly, HTI respectfully requests that the Court confirm that, through the 363 Sale Order, the obligation to control and maintain security for the Paniolo Premises in compliance with and subject to the requirements of the FCC was assumed by HTI, and further requests that this Court enjoin the SIC Parties from interfering with HTI's efforts to provide such security.

### D. Through the filing of the State Court Action, SIC and Waimana have breached the 363 Sale Order and the Marshal Sale Order.

The Plaintiffs' act of filing the State Court Action directly contravenes the terms of this Court's prior-issued orders. The Bankruptcy Court supervised and approved the Marshal Sale and the 363 Sale (together, the "Sales"), and has addressed disputes relating to the Sales and the parties' rights thereunder in its First Enforcement Order and in the 2021 AP proceeding. Instead of approaching this Court to resolve any potential disputes it had with HTI, however, the Plaintiffs filed the State Court Action in an attempt to seek a more favorable forum.

While the Complaint attaches the Marshal Sale Order, it slyly leaves out the 363 Sale Order and instead only attaches the APA (without its exhibits). *See id.* ¶¶ 15, 17. The 363 Sale Order contains this Court's exclusive jurisdiction provision:

> 52. This Court shall retain exclusive jurisdiction over **any matters related to or arising from** the Settlement Agreement and **the implementation of the Sale Order**, including without limitation, the **enforcement of the US Marshal Sale**, and Settlement Agreement Representations and Settlement Agreement Covenants.

363 Sale Order at ¶ 52 (emphasis added). See *also* Marshal Sale Order ¶ 8 ("This

54

Court maintains jurisdiction for of [sic] the purposes of interpretation, implementation and enforcement of this Order.")

The factual and legal issues in the State Court Action – chiefly, HTI's rights to use the "Licensed Property" – would unquestionably require the state court to interpret the 363 Sale Order and the Marshal Sale Order, to determine what assets were acquired by the Trustee and thereafter by HTI. *See, e.g.,* Complaint ¶ 19 (whether the Trustee sold to HTI "any rights to occupy the Licensed Property"). That is a task that properly belongs to this Court, and is a task that falls squarely under the provisions of the Court's orders retaining jurisdiction. *See, e.g., In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002) (finding that the bankruptcy court properly retained subject matter jurisdiction over a post-sale dispute between two non-debtors); *Mendoza v. Gen. Motors, LLC*, Case No. 10-2683, 2010 WL 5224136, at *1 (C.D. Cal. Dec. 15, 2010) (enforcing a bankruptcy court's retention-of-exclusive-jurisdiction clause contained within a sale order, in connection with a class action lawsuit which would have required a determination of whether certain liabilities were assumed through the sale). *See also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that bankruptcy courts "plainly" have jurisdiction "to interpret and enforce [their] own prior orders"). By filing and attempting to prosecute the State Court Action in state court, the Plaintiffs have directly defied this Court's retention of exclusive jurisdiction with respect to the Transferred Assets.

The SIC Parties have shown, time and time again, that they hold little regard for this Court's authority and jurisdiction, and the State Court Action is an attempt at subverting this Court's prior rulings. At a minimum, this Court should issue a finding that the SIC Parties have breached this Court's exclusive jurisdiction provision, as set forth in the 363 Sale Order, by filing and prosecuting the State Court Action.

## III. <u>CONCLUSION</u>

For the foregoing reasons, HTI thus respectfully requests that the Motion be granted in its entirety, and the Court enters the Interim Order and Final Order enforcing the 363 Sale Order.

DATED:     Honolulu, Hawaii, <u>March 29, 2022</u>.

CASE LOMBARDI & PETTIT

<u>    /s/ Ted N. Pettit                    </u>
TED N. PETTIT
DAVID G. BRITTIN
And
MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
MELISSA Y. BOEY

Attorneys for HAWAIIAN TELCOM, INC.

<u>**EXHIBIT 1**</u>

**Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

In re:

PANIOLO CABLE COMPANY, LLC,

Debtor.

Case No. 18-01319 (RJF)
Chapter 11

**MOTION BY HAWAIIAN
TELCOM, INC. FOR INTERIM
AND FINAL RELIEF
ENFORCING THE COURT'S
SALE ORDER**

Hearing:
Date: _____
Time: _____
Judge: Honorable Robert J. Faris

## ORDER GRANTING INTERIM RELIEF IN CONNECTION WITH MOTION BY HAWAIIAN TELCOM, INC. ENFORCING THE COURT'S SALE ORDER

Upon the motion (the "Motion")[1] of Hawaiian Telcom, Inc. ("HTI") seeking,

pursuant to Sections 105 and 363(f) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the

District of Hawaii (the "Local Rules"), entry of an interim order (this "Interim

Order") enforcing the Court's prior sale order; and consideration of the Motion and

---

[1] Any capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Local Rules, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the record of the Hearing; and upon consideration of the declarations filed in support of the Motion; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED on an interim basis as set forth herein.   All capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

2.     Sandwich Isles Communications, Inc. ("SIC") and its affiliates (including for avoidance of doubt but without limitation Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family), including all of their employees, contractors, personnel, agents, and representatives, are hereby compelled to:

a.      Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

b.      Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

c.      Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fence of or within the Paniolo Buildings and Paniolo Premises, welding shut any access gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

Interim Order

d.     Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

e.     Fully adhere to, and refrain from interfering with, any and all of HTI's security protocols in, on, or within the Paniolo Buildings and Paniolo Premises.

3.     This Interim Order shall be immediately effective and enforceable upon its entry.  Any applicable stay is hereby waived and shall not apply to this Final Order.

4.     This Court shall retain jurisdiction with respect to all matters arising from or related to the enforcement, implementation and/or interpretation of this Interim Order.

5.     A final hearing to consider the relief requested in the Motion shall be held on **May 2, 2022** at **2:00 p.m.** (prevailing Hawaii time) and any objections or responses to the Motion shall be filed and served so as to be actually received on or prior to _____, 2022 at _____ (prevailing Hawaii time).

**END OF ORDER**

## E<small>XHIBIT</small> 2

**Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

In re:

PANIOLO CABLE COMPANY, LLC,

Debtor.

Case No. 18-01319 (RJF)
Chapter 11

**MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**

<u>Hearing</u>:
Date: _____
Time: _____
Judge: <u>Honorable Robert J. Faris</u>

## ORDER GRANTING FINAL RELIEF IN CONNECTION WITH MOTION BY HAWAIIAN TELCOM, INC. ENFORCING THE COURT'S SALE ORDER

Upon the motion (the "<u>Motion</u>")[1] of Hawaiian Telcom, Inc. ("<u>HTI</u>") seeking, pursuant to Sections 105 and 363(f) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 9013-1 of the Local Bankruptcy Rules for the District of Hawaii (the "<u>Local Rules</u>"), entry of a final order (this "<u>Final Order</u>") enforcing the Court's prior sale order; and consideration of the Motion and the relief

---

[1] Any capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Local Rules, and it appearing that no other or further notice need be provided; and a final hearing having been held to consider the relief requested in the Motion (the "Final Hearing"); and the record of the Final Hearing; and upon consideration of the declarations filed in support of the Motion; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.

B.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding.  Venue

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Final Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  This Court expressly finds that there is no just reason for delay in the implementation of this Final Order and expressly directs entry of this Final Order as set forth herein which shall not be subject to any stay.

D.      The notice provided in connection with the Motion and the Final Hearing provided all interested parties with timely and proper notice of the relief requested in the Motion.  Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Final Order has been afforded to all parties entitled to notice.  No further or other notice is or shall be required in connection with the relief granted in this Final Order.

E.      The relief granted in this Final Order is necessary to ensure compliance with this Court's 363 Sale Order and other related previous orders.

F.      Through the Marshal Sale and the 363 Sale, HTI has properly acquired the entirety of the Paniolo Buildings, and thus now holds control and ownership over the entirety of the Paniolo Buildings.

G.      Through the Marshal Sale and the 363 Sale, HTI has properly acquired full rights of access to the Paniolo Buildings and the Paniolo Premises in order to operate the Paniolo Network.  The SIC Parties are prohibited from charging HTI any

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-3   Filed  03/29/22   Page 4 of 7

fees for accessing or using the Paniolo Buildings and Paniolo Premises, and HTI is not required to pay any such fees.

H. The obligation to control and maintain security for the Paniolo Premises, subject to the requirements of the Federal Communications Commission and the LOA, was assumed by HTI through the 363 Sale.

I. Sandwich Isles Communications, Inc. and Waimana Enterprises, Inc. have violated this Court's exclusive jurisdiction provision by filing the State Court Action, which is currently pending at Case No. 1CCV-22-0000321 in the State of Hawaii Circuit Court of the First Circuit. This Court retains exclusive jurisdiction to adjudicate the issues raised by SIC in the State Court Action with respect to the 363 Sale, the Marshal Sale, and/or the Transferred Assets.

IT IS THUS HEREBY ORDERED THAT:

1. The Motion is GRANTED on a final basis as set forth herein. All capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

2. Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3. Sandwich Isles Communications, Inc. ("SIC") and its affiliates (including for avoidance of doubt but without limitation Waimana Enterprises, Inc.,

4

Pa Makani LLC, Clearcom, Inc., and members of the Hee family), including all of their employees, contractors, personnel, agents, and representatives, are hereby compelled to:

a. Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| 1. | Anahola [Kauai] Central Office |
|---|---|
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

b. Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

c. Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access

5

gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

      d.    Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

      e.    Fully adhere to, and refrain from interfering with, any and all of HTI's security protocols in, on, or within the Paniolo Buildings and Paniolo Premises.

      f.    Remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

4.    This Final Order shall be binding in all respects upon all affected parties, including the SIC Parties.

5.    This Final Order shall be immediately effective and enforceable upon its entry.  Any applicable stay is hereby waived and shall not apply to this Final Order.

6.    This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the enforcement, implementation and/or interpretation of this Final Order.

**END OF ORDER**

6

Final Order

# SUMMARY OF APPENDICES AND EXHIBITS

filed in connection with
### *Motion by Hawaiian Telcom, Inc. for Interim and Final Relief Enforcing the Court's Sale Order*

## Exhibits and Appendices to Motion

| Exhibit/Appendix | Description |
|---|---|
| Exhibit 1 | Proposed Interim Order |
| Exhibit 2 | Proposed Final Order |
|  |  |
| Appendix A | Summary of Paniolo Premises |
| Appendix B | Summary of SIC Addenda |
| Appendix C | Summary of Incidents |
| Appendix D | FCC Public Notice Report No. SCL-00303, dated February 18, 2021 |
| Appendix E | FCC File No. SCL-ASG-20210122-0006 (Petition to Adopt Conditions to Authorization and License) |
| Appendix F | FCC Public Notice Report No. SCL-00329, dated August 13, 2021 |
| Appendix G | Hawaii Public Utilities Commission, Order No. 38269, at Docket No. 2022-0037 |

## Exhibits to *Declaration of Daniel Masutomi*

| Exhibit | Description |
|---|---|
| M-1 | Department of Hawaiian Homelands License Agreement No. 372 |
| M-2 | Partial Assignment of 372 License from Waimana to SIC |
| M-3 | Partial Assignment of 372 License from Waimana to Pa Makani LLC |
| M-4 | Partial Assignment of 372 License from Waimana to Clearcom, Inc. |
| M-5 | SIC Addendum No. 1 to License Agreement No. 372 (Laiopua) |
| M-6 | SIC Addendum No. 2 to License Agreement No. 372 (Kalamaula & Waimanalo) |
| M-7 | SIC Addendum No. 5 to License Agreement No. 372 (Waiehu) |
| M-8 | SIC Addendum No. 6 to License Agreement No. 372 (Hilo & Puukapu) |
| M-9 | SIC Addendum No. 8 to License Agreement No. 372 (Anahola) |
| M-10 | SIC Addendum No. 11 to License Agreement No. 372 (Nanakuli) |
| M-11 | Laiopua Building Plans **[filed under seal]** |
| M-12 | Kalamaula Building Plans **[filed under seal]** |
| M-13 | Waimanalo Building Plans **[filed under seal]** |
| M-14 | Waiehu Building Plans **[filed under seal]** |

1

| M-15 | Hilo Building Plans | **[filed under seal]** |
|------|---------------------|------------------------|
| M-16 | Puukapu Building Plans | **[filed under seal]** |
| M-17 | Anahola Building Plans | **[filed under seal]** |
| M-18 | Nanakuli Building Plans | **[filed under seal]** |
| M-19 | Kekaha Building Plans | **[filed under seal]** |
| M-20 | Puunene Building Plans | **[filed under seal]** |
| M-21 | Letter from HTI to the SIC Parties, dated October 1, 2021 | |
| M-22 | Letter from HTI to SIC and Waimana, dated December 23, 2021 | |
| M-23 | Letter from HTI to various regulatory agencies, dated March 21, 2022 | |
| M-24 | Right of Entry No. 704 Agreement (ROE) | |
| M-25 | First Amendment to ROE | |
| M-26 | Letter from HTI to SIC, dated September 16, 2021 | |
| M-27 | Email from HTI to SIC, dated September 17, 2021 | |

## Exhibits to *Declaration of Lynette Yoshida*

| Exhibit | Description |
|---------|-------------|
| Y-1 | Email chain between HTI and SIC, dated between December 10-13, 2021 |
| Y-2 | Email from HTI to SIC, dated December 22, 2021 |
| Y-3 | Photo of by-passed lock, taken on January 5, 2022 at Laiopua |
| Y-4 | Photo of second by-passed lock, taken January 7, 2022 at Laiopua |
| Y-5 | Photo of re-established daisy-chain lockset, taken January 7, 2022 at Laiopua |
| Y-6 | Photo of by-passed lock and re-established daisy-chain, taken January 7, 2022 at Waiehu |
| Y-7 | Email from SIC to HTI, dated January 11, 2022 |
| Y-8 | Photo of removed disc lock, taken on or around January 11, 2022 at Waimanalo |
| Y-9 | Photo of by-passed lock, taken on January 12, 2022 at Kalamaula |
| Y-10 | Email from SIC to HTI, dated January 12, 2022 |
| Y-11 | Photo of by-passed lock, taken on January 14, 2022 at Hilo |
| Y-12 | Photo of re-established daisy-chain lockset, taken on January 14, 2022 at Hilo |
| Y-13 | Photos of warehouse with newly established lockset, taken on January 14, 2022 at Hilo |
| Y-14 | Photos of SIC lock on driveway gate, taken on January 14, 2022 at Laiopua |
| Y-15 | Photos of SIC lock on pedestrian gate, taken on January 14, 2022 at Laiopua |
| Y-16 | Photo of SIC lock on gate, taken on January 20, 2022 at Laiopua |
| Y-17 | Photo of SIC lock on gate, taken on January 21, 2022 at Nanakuli |
| Y-18 | Photo of SIC lock on gate, taken on January 26, 2022 at Kalamaula |
| Y-19 | Photos of metal bar/pipe with metal enclosure on gate, taken on January 28, 2022 at Waimanalo |

| Y-20 | Photos of SIC lock on gate, taken on February 2, 2022 at Puunene |
|------|-----------------------------------------------------------------|
| Y-21 | Photos of SIC's welded lock box and padlock at gate, taken on February 8, 2022 at Waimanalo |
| Y-22 | Photo of re-secured gate (with HTI chain and padlock), taken on February 8, 2022 at Waimanalo |
| Y-23 | Photo of SIC lock on gate, taken on February 9, 2022 at Kalamaula |
| Y-24 | Photos of SIC's installed metal box on gate, taken on February 10, 2022 at Kekaha |
| Y-25 | Photos of SIC lock on gate, taken on February 11, 2022 at Nanakuli |
| Y-26 | Photos of SIC's installed metal box on gate, taken on February 11, 2022 at Anahola |
| Y-27 | Photos of SIC's installed permanent barrier on gate, taken on February 11, 2022 at Waimanalo |
| Y-28 | Photo of SIC lock on gate, taken on February 16, 2022 at Laiopua |
| Y-29 | Letter from DHHL's counsel (K. Herring) to SIC's counsel (L. Smith), dated January 5, 2022 |
| Y-30 | Letter from SIC's counsel (L. Smith) to DHHL's counsel (K. Herring), dated January 17, 2022 |
| Y-31 | Email from SIC to HTI, dated January 6, 2022 |
| Y-32 | Email from SIC to HTI, dated February 2, 2022 |
| Y-33 | Letter from SIC's counsel (L. Smith) to HTI's former counsel (T. Young), dated January 20, 2022 |
| Y-34 | Letter from SIC's counsel (L. Smith) to Chief of Police, Honolulu, dated January 24, 2022 |
| Y-35 | Letter from SIC's counsel (L. Smith) to Chief of Police, Hawaii, dated January 24, 2022 |
| Y-36 | Letter from SIC's counsel (L. Smith) to Chief of Police, Kauai, dated January 24, 2022 |
| Y-37 | Letter from SIC's counsel (L. Smith) to Chief of Police, Maui, dated January 24, 2022 |

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-4   Filed  03/29/22   Page 3 of 3

# APPENDIX A

# Summary of Paniolo Premises

| | Paniolo Premise | | Addendum No. | Building Plans | Incidents[1] |
|---|---|---|---|---|---|
| 1. | Anahola [Kauai] | A1 | No. 8 (Ex. M-9) | Ex. M-17 | Warehouse: 12/10/2021; 1/31/2022<br>Gate locks: 1/13/2022; 1/31/2022; 2/11/2022; 3/2/2022<br>Cabinet: 1/18/2022 |
| 2. | Kekaha [Kauai] | A2 | None | Ex. M-19 | Gate locks: 12/10/2021; 2/10/2022 |
| 3. | Nanakuli [Oahu] | A1 | No. 11 (Ex. M-10) | Ex. M-18 | Gate locks: 1/21/2022; 2/11/2022 |
| 4. | Waimanalo [Oahu] | A1 | No. 2 (Ex. M-6) | Ex. M-13 | Gate locks: 1/11/2022; 1/28/2022; 2/8/2022; 2/11/2022<br>Physical barricade: 1/27/2022 |
| 5. | Kalamaula [Molokai] | A1 | No. 2 (Ex. M-6) | Ex. M-12 | Gate locks: 1/12/2022; 1/26/2022; 2/9/2022 |
| 6. | Puunene [Maui] | A2 | None | Ex. M-20 | Gate locks: 1/10/2022; 2/2/2022 |
| 7. | Waiehu [Maui] | A1 | No. 5 (Ex. M-7) | Ex. M-14 | Gate locks: 1/7/2022 |
| 8. | Puukapu [Hawaii] | A2 | No. 6 (Ex. M-8) | Ex. M-16 | Gate locks: 1/14/2022; 1/26/2022 |
| 9. | Laiopua [Hawaii] | A1 | No. 1 (Ex. M-5) | Ex. M-11 | Gate locks: 1/5/2022; 1/12/2022; 1/14/2022; 1/20/2022; 2/16/2022 |
| 10. | Hilo [Hawaii] | A1 | No. 6 (Ex. M-8) | Ex. M-15 | Warehouse: 1/14/2022<br>Gate locks: 1/14/2022; 1/26/2022; 1/28/2022; 2/18/2022<br>Police: 1/27/2022; 3/10/2022 |

---

[1] *See* Appendix C and the *Declaration of Lynette Yoshida* for further details about each incident.

# Appendix B

# SUMMARY OF ADDENDA TO 372 LICENSE

| Add. No. | Paniolo Premise | Easement Description | Recordation Information | Ex. No. |
|---|---|---|---|---|
| 1 | Laiopua [Hawaii] | Easement to Lot 227 in The Villages of La'i'opua – Village 3; Kealakehe, North Kona, Island of Hawaii[1] | 9/3/1998 as Document No. 98-131443 | M-5 |
| 2 | Kalamaula [Molokai] | Easement to portions of Lots 65 and 65-A, Kalanianaole Beach Lots situated at Kalamaula, Molokai, Maui, Hawaii. Tax Map Key: 2nd Div. 5-2-09: portion 22 and 14 | 10/7/1998 as Document No. 98-151060 | M-6 |
|  | Waimanalo [Oahu] | an Easement to a portion of Lot 55, Waimanalo Residence Lots, Unit (File Plan 2216) situated as Waimanalo, Koolaupoko, Oahu, Hawaii. Tax Map Key: Div. 4-1-08: portion 3 | 10/7/1998 as Document No. 98-151060 | M-6 |
| 5 | Waiehu [Maui] | an Easement to a portion of Lot 14, Waiehu Kou Subdivision; Tax Map Key: 2nd Div. 3-2-21:14 (por). | 3/10/1999 as Document No. 99-036050 | M-7 |
| 6 | Hilo [Hawaii] | an Easement to a portion of Lot 89 of Panaewa House and Farm Lots, Section 1; Tax Map Key: 2-1-025-090 portion | 3/15/2000 as Document No. 2000-034722 | M-8 |
|  | Puukapu [Hawaii] | an Easement to a portion of Lot 23, File Plan 1769, Puukapu Pasture Lots – Section I, situated at Puukapu, Waimea, South Kohala, Hawaii; Tax Map Key: 3rd 6-4-04:009 portion[;] and<br><br>an Easement to a portion of Government Land between Puukapu Pasture Lots – Section I and Kuhio Village, situated at Puukapu, Waimea, South Kohala, Hawaii | 3/15/2000 as Document No. 2000-034722 | M-8 |

[1] Addendum 1 also granted an easement to a portion of Lot 9263-A which is not part of the Paniolo Network.

1

## SUMMARY OF ADDENDA TO 372 LICENSE

| Add. No. | Paniolo Premise | Easement Description | Recordation Information | Ex. No. |
|---|---|---|---|---|
| 8 | Anahola [Kauai] | Easement to Parcel 22 (Tax Map Key No. (4) 4-8-15) situated at Anahola, Kawaiahu, Kauai, Hawaii, beginning at the northwest corner of this parcel of land, on the southwest corner of Kalalea Road, and on the east side of Parcel 23 (Tax Map Key No. (4) 4-8-03) portion of Anahola Residence Lots, Hawaiian Home Lands, the coordinates of said point of beginning referred to Government Triangulation Station "KIKOO" being 4,735.02 South and 6,192.85 East, thence running azimuths measured clockwise from True South | 8/25/2000 as Document No. 2000-118582 | M-9 |
| 11 | Nanakuli [Oahu] | Easement to all of that certain parcel of land known as Lot "A," land situated Northeasterly of lot 54 of File Plan 1492 at the Northeasterly end of Nanakuli Avenue | 12/26/2002 as Document No. 2002-231257 | M-10 |

2

# <u>Appendix C</u>

# Summary of Incidents at Paniolo Premises

| Date | Location | Summary | Support |
|---|---|---|---|
| 12/10/2021 | Kekaha | HTI lock bypassed. | Yoshida Decl. ¶ 5 |
| 12/10/2021 | Anahola | HTI unable to access "warehouse" portion of building. | Yoshida Decl. ¶ 5; Ex. Y-1 |
| 1/5/2022 | Laiopua | HTI lock bypassed on two gates. On 1/7/2022, HTI had to cut the SIC bypassed lock and re-establish daisy chain locks. | Yoshida Decl. ¶¶ 8-9; Exs. Y-3, Y-4 |
| 1/7/2022 | Waiehu | HTI lock bypassed. | Yoshida Decl. ¶ 10; Ex. Y-6 |
| 1/10/2022 | Puunene | HTI lock bypassed. | Yoshida Decl. ¶ 11 |
| 1/11/2022 | Waimanalo | HTI lock and daisy chain bypassed and replaced with SIC lock. | Yoshida Decl. ¶ 12; Ex. Y-7 |
| 1/12/2022 | Kalamaula | HTI lock bypassed. | Yoshida Decl. ¶ 13; Ex. Y-9 |
| 1/12/2022 | Laiopua | Daisy chain locksets removed and replaced with single SIC lock. | Yoshida Decl. ¶ 14; Ex. Y-10 |
| 1/13/2022 | Anahola | HTI lock bypassed. | Yoshida Decl. ¶ 15 |
| 1/14/2022 | Puukapu | HTI lock bypassed. | Yoshida Decl. ¶ 16 |
| 1/14/2022 | Hilo | Daisy chain on pedestrian gate removed and replaced with SIC lock; daisy chain on driveway gate bypassed. | Yoshida Decl. ¶ 17; Ex. Y-11 |
| 1/14/2022 | Hilo | Lock for exterior door of "warehouse" room of building drilled out. Interior door of "warehouse" room blocked. | Yoshida Decl. ¶ 18; Ex. Y-13 |
| 1/14/2022 | Laiopua | HTI locks on driveway gate and pedestrian gate removed and replaced with SIC locks. | Yoshida Decl. ¶ 19; Exs. Y-14, Y-15 |
| 1/18/2022 | Anahola | Keys to cabinet removed denying access to terminal circuit. | Yoshida Decl. ¶ 20 |
| 1/20/2022 | Laiopua | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 21; Ex. Y-16 |
| 1/21/2022 | Nanakuli | Daisy chain interlocking HTI-SIC padlocks and heavy duty chain on | Yoshida Decl. ¶ 22; Ex. Y-17 |

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-7   Filed   03/29/22   Page 2 of 4

| Date | Location | Summary | Support |
|------|----------|---------|---------|
| | | driveway gate removed and replaced with SIC lock. | |
| 1/26/2022 | Puukapu | Fence had been tampered and was thus no longer secure. | Yoshida Decl. ¶ 24 |
| 1/26/2022 | Hilo | HTI lock bypassed. | Yoshida Decl. ¶ 25 |
| 1/26/2022 | Kalamaula | HTI lock bypassed. | Yoshida Decl. ¶ 26; Ex. Y-18 |
| 1/27/2022 | Hilo | SIC personnel called police on HTI personnel for entering the premises. | Yoshida Decl. ¶ 27 |
| 1/27/2022 | Waimanalo | SIC personnel blocked gate and would not allow HTI personnel into the premises, and then informed HTI personnel that they could stay on property only in the presence of SIC personnel. | Yoshida Decl. ¶ 28 |
| 1/28/2022 | Hilo | HTI lock removed. | Yoshida Decl. ¶ 29 |
| 1/28/2022 | Waimanalo | SIC cut HTI's lock and placed metal bar/pipe with enclosure on gate to prevent access. | Yoshida Decl. ¶ 30; Ex. Y-19 |
| 1/31/2022 | Anahola | HTI gate lock bypassed, and SIC personnel blocked access to "warehouse" room. | Yoshida Decl. ¶ 31 |
| 2/2/2022 | Puunene | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 32; Ex. Y-20 |
| 2/8/2022 | Waimanalo | HTI's combination lock and heavy duty lock to secure driveway gate removed and replaced with padlock encased in metal box. | Yoshida Decl. ¶ 33; Ex. Y-21 |
| 2/9/2022 | Kalamaula | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 34; Ex. Y-23 |
| 2/10/2022 | Kekaha | HTI lock bypassed and SIC installed metal box over its own lock. | Yoshida Decl. ¶ 35; Ex. Y-24 |
| 2/11/2022 | Nanakuli | SIC lock installed. | Yoshida Decl. ¶ 36; Ex. Y-25 |
| 2/11/2022 | Anahola | HTI lock bypassed and SIC installed metal box over its own lock. | Yoshida Decl. ¶ 37; Ex. Y-26 |

2

| Date | Location | Summary | Support |
|------|----------|---------|---------|
| 2/11/2022 | Waimanalo | Permanent barrier placed in driveway, and driveway gate welded shut, to prevent access. | Yoshida Decl. ¶ 38; Ex. Y-27 |
| 2/16/2022 | Laiopua | HTI lock replaced by SIC lock. | Yoshida Decl. ¶ 39; Ex. Y-28 |
| 2/18/2022 | Hilo | HTI's lock cut. | Yoshida Decl. ¶ 40. |
| 3/3/2022 | Anahola | HTI's padlock and chain removed and replaced with SIC lock. | Yoshida Decl. ¶ 41 |
| 3/10/2022 | Hilo | SIC personnel called police and informed HTI that he had been instructed to cut HTI's lock. | Yoshida Decl. ¶ 42 |

3

Appendix C

# APPENDIX D



# PUBLIC NOTICE

**FEDERAL COMMUNICATIONS COMMISSION**
**445 12th STREET S.W.**
**WASHINGTON D.C. 20554**

News media information 202-418-0500
Internet: http://www.fcc.gov (or ftp.fcc.gov)
TTY (202) 418-2555

Report No. SCL-00303NS                                    **Thursday February 18, 2021**

### Non-Streamlined Submarine Cable Landing License Applications
### Accepted For Filing

Unless otherwise specified, the following procedures apply to the applications listed below:

The applications listed below have been found, upon initial review, to be acceptable for filing. Pursuant to the Submarine Cable Landing License Act, 47 U.S.C. §§ 34-39, and Executive Order No. 10530, reprinted as amended in 3 U.S.C. § 301, each applicant seeks: (a) the grant of a cable landing license; (b) the modification of a cable landing license; and/or (c) the assignment or transfer of control of an interest in a submarine cable landing license. These applications are not subject to the streamlined processing procedures set forth in Section 1.767 of the Commission's rules, 47 CFR § 1.767.

Filings relating to this application must be received within 14 days of this notice. Ex parte communications between outside parties and Commission staff concerning these applications are permitted subject to the Commission's rules for "permit-but-disclose proceedings." See 47 C.F.R. § 1.1206.

These applications are being coordinated with the Department of State and other Executive Branch agencies pursuant to section 1.767(b) of the Commission's rules, 47 C.F.R. §1.767(b), and consistent with procedures established with the Department of State. See Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, Report and Order, 16 FCC Rcd 22167, 22192-93, paras. 51-52 (2001) (Submarine Cable Landing License Report and Order); Streamlined Procedures for Executive Branch Review of Submarine Cable Landing License Requests, State Department Media Note (Revised) (rel. Dec. 20, 2001) available at http://2001-2009.state.gov/r/pa/prs/ps/2001/6951.htm.

Pursuant to its decision in Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, FCC 01-332, 16 FCC Rcd 22167 (2001), and section 1.767 of the rules, the Commission will take action upon these applications within ninety (90) days after release of this public notice, unless it determines that additional time is needed.

People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 1-888-835-5322 (tty). All applications listed are subject to further consideration and review, and may be returned and/or dismissed if not found to be in accordance with the Commission's rules, regulations, and other requirements.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-8   Filed  03/29/22   Page 2 of 4
Appendix D

Assignment

**Current Licensee:**   Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**FROM:** Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**TO:**    Hawaiian Telcom, Inc.

Application for consent to the assignment of the cable landing license for the Paniolo Cable System, SCL-LIC-20070223-00003, from the Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11 Trustee) to Hawaiian Telcom, Inc. (HTI). The Paniolo Cable System is a non-common carrier, domestic fiber optic system consisting of 48 fiber pairs and serving the Hawaiian islands. The Paniolo Cable system connects the Hawaiian Islands of Kauai, Oahu, Molokai, Maui, and Hawaii. It has four interisland subsea segments with a total of seven landings: (1) Kekaha, Kaua'i to Makaha, Oahu; (2) Hawai'i Kai, Oahu, to Kaunakakai, Moloka'i; (3) Kaunakakai, Moloka'i, to Lahaina, Maui; and (4) Makena, Maui, to Kawaihae, Hawai'i. The cable went into service in 2009. Applicants state that HTI intends to operate this cable on a common carrier basis.

On November 13, 2018, HSBC Securities (USA) Inc., Sunrise Partners Limited Partnership, and Deutsche Bank Trust Company Americas (Petitioning Creditors) jointly filed an involuntary petition for bankruptcy protection of the Paniolo Cable Company, LLC under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the District of Hawaii (Bankruptcy Court). On November 29, 2018, the Petitioning Creditors filed a motion with the bankruptcy court seeking the appointment of a Chapter 11 trustee for Paniolo Cable Company, LLC. On February 11, 2019 the Bankruptcy Court entered an Order appointing the Chapter 11 Trustee. On March 8, 2019, Michael Katzenstein, as Chapter 11 Trustee of the Bankruptcy Estate of Paniolo Cable Company, LLC (the Chapter 11 Trustee) notified the Commission of the pro forma assignment of the Paniolo Cable System license from Paniolo Cable Company, LLC to Paniolo Cable Company, LLC, as debtor under the control of the Chapter 11 Trustee. See Public Notice, Report No. SCL-00235, SCL-ASG-20190308-00008, Actions Taken Under Cable Landing License Act, DA 19-200 (IB rel. Mar. 21, 2019).

On November 30, 2020, the Chapter 11 Trustee and HTI entered into an asset purchase agreement pursuant to which HTI will acquire the Paniolo Cable System assets and other unregulated assets. On December 28, 2020, the Bankruptcy Court entered a sale order that, among other things: (1) authorized and approved the sale of Paniolo Cable Company's assets free and clear of all liens, claims, interests, and encumbrances; and (2) approved the asset purchase agreement. Upon consummation of the proposed transaction, HTI will be the owner and operator of the Paniolo Cable System.

HTI is a Delaware corporation that is 100% owned by Hawaiian Telcom Communications, Inc., a Delaware holding company, which 100% owned by Hawaiian Telcom Holdco, Inc., a Delaware holding company, which is 100% owned by Cincinnati Bell, Inc. (Cincinnati Bell), an Ohio holding company. Applicants state that Cincinnati Bell is publicly traded and that its shares are widely held, and that the only entity with a 10% or greater interest is BlackRock, Inc., a Delaware investment management company that owns 14.68% of Cincinnati Bell.

Cincinnati Bell and HTI have pending applications regarding the proposed transfer of control of Cincinnati Bell to Red Fiber Parent LLC (Red Fiber Parent). Red Fiber Parent, a Delaware limited liability company, will acquire 100% of the stock of Cincinnati Bell. See Applications Filed for the Transfer of Control of Cincinnati Bell Inc. and Hawaiian Telcom, Inc. to Red Fiber Parent LLC, WC Docket No. 20-146, Public Notice, 35 FCC Rcd 11320 (WCB/IB/WTB 2020).

The sole member of Red Fiber Parent is RF Topco LLC (TopCo), a Delaware limited liability company formed at the direction of MIP V (FCC) AIV, L.P. (MIP V), a Delaware limited partnership. The sole member of TopCo is Red Fiber Holdings LLC (RF Holdings), a Delaware limited liability company. At the time of closing, RF Holdings would be majority owned (61.5% equity) and controlled by MIP V RF Partners, L.P. (MIP V Member), a Delaware limited partnership, which, in turn, would be majority owned (73.15% equity) and controlled by MIP V. Both MIP V and MIP V Member are funds managed by Macquarie Infrastructure Partners Inc. pursuant to agreement with the funds' general partner, Macquarie Infrastructure Partners V GP, LLC (MIP V GP), which is controlled by Macquarie Infrastructure and Real Assets Inc. (MIRA). MIRA is ultimately wholly owned and controlled by Macquarie Group Limited (MGL), a publicly traded Australian company that provides banking and investment services. RF Holdings would be indirectly minority owned by (i) certain U.S.-organized alternative investment vehicles (Ares AIVs) managed by the Private Equity Group of Ares Management Corporation (Ares Management), a Delaware entity (an aggregate 21.2% equity interest); and (ii) Retail Employees Superannuation Trust (REST), a widely held Australian public offer pension fund managed by Retail Employees Superannuation Pty Limited (Rest Trustee), as trustee of the fund (17.3% equity). REST's indirect interest in Red Fiber Parent will be held by Rest Nominees No. 2 Pty Ltd as trustee for REST US Infrastructure No. 2 Trust (Rest Immediate Entity). MIP V Member, the Ares AIVs, and Rest Immediate Entity would have the right to appoint directors of RF Holdings and Cincinnati Bell based on their equity interests in RF Holdings. According to the Applicants, passive investors will hold indirect equity interests in Red Fiber Parent, through RF Holdings, in the form of limited partnership interests in MIP V or MIP V Member (or an affiliate entity), or the Ares AIVs, or membership interests in REST. These passive investors would each hold indirect interests of less than 10% in Red Fiber Parent.

HTI certifies that it accepts and will abide by the routine conditions specified in 47 CFR § 1.767(g).

Pursuant to Commission practice, the application is being referred to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy or trade policy concerns related to the proposed foreign ownership of Cincinnati Bell and HTI.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-8   Filed   03/29/22   Page 3 of 4   Appendix D

REMINDER:

Applicants must certify that neither the applicant nor any party to the application is subject to a denial of federal benefits by federal and/or state courts under authority granted in 21 U.S.C. § 862. See 47 C.F.R. §§ 1.2001–.2003.

By this notice, we inform the public that submarine cable landing license applications that are part of larger transactions involving multiple Commission licenses or authorizations may involve "extraordinary circumstances" as referenced in Review of Commission Consideration of Applications under the Cable Landing License Act, Report and Order, 16 FCC Rcd 22167 (2001) and Rules and Policies on Foreign Participation in the U.S. Telecommunications Market, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891 (1997), paras. 327-28, Order on Reconsideration, 15 FCC Rcd 18158 (2000). Additionally, extraordinary circumstances result where Executive Branch agencies petition the Commission to defer action on an application pending the resolution of potential national security, law enforcement, foreign policy and trade policy issues. Accordingly, these applications may not be acted on within the 90-day review period that the Commission has established as the period of time normally required to reach a decision on non-streamlined cable landing licenses. This notice shall serve as public notice to applicants that, in these circumstances, additional time may be required for Commission review and final action. No additional formal public notice will be provided routinely with respect to specific applications in the event that the applicable review period extends beyond 90 days.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-8   Filed  03/29/22   Page 4 of 4

Appendix D

# APPENDIX E

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paniolo Cable Company, LLC, | ) | File No. SCL-ASG-20210122-00006 |
| and Hawaiian Telcom, Inc. | ) | |
| | ) | |
| Application for Consent to Assign | ) | |
| A Cable Landing License Held by Paniolo | ) | |
| Cable Company, LLC, Connecting the | ) | |
| Islands of Kauai, Oahu, Molokai, Maui, | ) | |
| And Hawai'i in the State of Hawaii, to | ) | |
| Hawaiian Telcom Inc. | ) | |
| | ) | |
| The Paniolo Cable System | ) | |

## PETITION TO ADOPT CONDITIONS TO AUTHORIZATION AND LICENSE

Pursuant to Executive Order 13913, the National Telecommunications and Information

Administration (NTIA) submits this Petition to Adopt Conditions to Authorization and License

(Petition) on behalf of the Committee for the Assessment of Foreign Participation in the United

States Telecommunications Services Sector (Committee).[1]  Through this Petition, and pursuant

to section 1.41 of the Commission's Rules, the Committee advises the Commission that it has no

objection to the Commission approving the above-captioned application, provided that the

Commission conditions its approval on the assurances of Hawaiian Telcom, Inc., ("HTI") to

abide by the commitments and undertakings set forth in the July 23, 2021, Letter of Agreement

(LOA), a copy of which is attached hereto.[2]

Section 2 of the Cable Landing License Act authorizes the President to withhold, revoke,

or condition a submarine cable landing license if the President determines that such action

---

[1] Exec. Order No. 13913, § 9(h), 85 Fed. Reg. 19643, 19647-48 (2020). The Executive Order
directs the Committee to "assist the [Commission] in its public interest review of national
security and law enforcement concerns that may be raised by foreign participation in the United
States telecommunications services sector." Id. § 3(a), 85 Fed. Reg. at 19643.
[2] 47 C.F.R. § 1.41.

would, among other things, "promote the security of the United States."[3] In 1954, the President delegated that authority to the Commission, subject to a requirement that it not act on an application without first obtaining "such advice from any executive department or establishment of the Government as the Commission deems necessary."[4] The Commission has long sought the expertise of the relevant Executive Branch agencies and has routinely granted agencies' requests to impose conditions on cable landing licenses to address national security, law enforcement, and other concerns raised by particular applications.[5]

After discussions with representatives of the parties in connection with the above-captioned application, the Committee has concluded that the additional commitments and undertakings set forth in the LOA will help ensure that those agencies with responsibility for protecting national security, enforcing the law, and preserving public safety can proceed appropriately to satisfy those responsibilities.

Accordingly, NTIA on behalf of the Committee advises the Commission that the Committee has no objection to the Commission granting the above-captioned application, provided that the Commission conditions its consent on compliance with the July 23, 2021, LOA attached to this filing.

Respectfully submitted,

National Telecommunications and
Information Administration
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230
(202) 482-1816

Kathy Smith
Chief Counsel


August 3, 2021

---

[3] 47 U.S.C. § 35.
[4] Exec. Order No. 10530, § 5(a), 19 Fed. Reg. 2709, 2711 (1954). See also 47 C.F.R. § 1.767(b).
[5] See, e.g., Actions Taken Under Cable Landing License Act, 34 FCC Rcd 8628 (2019), 32 FCC Rcd 3791, 3792-93 (2017), 28 FCC Rcd 1323, 1324 (2013), 24 FCC Rcd 2219, 2220 (2009), 23 FCC Rcd 13149, 13420 (2008).



July 23, 2021

Assistant Secretary for Trade and Economic Security
Office of Strategy, Policy, and Plans
Mail Stop 0445
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528-0445
IP-FCC@hq.dhs.gov

Chief, Foreign Investment Review Section (FIRS)
Deputy Chief, Compliance and Enforcement (FIRS)
On Behalf of the Assistant Attorney General for National Security
United States Department of Justice
National Security Division
175 N Street, NE
Washington, DC 20530
Compliance.Telecom@usdoj.gov

Andrew Pahutski
U.S. Department of Defense
1400 Defense Pentagon
Washington, DC 20301
osd.pentagon.dod-cio.list.team-telecom@mail.mil

Dear Madam/Sir:

This Letter of Agreement ("LOA") outlines the commitments made by Hawaiian Telcom, Inc. ("HT" or "Licensee") to the U.S. Department of Homeland Security, the U.S. Department of Justice, and the U.S. Department of Defense (collectively, the "Compliance Monitoring Agencies" or "CMAs") to address national security and law enforcement risks raised with regard to an application filed by Paniolo Cable Company ("PCC") and HT with the Federal Communications Commission ("FCC") requesting consent to assign the cable landing license for the Paniolo Cable System ("Paniolo") from PCC to HT.[1] Paniolo is a submarine cable system that connects five of the Hawaiian Islands: Kauai, Oahu, Molokai, Maui, and Hawai'i.

HT certifies as true and correct, under penalties outlined in 18 U.S.C. § 1001, all statements HT or its representatives have made to the CMAs and the FCC in the course of the review of the above-referenced application that the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Committee") conducted pursuant to Executive Order 13913. HT hereby adopts those statements as the basis for this LOA.

---

[1] FCC File No. SCL-ASG-20210122-00006.

HT has agreed to provide this LOA to the CMAs, and understands that upon execution of this LOA, the FCC will be petitioned to condition the cable landing license for Paniolo on compliance with this LOA.

For purposes of this LOA:

A.    "Access" means the ability to physically or logically undertake any of the following actions: (a) read, divert, or otherwise obtain non-public information or technology from or about software, hardware, a system or a network; (b) add, edit or alter information or technology stored on or by software, hardware, a system or a network; and (c) alter the physical or logical state of software, hardware, a system or a network (*e.g.*, turning it on or off, changing configuration, removing or adding components or connections).

B.    "Cybersecurity Incident Response Plan" means a plan or processes put in place to develop and implement the appropriate activities to take action regarding a detected cybersecurity event that has been determined to have an impact on HT prompting the need for response and recovery.

C.    "Domestic Communications" means: (a) Wire Communications or Electronic Communications (whether stored or not) between one location within in the United States, including its territories, to another location within the United States, including its territories; or (b) the U.S. portion of a Wire Communication or Electronic Communication (whether stored or not) that originates or terminates in the United States or its territories.

D.    "Domestic Communications Infrastructure" or "DCI" means: (a) any portion of Paniolo that physically is located in the United States, up to and including the submarine line terminating equipment, including (if any) transmission, switching, bridging, and routing equipment, and any associated software (with the exception of commercial-off-the-shelf ("COTS") software used for common business functions, *e.g.*, Microsoft Office) used by or on behalf of HT for Paniolo to provide, process, direct, control, supervise, or manage Domestic Communications; and (b) Network Operations Center ("NOC") facilities, as defined in Section F below.

E.    "Electronic Communication" has the meaning given it in 18 U.S.C. § 2510(12).

F.    "Network Operations Center" or "NOC" means the locations and facilities designated as such by HT for purposes of performing network management, monitoring, maintenance, or other operational functions for Paniolo.

G.    "Principal Equipment" means the primary electronic components of Paniolo, which comprises the DCI and Wet Infrastructure. Principal Equipment consists of: network element servers; routers; switches; repeaters; submarine line terminal equipment ("SLTE"); system supervisory equipment ("SSE"); signal modulators and amplifiers; power feed equipment ("PFE"); tilt and shape equalizer units ("TEQ/SEQ"); optical distribution frames ("ODF"); branching units ("BU"); synchronous optical network ("SONET"); synchronous digital hierarchy ("SDH"); interface equipment; wavelength selective switch ("WSS") technology; wave division multiplexing ("WDM"); dense wave division multiplexing ("DWDM"); coarse wave division

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-9   Filed   03/29/22   Page 5 of 17
Appendix E

multiplexing ("CWDM"); optical carrier network ("OCx") equipment, as applicable; all embedded software for the equipment; any non-embedded software used for monitoring, administration, or provisioning Paniolo (with the exception of COTS software used for common business functions, *e.g.*, Microsoft Office); and any other such equipment, whether physical or logical, that performs the functions of the equipment described in this definition that HT may use in the normal course of business.

H.  "Screened Personnel" has the meaning given it in Section 10 below.

I.  "Security" means a condition that results from the establishment and maintenance of protective measures that enable an organization to perform its mission or critical functions despite risks posed by threats to its use of systems. Protective measures may involve a combination of deterrence, avoidance, prevention, detection, recovery, and correction that should form part of the organization's risk management approach.

J.  "Wet Infrastructure" means hardware components installed and residing on the undersea portion of Paniolo, including fiber optic cables, repeaters, branching units, and routers (if any). Wet Infrastructure includes all the components used to define the topology of the undersea portion of Paniolo.

K.  "Wire Communication" has the meaning given it in 18 U.S.C. § 2510(1).


HT undertakes to comply with the following commitments:

**1. Security Point of Contact**

HT agrees to maintain a Security Point of Contact ("POC") for purposes of this LOA. The POC will possess the appropriate authority, reporting lines, independence, skills and resources to ensure compliance with the terms of this LOA. The POC will be a U.S. citizen and, to the knowledge of HT, will be eligible to hold an active U.S. Government security clearance at the "Secret" level or higher. HT agrees to nominate its proposed POC within **30 days** of the execution of this LOA. HT understands that the POC nomination will be subject to CMA review and approval and may be subject to a background check at the sole discretion of the CMAs. In order to facilitate this, HT will provide the name, date of birth, place of birth, social security number, and passport number of the nominee, and will subsequently provide any other information requested by the CMAs.

The POC will be available twenty-four (24) hours per day, seven (7) days per week, regarding any national security or law enforcement risks that the CMAs may identify with respect to Paniolo. Upon CMA request, the POC will make himself/herself available in person within the United States within **72 hours** at a date and location as deemed necessary by the CMAs. The POC will be responsible for receiving and promptly effectuating any lawful inquiries or requests for information, and HT will ensure that the POC has sufficient authority to effectuate compliance with obligations set forth in this LOA.

HT agrees to notify the CMAs of any proposed change to the POC at least **15 days** in advance (except in the case of the unexpected firing, resignation or death of a POC in which case such written notice must be provided within **5 days** of such event) of such proposed change. HT understands that any proposed POC will be subject to CMA review and approval pursuant to this Section as outlined above.

**2. Cable System Information**

Within **90 days** of the execution of this LOA, and, thereafter, within **30 days** upon CMA request, HT agrees to make available the following Paniolo information:

(a)     network management information, including: (1) a network map that includes physical and logical topology, including any terrestrial backhaul from the cable landing stations to SLTE locations or other facilities housing Paniolo Principal Equipment; (2) network and telecommunications architecture descriptions and associated descriptions of interconnection points and controlled gateways to the DCI and Wet Infrastructure; (3) network operational plans, processes, and procedures; (4) locations and functions of any NOCs, data centers, and main distribution facilities; (5) an organizational chart, to include specific reference to the names and positions of senior HT officials responsible for operations of Paniolo, and/or senior officials of any third parties performing such duties on behalf of HT; and (6) descriptions of interfaces and connections to Paniolo for service offload, disaster recovery, or administrative functions;

(b)     a complete and current list of all contracts held by HT or its designee(s) for the maintenance, repair and security of Paniolo; and

(c)     a restoration plan for the Principal Equipment and the Wet Infrastructure for Paniolo.

Within **45 days** of the execution of this LOA, HT agrees to confirm to the CMAs in writing the location of the Paniolo NOC(s), and other facilities with NOC functionality, and the controller, operator, or manager for, the Paniolo NOC(s). HT understands the CMAs will approve or disapprove the locations within **45 days** of acknowledgement of receipt or as otherwise agreed to by HT and the CMAs, with the right of approval not waived unless provided in writing by the CMAs. HT agrees to notify the CMAs of any proposed change to the NOC locations, or operators, to include the addition of new NOC locations, at least **45 days** in advance of such proposed change. HT understands the CMAs will approve or disapprove the new operator, location or locations within **45 days** of acknowledgement of receipt or as otherwise agreed to by HT and the CMAs, with the right of approval not waived unless provided in writing by the CMAs.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-9   Filed 03/29/22   Page 7 of 17
Appendix E

### 3. Principal Equipment List

Within **90 days** of the execution of this LOA, HT agrees to provide the CMAs with a list to include:

(a)     a complete and current list of all Principal Equipment, including:

      (1) a description of each item and the functions supported;

      (2) each item's manufacturer; and

      (3) the model and/or version number of any hardware or software; and

(b)     any vendors, contractors, or subcontractors involved in providing, installing, operating, managing, repairing, or maintaining the Principal Equipment.

Objections to the Principal Equipment List will be handled pursuant to Section 7.

At the sole discretion of the CMAs, HT agrees to supplement in writing the foregoing definition of Principal Equipment to address subsequent technological developments with submarine systems.

### 4. Modifications to Existing Principal Equipment

HT agrees to provide the CMAs at least **30 days'** advance notice prior to any maintenance, repair, or replacement that would result in any modification to the quantum, function, configuration, operation, or location of existing Principal Equipment for Paniolo. With any such notice, HT may request that the CMAs waive the notice obligation of this Paragraph 5 for substantially similar modifications in the future. For the avoidance of doubt, modifications requiring notice to the CMAs do not include routine software updates pushed through by approved vendors.

The 30 days' advance notice requirement is waived for any maintenance, repair, or replacement that is undertaken in response to an unforeseen or uncontrollable event and that is necessary to ensure the continued operability of Paniolo; however, in such circumstances, HT agrees to provide advance notice to the CMAs of the modification, if practicable, and, if impracticable, HT agrees to provide notice within **10 days** after the maintenance, repair, or replacement. This notice will include a detailed description of the equipment replaced and the circumstances surrounding the need to replace the Principal Equipment without 30 days' advance notice.

HT may continue to utilize any Principal Equipment maintained, repaired, or replaced pursuant to the process outlined in this Section, provided that the CMAs do not object pursuant to Section 7. In the event of such an objection, HT will not begin reliance upon, expand existing deployment, or enhance the capabilities of any Principal Equipment to which the CMAs have

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-9   Filed  03/29/22   Page 8 of 17
Appendix E

objected, and HT agrees to meet, confer, and otherwise attempt in good faith to resolve the CMAs' objection. Until the objection is resolved, HT will not upgrade, install, replace, or service any objectionable Principal Equipment without written authorization from the CMAs.

**5. Change in Vendors, Contractors, or Subcontractors for Principal Equipment**

HT agrees to provide at least **30 days'** advance notice prior to any change to the list of vendors, contractors, or subcontractors involved in providing, installing, operating, managing, repairing, or maintaining the Principal Equipment.

In addition, HT agrees to provide at least **30 days'** advance notice prior to changing the service offerings or support from a previously-listed vendor, contractor, or subcontractor (*i.e.*, where a previously-listed provider will be offering support in a previously unidentified way).

Objections to any new vendor, contractor, or subcontractor for the Principal Equipment or the proposed service offerings thereof will be handled pursuant to Section 7.

**6. Equipment Testing**

HT agrees to provide at least **30 days'** advance notice prior to initiating the testing of any new Principal Equipment connected to Paniolo by any vendor not already on the approved Principal Equipment List. Objections to any testing proposed pursuant to this Section will be handled pursuant to Section 7.

Prior to deployment of any distributed acoustic sensing technology onto the marine portion of this cable, HT agrees to receive the approval of the United States Navy.
HT will provide notice to osd.pentagon.ousd-a-s.list.team-telecom@mail.mil prior to the deployment, with a courtesy copy to the CMAs.

**7. Objection Resolution**

Within **90 days** of receipt of any notice provided by HT pursuant to Sections 3, 4, 5, or 6, the CMAs shall either provide written approval or disapproval to HT of the action described in such notice. If within the 90-days approval/disapproval period the CMAs seek additional information from HT, the approval/disapproval period shall be extended by the number of days the CMAs awaited the requested information. In the event of a disapproval, HT will not expand the existing deployment or enhance the capabilities of any Principal Equipment of which the CMAs have disapproved, and HT agrees to meet, confer and resolve the CMAs' objection. Until the CMAs' disapproval is resolved, HT will not upgrade, install, replace, or service any disapproved Principal Equipment without written authorization from the CMAs.

## 8. Measures to Prevent Improper Use and Unauthorized Logical Access

HT agrees to take practicable measures to prevent unauthorized logical Access to Paniolo and to prevent any unlawful use or disclosure of information carried on the same, and HT will include these measures in the policies that HT will develop and implement pursuant to this LOA. For purposes of this Section, such "practicable measures," at a minimum, include effectuating compliance with all applicable U.S. laws and regulations governing cybersecurity, information security, and privacy and will be measures consistent with best practices and guidelines, such as but not limited to the Cybersecurity Framework of the National Institute of Standards and Technology and 27001 Series standards of the International Organization for Standardization. These measures should also include items such as configuration management, security audits, and system interconnection documentation, as well as contractual safeguards and screening procedures for personnel with logical access to the DCI.

HT agrees that its policies will also include, among other things, policies or plans relating to its information security, supply chain security, cybersecurity incident response, remote access, cybersecurity, third-party contractors, outsourcing and offshoring, maintenance and retention of system logs, protection of lawful U.S. process, protection of U.S. Records obtained by HT in the ordinary course of business, and HT's plans regarding new contracts or amendments to existing contracts with third-party providers requiring those third parties to notify HT in the event of a breach or loss of U.S. Records within a specified time period after discovery, not to exceed 48 hours from the time of discovery, unless the CMAs grant a waiver.

HT agrees to take appropriate measures to protect and promote resiliency of Paniolo, including measures to ensure that security patches for systems and applications are up to date.

HT agrees to maintain or exceed security standards and best practices utilized within the U.S. telecommunications industry for maintenance of password systems and firewalls, monitoring and oversight of logical Access to Paniolo, maintenance of non-destructive logical Access logs, and periodic internal audits of network security and associated network devices.

HT agrees to submit a policy regarding logical security measures for Paniolo adopted in accordance with the requirements of this Section to the CMAs within **90 days** of the date of execution of this LOA. HT agrees that the policy will be updated when appropriate to conform with evolving information security standards, and that HT will make additional modifications to the policy, if requested by the USG Parties, and to work with the USG Parties to implement such modifications. The CMAs will approve or disapprove the policy within **90 days** of receipt.

## 9. Physical Security Measures

HT agrees to take practicable measures to physically secure Paniolo, including the DCI and Wet Infrastructure. HT will screen appropriate personnel in accordance with Section 10 below, and HT will require that all persons who physically access the DCI are escorted at all times by Screened Personnel, as defined herein.

HT agrees to submit a policy setting forth its physical security measures for Paniolo to the CMAs within **90 days** of the date of execution of this LOA. The CMAs will approve or disapprove the policy within **90 days** of receipt.

## 10. Screening of Personnel

HT agrees to implement, either directly (including through an affiliate) or through a vendor or service provider, a process to screen any existing or newly hired HT personnel (or any personnel performing under an agreement or arrangement with HT) in, at minimum, the following circumstances:

(a)     any person whose position could involve logical Access to the DCI; and

(b)     any person charged with securing the DCI.

HT's personnel screening process will be reflected in a written policy and will include background investigations, public criminal records checks, or other analogous means to ascertain a person's trustworthiness. Upon satisfactory completion of the requirements set forth in the screening policy, such persons will be considered "Screened Personnel."

HT agrees to submit the screening policy to the CMAs within **90 days** of the execution of this LOA. The CMAs will approve or disapprove the policy within **90 days** of receipt. HT agrees to cooperate with any request by the CMAs to provide additional identifying information regarding Screened Personnel.

## 11. Reporting Incidents and Breaches

HT agrees to report to the CMAs within **48 hours** if it learns of information that reasonably indicates:

(a)     unauthorized third-party Access to, or disruption or corruption of, Paniolo or any information being carried on Paniolo.

(b)     any other unauthorized Access to or disclosure of Domestic Communications on Paniolo in violation of federal, state, or local law; or

(c)     any material breach of the commitments made in this LOA, including a violation of any approved plan, policy, or procedure under this LOA.

(d)     Any unauthorized Access to, or disclosure of, information obtained from or relating to Government entities; or

(e)     Any one or more of the following which affect HT's computer network(s) or associated information systems:

  i.     Unauthorized disruptions to a service or denial of a service;

  ii.    Unauthorized processing or storage of data;

  iii.   Unauthorized modifications to system hardware, firmware, or software, including the identification of vulnerabilities introduced through a cyber supply chain compromise;

  iv.    Unplanned incidents that cause activation of HT's Cybersecurity Incident Response Plan; or

  v.     Attempts from unauthorized sources to Access systems or data if these attempts to Access systems or data may materially affect HT's ability to comply with the terms of this LOA; or

  vi.    An unauthorized occurrence that (A) actually or imminently jeopardizes the integrity, confidentiality, or availability of information or an information system; or (B) constitutes a violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

HT agrees to require any third-party service provider to disclose to HT any security breach, whether from data breach or other cause, within 48 hours of the third party discovering the breach, unless the CMAs grant a waiver.  HT agrees further to require any third-party service provider to disclose to HT, within 48 hours of discovery, unless the CMAs grant a waiver, any critical exposure, threat, and vulnerabilities activating its Cybersecurity Incident Response Plan, associated with the products or services provided to HT, including as a result of tainted software, introduction of malware, insertion of counterfeits, unauthorized production, tampering, theft, or insertion of malicious software and hardware, as well as poor development and manufacturing practices in the cyber supply chain.

Upon CMA request, HT agrees to submit in writing a follow-up report describing in greater detail the incident or breach and HT's steps to remediate the incident or breach to the CMAs within **15 days** of discovery of the relevant conduct.  HT also agrees to submit in writing supplementary information regarding any follow-up report until such evaluation is complete.  HT agrees to remediate any incidents or breaches reported pursuant to this provision to the satisfaction of the CMAs.

HT further agrees to take timely and appropriate remedial measures, as recommended by the US-Computer Emergency Readiness Team/Cybersecurity and Infrastructure Security Agency ("US-CERT"/"CISA"), an Information Sharing and Analysis Center ("ISAC"), or other authority, to respond and recover from any cyber or supply chain incident and mitigate vulnerabilities.

## 12. Instruction of Obligations

HT agrees to instruct appropriate officers, employees, contractors, and agents as to HT's obligations under this LOA, including the individuals' duty to report any violation, and to issue periodic reminders of such obligations.

HT agrees to issue initial instructions in writing and provide appropriate live training within **90 days** of the execution of this LOA, and HT agrees to submit a copy of such instructions to the CMAs at the same time. HT agrees to issue updated instructions or training annually thereafter.

## 13. Change in Services or Cable Operations

HT agrees to notify the CMAs in writing at least **30 days** prior to implementing any changes to the communications services or operations of Paniolo, including notice if HT's proposed change would impact any services provided to U.S. government customers pursuant to a contract with the U.S. government. HT agrees to provide a detailed description of the proposed change including the terms, conditions, individuals and/or entities involved in making the change to the communications services or operations.

## 14. Change in Control

If HT learns of any information that reasonably indicates that any single foreign entity or individual, other than those already identified, has or likely will obtain an ownership interest, whether direct or indirect, in HT or Paniolo above ten (10) percent, or if any foreign entity or individual, singly or in combination with other foreign entities or individuals, has or likely otherwise will gain either: (i) control, as determined in accordance with 47 C.F.R. § 63.09(b); or (ii) *de facto* or *de jure* control of HT or Paniolo, HT agrees to provide notice in writing to the CMAs within **15 days**. Notice under this Section will, at a minimum:

(a)     identify the entity or individual(s) acquiring control (specifying the name, addresses, and telephone numbers of the entity or individual(s));

(b)     identify the beneficial owners of any such increased or prospective increased ownership interest in HT or Paniolo by the entity or individual(s) (specifying the name, addresses, and telephone numbers of each beneficial owner); and

(c)     quantify the amount of ownership interest that the entity or individual(s) has or likely will obtain in HT or Paniolo and, if applicable, the basis for their prospective control of HT or Paniolo.

15.  **Annual Report**

On March 12, 2022 and each subsequent anniversary, HT agrees to submit to the CMAs a report assessing HT's compliance with the terms of this LOA for the preceding year.  The report shall include:

(a)  a certification, under penalties outlined in 18 U.S.C. § 1001, that all statements contained within the report are true and correct;

(b)  the names and contact information of the then-current POC(s);

(c)  Cable System Information, as described in Section 2 above, noting any changes during the reporting period;

(d)  an updated Principal Equipment List containing all information described in Section 3 above, identifying any modifications during the reporting period;

(e)  a copy of the then-current policies adopted in accordance with this LOA, including policies for logical security (Section 8), physical security (Section 9), screening (Section 10), incident reporting (Section 11), and employee training (Section 12), and a summary of any changes during the reporting period and the reasons therefor;

(f)  a summary of any events that occurred during the reporting period that will or reasonably could impact the effectiveness of or compliance with this LOA;

(g)  a summary of any known acts of noncompliance with the terms of this LOA that occurred during the reporting period, whether inadvertent or intentional, with a discussion of what steps have been or will be taken to prevent such acts from occurring in the future;

16.  **Third-Party Audit**

At their sole discretion, but no more frequently than once every calendar year, unless the original audit is found by the CMAs to have been unsatisfactory, the CMAs may request a third-party audit of HT's compliance with the terms of this LOA.

(a)  Within **60 days** of the CMAs requesting a third-party audit, HT will nominate two third-party auditors, subject to the approval of the CMAs.  Within **60 days** of the nominations, the CMAs will approve or disapprove the nominated third-party auditor firms.

(b)  If the CMAs disapprove of either of the nominated third-party auditors, HT agrees to nominate, within **30 days** of such objection, another third-party auditor.  If  the CMAs disapprove the nomination of a supplemental third-party auditor, HT will provide to the

CMAs three (3) additional candidates to be considered for third-party auditor from which the CMAs may choose at their discretion.

(c)     As part of the auditor nomination and approval process, the CMAs may condition approval of a nominated auditor on HT providing information regarding HT's and the nominated auditor's pre-existing relationship (if any).

(d)     HT will be solely responsible for any costs associated with any third-party audit carried out pursuant to this Section. The CMAs, however, will consider avoidance of unreasonable costs as a factor when exercising their rights under this Section.

(e)     HT will ensure the selected third-party auditor submits, prior to commencing the audit, a methodology and proposed scope of audit, both of which will be subject to CMA approval.

(f)     HT will ensure that the executed engagement agreement with the third-party auditor is provided to the CMAs within **5 days** of execution.

(g)     The third-party auditor will promptly deliver to the CMAs and HT all reports and related information generated or gathered during its review that relate directly to HT's compliance with the terms of this LOA and agrees to meet independently with the CMAs upon request.

## 17. Consultation and Visitation

HT agrees to meet and confer with the CMAs and to resolve to the satisfaction of the CMAs any concerns the CMAs may raise regarding compliance with this LOA.

HT agrees to negotiate in good faith to resolve to the satisfaction of the CMAs any national security or law enforcement risks the CMAs may identify with respect to any matters set forth in this LOA.

HT agrees that, upon **48 hours** advance notice, except when due to exigent circumstances such advance notice is not practicable, the CMAs may visit HT or Paniolo facilities to conduct on-site reviews to verify the implementation of and compliance with the terms of this LOA. Subject to applicable law, HT will provide unimpeded access to any documents, information, facilities, and personnel necessary to verify compliance with the terms of this LOA on the understanding that when advance notice of a visit is not provided, HT will provide the CMAs with access to documents, information, facilities, and personnel within **24 hours** of such an access request.

## 18. Computing Time

In computing any time period pursuant to this LOA, the below rules apply.

Appendix E

(a) For any period stated in days:

    i. the day of the event that triggers the period is excluded;

    ii. every day thereafter is counted, including intermediate Saturdays, Sundays, and federal holidays, except for those days that are tolled pursuant to Section 18(c); and

    iii. the last day of the period is included, but if the last day is a Saturday, Sunday, or federal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or federal holiday.

(b) For any period stated in hours:

    i. begin counting immediately on the occurrence of the event that triggers the period;

    ii. count every hour, including hours during intermediate Saturdays, Sundays, and federal holidays, except for those hours that are tolled pursuant to Section 18(c).; and

    iii. if the period would end on a Saturday, Sunday, or federal holiday, the period continues to run until the same time on the next day that is not a Saturday, Sunday, or federal holiday.

(c) Any approval provision applicable to the CMAs pursuant to this LOA shall be tolled during a lapse in appropriations or any time when the Federal government in the greater Washington, D.C. area is closed.

This LOA shall inure to the benefit of, and shall be binding upon, HT and its successors, assigns, subsidiaries, and affiliates.

HT agrees that, in the event that HT breaches the commitments set forth in this LOA, to include conduct contrary to the CMAs' timely objection to any notice submitted pursuant to this LOA, under subsection 10(f) of Executive Order 13913 ("the Executive Order"), a recommendation may be made that the FCC modify, condition, revoke, cancel, terminate, enter other declaratory relief, or render null and void any relevant license, permit, or other authorization granted by the FCC to HT or any successors-in-interest, in addition to any other remedy available at law or equity.

If, after this LOA takes effect, the CMAs or HT believe that changed circumstances warrant modifying or terminating this LOA (including if the CMAs determine that the terms of this LOA are inadequate or no longer necessary to address national security or law enforcement risks), HT and the CMAs agree to negotiate in good faith to modify this LOA. Rejection of a proposed modification alone shall not constitute evidence of a failure to negotiate in good faith.

Nothing in this LOA excuses HT from its obligations to comply with all applicable legal requirements and obligations, including all applicable statutes, regulations, requirements, or orders. More specifically, HT understands that all statements HT and/or its representatives make to the CMAs are and will remain subject to the penalties set forth in 18 U.S.C. § 1001, should any such statements violate that statute.

HT agrees to permit disclosure of confidential and highly confidential information submitted to the FCC pursuant to 47 C.F.R. § 0.442 to Federal government departments, agencies, and offices whose principals are listed in Section 3 of Executive Order 13913.

HT understands that, upon execution of this LOA by an authorized representative or attorney, or shortly thereafter, the FCC will be notified that there is no objection to grant of the application.

For and on behalf of Hawaiian Telcom Inc.

Christopher J. Wilson
Vice President and General Counsel
Hawaiian Telcom Inc.
221 East Fourth Street
Cincinnati, OH 45202
Tel: 513-397-0750
christopher.wilson@cinbell.com

# APPENDIX F



# PUBLIC NOTICE

**FEDERAL COMMUNICATIONS COMMISSION**
**45 L STREET NE**
**WASHINGTON  D.C.  20554**

News media information 202-418-0500
Internet: http://www.fcc.gov (or ftp.fcc.gov)
TTY (202) 418-2555

| | |
|---|---|
| | **DA No.        21-993** |
| **Report No.  SCL-00329** | **Friday  August 13, 2021** |

### Actions Taken Under Cable Landing License Act

### Section 1.767(a) Cable Landing Licenses, Modifications, and Assignments or Transfers of Control of Interests in Cable Landing Licenses (47 C.F.R. § 1.767(a))

By the Chief, Telecommunications and Analysis Division, International Bureau:

Pursuant to An Act Relating to the Landing and Operation of Submarine Cables in the United States, 47 U.S.C. §§ 34-39 (Cable Landing License Act), Executive Order No. 10530, Exec. Ord. No. 10530 reprinted as amended in 3 U.S.C. § 301, and section 1.767 of the Commission's rules, 47 C.F.R. § 1.767, the following applications ARE GRANTED.  These grants of authority are taken under section 0.261 of the Commission's rules, 47 C.F.R. § 0.261. Petitions for reconsideration under section 1.106 or applications for review under section 1.115 of the Commission's rules, 47 C.F.R. §§ 1.106, 1.115, may be filed within 30 days of the date of this public notice.

These applications have been coordinated with the Department of State and other Executive Branch agencies pursuant to section 1.767(b) of the Commission's rules, 47 C.F.R. §1.767(b), and consistent with procedures established with the Department of State. See Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, Report and Order, 16 FCC Rcd 22167, 22192-93, paras. 51-52 (2001) (Submarine Cable Landing License Report and Order); Streamlined Procedures for Executive Branch Review of Submarine Cable Landing License Requests, State Department Media Note (Revised) (rel. Dec. 20, 2001) available at http://2001-2009.state.gov/r/pa/prs/ps/2001/6951.htm.

This public notice serves as each cable landing licensee's Cable Landing License, or modification thereto, pursuant to the Cable Landing License Act and sections 1.767 and 1.768 of the Commission's rules.  Cable landing licensees should review carefully the terms and conditions of their licenses.   Failure to comply with these terms and conditions or relevant Commission rules and policies could result in fines or forfeitures.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-10   Filed  03/29/22   Page 2 of 4

Appendix F

**Current Licensee:**    Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**FROM:**  Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**TO:**      Hawaiian Telcom, Inc.

Application for consent to the assignment of the cable landing license for the Paniolo Cable System, SCL-LIC-20070223-00003, from the Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11 Trustee) to Hawaiian Telcom, Inc. (HTI). The Paniolo Cable System is a non-common carrier, domestic fiber optic system consisting of 48 fiber pairs and serving the Hawaiian islands. The Paniolo Cable system connects the Hawaiian Islands of Kauai, Oahu, Molokai, Maui, and Hawaii. It has four interisland subsea segments with a total of seven landings: (1) Kekaha, Kaua'i to Makaha, Oahu; (2) Hawai'i Kai, Oahu, to Kaunakakai, Moloka'i; (3) Kaunakakai, Moloka'i, to Lahaina, Maui; and (4) Makena, Maui, to Kawaihae, Hawai'i. The cable went into service in 2009. Applicants state that HTI intends to operate the cable on a common carrier basis.

On November 13, 2018, HSBC Securities (USA) Inc., Sunrise Partners Limited Partnership, and Deutsche Bank Trust Company Americas (Petitioning Creditors) jointly filed an involuntary petition for bankruptcy protection of the Paniolo Cable Company, LLC under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the District of Hawaii (Bankruptcy Court). On November 29, 2018, the Petitioning Creditors filed a motion with the bankruptcy court seeking the appointment of a Chapter 11 trustee for Paniolo Cable Company, LLC. On February 11, 2019 the Bankruptcy Court entered an Order appointing the Chapter 11 Trustee. On March 8, 2019, Michael Katzenstein, as Chapter 11 Trustee of the Bankruptcy Estate of Paniolo Cable Company, LLC (the Chapter 11 Trustee) notified the Commission of the pro forma assignment of the Paniolo Cable System license from Paniolo Cable Company, LLC to Paniolo Cable Company, LLC, as debtor under the control of the Chapter 11 Trustee. See Public Notice, Report No. SCL-00235, SCL-ASG-20190308-00008, Actions Taken Under Cable Landing License Act, DA 19-200 (IB rel. Mar. 21, 2019).

On November 30, 2020, the Chapter 11 Trustee and HTI entered into an asset purchase agreement pursuant to which HTI will acquire the Paniolo Cable System assets and other unregulated assets. On December 28, 2020, the Bankruptcy Court entered a sale order that, among other things: (1) authorized and approved the sale of Paniolo Cable Company's assets free and clear of all liens, claims, interests, and encumbrances; and (2) approved the asset purchase agreement. Upon consummation of the proposed transaction, HTI will be the owner and operator of the Paniolo Cable System.

HTI is a Delaware corporation that is 100% owned by Hawaiian Telcom Communications, Inc., a Delaware holding company, which is 100% owned by Hawaiian Telcom Holdco, Inc., a Delaware holding company, which is 100% owned by Cincinnati Bell, Inc. (Cincinnati Bell), an Ohio holding company. Applicants state that at this time Cincinnati Bell is publicly traded and that its shares are widely held, and that the only entity with a 10% or greater interest is BlackRock, Inc., a Delaware investment management company that owns 14.68% of Cincinnati Bell.

The Commission has granted applications regarding the proposed transfer of control of Cincinnati Bell to Red Fiber Parent LLC (Red Fiber Parent). Red Fiber Parent, a Delaware limited liability company, will acquire 100% of the stock of Cincinnati Bell. See Applications Granted For The Transfer Of Control Of Cincinnati Bell Inc. And Hawaiian Telcom, Inc. To Red Fiber Parent LLC, WC Docket No. 20-146, AU Docket No. 20-34, Public Notice, DA 21-615 (WCB/IB/WTB rel. May 26, 2021). According to the Applicants that transaction has not yet been consummated. On August 11, 2021, Applicants provided updated ownership information for Red Fiber Parent.

Upon consummation, Red Fiber Parent would directly acquire at closing 100% of the stock of Cincinnati Bell. The sole member of Red Fiber Parent is RF Topco LLC (TopCo), a Delaware limited liability company formed at the direction of MIP V (FCC) AIV, L.P. (MIP V), a Delaware limited partnership. The sole member of TopCo is Red Fiber Holdings LLC (RF Holdings), a Delaware limited liability company. At the time of closing, RF Holdings would be majority owned (65.8% equity) and controlled by MIP V RF Partners, L.P. (MIP V Member), a Delaware limited partnership, which, in turn, would be majority owned (64.77% equity) and controlled by MIP V. Both MIP V and MIP V Member are funds managed by Macquarie Infrastructure Partners Inc. pursuant to agreement with the funds' general partner, Macquarie Infrastructure Partners V GP, LLC (MIP V GP), which is controlled by Macquarie Infrastructure and Real Assets Inc. (MIRA). MIRA is ultimately wholly owned and controlled by Macquarie Group Limited (MGL), a publicly traded Australian company that provides banking and investment services.

RF Holdings would be indirectly minority owned by (i) certain U.S.-organized alternative investment vehicles (Ares AIVs) and certain U.S.-organized co-invest entities, all managed by the Private Equity Group of Ares Management Corporation (Ares Management), a Delaware entity (an aggregate 17.6% equity interest); and (ii) Retail Employees Superannuation Trust (REST), a widely held Australian public offer pension fund managed by Retail Employees Superannuation Pty Limited (Rest Trustee), as trustee of the fund (16.6% equity). REST's indirect interest in Red Fiber Parent will be held by Rest Nominees No. 2 Pty Ltd as trustee for REST US Infrastructure No. 2 Trust (Rest Immediate Entity). The sole beneficiary of Rest Immediate Entity is REST Nominees No. 1 Pty Ltd, as trustee for the Rest International Infrastructure Investments Holding Trust (Rest Intermediate Entity). The sole beneficiary of Rest Intermediate Entity is REST. The ultimate beneficial owners of Rest Trustee are Shop, Distributive and Allied Employees' Association (SDA), an Australian entity, with 50% of the beneficial interest, and the following foreign individuals, each with 12.5% of the legal and beneficial interest, as nominees of employer sponsors: Steven John Priestly (Australia and United Kingdom), Catriona Noble (Australia), Vaughn Nigel Richtor (Australia and United Kingdom), and Sally Louise Evans (Australia and New Zealand). MIP V Member, the Ares AIVs, and Rest Immediate Entity would have the right to appoint directors of RF Holdings and Cincinnati Bell based on their equity interests in RF Holdings. As of the effective time of the merger, MIP V Member will have five votes, Ares Management will have two votes, and REST will have one vote on the boards of RF Holdings and Cincinnati Bell. Additionally, there will be two independent and/or non-member appointed directors of each of RF Holdings and Cincinnati Bell.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-10   Filed  03/29/22   Page 3 of 4

Appendix F

We grant the Petition to Adopt Conditions to Authorizations and Licenses filed in this proceeding on August 3, 2021, by the National Telecommunications and Information Administration on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector. Accordingly, we condition grant of the application on compliance by Hawaiian Telcom Inc. with the commitments and undertakings set forth in the Letter of Agreement from Christopher J. Wilson, Vice President and General Counsel, Hawaiian Telcom Inc. to the Chief, Foreign Investment Review Section, Deputy Chief, Compliance and Enforcement, on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division, dated July 23, 2021 (LOA). A failure to comply and/or remain in compliance with any of these commitments and undertakings shall constitute a failure to meet a condition of this authorization and the underlying cable landing license and thus grounds for declaring the cable landing license terminated without further action on the part of the Commission. Failure to meet a condition of the authorization may also result in monetary sanctions or other enforcement action by the Commission. The Petition and the LOA may be viewed on the FCC's website through the International Bureau Filing System by searching for SCL-ASG-20210122-00006 and accessing the "Other Filings related to this application" from the Document Viewing Area.

HTI certifies that it accepts and will abide by the routine conditions specified in 47 CFR § 1.767(g).

This authorization is without prejudice to the Commission's action in any other related pending proceedings.

# APPENDIX G

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-11   Filed  03/29/22   Page 1 of 20

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF HAWAII

-------- In the Matter of --------  )
                                     )
    PUBLIC UTILITIES COMMISSION      )       DOCKET NO. 2022-0037
                                     )
Instituting an Emergency            )
Investigative Proceeding Regarding  )
Sandwich Isles Communications, Inc.'s )
Fitness, Willingness, and Ability to )
Continue Providing Telecommunications )
Services to Its Customers on Lands  )
Administered by the Department of   )
Hawaiian Home Lands.                )
_____ )


ORDER NO. __38269__

INSTITUTING AN EMERGENCY INVESTIGATIVE PROCEEDING
REGARDING SANDWICH ISLES COMMUNICATIONS, INC.'S
FITNESS, WILLINGNESS, AND ABILITY TO CONTINUE PROVIDING
TELECOMMUNICATIONS SERVICES TO ITS CUSTOMERS ON LANDS
ADMINISTERED BY THE DEPARTMENT OF HAWAIIAN HOME LANDS

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF HAWAII

-------- In the Matter of --------    )
                                      )
    PUBLIC UTILITIES COMMISSION       )    DOCKET NO. 2022-0037
                                      )
Instituting an Emergency              )    ORDER NO. **38269**
Investigative Proceeding Regarding    )
Sandwich Isles Communications, Inc.'s )
Fitness, Willingness, and Ability to  )
Continue Providing Telecommunications )
Services to Its Customers on Lands    )
Administered by the Department of     )
Hawaiian Home Lands.                  )
_____)


INSTITUTING AN EMERGENCY INVESTIGATIVE PROCEEDING
REGARDING SANDWICH ISLES COMMUNICATIONS, INC.'S
FITNESS, WILLINGNESS, AND ABILITY TO CONTINUE PROVIDING
TELECOMMUNICATIONS SERVICES TO ITS CUSTOMERS ON LANDS
<u>ADMINISTERED BY THE DEPARTMENT OF HAWAIIAN HOME LANDS</u>


By this Order, the Commission: (1) opens this proceeding
to investigate SANDWICH ISLES COMMUNICATIONS, INC.'s ("SIC")
fitness, willingness, and ability to continue providing
telecommunications services to its customers on lands administered
by the Department of Hawaiian Home Lands ("DHHL"); (2) names as
Parties to this docket SIC, the DIVISION OF CONSUMER ADVOCACY
("Consumer Advocate"), an <u>ex</u> <u>officio</u> party pursuant to
Hawaii Revised Statutes ("HRS") § 269-51 and Hawaii Administrative
Rules ("HAR") § 16-601-62(a), HAWAIIAN TELECOM, INC. ("HTI"),
and DHHL; and (3) invites any interested individual or

organization to file a motion to intervene or participate without intervention in this docket within twenty (20) days of the filing of this Order in accordance with HAR Chapter 16-601.

The Commission cannot overstate the paramount importance of maintaining affordable and reliable telecommunications services to the State as a whole, and in particular, to customers on Hawaiian Home Lands. To that end, it is critical that SIC demonstrate its continued ability to provide affordable and reliable telecommunications services to its customers in light of the practical and legal realities resulting from recent bankruptcy and federal district court proceedings, and for the involved and affected entities to develop a plan to move forward effectively given the current circumstances.

The purpose of this proceeding is to determine whether SIC is fit, willing, and able to continue providing telecommunications services to its customers on Hawaiian Home Lands, and, if so, to allow SIC and other parties to present solutions, with Commission assistance, that will allow SIC to continue providing reliable and affordable telecommunications services to the Hawaiian Home Lands moving forward, or will allow such services to continue in the absence of SIC.

BACKGROUND AND PROCEDURAL HISTORY

A.

SIC's History of Service to the Hawaiian Home Lands

SIC is a rural telephone company that was founded in 1995.[1] SIC has a Commission-issued Certificate of Authority ("COA") to provide intraLATA and intrastate telecommunications services in the State of Hawaii, restricted to providing services on lands administered by DHHL.[2] SIC established an infrastructure of inter-island undersea fiber cables and middle-mile terrestrial fiber on Hawaiian Home Lands, called the "Paniolo Network," that it used to provide telecommunications services to, among other things, Hawaiian Home Lands.[3] The middle-mile telecommunications

---

[1]See HAWAII DEPARTMENT OF COMMERCE & CONSUMER AFFAIRS, BUSINESS REGISTRATION DIVISION, https://hbe.ehawaii.gov/documents/business.html?fileNumber=98388D1 (last visited March 1, 2022); http://www.sandwichisles.com/SIC.html (last visited March 1, 2022). SIC is a wholly-owned subsidiary of Waimana Enterprises, Inc., a Hawaii corporation. See U.S. v. Sandwich Isles Commc'ns, Inc., 398 F.Supp.3d 757, 763 (D.Haw. 2019); see also Docket No. 96-0026, Order No. 16078, filed on November 14, 1997 ("Order No. 16078"), at 2 (hereinafter U.S. v. SIC).

[2]Order No. 16078 4-5 (also stating that "[a]s a holder of a COA, [SIC] is subject to all applicable provisions of HRS chapter 269, HAR chapter 6-80 and chapter 6-81, any other applicable state law and commission rules, and any orders that the commission may issue from time to time.")

[3]See DHHL's Memorandum in Support of Motion of Hawaiian Telcom, Inc. to Enforce Sale Order (Dkt No. 472) at *3, In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. October 8, 2021) ("DHHL Memorandum 472").

services link up to "last mile" infrastructure operated by SIC.[4] This middle and last mile infrastructure provides critical telecommunications services to DHHL, DHHL's beneficiaries, and DHHL's lessees throughout the State.

Between 1997 and 2001, the Rural Utilities Service ("RUS") of the U.S. Department of Agriculture ("USDA") loaned SIC an aggregate principal amount exceeding $160 million to assist with a build out of its telecommunications infrastructure in exchange for a broad security interest covering all of SIC's real, personal, and intangible property and all of SIC's relationships, privileges, permits, and contracts, which RUS subsequently perfected.[5] From 2002 through 2015, SIC also received over $27 million from the Federal Communications Commission ("FCC") via the Universal Service Fund ("USF") for various telecommunications-related costs.[6] In 2015, following the criminal tax fraud conviction of

---

[4]DHHL Memorandum 472.

[5]See DHHL Memorandum 472 at *3; see also U.S. v. SIC, 398 F.Supp. at 762. The loans were initially made by the Rural Telephone Bank ("RTB"), an agency of the USDA, pursuant to the Rural Electrification Act of 1936. The RTB was subsequently succeeded by the RUS in 2006. Id.

[6]FCC 20-131, In the Matter of Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee, Forfeiture Order, File No. EB-IHD-15-00019603, released October 1, 2020 ("FCC Forfeiture Order"), at 2. The USF is a federal funding mechanism for subsidizing telephone service to low-income households and high-cost areas. See Universal Service Fund, FEDERAL COMMUNICATIONS COMMISSION, https://www.fcc.gov/general/universal-service-fund.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 637-11  Filed  03/29/22  Page 6 of 20
Appendix G

Albert Hee,[7] the FCC opened an investigation into "whether SIC received any improper payments from the federal high-cost support mechanism from 2002 to June 2015, the period during which much of Hee's criminal conduct occurred."[8] Thereafter, in 2015, the Commission declined to certify to the FCC and the Universal Services Administrative Company ("USAC")[9] that all federal high-cost support provided to SIC was used in the preceding calendar year and would be used in the coming calendar year only for its intended purpose (i.e., only for the provision, maintenance, and upgrading of facilities and services for which the support is intended), consistent with Title 47 of the Code of Federal Regulations § 54.314(a).[10] The FCC subsequently

---

[7] Albert S.N. Hee was "Waimana's sole shareholder for most relevant times and held numerous positions within SIC, Waimana, and other affiliated companies he controlled . . . ." FCC Forfeiture Order at 2. See also U.S. v. Albert S.N. Hee, No. 14-cr-00826-SOM (D. Haw. June 23, 2015).

[8] FCC Forfeiture Order at 8 (noting the FCC's "ongoing obligation to protect the [USF] from waste, fraud, and abuse, and to ensure that universal service support is used for its intended purposes." Id. at 2).

[9] The USF consists of four separate funds, one being the high-cost support fund, which, as noted above, is designed to support rural providers serving high-cost areas. See Program Overview, UNIVERSAL SERVICE ADMINISTRATIVE CO., https://www.usac.org/high-cost/program-overview/ (last visited March 1, 2022); Universal Service Fund, FEDERAL COMMUNICATIONS COMMISSION https://www.fcc.gov/general/universal-service-fund (last visited March 1, 2022).

[10] See Docket No. 2015-0083, Decision and Order No. 33167, filed on September 28, 2015.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 637-11  Filed  03/29/22  Page 7 of 20

found SIC to have received over \$27 million in unearned payments due to falsified cost reporting, resulting in an FCC-imposed forfeiture penalty of \$49,598,448.[11]

B.

SIC's Default and Bankruptcy Proceedings

SIC defaulted on the loans from RUS and RUS obtained a judgment against SIC in the amount of \$138,557,635.82 in the U.S. District Court for the District of Hawaii in February of 2020 ("RUS Judgment").[12] As a part of RUS' levy on

_____

[11] See FCC Forfeiture Order ("[W]e impose a forfeiture penalty of \$49,598,448 against SIC, jointly and severally with Waimana and [Albert] Hee. The forfeiture we impose here reflects the extraordinary gravity and extent of SIC's willful and fraudulent violations and furthers the [FCC's] goals of ensuring accountability for past conduct, deterring future violations, promoting compliance with our rules, and protecting the integrity of the Universal Service Fund." Id. at 2-3).

[12] See Amended Partial Judgment in a Civil Case, U.S. v. SIC (Dkt. No. 226) (D. Haw. Feb. 18, 2020), Civ. No. 18-00145 JMS-RT, ECF # 226 (D. Haw. Feb. 18, 2020); see also U.S. v. SIC (Dkt. No. 265) (D. Haw. June 29, 2020) (Order Overruling Objection to Writ of Execution), Civ. No. 18-00145 JMS-RT, ECF # 265 (D. Haw. June 29, 2020) (Order Overruling Objection to Writ of Execution) and Katzenstein v. Sandwich Isles Commc'ns (In re Paniolo Cable Co.), Civ. No. 21-00499 JMS-WRP (D. Haw. Mar. 3, 2022) (Order Granting the United States' Motion to Quash Pau Loa Ventures, Inc.'s Writ of Execution ("Order Granting U.S. Motion to Quash")). Despite the ongoing complexity of the Paniolo Cable bankruptcy proceeding, it is the Commission's understanding that prior to RUS obtaining its \$138,557,635.82 judgment against SIC in February 2020, Michael Katzenstein, the Paniolo Cable bankruptcy trustee obtained an Order and Judgment against SIC in the amount of \$256,552,854 in January 2020 ("Katzenstein Judgment"), which was recorded prior to entry of the RUS Judgment. The Katzenstein Judgment

SIC's assets to satisfy its judgment, the Paniolo Network was sold to HTI via federal bankruptcy court proceedings.[13]  As of August 31, 2021, the transaction effectuating HTI's purchase of the Paniolo Network had closed, and HTI's position is that it owns the Paniolo Network free and clear of other claims and liens.[14]  Upon review of the bankruptcy proceedings, it appears that the bankruptcy court case terminated SIC's rights to occupancy and use of the Paniolo Network.[15]

---

was assigned to an entity called "Pau Loa Ventures" in June 2020, and on October 25, 2021, the bankruptcy court issued a Writ of Execution in favor of Pau Loa Ventures, directing the U.S. Marshal to levy SIC's property to satisfy the Katzenstein Judgment ("Pau Loa Writ of Execution").  Order Granting U.S. Motion to Quash at 4-6. RUS subsequently filed a Motion to Quash the Pau Loa Writ of Execution, arguing that "the property identified in Pau Loa's Writ of Execution is fully encumbered by the [U.S.'s] senior lien and that [SIC] has no remaining equity in the property." Id. at 6. On March 3, 2022, the Court granted RUS' Motion to Quash.  Order Granting U.S. Motion to Quash at 12-13.

[13] See HTI's Motion to Enforce Sale Order (Dkt No. 459) at *4-5, In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. October 2, 2021) ("HTI Motion 459") (noting that the bankruptcy court entered into a sale order (Dkt. No. 366) approving the sale of certain Paniolo assets to HTI, pursuant to an asset purchase agreement); see also In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. Nov. 19, 2021) (Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order).

[14] See HTI Motion 459 at *4-5; Letter From: HTI To: SIC, Clearcom, Inc., Waimana Enterprises, Inc., and Pa Makani, Inc. Re: Notice of disconnection from the Paniolo Network, dated October 1, 2021 ("HTI October 1, 2021 Letter").

[15] HTI October 1, 2021 Letter.  Per the Commission's review of the proceedings, it appears that that the Trustee did, in fact, sell the Paniolo network to HTI free and clear of any claim, lien, or other encumbrance by SIC.  In an adversary proceeding, SIC claimed that the

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 637-11  Filed  03/29/22  Page 9 of 20
Appendix G

C.

<u>Current Dispute Regarding the Paniolo Network</u>

Following the transfer of the Paniolo Network to HTI, HTI sent SIC a letter noting the change in ownership and expressing an asserted commitment to offering local exchange carriers services on HTI's network.[16]  HTI allowed SIC to temporarily continue uninterrupted use of the Paniolo facilities to avoid disruption of telecommunication and other services, pending the negotiation of a more permanent agreement to govern that relationship.  However, correspondence from HTI to SIC states that it is HTI's position that SIC did not make required

---

sale of the Paniolo Network free and clear of SIC's right to use the Paniolo Network was a violation of a previous settlement agreement entered between SIC and the Trustee, but the Court in the adversary bankruptcy proceeding found as a matter of law that any violation by the Trustee was excused by SIC's earlier breaches of the same settlement agreement, and therefore that SIC's claims against the Trustee and against HTI related to its alleged contracts for use of the Paniolo Network were invalid.  <u>See</u> Order Granting Defendant Michael Katzenstein, as Chapter 11 Trustee's Motion for Summary Judgment on All Claims in Plaintiff's Complaint Filed October 12, 2021 (Dkt No. 57), <u>In re Paniolo Cable Company, LLC</u>, Case No. 18-01319 RJF, Adversary Proc. No. 21-90017 (Bankr. D. Haw. February 1, 2022) (citing and incorporating Oral Ruling, PDF File with Audio File Attachment (Dkt No. 56)), <u>In re Paniolo Cable Company, LLC</u>, Case No. 18-01319 RJF, Adversary Proc. No. 21-90017 (Bankr. D. Haw. January 14, 2022) ("Adversary Proceeding Ruling").

[16]Letter From: HTI To: SIC Re: "Transfer of Ownership of Paniolo Network from the bankruptcy estate of Paniolo Cable Company LLC [] to [HTI], use of Paniolo Network by [SIC]," dated August 31, 2021 ("HTI August 31, 2021 Letter").

2022-0037                                8

payments to HTI related to use of the Paniolo Network.[17]  HTI sent a letter to SIC indicating that, despite SIC's nonpayment, HTI was seeking to negotiate and enter an agreement for SIC's future use of the Paniolo Network but that if no such agreement was reached by March 31, 2022, HTI would revoke SIC's access to and use of the Paniolo Network.[18]  This would also affect SIC's ability to provide telecommunications service to its customers via SIC's "last mile" network.

Other correspondence between HTI and SIC alleges that SIC is obfuscating HTI's access to and ownership of certain elements of the Paniolo Network.[19]  For example, HTI asserts that SIC has barricaded interior doors and changed exterior locks to certain of the Paniolo Network's facilities despite SIC having no legal ownership thereof or other authorization.[20]  HTI further alleges that SIC's interference with HTI's rights as the owner of the Paniolo Network has not ceased despite demand.[21]

---

[17]Letter From: HTI To: Waimana Enterprises, Inc. and SIC Re: Notice of Revised Access Protocols for Hawaiian Telcom Premises, dated December 23, 2021 ("HTI December 23, 2021 Letter").

[18]HTI December 23, 2021 Letter.

[19]See HTI December 23, 2021 Letter.

[20]HTI December 23, 2021 Letter.

[21]HTI December 23, 2021 Letter.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 637-11  Filed  03/29/22  Page 11 of 20

Appendix G

D.

<u>Commission IRs</u>

The Commission had been monitoring the federal District Court and bankruptcy court proceedings, and, on September 21, 2021, issued a set of Information Requests ("IRs") to SIC regarding, among other things, SIC's ability and willingness to continue providing services to its customers.[22] SIC did not respond to those IRs or otherwise object or request more time to answer.[23] Accordingly, the Commission issued Order No. 38003 compelling SIC to respond to the IRs on October 5, 2021.[24] Following the Commission's order compelling a response, SIC did respond to the Commission's first set of IRs and subsequently responded to a second set of IRs, which was issued by the Commission on October 14, 2021.[25]

In SIC's responses to the Commission's IRs, SIC indicates that certain agreements with the Bankruptcy Trustee

---

[22]Letter From: Commission To: Sandwich Isles Communications, Inc. Re: Inquiry Regarding Sandwich Isles' Communications, dated September 21, 2021.

[23]Order No. 38003 (Non-Docketed), "Compelling Sandwich Isles Communications, Inc. to Respond to Information Requests, Filed on September 21, 2021," filed on October 5, 2021 ("Order No. 38003"), at 2.

[24]<u>See</u> Order No. 38003.

[25]Letter From: Commission To: Sandwich Isles Communications, Inc. Re: Follow-Up Inquiries Regarding Sandwich Isles Communications, Inc., dated October 14, 2021.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 637-11  Filed  03/29/22  Page 12 of 20          Appendix G

"insure [sic] SIC will be able to continue to provide service into the future."[26]  SIC further indicates that it remains willing to provide services to the Hawaiian Home Lands, but that it "may be unable to provide service if the [Hawaiian Home Commission] decides to take action that would facilitate negating" the agreements SIC claims will allow it to continue to provide services.[27]  SIC provided a limited response to a Commission IR regarding the effects on SIC's property from the RUS continuing to levy on the RUS Judgment against SIC.[28]

E.

SIC Annual Financial Reports

Pursuant to HAR §§ 6-80-91 and 92, telecommunications carriers are required to file annual financial reports ("AFRs") with the Commission, which must include, among other things, a statement of operations reflecting intrastate revenues by services and intrastate expenses by accounts, and a balance sheet reflecting the carrier's intrastate operations.

---

[26]SIC Response to PUC-SIC-IR-05(a).

[27]SIC Response to PUC-SIC-IR-05(b).

[28]SIC Response to PUC-SIC-IR-6.  The Commission is interested in SIC's position on these same matters now that the Court in the adversarial bankruptcy proceeding has issued its decision regarding the agreements to which SIC may have been referring. See Adversary Proceeding Ruling.

2022-0037                    11

SIC's AFRs have been filed subject to non-docketed protective orders issued by the Commission, and as such, the Commission will not reveal any specific confidential information contained therein at this time.[29]  However, the Commission, based upon its review of SIC's annual reports from 2015 to 2020, observes that SIC appears to be in a dire financial situation. SIC's financial situation will also be a subject of investigation in this docket.

F.

<u>Consumer Advocate's Request for Proceeding</u>

Following SIC's responses to the Commission's first set of IRs, the Consumer Advocate requested that the Commission open a docket "to facilitate transparency and access to information regarding this matter."[30]  "The Consumer Advocate believes that establishing a docket will allow interested stakeholders, such as

---

[29]This is not a determination by the Commission that the information was properly redacted, and the Commission reserves the right to order SIC to re-file information unredacted if it is later determined to have been improperly designated as confidential pursuant to the Uniform Information Practices Act.

[30]Letter From: Consumer Advocate To: Commission Re: Sandwich Isles Communications, Inc. and Service to Department of Hawaiian Home Land properties, dated October 15, 2021 ("Consumer Advocate Letter").

2022-0037                    12

SIC's customers, to access and review relevant documents regarding this matter."[31]

## II.

### DISCUSSION

At this time, the Commission intends to address the uncertainties surrounding SIC's fitness, willingness, and ability to provide services to its customers on Hawaiian Home Lands in the face of the pending March 31, 2022 deadline on which HTI states that it will cut SIC off from the Paniolo Network. The Commission understands that SIC contends that it has the legal right to continue to use the Paniolo Network under certain agreements, which may or may not be enforced by the Bankruptcy Court.[32] But considering that SIC's customers in Hawaiian Home Lands could abruptly lose access to needed telecommunications services depending on a number of potential outcomes, that uncertainty is unacceptable.

The Commission therefore opens this docket to assess whether SIC is fit, willing, and able to continue to provide service to its customers in the Hawaiian Home Lands, and to develop

---

[31]Consumer Advocate Letter.

[32]SIC Response to PUC-SIC-IR-05(a), (b).

2022-0037                    13

and analyze possible alternatives in the event the Commission finds

that SIC cannot.

A.

Opening the Subject Docket

1.    The Commission opens this emergency investigative

proceeding to analyze whether SIC will be fit, willing, and able

to continue to provide services to its customers, and, in the event

it cannot, to propose and analyze possible solutions for its

customers that are being, or would be, deprived of service.

2.    The named parties herein are SIC, the

Consumer Advocate pursuant to HRS § 269-51 and HAR § 16-601-62(a),

HTI, and DHHL.

3.    The Commission invites any other interested

individual or organization to timely file a motion to intervene or

participate in this proceeding within twenty (20) days from the

filing date of this Order, in accordance with HAR Chapter 16-601.

4.    The Commission invites SIC to file a response to

the issues raised in this Order by Monday, March 21, 2022.

The Commission will issue an order following SIC's response,

that lays out the Statement of Issues for this proceeding, as well

as sets forth the procedural schedule.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-11   Filed  03/29/22   Page 16 of 20          Appendix G

III.

<u>ORDERS</u>

The Commission ORDERS:

1.   The Commission opens this emergency investigative docket to analyze whether SIC is fit, willing, and able to continue to provide services to its customers, and, in the event it cannot, to propose and analyze possible solutions for its those customers that are being, or will be, deprived of service.

2.   The named parties herein are SIC and the Consumer Advocate pursuant to HRS § 269-51 and HAR § 16-601-62(a), HTI, and DHHL.

3.   The Commission invites any interested individual or organization to timely file a motion to intervene or participate in this proceeding within twenty (20) days from the filing date of this Order, in accordance with HAR Chapter 16-601.



2022-0037                           15

4. The Commission invites SIC to file a response to the issues raised in this Order by Monday, March 21, 2022. The Commission will issue an order following the filing of SIC's response that lays out the Statement of Issues for this proceeding, as well as sets forth the procedural schedule.

DONE at Honolulu, Hawaii ___MARCH 11, 2022___.

PUBLIC UTILITIES COMMISSION
OF THE STATE OF HAWAII

By _____
James P. Griffin, Chair

By _____
Jennifer M. Potter, Commissioner

By _____
Leodoloff R. Asuncion, Jr., Commissioner

APPROVED AS TO FORM:

_____
Caroline C. Ishida
Commission Counsel

2022-0037.ljk

2022-0037                    16

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Order No. 37043, the foregoing order was served on the date of filing by electronic mail addressed to the following parties:

DEAN NISHINA
EXECUTIVE DIRECTOR
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
DIVISION OF CONSUMER ADVOCACY
dnishina@dcca.hawaii.gov

KEVIN W. HERRING, ESQ.
ASHFORD & WRISTON
A LIMITED LIABILITY LAW PARTNERSHIP LLP
kherring@awlaw.com

WILLIAM J. AILA, JR.
CHAIRMAN, HAWAIIAN HOMES COMMISSION
DEPARTMENT OF HAWAIIAN HOME LANDS
william.j.ailajr@hawaii.gov

FILED

2022 Mar 11 PM 16:00

PUBLIC UTILITIES
COMMISSION

The foregoing document was electronically filed with the State of Hawaii Public Utilities Commission's Document Management System (DMS).

# Appendix H

Of Counsel:
SULLIVAN MEHEULA LEE, LLLP

WILLIAM K. MEHEULA III          2277
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaii 96813
Telephone:  (808) 628-7535
Facsimile:  (808) 533-2467
Email:  meheula@smlhawaii.com
Attorney for Plaintiff
WAIMANA ENTERPRISES INC.

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-22-0000321**
**18-MAR-2022**
**05:07 PM**
**Dkt. 1 CMPS**

Of Counsel:
KOBAYASHI SUGITA & GODA, LLP

LEX R. SMITH          3485
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone:  (808) 535-5700
Facsimile:  (808) 535-5799
Email:  lsmith@ksglaw.com

Attorney for Plaintiff
SANDWICH ISLES COMMUNICATIONS INC.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC., <br><br> Plaintiffs, <br><br> vs. <br><br> HAWAIIAN TELCOM INC., <br><br> Defendant. | CIVIL NO. _____ <br> (Other Civil Action) <br><br> COMPLAINT; EXHIBITS "A" – "K"; SUMMONS |

I do hereby certify that the foregoing is a full, true and correct copy of the official court record of the Courts of the State of Hawaiʻi.
Dated at: Honolulu, Hawaiʻi 22-MAR-2022, /s/ Lori Ann Okita, Clerk of the First Judicial Circuit, State of Hawaiʻi

<u>COMPLAINT</u>

Waimana Enterprises Incorporated (**"Waimana"**) and Sandwich Isles Communications, Inc. (**"SIC"**) for their complaint against Hawaiian Telcom Inc. (**"Hawaiian Tel"**) alleges and avers as follows.

Waimana and SIC are the owners and holders of License 372 requiring Waimana and SIC to provide all infrastructure necessary to provide modern telecommunications services to every resident of the Hawaiian Home Lands (**"HHL"**), no matter how remote their residence may be. Many of its customers do not have electricity or water and one family lives in a tent. License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana's and SIC's monthly charge to the customer will be no more than is charged for comparable service in urban areas in the state of Hawaii. The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes. It is essential to sustaining, expanding and upgrading modern service to the HHL residents in the future that the requirements of License 372, or equivalent, be continued. Hawaiian Telcom does not have any license for the Paniolo facilities on Waimana's and SIC's Licensed Property under License 372 that it purchased in 2021 and, even if Hawaiian Tel had a license for the Licensed Property (which it does not), Hawaiian Tel is not meeting the requirements of License 372. This lawsuit is brought in order to remedy that critical situation which is damaging the residents of the Hawaiian Home Lands.

1. SIC is a corporation organized and existing under the laws of the State of Hawaii.

2. Waimana is a corporation organized and existing under the laws of the State of Hawaii.

3. Hawaiian Tel is a corporation organized under the laws of the State of Hawaii.

2

4.      Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**HHCA**")
authorizes the Hawaiian Homes Commission ("**HHC**") to grant licenses, for lots, as easements
for public purposes including utility facilities. Waimana is the owner and holder of License No.
372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to
authorization from the HHC (hereinafter "**License 372**").

5.      Under HHCA 207(c)(1), License 372 is an interest in real estate issued to
Waimana pursuant to HHCA. 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22. A
true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this
reference.

6.      By instrument dated January 15, 1996, Waimana partially assigned License 372 to
SIC (the "**Partial Assignment**"). The Partial Assignment is expressly limited to "IntraLata and
Intrastate telecommunication ("**voice**") services" on the Hawaiian Home Lands ("**HHL**"). A
true copy of the Partial Assignment is attached hereto as **Exhibit "B."** By instrument dated
October 6, 2008, the HHC consented to the Partial Assignment. A true copy of the Consent is
attached hereto as **Exhibit "C"**. Partial Assignment remains in full force and effect, and SIC is
not in breach of the License 372 and has not abandoned License 372.

7.      The DHHL has confirmed as recently as January 6, 2022 that License 372
remains in full force and effect, is valid and has not been cancelled. Waimana and SIC also are
not in breach of the License 372 and have not abandoned License 372.

8.      License 372 in relevant part provides:

LICENSOR [DHHL] determines that the LICENSE established herein is essential
in order to provide broad band telecommunication services of all types (including but not
limited to local, intrastate, interstate and international telephone; video on demand;
interactive communication; cable television; medical and educational links; and
electronic data transmission) to LICENSOR'S lands in a timely manner;

3

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

5.    LEVEL OF TELECOMMUNICATION SERVICES.  LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.    COST OF TELECOMMUNICATIONS SERVICES.  LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

9.    Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing ("**Licensee Buildings**")and underground conduits throughout HHL to beneficiary lessee residences (collectively "**Licensed Property.**") SIC used those facilities for the provision of voice services.  SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice services ONLY on HHL.  Waimana caused other subsidiaries to provide other telecommunications services (internet, wireless etc.) by using, in part, the excess capacity on SIC's facilities.

4

10. Paniolo Cable Company Inc. ("**Paniolo**"), which is a third-party mainland undersea cable company not owned or controlled by Waimana, developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai. Paniolo's facilities were connected to and housed in SIC's existing facilities on the Licensed Property, pursuant to SIC's joint use agreement with Paniolo. All of Paniolo's facilities were leased to SIC. Paniolo had no interest in any HHL, as the Licensed Property was licensed to Waimana pursuant to its rights under License 372 and SIC pursuant to its rights under its partial assignment. The assets owned by Paniolo and leased to SIC including the assets on the Licensed Property are hereinafter referred to as the "**Paniolo Assets**."

11. In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

12. Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

13. With the money judgment, Katzenstein obtained a Writ of Execution and caused the United States Marshal to hold an execution sale of certain specifically identified telecommunications assets of SIC all of which were on the License Property. Katzenstein, however, did not acquire any interest in License Property as a result of the execution sale. (The SIC assets acquired by Katzenstein in the execution sale are hereinafter referred to as the "**Katzenstein-Acquired SIC Assets**.")

5

14.     The Katzenstein-Acquired SIC Assets covered only a small specified portion of SIC's facilities on the Licensed Property.  Katzenstein did not want SIC's "last mile" or "local loop" facilities ("**last mile facilities**") that connect each home on HHL to the local, national and international communication networks or the warehouses and security fencing.  Katzenstein and Hawaiian Tel did not want responsibility to service **ALL** customers on the HHL.  Katzenstein and Hawaiian Tel wanted the assets that could be used to improve service to Hawaiian Tel's customers off of HHL.  These assets continue to be owned by SIC and are essential to sustaining and expanding service to SIC's, Waimana's and/or Waimana's other subsidiaries' customers on the HHL.

15.     By order entered March 16, 2020 the U.S. Bankruptcy Court confirmed the sale of the Katzenstein-Acquired SIC Assets to Trustee Katzenstein.  A true copy of the March 16, 2020 Order is attached hereto as **Exhibit "D."**

16.     Katzenstein knew that he could not obtain rights to the Licensed Property.  He therefore negotiated with SIC and obtained from SIC the right to use the Licensed Property.  In exchange, Katzenstein committed to amongst other conditions not impair telecommunications service to HHL and granted SIC the right to use Paniolo Fiber Pairs on the Paniolo Assets to continue to provide telecommunications services to HHL.  This agreement, entitled  the Master Relationship Agreement dated March 6, 2020 ("**MRA,**")  attached hereto as **Exhibit "E,"** , which was approved by the Bankruptcy Court by order dated June 4, 2020, allowed Katzenstein to use License 372 for the purposes authorized by SIC:

> For the avoidance of doubt, the Parties acknowledge and agree that
> DHHL License will not be assigned by SIC to Paniolo, but that
> SIC shall, and hereby does, grant to Paniolo the full benefit and use
> of the DHHL License for the IRU Term provided Paniolo does not
> exercise its rights under such grant to impair service to HHL.

6

<u>Id.</u> at Schedule 2, section 2.3.

17.     Katzenstein then sold the Katzenstein-Acquired SIC Assets (together with Paniolo's Assets) to defendant Hawaiian Tel.  A copy of the Asset Purchase Agreement dated November 30, 2020 ("**APA**") is attached hereto as **Exhibit "F."**

18.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court confirming that because Hawaiian Tel did not acquire the right to use License 372, "The Buyer will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in a emails dated January 6, 2021 to alhee@waimana.com that state that License 372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that any purchaser of the assets would require a license from DHHL."

19.     Katzenstein never had any rights to any real estate on HHL including the Licensed Property.  License 372 was never assigned to Katzenstein.  Because Katzenstein never owned any interest in License 372, he could not, and did not, sell to Hawaiian Tel any rights to occupy the Licensed Property.

20.     Hawaiian Tel had the opportunity to assume from Katzenstein all of the benefits of MRA including the use and enjoyment of SIC's rights under License 372.

21.     Hawaiian Tel, however, chose not to assume that agreement that would have given it the right to use the Licensed Property.   At the time Hawaiian Tel made its choice not to assume this agreement with SIC, Hawaiian Tel knew that it was buying facilities located on Waimana's and SIC's Licensed Property.

22.     Hawaiian Tel's failure to assume the right to use the Licensed Property was not inadvertent.  Hawaiian Tel has repeatedly emphasized that its decision not to assume the

7

agreement that allowed Katzenstein to use the License Property was deliberate and intentional.

For example, in Hawaiian Tel's motion filed in the U.S. Bankruptcy Court on November 16,

2021, attached hereto as **Exhibit "H,"** Hawaiian Tel boldly asserted that the agreements giving

Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were
> contracts that could have been assigned by the Trustee to HTI at
> HTI's sole election. ... **HTI, however, did not elect to designate
> any of the SIC Agreements as agreements to be assigned by the
> Trustee to HTI**

Id. at 14 (emphasis added).

23.     Thus, Hawaiian Tel had the opportunity to acquire the right to use the Licensed

Property but chose not to do so.

24.     On August 31, 2021, the APA sale of Paniolo's Assets from Katzenstein to

Hawaiian Tel closed.

25.     Hawaiian Tel is a trespasser on the Licensed Property or in the alternative, a "hold

over tenant" from Katenzstein's use rights under the MRA, which is unlikely because Hawaiian

Tel knowingly rejected assignment of those rights.

26.     On and after August 31, 2021, Hawaiian Tel had no right to locate the assets it

had purchased on the Licensed Property. Hawaiian Tel does not have a license allowing its

assets to be on Licensed Property.

27.     Hawaiian Tel purchased from Katzenstein certain facilities located on the

Licensed Property, but has absolutely no interest in the land surrounding and under facilities.

The rights to that land are held by Waimana and SIC pursuant to License 372. Hawaiian Tel has

no license nor any other right to use the Licensed Property under and surrounding its facilities on

HHL.

8

28.     License 372 places strict and expensive obligations on Waimana and SIC to assure service to every customer on HHL

29.     Hawaiian Tel acknowledges that it needs a license to operate its facilities on HHL, but to date has not obtained one.

30.     In License 372, DHHL granted Waimana the exclusive right to provide telecommunication service on HHL (**"Exclusive Service Right"**). However, in addition to this Exclusive Service Right, License 372 also granted Waimana the exclusive right to possess the Licensed Property.

31.     Hawaiian Tel may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 (**"FCC Order"**), attached hereto as **Exhibit "I,"** requires DHHL to provide access to the Licensed Property on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the Exclusive Service Right. However, the order does not require Waimana and SIC to share use of the Licensed Property. The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

32.     Under the severability provision of the License 372 at section 22, while the Exclusive Service Right may have been invalidated by the FCC Order, the order did not invalidate and FCC does not have jurisdiction to invalidate Waimana's and SIC's right to exclusive possession of the Licensed Property subject to DHHL's rights set forth in License 372. Waimana and SIC require exclusive possession to perform its telecommunications obligations

9

required under License 372.  Thus, Waimana's and SIC's right to exclusive possession of the Licensed Property survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL.  An internal DHHL memo to the HHC dated January 18, 2022 states "DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice." confirming that the FCC ORDER dealt with License 372 Exclusive Service Right, a copy of which is attached hereto as **Exhibit "G."**

33.     Waimana and SIC are the owners of numerous improvements on the properties licensed under License 372 that were not obtained by Katzenstein and thus were **not** purchased by Hawaiian Tel and are still owned, maintained and used by SIC and/or Waimana and/or Waimana's other subsidiaries to provide service to their HHL customers.  Hawaiian Tel's destructive actions are interfering with Waimana and its subsidiaries' including SIC's ability to continue to provide service to the residents of the HHL.  Hawaiian Telcom are using these Licensed Properties without authorization or paying for such use.

34.     Waimana and SIC have repeatedly urged Hawaiian Tel to negotiate terms on which Hawaiian Tel can be allowed to use the Licensed Property, as Katzenstein did.  Hawaiian Tel has refused to do so.  Hawaiian Tel wants something it and Katzenstein knew was illegal and unfair—Hawaiian Tel wants to use the Licensed Property for free and without committing to not impair telecommunications service to HHL and the obligations of License 372 which DHHL and the HHC granted Waimana and SIC.

35.     Because Hawaiian Tel has no right to locate its facilities on Waimana and SIC's Licensed Property, and Hawaiian Tel has refused to negotiate satisfactory terms for the use of those licensed lands, and Hawaiian Tel continues to damage assets they do not own, Waimana

10

had no choice but to demand that Hawaiian Tel remove its facilities from Waimana and SIC's licensed lands. A true copy of the February 10, 2022, demand letter is attached as **Exhibit "J"**.

36. Since August 31, 2021, Hawaiian Tel has changed the locks on SIC warehouses, continues to damage SIC's security fencing, including cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to Waimana and SIC's facilities located on Waimana and SIC's licensed lands. Numerous police reports of these incidents have been made.

37. Despite SIC's and Waimana's demands to follow its security protocols, Hawaiian Tel has failed and refused to stop destroying SIC's property trespassing and remove its facilities from Waimana and SIC's licensed lands.

38. License 372 grants Waimana and SIC an interest **in land**.

39. Despite warnings from Waimana and SIC, Hawaiian Tel has repeatedly cut locks and damaged Waimana's and SIC's improvements that Katzenstein has never owned and therefore Hawaiian Tel does not, and could not own. A copy of Hawaiian Tel's letter asserting their alleged "justification" for doing so is attached hereto as **Exhibit "K,"** which only proves that Hawaiian Tel is unfairly competing with Waimana and SIC by usurping Waimana's and SIC's Licensed Property and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

COUNT I

40. Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 39 hereinabove.

11

41. Hawaiian Tel is a trespasser or holdover tenant, squatting on land licensed to Waimana and SIC pursuant to License 372 and preventing Waimana and SIC from using the Licensed Property and serving HHL lessees.

42. Hawaiian Tel has no license, nor any other legal right, to occupy SIC's and Waimana's Licensed Property.

43. SIC is entitled to: (a) an injunction barring Hawaiian Tel from access to the Licensed Property, and/or a judgment for possession of the Licensed Property under License 372 and an order evicting of Hawaiian Tel from the Licensed Property and an order to remove any property of Hawaiian Tel located thereon, (b) damages for wrongfully using the Licensed Property in violation of Waimana and SIC's rights under License 372 including damages for use of the Licensed Property and disgorgement of Hawaiian Tel profits; and (c) punitive damages.

## COUNT II

44. Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 43 hereinabove.

45. Hawaiian Tel has willfully damaged Waimana's and SIC's property located on Waimana's and SIC's licensed premises, and used without authorization or compensation SIC's "last mile" facilities that constitutes conversion.

46. Waimana and SIC are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by Hawaiian Tel's tortious actions in deliberately, repeatedly damaging Waimana's and SIC's property; (b) lost profits and compensation for use of the Licensed Property and disgorgement of Hawaiian Tel profits for use of SIC's "last mile" facilities; and (c) punitive damages.

## COUNT III

12

47.     Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 46 hereinabove.

48.     Hawaiian Tel is a competitor with Waimana and SIC in the telecommunications business.

49.     Hawaiian Telecom engaged in unfair methods of competition by usurping Waimana and SIC's land rights under the License 372 and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

50.     Hawaiian Tel's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

51.     Hawaiian Tel's conduct negatively affects competition and harms fair competition by impeding Waimana and SIC's operation on HHL.

52.     Waimana and SIC have been damaged in its business and property by Hawaiian Tel's unfair methods of competition in an amount to be proven at trial

WHEREFORE, Plaintiffs pray the Court grant the following relief:

1.     Issuance of a judgment for eviction against Hawaiian Tel, evicting Hawaiian Tel from Licensed Areas and to remove its property therefrom;

2.     Issuance of a Writ of Possession in favor of plaintiffs and against defendant Hawaiian Tel directing the sheriff to remove Hawaiian Tel from the lands covered by plaintiffs' License 372;

3.     For a temporary restraining order and preliminary and permanent injunctions enjoining occupying the Licensed Property and prohibiting Hawaiian Tel from damaging Wamana's and SIC's facilities located on the Licensed Property and last mile facilities on HHL.

4.     For damages in an amount to be determined at trial.

13

5.  For treble damages in an amount be determined at trial.

6.  For punitive damages in an amount to be determined at trial.

7.  For plaintiffs' reasonable costs and attorneys' fees incurred herein.

8.  For such other and further relief as the Court deems just.

Dated: Honolulu, Hawaii March 18, 2022.


                        /s/Lex R. Smith
                        LEX R. SMITH

                        Attorney for Plaintiff
                        SANDWICH ISLES COMMUNICATIONS INC.



                        /s/ William Meheula
                        WILLIAM MEHEULA

                        Attorney for Plaintiff
                        WAIMANA ENTERPRISES INC.

14